**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

**I. CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE SIXTH JUDICIAL CIRCUIT,
IN AND FOR PASCO COUNTY, FLORIDA

US ALLIANCE GROUP INC, PAYMENT SOLUTIONS INTERNATIONAL LLC, AIDEN FLORIDA BANCSHARES INC, AIDEN FINTECH GROUP INC

Plaintiff

Case # ________________

Judge ________________

vs.

FIRST NATIONAL BANK OF PASCO, FNBPASCO HOLDINGS LLC, ANDER PLATT GIBBS, ANDER PLATT GIBBS, JOHN ZAZZERA, JOHN HENSON, MARLENE MANN, PAUL MIDILI, STEVEN CARLE, ERNEST PEEPLES, PAULA S ONEIL, MANNY LONG, LARKA FREYA

Defendant

UNOFFICIAL DOCUMENT

---

**II. AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

- ☐ $8,000 or less
- ☐ $8,001 - $30,000
- ☐ $30,001- $50,000
- ☐ $50,001- $75,000
- ☐ $75,001 - $100,000
- ☒ over $100,000.00

**III. TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

UNOFFICIAL DOCUMENT

☐ Replevins
☐ Evictions
  ☐ Residential Evictions
  ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No ☒

**IV. REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☒ Punitive

**V. NUMBER OF CAUSES OF ACTION:** [ ]
(Specify)

18

**VI. IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ yes
☒ no

**VII. HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ no
☐ yes If "yes," list all related cases by name, case number, and court.

**VIII. IS JURY TRIAL DEMANDED IN COMPLAINT?**
☒ yes
☐ no

**IX. DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
☐ yes
☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Anthony J Aragona III  Fla. Bar # 36676
Attorney or party  (Bar # if attorney)

Anthony J Aragona III  05/12/2025
(type or print name)  Date



UNOFFICIAL DOCUMENT

Filing # 223190965 E-Filed 05/15/2025 11:51:22 AM 

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.**

Plaintiffs,

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS;**
**JOHN ZAZZERA;**
**JOHN HENSON;**
**MARLENE MANN;**
**PAUL MIDILI;**
**STEVEN CARLE;**
**ERNEST PEEPLES;**
**PAULA S. O'NEIL;**
**MANNY LONG;**
**LARKA FREYA;**

Defendants.
_______________________________________/

UNOFFICIAL DOCUMENT

**NOTICE OF FILING AFFIDAVIT IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs hereby give notice of filing the Affidavit of James C. Huber in Support of Temporary Restraining Order and Preliminary Injunction, dated May 14, 2025, in the above-captioned matter. A true and correct copy of the Affidavit is attached hereto and incorporated herein.

Dated: May 15, 2025

Respectfully submitted,

By: /s/
Anthony Aragona III, Esq.
Florida Bar Number: 36676
**GLOBAL LEGAL LAW FIRM PLLC**
200 W Palmetto Park Rd. Suite 302
Boca Raton, Florida 33432
Telephone: (858) 283-7056
aaragona@attorneygl.com

*Attorneys for Plaintiffs,*
U.S. ALLIANCE GROUP, INC.;
PAYMENT SOLUTIONS
INTERNATIONAL, LLC; and
AIDEN FLORIDA BANCSHARES, INC.

UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants*.

____________________________________/

**AFFIDAVIT OF JAMES C. HUBER IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

UNOFFICIAL DOCUMENT

1. I, James C. Huber, am an attorney with Global Legal Law Firm and am California Litigation Counsel for Plaintiffs U.S. ALLIANCE GROUP INC (hereinafter, "USAG"), PAYMENT SOLUTIONS INTERNATIONAL LLC (hereinafter, "PaySol", and AIDEN FLORIDA BANCSHARES INC. (with USAG and PaySol, collectively, "Plaintiffs"). I do not represent Plaintiffs in this proceeding; however, I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

2. I submit this Affidavit in support of Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction (hereinafter, "Application").

3. Since March 2025, USAG and PaySol have suffered and continue to suffer immediate and irreparable injury as a result of Defendants' unlawful conduct, including the unauthorized freezing and "zeroing out" of USAG's and PaySol's bank accounts by First National Bank of Pasco (hereinafter, "Pasco").

4. USAG and PaySol are unable to remit funds to their merchant clients due to the frozen accounts. At least three merchants have contacted me to understand why they are unable to access their funds. Attached hereto as **Exhibits A**, **B**, and **C** are true and accurate copies of these inquiries. Also, one merchant formally demanded $700,000 from USAG and PaySol.

5. In addition, on March 7, 2025, Trulieve Inc. ("Trulieve"), a merchant and its associated entities filed a complaint in this Court, in the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, Florida, titled Trulieve Inc. et al. v. Payment Solutions International, LLC and First National Bank of Pasco (2025) (Case No.: 2025-CA-000695), alleging that PaySol and Pasco failed to deposit funds from transactions to Trulieve's accounts, which case settled and which settlement agreement was filed in this Court. I was involved with Trulie's counsel in negotiating the settlement.

6. Demands from merchants' whose funds are held in USAG and PaySol accounts, and

UNOFFICIAL DOCUMENT

which funds have been frozen and "zeroed out" by Pasco, cannot be satisfied absent court intervention and the immediate release of the withheld funds.

7. Monetary damages are inadequate to compensate USAG and PaySol for the ongoing harm to their reputations, merchant relationships, and standing in the cannabis payment processing industry. The damage to USAG's and PaySol's goodwill, once lost, cannot be repaired through any later monetary award.

8. USAG and PaySol have demonstrated a substantial likelihood of success on the merits of their claims, including breach of contract, conversion, unjust enrichment, and violations of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA). The ACH Origination Agreements (Exhibits A and B of the Application) clearly contemplated and authorized cannabis-related payment processing. Pasco's sudden termination of services and seizure of USAG's and PaySol's funds lacked legal justification and violated those agreements.

9. The Termination Letter (Exhibit F of the Application) and Freeze Notice (Exhibit G of the Application) issued by Defendants provide vague and conclusory assertions about operational burdens and regulatory risk but cite no statutory, contractual, or court-ordered basis for freezing USAG's and PaySol's accounts. To date, Pasco has refused to identify any lawful authority for their actions.

10. USAG's and PaySol's ability to serve licensed cannabis businesses through compliant electronic payment processing is both a public good and legally permissible under Florida law. Additionally, the public interest is served by enjoining Pasco because an allegedly federally-regulated bank[1] is unjustifiably withholding millions of dollars belonging to multiple merchants who are operating lawfully within the State of Florida, thereby disrupting legitimate commerce and undermining confidence in the integrity of the State's financial system.

[1] It should be noted that First National Bank of Pasco does not appear on Florida's Secretary of State website.



UNOFFICIAL DOCUMENT

11. If Pasco is allowed to continue withholding funds, USAG and PaySol's entire merchant portfolio may collapse. In contrast, Pasco will suffer no legitimate harm from being ordered to release funds they have no right to withhold.

12. USAG and PaySol face the imminent collapse of their businesses. The inability to pay merchants due to the account freeze has already caused merchant attrition, contractual defaults, and reputational damage. Each day that passes without access to the frozen funds worsens this harm and increases the likelihood of complete operational failure.

13. Plaintiffs' Counsel, Anthony Aragona, and I have made multiple good-faith efforts to communicate with Pasco and the other defendants in this action regarding the status and release of the funds. Those efforts have been met with silence, delay, or unsubstantiated justifications.

Under penalties of perjury, I declare that I have read the foregoing Affidavit and that the facts stated in it are true and correct.

FURTHER AFFIANT SAYETH NAUGHT

Executed on May 14, 2025 in Encinitas, California.

UNOFFICIAL DOCUMENT

James C. Huber

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Diego )

On May 14, 2025 before me, ~~James C. Huber~~ ADH Alicia D Hjalmarson
(insert name and title of the officer)

personally appeared James C. Huber, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature Alicia D. Hjalmarson, Notary Public (Seal)

ALICIA D. HJALMARSON
Notary Public - California
San Diego County
Commission # 2404113
My Comm. Expires Jun 7, 2026

UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No.: 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants*.
_______________________________________/

UNOFFICIAL DOCUMENT

**NOTICE OF HEARING**

**YOU ARE HEREBY NOTIFIED** that the following Hearing has been scheduled:

MOTION TO BE HEARD: **PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

DATE: **June 6th, 2025**

TIME: **1:15 PM (45 minutes)**

BEFORE: **Honorable Alicia Polk**

LOCATION: **ZOOM Appearance Only**

1. The hearing will be held via Zoom video conference. No account is necessary on Zoom to participate, and the parties may participate by going to http://www.zoom.us/ and clicking the link to "Join a Meeting" at the scheduled date/time set forth above by using the following meeting ID: 919 2425 6749 and password: 587551. Persons participating in the Zoom hearing without a computer having audio and visual capabilities may appear telephonically for the Zoom hearing by calling +17866351003,,91924256749#,,,,*587551# US (Miami) +14702509358,,91924256749#,,,,*587551# US (Atlanta) and using the same meeting ID with the password.

2. Participants should adhere to the following guidelines for Zoom hearings:

A. This is not a meeting. This is a court hearing. Dress and behave as if you were attending court in person. Pay attention to the time, as there are likely other hearings following yours and the hearing will need to conclude on time.

B. At the start of the hearing all participants will be in a virtual waiting room, and the parties, counsel, and any court reporter, will be admitted in the virtual hearing by the presiding judge upon the start of the hearing.

C. Please "rename" yourself on Zoom to show your actual name, so you can be readily identified by others for your hearing.

D. Any witnesses will be left in the waiting room until such time as they are "called" to testify, at which point they will be admitted to the virtual hearing room.

E. If at any point in a hearing an attorney needs to confer with his/her client separately, they may advise the Court and the presiding judge (if appropriate) will open a "breakout room" and assign the attorney and party to the breakout room for them to have their conversation outside of the presence of the Court and other participants. Similarly, if counsel for all parties need/want to speak together with the Judge without the parties present, they may make such a request and (if appropriate) the Court will open a "breakout room" for that conversation to occur, akin to how counsel may meet with a Judge in chambers prior to a traditional in-person hearing.

F. The same rules which apply to a hearing in person before the Court, also apply to a video hearing through Zoom.

G. No minor children are permitted to attend, or be present in the room where any participant is attending, the virtual hearing via Zoom. Persons with minor children of

UNOFFICIAL DOCUMENT

the action in the same building where the participant is appearing should take all reasonable steps to insure the minor children are not exposed to the proceedings. Participants may wish to use earbuds or headphones to assist in shielding the children from the litigation.

H. When speaking, remember to look directly at the webcam, not at the screen.

I. Position the camera at your eye level or slightly above eye level, and be mindful of what is behind you as everyone participating in the hearing will be able to see.

J. Check the lighting. Light from a window behind you might blind the camera, making you look dark. Light above you in the center of a room might also cast shadows. Ideally, position a lamp, or sit facing a window, where light is directly on your face.

K. Participants should speak one at a time and pause prior to speaking in case there is any audio/video lag for any other participant(s).

L. Participants are required to mute themselves when not speaking in order to avoid any potential background noise.

M. **It is the responsibility of counsel, prior to the scheduled hearing, to insure not only the attorney, but the attorney's client(s) and any witness(es) for their client:** (1) **have access to Zoom;** (2) **have access to the exhibits for which they will be testifying; and** (3) **are familiar with the use of Zoom**.

UNOFFICIAL DOCUMENT

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served to all parties listed in the Court's E-filing portal, this 28th day of May, 2025.

Respectfully submitted,

*/s/ Anthony J. Aragona*____

Anthony J. Aragona, III, Esq
**GLOBAL LEGAL LAW FIRM**
200 W. Palmetto Park Rd., Suite 302
Boca Raton, FL 33432
Telephone: (888) 846-8901
Email: aaragona@attorneygl.com

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants*.

___________________________________/

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; MEMORANDUM OF LAW IN SUPPORT**



Electronically Filed Pasco Case # 2025CA001443CAAXES 05/15/2025 11:51:22 AM

UNOFFICIAL DOCUMENT

# I. INTRODUCTION

## A. Background

Plaintiffs U.S. ALLIANCE GROUP, INC ("USAG"), PAYMENT SOLUTIONS INTERNATIONAL, LLC d/b/a PaySol ("PaySol"), and AIDEN FLORIDA BANCSHARES, INC. (hereinafter, "Aiden") (collectively with USAG and PaySol, "Plaintiffs") seek the immediate and equitable intervention of this Court to prevent ongoing and irreparable harm arising from the unlawful conduct of Defendants FIRST NATIONAL BANK OF PASCO (hereinafter, "Pasco"), FLORIDA BANCSHARES, INC. ("Bancshares"), FNBPASCO HOLDINGS, LLC ("FNB") (collectively with Pasco and Bancshares, "Bank Defendants"), A.P. GIBBS ("Gibbs"), JOHN ZAZZERA ("Zazzera"), JOHN HENSON ("Henson"), MARLENE MANN ("Mann"), PAUL MIDILI ("Midili"), STEVEN CARLE ("Carle"), ERNEST PEEPLES ("Peeples"), PAULA S. O'NEIL ("O'Neil"), MANNY LONG ("Long"), and LARKA FREYA ("Freya"), and collectively with Gibbs, Zazzera, Henson, Mann, Midili, Carle, Peeples, O'Neil, and Long, the ("Officers and Directors"), and all Defendants shall be referred to collectively as ("Defendants"), which conduct is in violation of their contractual, statutory, and fiduciary obligations.

UNOFFICIAL DOCUMENT

Specifically, Plaintiffs request entry of a temporary restraining order and preliminary injunction compelling Defendants to release funds that were frozen and now segregated and possibly converted by Defendants, which funds rightfully belong to Plaintiffs' merchant clients, and to cease further interference with the performance of the Cannabis Retail Business ("CRB") ACH Origination Agreements ("Origination Agreements") currently in effect.

As detailed in the Verified Complaint, Plaintiffs contracted with Bank Defendants for ACH payment processing services, including services for cannabis-related merchants, which Bank Defendants were well aware of at the time of contracting, and even submitted a questionnaire and other forms to Plaintiffs relating to the fact that Plaintiffs' customers were in the cannabis industry.

*See* **Composite Exhibit "H"** to Verified Complaint.

After Plaintiffs onboarded a large portfolio of its merchants and began transmitting ACH transactions under the supervision and sponsorship of Bank Defendants, as contemplated by the Origination Agreements, Bank Defendants unilaterally froze over two million dollars ($2,000,000) in funds. These funds are held by USAG and PaySol on behalf of their merchant customers. These funds belong to Plaintiffs' merchant customers, and the Bank Defendants' improper freezing of Plaintiffs' funds is in breach of the parties' Origination Agreements and without any lawful authority. These funds are directly tied to merchant transactions facilitated by Plaintiffs and Bank Defendants and now said to be held in "constructive trust" by Bank Defendants related to an undefined audit that may or may not have anything to do with Plaintiffs.

UNOFFICIAL DOCUMENT

The consequences of Defendants' conduct on Plaintiffs have been swift and severe: Plaintiffs' merchants have terminated their relationships; revenue has been diverted to competitors; and Plaintiffs' reputations have already suffered immediate, irreparable, and ongoing damage. Multiple merchants are threatening litigation. These injuries cannot be adequately remedied by monetary damages alone and constitute irreparable harm under Florida law. Defendants' conduct not only breaches the express terms of the Origination Agreements, but also violates the implied covenant of good faith and fair dealing, fiduciary duties owed to Plaintiffs, and Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201 *Fla. Stat.,* et seq.

Under well-established Florida precedent, injunctive relief is warranted where, as here, Plaintiffs demonstrate: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable harm in the absence of injunctive relief; (3) the lack of an adequate remedy at law; and (4) that injunctive relief will serve the public interest. See *Florida Department of Health v. Florigrown, LLC* (Fla. 2021) 317 So.3d 1101, 1110. Each of these elements is plainly satisfied, as discussed herein.

Absent swift intervention, Defendants will continue to wrongfully withhold funds, obstruct

performance under the operative contracts, and inflict further economic and reputational harm upon Plaintiffs. Plaintiffs respectfully request that this Court preserve the status quo by granting immediate injunctive relief and compelling Defendants to honor their legal and contractual obligations, restoring Plaintiffs' funds to Plaintiffs' use.

**B. Facts**

On or about August 3, 2022, USAG and Pasco, as well as PaySol and Pasco, entered into ACH origination agreements. *See* **Exhibits "A"** and "**B"** to Verified Complaint. ("Origination Agreements"). Importantly, the Origination Agreements contemplate cannabis merchants, as they are both titled "ACH CRB Origination Agreement." *See* Attachment 5 to Origination Agreements, which establishes surcharges for CRB (a/k/a cannabis related business) compliance.

As set forth in the Verified Complaint, Defendants represented themselves to Plaintiffs as a bank that specialized in the cannabis electronic payments industry, and as the first federally-regulated bank in the United States to provide loans to companies in the cannabis industry. Further, Defendants represented that they could adequately onboard and settle Plaintiffs' growing portfolio of high-risk merchants, specifically consisting largely of cannabis merchants. Indeed, Pasco, and the other Defendants, sponsored Plaintiffs' participation in the ACH Network for specifically cannabis payment processing. *See* **Exhibits "C" and "D"** to Verified Complaint.

UNOFFICIAL DOCUMENT

Based upon Defendants' representations, Plaintiffs began to enter into merchant processing agreements with cannabis merchants and onboard them for ACH payment processing. A merchant processing agreement ("MPA") sets forth the terms under which a merchant is authorized to accept ACH transactions through the sponsoring bank, here Bank Defendants, and their sponsored service providers, here USAG and PaySol, in accordance with the NACHA, the entity that regulates ACH payment processing, Rules. It outlines the parties' respective duties, including transaction handling, settlement procedures, fees, chargeback management, and compliance obligations. A true and

accurate copy of PaySol's standard MPA with its merchants is attached as *See* **Exhibit "E"** to Verified Complaint. Importantly, the MPA contemplates cannabis transactions. *Id.*, Addendum A, Section 8.

Recently, this year, Plaintiffs are informed and believe that the Office of the Comptroller of the Currency ("OCC") audited Pasco, on information and belief, as a result of Bank Defendants' involvement in the cannabis industry, but primarily due to the Bank Defendants' non-compliance with laws and regulation related thereto.

On March 7, 2025, Trulieve Inc. ("Trulieve"), a cannabis retailer and its associated entities filed a complaint in the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, Florida, titled *Trulieve Inc. et al. v. Payment Solutions International, LLC and First National Bank of Pasco* (2025) (Case No.: 2025-CA-000695), alleging that PaySol and Pasco failed to deposit funds from cannabis transactions to Trulieve Inc's merchant accounts. That case promptly settled and that settlement agreement was filed with the court.

On March 21, 2025, Counsel for Bank Defendants sent Plaintiffs a termination letter ("Termination Letter") stating that: "The Bank has made the strategic decision to discontinue offering deposit accounts and services to Tier I and Tier II (direct and indirect) cannabis related businesses." (Termination Letter at p. 1.) *See* **Exhibit "F"** to Verified Complaint. The Termination Letter further stated that Plaintiffs' bank accounts would be closed within thirty (30) days and that Bank Defendants would be terminating the Origination Agreements.

On or about April 11, 2025, Counsel for Bank Defendants sent Counsel for Plaintiffs a notice of account freeze ("Freeze Notice") advising that Pasco (and the other Bank Defendants): "is now exercising its rights to indemnity and its security interest in USAG's funds. Accordingly, the Bank is freezing USAG's and its affiliates' Bank accounts. The Bank will use the funds in such accounts to pay for the lookback and other indemnifiable items under the Agreements." See **Exhibit "G"** to

UNOFFICIAL DOCUMENT

Verified Complaint. That notice stated that the Bank was undergoing an audit that would cost over $1 million without providing any supporting documents.

In addition to freezing Plaintiffs' funds, Defendants recently and without warning zeroed out all account balances belonging to Plaintiffs and their merchants. Defendants' unilateral elimination of all balances has left Plaintiffs unable to meet their contractual obligations to merchants, has worsened merchant attrition, and has caused irreparable harm to Plaintiffs' business operations, goodwill, and reputation. This action was taken without any court order, regulatory mandate, or lawful contractual basis.

Further, at least four of PaySol's merchants have now demanded their funds from PaySol and have threatened litigation. One of those merchants demanded approximately $700,000 from PaySol, which funds Bank Defendants withhold or have converted.

UNOFFICIAL DOCUMENT

## II. MEMORANDUM OF LAW

### A. Grant of a Temporary Restraining Order and Preliminary Injunction Will Preserve the Status Quo.

"'The general function of a temporary injunction is to preserve the status quo for disputing parties until the court is able to resolve the underlying dispute on its merits.' *Coscia v. Old Fla. Plantation, Ltd.*, 828 So. 2d 488, 490 (Fla. 2d DCA 2002) (citing *State Agency for Health Care Admin. v. Cont'l Car Serv., Inc.*, 650 So. 2d 173 (Fla. 2d DCA 1995)). The status quo is 'the last, actual, peaceable, noncontested condition which preceded the pending controversy.' *Nazia, Inc. v. Amscot Corp.*, 275 So. 3d 702, 705 (Fla. 5th DCA 2019) (quoting *Chi. Title Ins. Agency of Lee Cnty. v. Chi. Title Ins. Co.*, 560 So. 2d 296, 297 (Fla. 2d DCA 1990))." (*Gulf Coast Commercial, LLC v. KOS Corp.* (Fla. Dist. Ct. App. 2022) 351 So.3d 1212, 1215.)

Here, the status quo – the last, actual, peaceable, noncontested condition preceding the pending controversy – is when Plaintiffs had full access to their bank accounts, which contained

approximately $2 million in funds, and the ability to dispose of those funds pursuant to the Origination Agreements.

**B. Plaintiffs Establish the Required Elements for a Temporary Injunction.**

Plaintiffs must establish four elements to obtain a temporary injunction: "(1) a substantial likelihood of success on the merits, (2) the unavailability of an adequate remedy at law, (3) irreparable harm absent entry of an injunction, and (4) that the injunction would serve the public interest." *Florida Department of Health v. Florigrown, LLC* (Fla. 2021) 317 So.3d 1101, 1110.

1. Plaintiffs establish a substantial likelihood of success on the merits.

Here, in their Verified Complaint, Plaintiffs allege seventeen (17) meritorious causes of action. Six of those causes of action – Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Conversion, Unjust Enrichment, Unfair Business Practices, and Fraudulent Misrepresentation – each independently establish that Plaintiffs are presently entitled to their funds, which are currently withheld and frozen by Defendants. These funds total approximately $2 million.

On the other hand, Defendants state no legal basis for withholding and freezing Plaintiffs' funds, and then zeroing out the account balances. To the contrary, in their Termination Letter, Defendants state various amorphous reasons for terminating Defendants' accounts, such as "Operational burden, including burden of regulatory reporting requirements; and Increasing costs of compliance and monitoring." See **Exhibit "F"** to Verified Complaint. It is telling that Defendants admit that regulatory compliance was too great a burden to be borne by them, yet the Bank Defendants had the role of being a "Sponsoring Bank" to Plaintiffs USAG and PaySol, which role required them to oversee these transactions and ensure regulatory compliance!

Further, in the Freeze Notice, Defendants also state no legal basis for withholding and freezing Plaintiffs' funds. Rather, Defendants again state various amorphous reasons for the freezing of Plaintiffs' funds, such as: "Circumventing and violating laws, regulations, and rules; engaging in

UNOFFICIAL DOCUMENT

prohibited transactions; and failing to maintain a sufficient reserve account with the Bank." What exactly those laws, regulations, and rules are, remain a mystery to Plaintiffs. Despite Plaintiffs' efforts to ascertain from Defendants the specific justification for withholding and freezing the funds, Defendants have not been forthcoming. Surprisingly, Defendants can state with greater certitude the cost of the sudden necessity of complying with federal regulators: "Therefore, without limitation, the Bank may: Be entitled to **unlimited damages** and indemnity obligations… The Bank currently estimates that the cost of this lookback will exceed **$1,000,000**." **Exhibit "G"** to Verified Complaint [emphasis added]. Importantly, Defendants cite no statutory authority, court order, or directive from any federal or other regulatory agency that mandates the withholding or freezing of Plaintiffs' funds.

While, in their Verified Complaint, Plaintiffs cite to statutory authority, Defendants' unverified assertions in the Freeze Notice read more like a pretext to commandeer, convert, seize, and misappropriate $1,000,000 of Plaintiffs' funds (due to Bank Defendants' own negligence and failure to properly oversee compliance with laws and regulations applicable to the cannabis industry), rather than a supportable legal basis for their actions. As stated above, the Origination Agreements specifically provided for ACH payment processing for cannabis transactions, so Defendants' sudden change in their position is neither credible nor made in good faith.

Therefore, as Defendants have failed to submit any adequate legal basis for their actions, Plaintiffs establish a substantial likelihood of success on the merits.

2. <u>An adequate remedy at law is unavailable.</u>

As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have already suffered irreparable harm, including: (i) loss of merchant relationships and accounts to competitors; (ii) reputational damage; and (iii) exclusion from board participation and corporate decision-making, which exacerbated the foregoing, as set forth in the Verified Complaint.

Likewise, an adequate remedy at law is unavailable because Plaintiffs' goodwill is an

UNOFFICIAL DOCUMENT

intangible asset that cannot be replaced by money damages. Plaintiffs' good name, reputation, and popularity within the cannabis industry will permanently be impaired if the Court does not grant a temporary injunction. *See T.K. Communications, Inc. v. Herman* (Fla. Dist. Ct. App. 1987) 505 So.2d 484, 486 ("The breach consists of intangibles that cannot be replaced by money damages; for instance, the use of the disc jockeys' valuable names and reputations and the capitalization on the disc jockeys' popularity."). Plaintiffs require injunctive relief.

3. Plaintiffs will suffer irreparable harm absent entry of an injunction.

Plaintiffs will suffer irreparable harm because monetary damages cannot adequately compensate permanent impairment to business goodwill, due to merchant attrition and reputational damage. *See Grant v. Robert Half Intern., Inc.* (Fla. Dist. Ct. App. 1992) 597 So.2d 801, 802 ("Robert Half has demonstrated irreparable harm due to Grant's solicitation of Robert Half's clients, as well as injury to Robert Half's goodwill and business reputation."). Further, Plaintiffs have no viable way to pay their merchants monies currently due and owing if the Court does not grant a temporary injunction. Absent entry of an injunction, the irreparable harm to the Plaintiffs will only increase and compound.

Likewise, the loss of customers is something that money cannot replace. This proposition is supported by the court's findings in *Atomic Tattoos, LLC v. Morgan*, 45 So.3rd 63 (Fla. 2d DCA 2010) ("Any continued breach of the agreement and covenant not to compete could further damage Atomic Tattoos' goodwill and relationship with its clients and nothing short of an injunction would prevent that loss. Monetary damages would be difficult to determine because the number of 'sales' lost, as well as any potential profit, would be nearly impossible to calculate, particularly with a continuing breach."). The same holds true in the instant case. Defendants' continued withholding and freezing of Plaintiffs' assets cannot be remedied by monetary damages because Plaintiffs' will permanently lose a significant portion, and likely the entirety, of their customer base, which, due to

UNOFFICIAL DOCUMENT

the accompanying damage to reputation and loss of goodwill, cannot be regained, such that injunctive relief is both necessary and appropriate.

Further, Plaintiffs may lose the entirety of their funds, as Pasco does not appear on the Florida Secretary of State website as authorized to do business within the State of Florida and it is possible that judgment may not had against Pasco (as distinguished from other Defendants) because it does not exist as a legal entity.

The zeroing out of Plaintiffs' accounts amplifies the irreparable harm, as it renders Plaintiffs completely unable to recover any of their funds without the Court's intervention. Demands from at least two of PaySol's merchants further amplifies the irreparable harm.

4. <u>Injunctive relief will serve the public interest.</u>

A party seeking injunctive relief may demonstrate that it serves the public interest by showing a legitimate business interest in protecting relationships with its referral sources. *See Smart Pharmacy, Inc. v. Viccari* (Fla. Dist. Ct. App. 2016) 213 So.3d 986, 991 ("Finally, the record reflects that a preliminary injunction would serve the public interest because the trial court found that Smart Pharmacy has a legitimate business interest in protecting its relationships with its referral sources.).

Here, Plaintiffs occupied a respected position within the cannabis industry and had many referral sources. These referral sources have become almost non-existent because of Plaintiffs' inability to pay their merchants due to Defendants' actions.

Likewise, here, Plaintiffs' referral sources will be effectively eliminated if Plaintiffs are unable to pay their existing merchants monies currently due and owing. In fact, at least one of these merchants has already filed a complaint against PaySol and Pasco, which lawsuit has now been settled. *See Trulieve Inc. et al. v. Payment Solutions International, LLC and First National Bank of Pasco* (2025) (Case No.: 2025-CA-000695) in the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, Florida.

UNOFFICIAL DOCUMENT

Granting a temporary injunction will serve the public interest because such will enable Plaintiffs to pay their merchant clients, thereby honoring their contractual agreements with third parties, protecting and maintaining market efficiency, and protecting consumer access to products and services.

Further, restoring the balances of Plaintiffs' accounts, which Defendants wrongfully reduced to zero, is necessary to protect not only Plaintiffs' business operations but also the contractual expectations and financial rights of third-party merchants who depend on Plaintiffs for payment.

**C. The Balance of the Equities Favors Entry of a Temporary Injunction.**

As a general rule, "equity will not require by injunction the performance of an act where the harm to the person coerced is wholly disproportionate to the benefit to the other party, or, indeed, when greater injury and inconvenience will result to the defendant from an injunction than will be caused to the plaintiff by its refusal." *Liza Danielle, Inc. v. Jamko, Inc.* (Fla. Dist. Ct. App. 1982) 408 So.2d 735, 740.

Here, absent the imposition of a temporary restraining order and preliminary injunction, Plaintiffs are suffering and will continue to suffer irreparable harm to their legitimate business interests including, but not limited to, loss of merchants, loss of goodwill, continued damage to their reputation, and the inability to deliver on their contractual obligations to pay merchants monies currently due and owing.

Defendants, on the other hand, will suffer no cognizable harm if the temporary restraining order and preliminary injunction are granted. Bank Defendants unilaterally froze over $2 million owed to Plaintiffs, in breach of the Origination Agreements and without any valid legal basis.

Most recently, and without notice or lawful justification, Defendants went even further by zeroing out all of Plaintiffs' and their merchants' accounts, wiping the account balances entirely. This extraordinary act compounds the irreparable harm Plaintiffs face and demonstrates Defendants'

UNOFFICIAL DOCUMENT

ongoing bad faith misconduct.

The OCC may have audited Defendants or served Defendants a subpoena, not because of their involvement in the cannabis industry, but non-compliance with the applicable laws and regulations, which Pasco is a sponsoring bank of USAG and PaySol, and has the obligation to oversee and ensure compliance in these transactions. Defendants may contend that the subpoena or regulatory investigation supports their withholding and freezing of Plaintiffs funds. However, a subpoena or regulatory investigation alone, without any relevant statutory authority or a court order, is an insufficient basis to withhold and freeze Plaintiffs funds.

As pertains to balancing equities, indeed, courts *will not* grant injunctive relief in the form of asset freezes when monetary damages suffice. See *Weinstein v. Aisenberg* (Fla. Dist. Ct. App. 2000) 758 So.2d 705, 706, *dismissed* (Fla. 2000) 767 So.2d 453 ("Even where the party seeking injunctive relief alleges that the opposing party may dissipate bank assets, a judgment for money damages is adequate and injunctive relief is improper, notwithstanding the possibility that a money judgment will be uncollectible."); *Supreme Service Station Corp. v. Telecredit Service Center, Inc.* (Fla. Dist. Ct. App. 1982) 424 So.2d 844, 844 ("A civil complaint which alleges that defendant corporation, through its officers, has defrauded plaintiff corporation and is about to remove its assets beyond the jurisdiction of the court does not warrant a temporary injunction."); and *Mary Dee's, Inc. v. Tartamella* (Fla. Dist. Ct. App. 1986) 492 So.2d 815 (Holders of unsecured promissory note could obtain money judgment against defendants, and thus had adequate remedy at law, so that motion to dissolve temporary injunction prohibiting defendants from dispersing assets of defendant corporation among individual defendants, should not have been denied.).

Further, Courts are not obligated to apply the balancing doctrine when the party against whom the injunction is sought has engaged in wrongdoing: "No Florida court that we have found has applied the 'balancing' doctrine described above to a situation where the servient tenement owner

UNOFFICIAL DOCUMENT

intentionally and consciously encroached onto the easement and the dominant tenement owner was not guilty of some form of estoppel or laches." (*Diefenderfer v. Forest Park Springs* (Fla. Dist. Ct. App. 1992) 599 So.2d 1309, 1314.) "[T]he duty of the court is to protect rights, and innocent complainants cannot be required to suffer the loss of their rights because of the expense to the wrongdoer." (*Diefenderfer v. Forest Park Springs* (Fla. Dist. Ct. App. 1992) 599 So.2d 1309, 1314.)

Here, Defendants likely failed to comply with laws and regulations applicable to the cannabis industry, despite representing to Plaintiffs that they were sophisticated in the industry and were qualified to manage Plaintiffs' and their merchants' funds. This representation, at minimum, was negligently made and, likely, was made with the intent to deceive.

Therefore, Plaintiffs are not only entitled to an equitable remedy because they have established the four requisite elements of such; further, the equities of the case strongly support the grant of a temporary injunction.

UNOFFICIAL DOCUMENT

**D. A Substantial Bond Should Not Be Required.**

"No temporary injunction shall be entered unless a bond is given by the movant in an amount the court deems proper, conditioned for the payment of costs and damages sustained by the adverse party if the adverse party is wrongfully enjoined. Unless otherwise specified by the court, the bond shall be posted within 5 days of entry of the order setting the bond." (Fla. R. Civ. P. 1.610.) While a bond is mandatory, the language of the statute allows the Court to exercise its discretion in determining what amount is proper.

In the instant case, Plaintiffs have demonstrated a high likelihood of success on the Motion. The facts here – including Defendants' gross negligence in failing to comply with the relevant laws and regulations applicable to the cannabis industry, their willful disregard of Plaintiffs' shareholder rights, and their failure to state any legal basis for their commandeering, conversion, seizure and misappropriation of Plaintiffs' funds – all weigh against entry of a substantial bond. Accordingly,

Plaintiffs respectfully request that this Court issue a temporary restraining order and a preliminary injunction requiring a bond of not more than $10,000.00, which may be satisfied by Aiden pledging its shares in Bancshares as collateral.

**E. Plaintiffs Are Entitled to Attorneys' Fees.**

The Origination Agreements provide: "[USAG/PaySol] shall indemnify the Financial Institution against any loss, liability or expense (including attorneys' fees and expenses) resulting from or arising out of any breach of any of the foregoing warranties or agreements."

Florida law provides for reciprocal attorneys' fees on actions on contract: "If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract." § 57.105(7), *Fla. Stat.*

Therefore, if Plaintiffs prevail on this Motion, Plaintiffs should be entitled to attorneys' fees, in an amount to be determined.

**III. CONCLUSION AND PRAYER FOR RELIEF**

Based on the foregoing, Plaintiffs have established their need for the immediate issuance of an *ex parte* temporary restraining order and preliminary injunction prohibiting Defendants from continuing to withhold Plaintiffs' funds. Accordingly, Plaintiffs respectfully request that this Court enter a temporary restraining order and then immediately set this matter for a hearing to determine the necessity of an award of a preliminary injunction to prevent any further irreparable injury to Plaintiffs.

Specifically, Plaintiffs respectfully request that the Court:

1. Order temporary injunctive relief against Defendants as follows:

A. Enjoining Defendants from continuing to breach the terms of the Origination



UNOFFICIAL DOCUMENT

Agreements;

B. Enjoining Defendants from continuing to withhold and freeze Plaintiffs' funds; and

C. Enjoining Defendants from continuing to prevent Aiden from exercising its shareholder rights;

2. Order the temporary restraining order and preliminary injunction to remain in effect until further Order;

3. Order Defendants to pay Plaintiffs' attorneys' fees and costs incurred in this Motion; and

4. Order any further relief the Court deems just and appropriate.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed through the E-Filing portal to the Clerk of Courts and served upon all parties on the Court's E-Service list in this case on this 15th day of May, 2025.

UNOFFICIAL DOCUMENT

Respectfully submitted,

By: *_/s/ Anthony Aragona III, Esq._*
Anthony Aragona III, Esq.
Florida Bar Number: 36676
**GLOBAL LEGAL LAW FIRM PLLC**
200 W Palmetto Park Rd. Suite 302
Boca Raton, Florida 33432
Telephone: (858) 283-7056
aaragona@attorneygl.com

*Attorneys for Plaintiffs,*
U.S. ALLIANCE GROUP, INC.;
PAYMENT SOLUTIONS
INTERNATIONAL, LLC; and
AIDEN FLORIDA BANCSHARES, INC.

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs,*

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants.*
_________________________________/

UNOFFICIAL DOCUMENT

## SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**A.P. GIBBS**
Individually
13324 14th Street
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

UNOFFICIAL DOCUMENT

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller

**By:** ______________________________
**Deputy Clerk**

Unofficial Document

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;
PAYMENT SOLUTIONS INTERNATIONAL, LLC;
AIDEN FLORIDA BANCSHARES, INC.;
AIDEN FINTECH GROUP, INC.;**

*Plaintiffs,*

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;
FLORIDA BANCSHARES, INC.;
FNBPASCO HOLDINGS, LLC;
A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;
JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;
JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;
MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;
PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;
STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;
ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;
PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;
MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;
LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants.*
_________________________________/

UNOFFICIAL DOCUMENT

## SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**FLORIDA BANCSHARES, INC.**
c/o Manny Long as Registered Agent
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

UNOFFICIAL DOCUMENT

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAAXES 05-22-2025 04:18 PM
Deputy Clerk: Haley Joyner

**By:** ______________________________

**Deputy Clerk**

UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs,*

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants.*
_________________________________/

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

## SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**FNBPASCO HOLDINGS, LLC**
c/o Tod G. Pukas SVP as Registered Agent
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025 __________, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAWS 05-22-2025 04:18 PM
Deputy Clerk: Haley Joyner

**By:** ________________________
**Deputy Clerk**

UNOFFICIAL DOCUMENT

Filing # 223119631 E-Filed 05/14/2025 02:40:52 PM DIN: 34

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs,*

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants.*
_________________________________/

UNOFFICIAL DOCUMENT

## SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**JOHN HENSON**
As Director of Florida Bancshares, Inc.
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

UNOFFICIAL DOCUMENT

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAXES 05-22-2025 04:25 PM
Deputy Clerk: Haley Joyner

**By:** ______________________________
**Deputy Clerk**

UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;
PAYMENT SOLUTIONS INTERNATIONAL, LLC;
AIDEN FLORIDA BANCSHARES, INC.;
AIDEN FINTECH GROUP, INC.;**

*Plaintiffs,*

v. Case No.: 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;
FLORIDA BANCSHARES, INC.;
FNBPASCO HOLDINGS, LLC;
A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;
JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;
JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;
MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;
PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;
STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;
ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;
PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;
MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;
LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants.*
_______________________________/

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

## SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**JOHN ZAZZERA**
As President and CEO of Florida Bancshares, Inc.
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAAXES 05-22-2025 04:18 PM
Deputy Clerk: Haley Joyner

**By:** ______________________________
**Deputy Clerk**

UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;
PAYMENT SOLUTIONS INTERNATIONAL, LLC;
AIDEN FLORIDA BANCSHARES, INC.;
AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;
FLORIDA BANCSHARES, INC.;
FNBPASCO HOLDINGS, LLC;
A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;
JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;
JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;
MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;
PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;
STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;
ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;
PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;
MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;
LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants*.
________________________________/

UNOFFICIAL DOCUMENT

# SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**LARKA FREYA**
As Secretary of Florida Bancshares, Inc.
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

UNOFFICIAL DOCUMENT

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como "Plaintiff/Plaintiffs Attorney". (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d'autres obligations d'un avocet. Si vous ne connaissez pas d'avocat, vous pourriez telephone a un service de reference d'avocats ou a un bureau d' assistance juridique (figuarant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiffs Attorney" (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAAXES 05-22-2025 04:25 PM
Deputy Clerk: Haley Joyner

**By:** ______________________________
**Deputy Clerk**

UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;
PAYMENT SOLUTIONS INTERNATIONAL, LLC;
AIDEN FLORIDA BANCSHARES, INC.;
AIDEN FINTECH GROUP, INC.;**

*Plaintiffs,*

v. Case No.: 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;
FLORIDA BANCSHARES, INC.;
FNBPASCO HOLDINGS, LLC;
A. P. GIBBS, individually and as Chairman
of FLORIDA BANCSHARES, INC.;
JOHN ZAZZERA, as President and CEO of
FLORIDA BANCSHARES, INC.;
JOHN HENSON, as Director of
FLORIDA BANCSHARES, INC.;
MARLENE MANN, as Director of
FLORIDA BANCSHARES, INC.;
PAUL MIDILI, as Vice Chairman of
FLORIDA BANCSHARES, INC.;
STEVEN CARLE, as Director of
FLORIDA BANCSHARES, INC.;
ERNEST PEEPLES, as Director of
FLORIDA BANCSHARES, INC.;
PAULA S. O'NEIL as Director of
FLORIDA BANCSHARES, INC.;
MANNY LONG, as Treasurer of
FLORIDA BANCSHARES, INC.;
LARKA FREYA as Secretary of
FLORIDA BANCSHARES, INC.;**

*Defendants.*
_________________________________/

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

# SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**MANNY LONG**
As Treasurer of Florida Bancshares, Inc.
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAAXES 05-22-2025 04:25 PM
Deputy Clerk: Haley Joyner

**By:** ____________________
**Deputy Clerk**

UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs,*

v. Case No.: 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants.*
__________________________________/

UNOFFICIAL DOCUMENT

## SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**MARLENE MANN**
As Director of Florida Bancshares, Inc.
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

UNOFFICIAL DOCUMENT

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller

**By:** ______________________
**Deputy Clerk**



UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No.: 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants*.
_________________________________/

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

**SUMMONS**

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**PAUL MIDILI**
As Vice Chairman of Florida Bancshares, Inc.
13315 U.S. Hwy 301
Dade City, FL 33525

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como "Plaintiff/Plaintiffs Attorney". (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d'autres obligations d'un avocet. Si vous ne connaissez pas d'avocat, vous pourriez telephone a un service de reference d'avocats ou a un bureau d' assistance juridique (figuarant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiffs Attorney" (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAAXES 05-22-2025 04:20 PM
Deputy Clerk: Haley Joyner

**By:** ______________________________
**Deputy Clerk**

UNOFFICIAL DOCUMENT

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No.: 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants.*
_________________________________/

UNOFFICIAL DOCUMENT

## SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**PAULA S. O'NEIL**
As Director of Florida Bancshares, Inc.
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAAXES 05-22-2025 04:24 PM
Deputy Clerk: Haley Joyner

**By:** ______________________________
**Deputy Clerk**

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No.: 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants*.
_________________________________/

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

## SUMMONS

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**STEVEN CARLE**
As Director of Florida Bancshares, Inc.
13315 U.S. Hwy 301
Dade City, FL 33525

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como "Plaintiff/Plaintiffs Attorney". (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d'autres obligations d'un avocet. Si vous ne connaissez pas d'avocat, vous pourriez telephone a un service de reference d'avocats ou a un bureau d' assistance juridique (figuarant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiffs Attorney" (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAAXES 05-22-2025 04:24 PM
Deputy Clerk: Haley Joyner

By: ______________________

**Deputy Clerk**

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;
PAYMENT SOLUTIONS INTERNATIONAL, LLC;
AIDEN FLORIDA BANCSHARES, INC.;
AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No. 2025CA001443CAAXES

**FIRST NATIONAL BANK OF PASCO;
FLORIDA BANCSHARES, INC.;
FNBPASCO HOLDINGS, LLC;
A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;
JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;
JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;
MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;
PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;
STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;
ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;
PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;
MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;
LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants*.
___________________________________/

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

**SUMMONS**

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint upon the Defendant whose name and address is:

**FIRST NATIONAL BANK OF PASCO**
c/o Manny Long as Registered Agent
13315 U.S. Hwy 301
Dade City, FL 33525

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this Summons is served on you to file a written response to the attached Complaint with the clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**ANTHONY J. ARAGONA**
**Global Legal Law Firm PLLC**
**200 W. Palmetto Park Road Suite 302**
**Boca Raton, FL 33432**

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias contados, a partir del recibo de esta notificacion, para contester la demanda adjunta, por escrito, y presentaria ante este tribunal una hamada Telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres del las partes interesadas endico caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser desojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal existen otros requisites legales. Si lo desea, puede usted consultar a un abogado immediatamente. Sino conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que apparencen enla guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debeni usted enviar por correo, o entregar una copia de su respuesta a la persona denonimada abajo como “Plaintiff/Plaintiffs Attorney”. (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal un simple coup de telephone est insuffisant pour vous protegar; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal etende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que vtre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulteieur du Tribunal 11 y a d’autres obligations d’un avocet. Si vous ne connaissez pas d’avocat, vous pourriez telephone a un service de reference d’avocats ou a un bureau d’ assistance juridique (figuarant a l’annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au “Plaintiff/Plaintiffs Attorney” (Plaingnant ou a son avocet) nomme ci-dessous.

**WITNESS** my hand and official seal of the Court on May 22, 2025, 2025.

Nikki Alvarez-Sowles
Pasco County Clerk & Comptroller
2025CA001443CAWS 05-22-2025 04:17 PM
Deputy Clerk: Haley Joyner

**By:**
**Deputy Clerk**

UNOFFICIAL DOCUMENT

Filing # 222883502 E-Filed 05/12/2025 11:16:27 AM DIN: 3

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, FLORIDA**

**U.S. ALLIANCE GROUP, INC;**
**PAYMENT SOLUTIONS INTERNATIONAL, LLC;**
**AIDEN FLORIDA BANCSHARES, INC.;**
**AIDEN FINTECH GROUP, INC.;**

*Plaintiffs*,

v. Case No.

**FIRST NATIONAL BANK OF PASCO;**
**FLORIDA BANCSHARES, INC.;**
**FNBPASCO HOLDINGS, LLC;**
**A. P. GIBBS, individually and as Chairman of FLORIDA BANCSHARES, INC.;**
**JOHN ZAZZERA, as President and CEO of FLORIDA BANCSHARES, INC.;**
**JOHN HENSON, as Director of FLORIDA BANCSHARES, INC.;**
**MARLENE MANN, as Director of FLORIDA BANCSHARES, INC.;**
**PAUL MIDILI, as Vice Chairman of FLORIDA BANCSHARES, INC.;**
**STEVEN CARLE, as Director of FLORIDA BANCSHARES, INC.;**
**ERNEST PEEPLES, as Director of FLORIDA BANCSHARES, INC.;**
**PAULA S. O'NEIL as Director of FLORIDA BANCSHARES, INC.;**
**MANNY LONG, as Treasurer of FLORIDA BANCSHARES, INC.;**
**LARKA FREYA as Secretary of FLORIDA BANCSHARES, INC.;**

*Defendants*.

___________________________________/

**VERIFIED COMPLAINT FOR DAMAGES,**
**DECLATORY RELIEF, AND INJUNCTIVE RELIEF**



Electronically Filed Pasco Case # 2025CA001443CAAXES 05/12/2025 11:16:27 AM

UNOFFICIAL DOCUMENT

1. Plaintiffs, U.S. ALLIANCE GROUP, INC ("USAG"), PAYMENT SOLUTIONS INTERNATIONAL, LLC d/b/a PaySol ("PaySol"), AIDEN FLORIDA BANCSHARES, INC. ("Aiden Florida"), and AIDEN FINTECH GROUP, INC. ("Aiden Fintech", and, collectively with Aiden Florida, USAG, and PaySol, "Plaintiffs") file this Complaint against Defendants, FIRST NATIONAL BANK OF PASCO ("Pasco"), FLORIDA BANCSHARES, INC. ("Bancshares"), FNBPASCO HOLDINGS, LLC ("FNB", and, collectively with Pasco and Bancshares, "Bank Defendants"), A.P. GIBBS, individually, and as Chairman of Bancshares ("Gibbs"), JOHN ZAZZERA as President and CEO of Bancshares ("Zazzera"), JOHN HENSON as Director of Bancshares ("Henson"), MARLENE MANN, as Director of Bancshares ("Mann"), PAUL MIDILI, as Vice Chairman of Bancshares ("Midili"), STEVEN CARLE, as Director of Bancshares ("Carle"), ERNEST PEEPLES, as Director of Bancshares ("Peeples"), PAULA S. O'NEIL, as Director of Bancshares ("O'Neil"), MANNY LONG, as Treasurer of Bancshares ("Long"), and LARKA FREYA, as Secretary of Bancshares ("Freya", and, collectively with Gibbs, Zazzera, Henson, Mann, Midili, Carle, Peeples, O'Neil, and Long, the "Officers and Directors", and, collectively with Bank Defendants, "Defendants")[1], and allege as follows:

UNOFFICIAL DOCUMENT

**PARTIES**

2. USAG is a California corporation, with its principal address located at 29883 Santa Margarita Pkwy, Rancho Santa Margarita, CA 92688, and is registered to do business in the State of Florida.

3. PaySol is a Delaware limited liability corporation, with its principal address located at 29883 Santa Margarita Pkwy, Rancho Santa Margarita, CA 92688, and is registered to do business in the State of Florida.

[1] Plaintiffs reserve the right to amend this Verified Complaint as they uncover more factually specific information in discovery, to allege Defendants' misconduct with more specificity, and, as may be warranted, to include other of the Officers and Directors as party Defendants in their individual capacities.

4. Aiden Florida is a Florida corporation, with its principal address located at 29883 Santa Margarita Pkwy, Rancho Santa Margarita, CA 92688, and is registered to do business in the State of Florida.

5. Aiden Fintech is a Delaware corporation, with its principal address located at 29883 Santa Margarita Pkwy, Rancho Santa Margarita, CA 92688, and is registered to do business in the State of California. Aiden Florida and Aiden Fintech are collectively referred to as the "Aidens."

6. Pasco's principal place of business is located in Pasco, Florida. Pasco has five branches and over $300 million in assets. Pasco, whether as an entity or a fictitious (d/b/a) name, is neither registered nor authorized to do business in the State of Florida and it does not appear on Florida's Secretary of State website as a d/b/a or registered entity.

7. Bancshares is a Florida corporation, with its principal place of business located at 13315 U.S. Hwy 301, Dade City, FL 33525, and is the one-bank holding company of Pasco.

8. FNB is a Florida limited liability company with its principal place of business located at 13315 U.S. Hwy 301, Dade City, FL 33525. On the Florida Secretary of State website, Bancshares is listed as FNB's authorized person.

9. Gibbs is the Chairman of Bancshares and, on information and belief, resides in the State of Florida. Gibbs is included as a Defendant, individually, pursuant to 607.0831(1)(b)(3), *Fla. Stat*.

10. Zazzera is the President & CEO of Bancshares and, on information and belief, resides in the State of Florida.

11. Henson is a Director of Bancshares and, on information and belief, resides in the State of Florida.

12. Mann is a Director of Bancshares and, on information and belief, resides in the State of Florida.

UNOFFICIAL DOCUMENT

13. Midili is the Vice-Chairman of Bancshares and, on information and belief, resides in the State of Florida.

14. Carle is a Director of Bancshares and, on information and belief, resides in the State of Florida.

15. Peeples is a Director of Bancshares and, on information and belief, resides in the State of Florida.

16. O'Neil is a Director of Bancshares and, on information and belief, resides in the State of Florida.

17. Long is the Treasurer of Bancshares and, on information and belief, resides in the State of Florida.

18. Freya is the Secretary of Bancshares and, on information and belief, resides in the State of Florida.

UNOFFICIAL DOCUMENT

## JURISDICTION AND VENUE

19. Jurisdiction is proper under Fla. Stat. § 26.012 because the amount in controversy exceeds $50,000.

20. Venue is proper under Fla. Stat. § 47.011 because the Defendants reside in and do business in Pasco County, Florida, which is also where the causes of action accrued.

## STATEMENT OF FACTS

### A. Background to the ACH Payments Industry

21. An Automated Clearing House ("ACH") payment is an electronic funds transfer between bank deposit accounts within the United States, generally processed on a nationwide electronic payment system that facilitates transfers of funds between banks and credit unions commonly referred to as the ACH Network. This system facilitates various business to business, consumer to business, and business to consumer transactions, including direct deposits, bill payments,

and business-to-business transfers, by batching and processing them efficiently and securely.

22. To participate in ACH payments, businesses commonly referred to as merchants, must first establish a relationship with a financial institution authorized to originate transactions into the ACH Network. This financial institution is referred to as an Originating Depository Financial Institution ("ODFI"). The ODFI is typically a bank or credit union that contracts with the merchant (also known as the "Originator") to transmit debit or credit entries through the ACH Network (each an "ACH Entry") in accordance with applicable laws, regulations, and the National Automated Clearing House Association ("NACHA") Operating Rules ("NACHA Rules"). This process is referred to as "Origination."

23. Conversely, a Receiving Depository Financial Institution ("RDFI") is the financial institution that receives ACH Entries from the ACH Operator as defined below and posts them to the accounts of its customers, who are the payers in the transaction (i.e., those authorizing the transfer of funds to a merchant or service provider). In the context of ACH transactions, the RDFI is commonly referred to as the customer's bank.

24. The ACH Operator is a central clearing facility, such as the Federal Reserve or the Clearing House, who receives ACH entries from ODFIs, processes and sorts these entries, and delivers them to the appropriate RDFIs for settlement.

25. The ACH Network is a nationwide electronic payment system in the United States that facilitates the movement of funds between participating financial institutions, including ODFIs, RDFIs, and ACH Operators. Governed by the NACHA Rules, the ACH Network establishes binding obligations for all participants, including ODFIs, RDFIs, merchants, and third-party service providers involved in ACH transactions.

26. ODFIs may contract with third-party service providers to provide ACH-related processing services to merchants under the ODFI's authority and oversight. Such third-party

UNOFFICIAL DOCUMENT

organizations are referred to as Third-Party Senders ("TPS") or Third-Party Service Providers ("TPSP") under the NACHA Rules, depending on the specific nature of their involvement in the transmission of ACH Entries.

27. A TPS is an intermediary that originates ACH transactions on behalf of a merchant without requiring a direct agreement between the merchant and the ODFI. In this arrangement, the TPS enters into an origination agreement with the ODFI, which agreement establishes the terms under which a TPS and/or TPSP is authorized to initiate ACH transactions through the ODFI, in compliance with applicable laws, regulations, and the NACHA Rules. The origination agreement outlines the responsibilities of both parties, including authorization procedures, transaction limits, risk management protocols, fees, and conditions for termination.

28. A TPSP is an entity that performs various functions related to ACH processing on behalf of the ODFI or RDFI. These functions can include activities such as formatting ACH files, providing software solutions, or facilitating the transmission of ACH Entries to the ACH Operator. Unlike a TPS, a TPSP does not originate transactions on behalf of an Originator. However, when a TPSP performs functions directly on behalf of an ODFI, such as acting as a sending point, an origination agreement between the TPSP and the ODFI is typically established to outline the responsibilities and expectations of both parties in this process.

29. Importantly, the ODFI remains entirely responsible for the TPS or TPSP acting on its behalf. The ODFI must ensure that such services are conducted in accordance with the NACHA Rules. An ODFI may not delegate or disclaim its responsibility for compliance with respect to any third party acting on its behalf and is required to establish and enforce appropriate oversight and monitoring procedures.

30. Importantly, the ODFI retains ultimate responsibility for all ACH Entries originated through it, including those transmitted by a TPS. An ODFI is required to perform due diligence with

UNOFFICIAL DOCUMENT

respect to any TPS, sufficient to form a reasonable belief that the TPS has the capacity to perform its obligations in compliance with the NACHA Rules. This due diligence includes assessing the nature of the TPS's ACH activity and the risks it presents, establishing and implementing procedures to monitor the TPS's origination and return activity, and enforcing restrictions on the types of ACH Entries that the TPS may originate. The performance by a TPS of any of the obligations of the ODFI does not relieve the ODFI of any of its obligations under the NACHA Rules.

31. In addition, an ODFI must perform thorough due diligence and underwriting prior to authorizing a merchant to initiate ACH transactions and must continue to monitor the merchant and its ACH Entries on an ongoing basis. While a TPS and/or TPSP may assist in aspects of the underwriting and monitoring process, the ODFI retains ultimate responsibility and liability for ensuring the legitimacy, compliance, and settlement of all ACH transactions it originates.

**B. Background as to the Parties**

32. USAG is a TPS.

33. PaySol is USAG's sales agent and is a TPSP.

34. Aiden Florida was formed for the purpose of investment in and acquisition of Bancshares.

35. Aiden Fintech was formed for the purpose of acquisition of Bancshare's treasury shares.

36. Pasco is a bank, and is an ODFI. Importantly, Pasco acts as a "Sponsoring Bank" for USAG as a TPS. Pasco also a "Sponsoring Bank" for PaySol as a TPSP, as set forth below.

37. As a Sponsoring Bank, Pasco had significant responsibilities in overseeing the transactions of USAG and PaySol, and ensuring regulatory compliance.

38. Bancshares is the holding corporation of Pasco. On information and belief, Pasco is a mere instrumentality of Bancshares, because: (i) the same people control both Bancshares and Pasco;



UNOFFICIAL DOCUMENT

(ii) both Bancshares and Pasco operate out of the same facility; (iii) Pasco's contracts were in part performed by employees of Bancshares; and (iv) Pasco shares financial obligations with Bancshares. Essentially, these parties are alter egos of each other, such that either or both are responsible for the allegations alleged against herein against the Bank Defendants.

39. On further information and belief, FNB has a significant or controlling interest in Bancshares and Bancshares is a mere instrumentality of FNB, because: (i) the same people control both FNB and Bancshares; (ii) both FNB and Bancshares operate out of the same facility; (iii) Bancshares contracts were in part performed by employees of FNB; and (iv) Bancshares shares financial obligations with FNB. Essentially, these Defendants are alter egos of each other, such that either or both are responsible for the allegations alleged against the Bank Defendants.

40. TPSs and TPSPs, such as USAG and PaySol, out of necessity, spend a considerable amount of time and resources to acquire merchants in order to build their merchant networks. These relationships require considerable time, attention, and expertise to build and maintain.

41. As the ODFI, the Bank Defendants, through their Officers and Directors, enabled USAG and PaySol to originate and accept ACH payments by providing them with access to the ACH Network. Accordingly, the Bank Defendants are responsible for underwriting the merchants solicited by USAG and PaySol, processing the merchants' ACH entries, and settling funds into the merchants' respective deposit accounts. USAG and PaySol participated in the underwriting process; however, under NACHA Rules, the Bank Defendants, in their role as the Sponsoring Bank, are ultimately responsible for underwriting and approving all merchants using Pasco's ACH transaction processing.

42. Likewise, under the NACHA Rules, the Bank Defendants bore ultimate responsibility for ensuring that USAG and PaySol operated in compliance with applicable rules and regulations for the ACH transaction processing business operations described above. This includes conducting thorough due diligence and underwriting of USAG and PaySol prior to establishing a relationship

UNOFFICIAL DOCUMENT

with them as, respectively, a TSP and TPSP, as well as continuous and ongoing monitoring of their activities in those roles. ODFIs are required to assess the risk profiles of TPSs and TPSPs, implement appropriate controls, and ensure that they have the capacity to fulfill their obligations within the ACH Network. Failure by an ODFI to perform adequate due diligence and monitor TPS and TPSP activities violates NACHA Rules.

**C. Aiden Florida's First Offer to Purchase Bancshares's Shares**

43. In or around March 2021, Aiden Florida met with the officers and directors of Bancshares regarding Aiden Florida's affiliate BridgeFi. BridgeFi was founded in 2018 to create a flexible, cloud-based loan origination and management system for consumer lines of credit and providing financing solutions and technology delivery capabilities enabling distributors to present real-time loans to consumers with varying credit backgrounds. At that point, the officers and directors of Bancshares approached Aiden Florida regarding investment into, and potential purchase of, Bancshares. Around the same time, Defendants engaged Hovde Group, a boutique investment bank, M&A and capital markets advisory firm to solicit other offers for purchase of Bancshares.

44. In September 2021, BridgeFi became a loan management partner of Pasco, for the sole purpose to bring the Bank Defendants additional merchants and capital, and to provide underwriting and loan management for the consumer. It has been learned by the Plaintiffs that the Bank Defendants have been contacting USAG's customers, including Community Choice Financial ("CCFI") directly, without the permission or knowledge of USAG.

45. In or around November 2021, the Officers and Directors, specifically, Chief Executive Officer, Steve Hickman, encouraged Aiden Florida to make an offer to purchase Pasco. He, on behalf of the Bank Defendants, stated to Aiden Florida that Hovde Group had procured a potential buyer ("Hovde Buyer") of Bancshares, in part to encourage Aiden Florida to make an offer to purchase Bancshares. However, the Officers and Directors represented to Aiden Florida that Hovde Group had



UNOFFICIAL DOCUMENT

procured a buyer that would only be able to make a relatively small investment, smaller than had been hoped. Because of BridgeFi's profitability, the Bank Defendants represented that they preferred Aiden Florida's investment and partnership with BridgeFi, over the Hovde Buyer.

46. In or around November 2021, the Bank Defendants represented to Aiden Florida that Pasco and Bancshares had $35 million in high-yield bonds.

47. In or around December 2021, the Bank Defendants again solicited Aiden Florida's purchase of a controlling stake in Pasco and Bancshares.

48. In or around January 2022, as a result of the Bank Defendants' representations, Aiden Florida submitted a Letter of Intent ("LOI") to Defendants, proposing to acquire 65% of the shares of Bancshares. Aiden Florida paid ***1.9 times*** the book value of the shares, or about $34 dollars per share, which offer was significantly higher than the average multiple at the time presented.

49. Unbeknownst to Aiden Florida, the Bank Defendants had already sold, or were in the process of selling, Pasco's portfolio of $35 million in high-yield bonds and, simultaneously, had Pasco purchase approximately $74 million in low-yield bonds.

50. In or around April 2022, Aiden Florida learned that the initial bond portfolio of $35 million in high-yield bonds had converted to $74 million in low-yield bonds. It is common knowledge in the finance industry that when interest rates are rising, which there was every indication that the government was raising interest rates during this time period, the value of low-yield bonds usually goes down. In order to continue to push the stock price of Pasco up, the Bank Defendants would appear to be more profitable, thus raising the value of Pasco's stockThe Officers and Directors acted in bad faith, and without the care that an ordinarily prudent person in a like position would exercise under similar circumstances. The Officers and Directors did not take these actions in a manner that they reasonably believed to be in the best interests of the corporation. Rather, the Officers and Directors undertook these transactions ***for their own benefit***, by issuing distributions to themselves

UNOFFICIAL DOCUMENT

and manipulating the value of Pasco's and Bancshares's stocks, at the expense of Aiden Florida. Such actions constituted conscious disregard for the best interest of the Bank Defendants, and the Officers and Directors acted willfully and intentionally, in direct violation of their obligations and duties to the Bank Defendants and at the expense of the Plaintiffs.

51. In June 2022, financial reports released by Bancshares to Aiden Florida reflected a portfolio heavily weighted with low-yield assets. As a result of the change in ownership and rising interest rates, Aiden Florida was forced to mark the bonds for market and seek an additional $25 million in capital due to the concealed deterioration of Pasco's bond portfolio and the misconduct of the Officers and Directors, who benefitted from their misconduct.

52. As a result of the above, investors affiliated with Aiden Florida declined to provide financing, causing the acquisition to fail, while the Officers and Directors enriched themselves, awarding dividends and further profiting from their own misconduct.

UNOFFICIAL DOCUMENT

**D. The Cannabis-Related-Business ACH Origination Agreements**

53. On or about August 3, 2022, USAG and Pasco, as well as PaySol and Pasco, entered into ACH origination agreements. *See* **Exhibits "A"** and **"B"**, respectively (collectively referred to as "ACH Origination Agreements"). Importantly, the ACH Origination Agreements contemplate the processing of ACH transactions by cannabis merchants, as they are both titled "ACH CRB Origination Agreement". "CRB" stands for "cannabis retail business. *See* Attachment 5 to the ACH Origination Agreements, which establishes surcharges for CRB compliance.

54. Further, the Bank Defendants, through their Officers and Directors, specifically held themselves out to Plaintiffs as a bank that specializes in the cannabis electronic payments industry, and touted Pasco as the first federally-regulated bank in the United States to provide loans to companies operating in the cannabis industry. The Bank Defendants represented that they could adequately onboard, process, and settle ACH transactions for USAG's and PaySol's growing

portfolio of high-risk merchants, specifically consisting largely of CRB merchants. *See* **Composite Exhibit "H"**. The Bank Defendants even recommended CRB merchants to USAG and PaySol for payment processing. Importantly, the Bank Defendants, acted as a Sponsoring Bank to USAG's and PaySol's participation in the ACH Network for specifically payment processing for CRBs. *See* **Exhibit "C"**, Pasco's ACH sponsorship letter to Plaintiffs. *See also* **Exhibit "D"**, Pasco's sponsorship letter to USAG for card processing.

55. Based upon Defendants' representations as recited above and in **Exhibits "A"** through **"D"**, USAG and PaySol began to enter into merchant processing agreements with CRB merchants as a TPS and/or TPSP with Pasco as the ODFI, onboarding them for ACH payment processing. *See* **Exhibit "I"**. A merchant processing agreement ("MPA") sets forth the terms under which a merchant is authorized to accept ACH transactions through their TPS/TPSP and the sponsoring ODFI, in accordance with the NACHA Rules. The MPA outlines the parties' respective duties, including transaction handling, settlement procedures, fees, chargeback management, and compliance obligations. *See* **Exhibit "E"**, PaySol's standard MPA with its merchants. Importantly, the MPA contemplates CRB transactions. *See* Addendum A, Section 8 to the MPA.

UNOFFICIAL DOCUMENT

**<u>E. Aiden Florida's Second Offer to Purchase Pasco's and Bancshares's Shareholdings</u>**

56. On or about August of 2024, Aiden Florida submitted a ***second offer*** to acquire a controlling interest in Bancshares, this time proposing to purchase one hundred percent (100%) of the outstanding shares of its common stock ("Second Purchase Offer").

57. The Bank Defendants, through certain of their Officers and Directors, failed to properly disclose or submit the Second Purchase Offer to Pasco's Board of Directors and shareholders for consideration and approval, which omission was in violation of their respective fiduciary duties and corporate governance obligations. As a result, the transaction was never consummated. Had the

offer been approved and the transaction completed, Aiden Florida would have assumed control and implemented enhanced compliance protocols that would have prevented or mitigated the regulatory actions that later befell Pasco and which have resulted in damages to Plaintiffs.

58. By the end of 2022, the due diligence costs for the acquisition of Pasco and Bancshares had skyrocketed. Further, Plaintiffs learned that the Bank Defendants, through certain of their Officers and Directors, had actually concealed many of Pasco's expenses, including mortgage commissions, building repairs, and IT systems, which further misrepresented the earnings of Pasco and Bancshares, and consequently their respective shares. Upon uncovering these irregularities and facing escalating due diligence expenses, Aiden Florida ended acquisition talks, triggering a contractual breakup fee, for which the Bank Defendants asserted Aiden Florida was liable.

59. However, recognizing the value that Aiden Florida's affiliate BridgeFi, brought to the Bank Defendants, they offered ostensibly more favorable terms to Aiden Florida, this time in the form of a purchase of treasury shares and a seat on their Board of Directors

### F. The Treasury Share Purchase and Third Offer to Purchase Pasco's and Bancshares's Shareholdings

60. On or about March 17, 2023, Aiden Fintech and Bancshares entered into an agreement through which Aiden Fintech would acquire 58,000 of Bancshares's 147,349 treasury shares (39.36% of the treasury shares) (the "Treasury Share Purchase").

61. As part of the Treasury Share Purchase, the Bank Defendants, through their Officers and Directors, fraudulently induced Aiden Fintech to execute a release of liability ("Release"). At the time Aiden Fintech executed the Release, it was unaware of the full extent of the Bank Defendants' prior misconduct, including the bond scheme and other related misrepresentations. This remained unknown to Plaintiffs because the Bank Defendants, through their Officers and Directors, knowingly and intentionally withheld material information about the true nature of the company's bond



UNOFFICIAL DOCUMENT

transactions and overall financial health. The Officers and Directors fraudulently induced Aiden to sign the Release by misrepresenting it as a breakup fees release, rather than a release intended to avoid liability for their own corporate malfeasance. Notably, Aiden Florida did not sign the Release.

62. On or about September 18, 2024, Aiden Fintech renewed its intent to acquire Bancshares and asserted its right to appoint a director to the Board of Directors.

63. On information and belief, Defendants caused or authorized the issuance of additional shares of treasury stock in one or more Defendant entities, in violation of the corporate bylaws and applicable shareholder agreements. The issuance of these shares had the effect of diluting Aiden Fintech's ownership interest and voting power and was undertaken for the improper purpose of entrenching control in the hands of a few individuals, rather than to advance any legitimate corporate purpose. The Officers and Directors were discussing issuing additional shareholder stock in order to raise the valuation of Pasco.

64. As a shareholder, Aiden Fintech held a contractual and governance right to appoint one or more directors to the board, a right which the Bank Defendants unlawfully abrogated by refusing to recognize or implement Aiden Fintech's appointments.

UNOFFICIAL DOCUMENT

**G. Uncovering of Additional Unlawful Conduct**

65. In late 2024, the Aidens discovered that the above-stated unlawful conduct extended across the entirety of the Officers and Directors.

66. Former director, Chris Black, also discovered these issues, determined that the Board's conduct was illegal, and resigned from Bancshares over these concerns. Mr. Black confirmed that the Board's actions would expose Defendants to significant liability to the Aidens. *See* **Exhibit "F",** Mr. Black's letter to the Board of Directors stating his concerns.

67. The Aidens later learned that certain officers were alleged to have engaged in sexual harassment and an inappropriate relationship with a bank teller, which officer resigned, but the reason

cited was “health issues”, not the actual reason.

68. In addition, the Aidens later learned that the Board of Directors discriminated against the Aidens and disfavored their offers to purchase Pasco because the Aidens’ controlling shareholder was born in Lebanon.

69. Even worse, the Aidens discovered that the reason why the Officers and Directors never presented the Aidens’ offers to the Board of Directors is that its Chairman, Gibbs, had pledged his shareholdings of Pasco and/or Bancshares at $20 dollars a share in order to obtain a loan for his daughter through another bank. If the sale had gone through, Gibbs’ wrongful actions which encumbered his shares would have been revealed. As Gibbs is the largest shareholder, the founder of Pasco, and exercises significant influence on the Officers and Directors, he actively went against the Bank Defendants’ best interests to protect his own misconduct. Importantly, Gibbs would have been forced to recognize a large loss if he had sold significant shareholdings to the Aidens, the main reason why he intentionally failed to disclose the Aidens’ offer to the Board of Directors and shareholders. Gibbs’ behavior was in conscious disregard for the best interests of the Bank Defendants, and further demonstrated recklessness and bad faith and/or with malicious purpose and accordingly, pursuant to § 607.0831, Fla. Stat. has individual liability beyond his culpability as an officer of Bank Defendants.[2]

70. Recognizing that certain of the Officers and Directors were using their positions in Pasco as “piggy banks” to enrich themselves at the expense of the shareholders, and recognizing the malfeasance cited in the preceding paragraphs, Aiden Fintech decided it was time to exit.

## <u>H. Background to the Instant Litigation</u>

71. In summary of the above, the Bank Defendants underwrote USAG and PaySol and

[2] Plaintiffs reserve the right to amend the Complaint to add other Officers and Directors in their individual capacities in accordance with Florida Statutes as appropriate with the discovery of more details surrounding these Defendants’ actions and inactions.



UNOFFICIAL DOCUMENT

executed the ACH Origination Agreements with them, after which USAG and PaySol began to solicit CRB merchants. After Defendants underwrote the CRB merchants, USAG and PaySol entered into MPAs with the CRB merchants. After USAG and PaySol entered into MPAs with the CRB merchants, Pasco began processing ACH transactions for CRB sales.

72. In ACH transactions involving both a TPS (USAG) and a TPSP (PaySol), the flow of funds to the merchant's account typically proceeds as follows: the TPS, acting on behalf of the merchant, initiates the ACH transaction through the ODFI (Pasco); the TPSP facilitates this process by providing technological services, such as formatting the ACH files and transmitting them to the ACH Network, without ever directly handling the funds. Afterwards, the funds are debited from the payer's (CRB merchant's customer) account and credited to the TPS's (USAG) and then TPSP's (PaySol) account before being disbursed to the CRB merchant's account(s).

73. The Office of the Comptroller of the Currency ("OCC") is an independent bureau of the U.S. Treasury Department. The OCC charters, regulates, and supervises all national banks, federal savings associations, and federal branches and agencies of foreign banks, ensuring they operate in a safe and sound manner and comply with applicable laws and regulations.

74. Most likely as a result of their involvement in the cannabis industry, but non-compliance with the industry's standards, recently Pasco was audited by the OCC and thereafter sued by a CRB merchant seeking to impose a constructive trust, soon after which Pasco froze USAG's and PaySol's funds held in deposit accounts titled to their respective names at Pasco. USAG and PaySol currently owe a significant portion of these frozen funds to various CRB merchants with whom they entered into MPAs. While this case has settled between the parties, Pasco continued to keep Plaintiffs' accounts frozen, without providing any sufficient justification for doing so.

75. At the time USAG and PaySol entered the ACH Origination Agreements for Pasco's provision of ACH transaction processing to USAG, PaySol, and their CRB merchants, it was agreed

UNOFFICIAL DOCUMENT

that Pasco would provide such services in good faith and in a reasonable manner and that, in exchange, Pasco and thereby the other Bank Defendants would receive a portion of the monies generated from the transactions originated by USAG and PaySol for their CRB merchants.

76. Providing ACH transaction processing services in a reasonable manner, as Pasco was bound to do, would include, for example, taking reasonable precautions to ensure that funds are not unreasonably withheld from USAG and PaySol and/or their respective CRB merchants, and kept by Bank Defendants.

77. Additionally, providing ACH transaction processing services in good faith would include, ensuring that in the event that proceeds from settled ACH transactions ***were*** withheld, they would only be withheld in a reasonable manner and for a reasonable period of time.

78. Pasco's wrongful withholding of USAG's and PaySol's funds have caused their CRB merchants to enter into MPAs with Plaintiffs' competitors. This merchant attrition has caused great financial harm and damage to Plaintiffs' reputation, which damage is ongoing, and directly caused by Pasco and the Bank Defendants.

79. Most recently, Defendants wrongfully, and without notice or authorization, "zeroed out" all of Plaintiffs' and their respective CRB merchants' deposit accounts titled to them at Pasco, meaning that when Plaintiffs tried to check the balances on these frozen accounts, none of the accounts had any funds in them. When the frozen funds were removed from these accounts, it amounted to a wrongful conversion of property to which the Bank Defendants were not entitled to. As a result of the these deposit account balances being reduced to zero, Plaintiffs suffered further financial harm and merchant attrition, and major disruption to their respective business operations. The Bank Defendants' conduct was done unilaterally and without justification, and have left Plaintiffs uncertain as to the whereabouts of over $2 million in deposits with Pasco, and whether Pasco converted Plaintiffs' funds for its own use.

UNOFFICIAL DOCUMENT

80. At least two of PaySol's merchants have now demanded their funds from PaySol. One of those merchants demanded approximately $700,000 from PaySol, which funds Defendants continue to withhold or have converted to their own use.

**COUNT I – NEGLIGENCE**
(By All Plaintiffs Against Bank Defendants)

Plaintiffs reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

81. Bank Defendants owed USAG and PaySol a duty to exercise reasonable care in the underwriting, processing, and settlement of ACH transactions, especially given the nature of their contractual relationship under the ACH Origination Agreements and Pasco's role as the ODFI and Sponsoring Bank.

82. Bank Defendants each breached this duty by: (i) failing to conduct reasonable due diligence and risk management before entering into ACH Origination Agreements involving CRB merchants; (ii) misrepresenting their regulatory capacity and experience handling CRB ACH transaction processing; (iii) freezing funds owed to and/or existing in USAG's and PaySol's respective deposit accounts at Pasco without notice or reasonable basis, despite contractual and operational obligations to promptly remit/settle such funds.

83. As a direct and proximate result of the Bank Defendants' breaches of such duties by both their actions and inactions, Plaintiffs have suffered and continue to suffer substantial harm, including: (i) loss of CRB merchant and other merchant relationships under MPAs and accounts to competitors; (ii) reputational damage; (iii) financial losses arising from the wrongful freezing USAG's and PaySol's respective deposit accounts titled to them respectively at Pasco; (iv) financial losses from the Bank Defendants' most recent wrongful act of zeroing out and converting USAG's and PaySol's respective deposit accounts without notice or justification; and (v) disruption of



UNOFFICIAL DOCUMENT

Plaintiffs' business operations.

84. Based thereon, Plaintiffs are therefore entitled to damages in an amount to be proven at trial, including consequential and reputational damages, interest, and all other relief this Court deems just and proper.

WHEREFORE, Plaintiffs pray for relief, against Bank Defendants, jointly and severally:

1. For an award of general and special damages in excess of two million dollars ($2,000,000.00) and according to proof at the time of trial;

2. For a temporary restraining order and preliminary injunction compelling Bank Defendants to immediately release Plaintiffs' funds;

3. For a temporary restraining order and preliminary injunction enjoining Defendants from taking any actions that interfere with performance of the ACH Origination Agreements during the pendency of this action;

4. For interest due according to proof, including but not limited to prejudgment interest;

5. For costs of suit as provided by law; and

6. For such other and further relief that the Court considers just and proper.

UNOFFICIAL DOCUMENT

**COUNT II – BREACH OF CONTRACT (DEPOSIT ACCOUNT BREACHES)**
(By Plaintiffs USAG and PaySol Against Bank Defendants)

USAG and PaySol reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

85. USAG and PaySol entered into the ACH Origination Agreements with Pasco.

86. USAG and PaySol performed their obligations under the ACH Origination Agreements.

87. Pasco and Bank Defendants materially breached the Origination Agreements by: (i) freezing and refusing to release ACH funds without notice or cause; (ii) failing to process ACH entries

as submitted; and (iii) "zeroing out" Plaintiffs' deposit accounts and converting their funds.

88. As a direct and proximate result of these breaches, USAG and PaySol have suffered: (i) loss of fees and revenue from ACH transaction processing; (ii) loss of merchant relationships resulting from interrupted services; (iii) operational disruption related to frozen and removed funds; and (iv) out-of-pocket expenses incurred in addressing Defendants' non-performance.

89. USAG and PaySol are entitled to recover damages according to proof at trial, as well as attorneys' fees and costs as provided in the ACH Origination Agreements and under Fla. Stat. § 57.105(7).

WHEREFORE, Plaintiffs, USAG and PaySol pray for relief, against Bank Defendants, jointly and severally:

1. For an award of general and special damages in excess of two million dollars ($2,000,000.00) and according to proof at the time of trial;

2. For a temporary restraining order and preliminary injunction compelling Pasco to immediately release Plaintiffs' funds;

3. For a temporary restraining order and preliminary injunction enjoining Pasco from taking any actions that interfere with performance of the ACH Origination Agreements during the pendency of this action;

4. For interest due according to proof, including but not limited to prejudgment interest;

5. For costs of suit as provided by law; and

6. For such other and further relief that the Court considers just and proper.

**COUNT III – BREACH OF CONTRACT (OTHER BREACHES)**
(By Plaintiffs USAG and PaySol Against Bank Defendants)

USAG and PaySol reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

UNOFFICIAL DOCUMENT

90. USAG and PaySol each entered into the ACH Origination Agreements, valid and binding contracts, with Pasco and Bancshares.

91. The ACH Origination Agreements required Pasco and Bancshares to provide ACH transaction processing services for USAG, PaySol, and their respective merchants, including CRB merchants, in accordance with applicable industry standards and the NACHA Rules.

92. USAG and PaySol performed all conditions, covenants, and obligations required of them under the ACH Origination Agreements, including soliciting and onboarding qualified merchants, submitting ACH transactions, and participating in the underwriting process.

93. The Bank Defendants materially breached the ACH Origination Agreements by: (i) misrepresenting their capacity and regulatory position regarding CRB merchant transactions at the time of contracting; and (ii) failing to act in a commercially reasonable manner, thereby violating both express and implied terms of the ACH Origination Agreements.

94. As a direct and proximate result of Bank Defendants' conduct, USAG and PaySol have suffered: (i) unrecovered costs associated with merchant onboarding and underwriting; (ii) administrative and operational burdens caused by reliance on false or misleading statements; and (iii) internal business losses directly traceable to Bank Defendants' failure to perform as represented.

95. USAG and PaySol are entitled to recover damages according to proof at trial, as well as attorneys' fees and costs as provided in the ACH Origination Agreements and under Fla. Stat. § 57.105(7).

WHEREFORE, Plaintiffs, USAG and PaySol pray for relief, against Bank Defendants, jointly and severally:

1. For an award of general and special damages according to proof at the time of trial;

2. For interest due according to proof, including but not limited to prejudgment interest;

3. For costs of suit as provided by law; and

UNOFFICIAL DOCUMENT

4. For such other and further relief that the Court considers just and proper.

**COUNT IV – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
(By Plaintiffs USAG and PaySol Against Bank Defendants)

USAG and PaySol reallege and incorporate by reference paragraphs 1 through 80, and 85 through 95 as if fully set forth herein.

96. USAG and Pasco, and PaySol and Pasco, entered into valid and enforceable contracts, namely, the ACH Origination Agreements, which contain implied covenants of good faith and fair dealing.

97. The purpose of the ACH Origination Agreements was to provide USAG, PaySol, and their respective merchants, including CRB merchants, with a platform to process ACH transactions and to ensure proper remittance/settlement of funds to USAG, PaySol and their merchants in exchange for shared transaction revenue.

98. Bank Defendants breached the implied covenant of good faith and fair dealing by: (i) arbitrarily freezing and then converting funds existing in USAG's and PaySol's respective deposit accounts without explanation or justification; (ii) failing to notify Plaintiffs of regulatory issues affecting performance or to engage in reasonable communication related thereto; (iii) retaining revenue derived from USAG's and PaySol's efforts while refusing to process ACH transactions or disburse/settle funds resulting from completed ACH transactions; and (iv) withholding performance in a manner that deprived USAG and PaySol of the primary benefit of the ACH Origination Agreements.

99. Bank Defendants' conduct was not merely a breach of express contractual terms but amounted to an abuse of discretion and a violation of the trust and reliance inherent in the parties' business relationship which deprived USAG and PaySol of their respective benefits of the bargain under the ACH Origination Agreements.

UNOFFICIAL DOCUMENT

100. As a direct and proximate result of Bank Defendants bad-faith conduct, USAG and PaySol have suffered and continue to suffer financial losses, reputational harm, and loss of key merchant relationships.

101. USAG and PaySol seek damages in an amount to be proven at trial, as well as any other relief the Court deems just and proper.

WHEREFORE, Plaintiffs, USAG and PaySol pray for relief, against Bank Defendants, jointly and severally:

1. For an award of general and special damages in excess of two million dollars ($2,000,000.00) and according to proof at the time of trial;

2. For a temporary restraining order and preliminary injunction compelling Pasco to immediately release Plaintiffs' funds;

3. For a temporary restraining order and preliminary injunction enjoining Pasco from taking any actions that interfere with performance of the ACH Origination Agreements during the pendency of this action;

4. For interest due according to proof, including but not limited to prejudgment interest;

5. For costs of suit as provided by law; and

6. For such other and further relief that the Court considers just and proper.

UNOFFICIAL DOCUMENT

**COUNT V – BREACH OF FIDUCIARY DUTIES**
(By Plaintiffs Against All Defendants)

Plaintiffs reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

102. Due to the special relationship between the Bank Defendants and the Plaintiffs, wherein Bank Defendants were Sponsoring Banks of USAG and PaySol, the Bank Defendants took on a special role beyond the typical customer relationship, and a fiduciary relationship existed

between Plaintiffs and Defendants arising from: (i) the ACH Origination Agreements for ACH payment processing, which placed Defendants in a position of trust over USAG, PaySol, and their merchants' funds; and (ii) Aiden Fintech's status as a minority shareholder in one or more of the Bank Defendants, entitling Aiden Fintech to fiduciary protections from the Officers and Directors, and Bank Defendants' majority shareholders.

103. In connection with the ACH transaction processing relationship, Defendants accepted and exercised substantial control over Plaintiffs' financial operations, including merchant underwriting, transaction processing, and settlement of funds. Plaintiffs reposed trust and confidence in Defendants, who knowingly accepted such trust and responsibility.

104. As fiduciaries, Defendants owed Plaintiffs the following duties:

(a) The duty of loyalty;

(b) The duty of care;

(c) The duty of good faith, and to place the interests of Plaintiffs above their own;

(d) The duty to act with a superlative degree of frankness and fair dealing;

(e) The duty to disclose all material facts;

(f) The duty to refrain from self-dealing;

(g) The duty of honesty; and

(h) The overall duty to not take unfair advantage and to act in the best interest of Plaintiffs.

105. Defendants breached their respective fiduciary duties by breaching their duty of loyalty and placing their interests above Plaintiffs' interests related to ACH transaction processing and: (i) wrongfully freezing and then converting funds existing in USAG's and PaySol's deposit accounts without notice, explanation, contractual basis, or justification; (ii) failing to properly manage, settle and remit those funds; (iii) misrepresenting their regulatory readiness to support CRB related ACH transactions; and (iv) causing reputational harm to and merchant attrition from USAG

UNOFFICIAL DOCUMENT

and PaySol.

106. Additionally, as a shareholder of Bancshares, Aiden Fintech was entitled to fiduciary duties of loyalty, care, candor, and full disclosure from the Officers and Directors and the Bank Defendants.

107. In January 2022, Aiden Florida submitted a LOI to purchase shares. Unbeknownst to Aiden Florida, Defendants conspired to manipulate Bancshares' financial profile and enrich themselves by selling the high-yield bonds in its bond portfolio and acquiring a portfolio of low-yield bonds.

108. Relying on Defendants' misrepresentations and misstated valuation of the Bank Defendants, Aiden Fintech invested additional capital, obtained a board seat, and, based on incomplete, misrepresented and concealment of information by Defendants, executed the Release in favor of Defendants.

109. At the time of Aiden Fintech's execution of the Release, the Aidens were unaware of the scope of Defendants' misconduct, due to Defendants' willful concealment. In 2023, the Aidens discovered that the misconduct was systemic and involved all or nearly all officers and directors of Bancshares. One director, Chris Black, independently discovered these breaches, resigned from Pasco's Board of Directors, and confirmed that the Board of Directors' actions were illegal and exposed all Defendants to liability.

110. Defendants further breached their fiduciary duties owed to Plaintiffs by: (i) denying Aiden Fintech its contractual right to appoint additional directors to Pasco's and Bancshares's Boards of Directors; (ii) withholding the Bank Defendants' material corporate information from Aiden Fintech; (iii) engaging in unauthorized and improper stock issuances in Bancshares to dilute Aiden Fintech's equity and voting power; and (iv) failing to disclose bona fide purchase offers such as the First Purchase Offer and Second Purchase Offer that would have benefited all of Bancshares'

UNOFFICIAL DOCUMENT

shareholders.

111. These breaches were intentional and committed in bad faith, and constituted self-dealing designed to oppress Aiden Fintech, who is and was a minority shareholder of Bancshares, and unjustly enrich the officers and directors of Bancshares.

112. As a direct and proximate result of Defendants' breaches of fiduciary duties, Plaintiffs have suffered and continue to suffer substantial harm, including but not limited to: (i) termination of MPAs resulting in the loss of merchant accounts and business opportunities; (ii) exclusion from the Bank Defendants' corporate governance; (iii) lost financial opportunities; and (iv) severe reputational and economic harm. Further, Defendants' breaches caused dilution of Aiden Fintech's shareholding and voting rights.

113. Plaintiffs seek compensatory and consequential damages in an amount to be proven at trial, equitable remedies including rescission of the Release, which was procured by fraud, restoration of Aiden Fintech's full shareholder rights, reversal or cancellation of any unauthorized stock issuances to the Officers and Directors, other of Defendants' shareholders and third-parties, and such other relief as the Court deems just and proper.

WHEREFORE, Plaintiffs demands judgment against Defendants for compensatory damages, special damages, interest, costs and such other relief as this Court may deem appropriate.

**COUNT VI – BREACH OF SHAREHOLDER AGREEMENT**
(By USAG and PaySol Against Bank Defendants)

USAG and PaySol reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

114. Aiden Fintech entered into a valid and enforceable agreement, the Treasury Purchase Agreement, with Bancshares. *See* **Exhibit "G"**.

115. Aiden Fintech fully performed its obligations under the Treasury Purchase Agreement

UNOFFICIAL DOCUMENT

or was excused from performance due to Bank Defendants' prior material breaches.

116. Bank Defendants breached the Treasury Purchase Agreement by: (i) issuing stock or altering the capital structure of the Bank Defendants without notice to or approval from Aiden Fintech; (ii) failing to hold meetings, provide reports, or permit participation as required; (iii) taking actions that diluted or impaired Aiden Fintech's ownership rights and economic interest in Bancshares; and (iv) withholding funds and operating decisions from Aiden Fintech in bad faith.

117. These breaches were material and have directly harmed and continue to harm Aiden Fintech by excluding it from corporate governance, reducing the value of its investment, and interfering with its shareholder rights.

118. As a result of Bank Defendants' breaches, Aiden Fintech seeks damages, equitable relief to enforce the Treasury Purchase Agreement, restoration of rights and equity interest, and any other relief deemed just by this Court.

WHEREFORE, Plaintiffs, USAG and PaySol demand judgment against Defendants for compensatory damages, special damages, interest, costs and such other relief as this Court may deem appropriate.

UNOFFICIAL DOCUMENT

## COUNT VII – CONVERSION

(By Plaintiffs USAG and PaySol Against Bank Defendants)

USAG and PaySol reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

119. USAG and PaySol had ownership of, or an immediate right to possess, specific funds held by Bank Defendants arising from ACH transactions processed and settled on behalf of USAG's and PaySol's merchants, including CRB merchants, pursuant to applicable MPAs and the ACH Origination Agreements.

120. These funds were derived from identifiable ACH transactions initiated by USAG and

PaySol and were either contractually owed to USAG and PaySol or held by Bank Defendants solely for the purpose of remitting to USAG, PaySol, and/or their respective merchants.

121. Bank Defendants wrongfully exercised dominion and control over these funds by: (i) wrongfully freezing and then converting funds existing in USAG's and PaySol's deposit accounts without notice, explanation, contractual basis, or justification; (ii) failing to properly manage, settle and remit those funds; (iii) refusing to remit funds owed to USAG and PaySol despite repeated demands; (iv) reducing USAG's and PaySol's account balances to zero without authorization and moving such funds out of their respective deposit accounts; and (v) retaining the benefit of the converted funds for their own use and benefit, and to USAG's and PaySol's detriments.

122. USAG and PaySol did not consent to Bank Defendants' continued control of these funds, and Bank Defendants had no legal right to retain them under the terms of the ACH Origination Agreements or applicable law. USAG and PaySol have demanded that Bank Defendants unfreeze and release these funds, and Bank Defendants have refused to do so, nor to provide any adequate explanation for their actions.

123. As a direct and proximate result of Bank Defendants' wrongful conduct, USAG and PaySol have suffered and continue to suffer significant financial harm, reputational injury, and loss of merchant business.

124. USAG and PaySol are entitled to damages in an amount to be proven at trial, as well as any additional equitable relief deemed appropriate by the Court.

WHEREFORE, Plaintiffs, USAG and PaySol demand judgment against Bank Defendants for compensatory damages, special damages, interest, costs and such other relief as this Court may deem appropriate.

**COUNT VIII – UNJUST ENRICHMENT**
(By USAG and PaySol Against Bank Defendants)

UNOFFICIAL DOCUMENT

USAG and PaySol reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

125. USAG and PaySol conferred substantial financial and operational benefits on Bank Defendants by: (i) generating ACH transaction processing volume through their merchant network; (ii) delivering fees and revenue to Bank Defendants through ACH origination activity; and (iii) allowing Bank Defendants to retain funds in connection with cannabis-related ACH transactions.

126. Bank Defendants were aware of and voluntarily accepted these benefits by processing transactions and holding the associated funds.

127. Despite retaining USAG's PaySol's respective funds and profiting from the ACH transaction processing revenue generated by USAG and PaySol, Bank Defendants failed to: (i) remit/settle owed amounts to USAG and PaySol; or (ii) provide the contracted services in exchange for those benefits. Further, Bank Defendants wrongfully zeroed out USAG's and PaySol's accounts, unjustly retaining funds owed to USAG and PaySol.

128. Under the circumstances, it would be unjust and inequitable for Bank Defendants to retain the financial and reputational benefits derived from USAG's and PaySol's efforts and merchant relationships without proper compensation.

129. USAG and PaySol are entitled to restitution in an amount to be determined at trial, representing the value of the benefits conferred and retained by Defendants.

WHEREFORE, Plaintiffs, USAG and PaySol demand judgment against Bank Defendants for compensatory damages, special damages, interest, costs and such other relief as this Court may deem appropriate.

**COUNT IX – UNFAIR BUSINESS PRACTICES (FDUPTA)**
(By USAG and PaySol Against Bank Defendants)

USAG and PaySol reallege and incorporate by reference paragraphs 1 through 84, 96 through

UNOFFICIAL DOCUMENT

113, and 119 through 124 as if fully set forth herein.

130. This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 et seq., to redress Bank Defendants' deceptive and unfair conduct in the course of trade and commerce.

131. Bank Defendants represented themselves to Plaintiffs as experienced in processing ACH transactions CRB merchants and capable of supporting high-risk merchant portfolios, inducing USAG and PaySol to enter into the ACH Origination Agreements and build out merchant relationships on Bank Defendants' platform.

132. These representations were deceptive and misleading because: (i) Bank Defendants were not capable of managing the regulatory or operational risks associated with ACH transaction processing for CRB merchants; (ii) Bank Defendants failed to disclose regulatory concerns or investigations prior to freezing funds; (iii) Bank Defendants withheld performance and retained funds in a manner designed to harm USAG and PaySol and redirect their merchant relationships; and (iv) Bank Defendants wrongfully zeroed out USAG's and PaySol's deposit accounts without lawful justification, further damaging USAG's and PaySol's business operations.

133. Bank Defendants' conduct constitutes both: (i) deceptive practices, through false or misleading representations of their capabilities; and (ii) unfair practices, through oppressive conduct including freezing funds and failing to remit monies owed.

134. Bank Defendants engaged in these acts in the course of trade or commerce, directly affecting USAG's and PaySol's business operations, merchant relationships, and financial standing.

135. As a direct and proximate result of Bank Defendants' deceptive and unfair conduct, USAG and PaySol have suffered actual damages, including loss of revenue, loss of merchant accounts, reputational damage, and related financial losses.

136. USAG and PaySol seek all available remedies under the Florida Deceptive and Unfair

UNOFFICIAL DOCUMENT

Trade Practices Act (FDUTPA), including injunctive or other equitable relief pursuant to Fla. Stat. § 501.211(1), actual damages pursuant to Fla. Stat. § 501.211(2), attorneys' fees and costs pursuant to Fla. Stat. § 501.2105, and such other relief as this Court deems just and proper.

WHEREFORE, Plaintiffs, USAG and PaySol demand judgment against Bank Defendants for compensatory damages, special damages, interest, costs, attorney's fees and such other relief as this Court may deem appropriate.

**COUNT X – VIOLATION OF BYLAWS**
(By the Aidens Against All Defendants)

The Aidens reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

137. Aiden Fintech is a shareholder of one or more of the Bank Defendants and was entitled to rely upon Defendants' compliance with the governing bylaws of Bank Defendants and any applicable shareholder agreements adopted by those entities.

138. The corporate bylaws govern critical aspects of internal governance and shareholder rights.

139. Defendants violated these bylaws and governing instruments through a pattern of conduct that included: (i) issuing or authorizing the issuance of shares without providing required notice or obtaining shareholder approval; (ii) failing to observe procedural safeguards concerning board resolutions and shareholder communications; (iii) improperly diluting Aiden Fintech's equity interest and voting rights through unauthorized share issuance or restructuring; (iv) withholding material financial, corporate, and operational information from the Aidens; (v) refusing to recognize or allow Aiden Fintech to appoint one or more directors to the board; (vi) concealing or failing to disclose the Aidens' offers to purchase Bank Defendants, which should have been submitted to shareholders for consideration; and (vii) taking corporate actions impacting governance and

UNOFFICIAL DOCUMENT

ownership structure without adherence to proper procedures or shareholder consultation.

140. These actions were taken unilaterally and in bad faith by individuals in control of the Defendants, including the Officers and Directors, with the intent to circumvent Aiden Fintech's contractual and statutory governance rights, entrench their own control, and exclude minority interests from participating in corporate decision-making.

141. As a direct and proximate result of Defendants' violations of the corporate bylaws and applicable shareholder agreements, Aiden Fintech has suffered: (i) financial harm and dilution of its ownership interest; (ii) loss of its governance and voting rights; (iii) exclusion from board representation; and (iv) reputational damage and impairment of its shareholder value.

WHEREFORE, the Aidens seek declaratory and injunctive relief enforcing Aiden Fintech's rights under the bylaws and shareholder agreement, restoration of Aiden Fintech's director appointment rights, reversal or cancellation of any improperly issued shares, an accounting of concealed offers and board actions, compensatory damages, and any additional relief this Court deems just and proper.

**COUNT XI – MINORITY SHAREHOLDER OPPRESSION**
(By Aiden Fintech Against All Defendants)

Aiden Fintech realleges and incorporates by reference paragraphs 1 through 80 as if fully set forth herein.

142. Aiden Fintech is a minority shareholder in one or more of Bank Defendants.

143. Defendants, acting through their majority shareholders, Officers, and Directors, engaged in a systematic course of conduct intended to oppress and freeze out Aiden Fintech from participation in the Bank Defendants.

144. Specific acts of minority shareholder oppression include: (i) refusing to recognize Aiden Fintech's contractual and legal right to appoint directors to the board; (ii) failing to disclose or

UNOFFICIAL DOCUMENT

present to shareholders offers to acquire the company, thus depriving the Aidens of potential exit value or liquidity; (iii) issuing or restructuring shares without approval or notice, thereby diluting Aiden Fintech's ownership interest; (iv) freezing corporate funds, withholding information, and excluding Aiden Fintech from critical decisions affecting corporate direction and value.

145. These actions were unfairly prejudicial, in bad faith, and undertaken to benefit controlling individuals at the direct expense of Aiden Fintech.

146. The Officers and Directors engaged in a pattern of oppressive conduct aimed at marginalizing Aiden Fintech's role as a minority shareholder. This included refusing to recognize Aiden Fintech's contractual right to appoint directors, withholding material corporate information, and excluding Aiden Fintech from participating in key corporate decisions. Such actions were taken in bad faith and with the intent to harm Aiden Fintech's interests. Such actions constitute willful misconduct, breaches of their fiduciary duties, self-dealing, betrayal of trust, and unjust enrichment.

147. As a result, Aiden Fintech has been economically harmed, disenfranchised as a shareholder, and excluded from its rightful role in corporate governance.

WHEREFORE, Plaintiff, Aiden Fintech, seek damages and equitable relief against Defendants, including an accounting, injunctive relief, restoration of shareholder rights, and other remedies deemed appropriate by the Court.

UNOFFICIAL DOCUMENT

**COUNT XII – UNLAWFUL STOCK ISSUANCE**
(By Aiden Fintech Against All Defendants)

Aiden Fintech realleges and incorporates by reference paragraphs 1 through 80 as if fully set forth herein.

148. Aiden Fintech is a shareholder of one or more of Bank Defendants.

149. Defendants issued or authorized the issuance of corporate shares without: (i) providing notice to Aiden Fintech as required under the bylaws or shareholder agreement; (ii) obtaining

shareholder approval or board resolution; (iii) receiving adequate or proper consideration for such shares; or (iv) complying with other procedural or legal requirements under Fla. Stat. §§ 607.0621-607.0624.

150. The issuance of such shares was improper, unlawful, and conducted in a manner that diluted or impaired Aiden Fintech's ownership interest, voting rights, and influence over corporate affairs.

151. These actions were undertaken in bad faith, without transparency, and in furtherance of an oppressive scheme to harm Aiden Fintech's shareholder rights and redistribute control of the corporation.

152. The Officers and Directors, specifically Gibbs, but likely including others, in their capacities as Officers and Directors, knowingly authorized the issuance of additional shares of stock without providing requisite proper notice to Aiden Fintech or obtaining necessary shareholder approval, in direct violation of the corporation's bylaws and Fla. Stat. § 607.0621. This unauthorized stock issuance resulted in the dilution of Aiden Fintech's ownership interest and voting power. The Officers and Directors', and specifically Gibbs's, actions were undertaken with the intent to entrench their control over the Bank Defendants and suppress minority shareholder rights, constituting willful misconduct, breaches of their fiduciary duties, self-dealing, betrayal of trust, and unjust enrichment.

153. As a result of the unlawful stock issuance, Aiden Fintech has suffered loss of equity value, diminished influence over the company, and reputational and economic harm.

WHEREFORE, Plaintiff, Aiden Fintech seeks: (i) a declaration that the unauthorized issuance of shares was invalid; (ii) rescission or cancellation of such shares; (iii) restoration of Aiden Fintech's ownership interest; and (iv) damages and other equitable relief as the Court deems just and proper.

**COUNT XIII – DEMAND FOR INSPECTION OF CORPORATE BOOKS AND RECORDS**

(By Aiden Fintech Against Bank Defendants)

UNOFFICIAL DOCUMENT

Aiden Fintech realleges and incorporates by reference paragraphs 1 through 80 as if fully set forth herein.

154. Aiden Fintech is a current shareholder of one or more Bank Defendants.

155. Pursuant to Fla. Stat. § 607.1602, Aiden is entitled to inspect and copy corporate books and records that are reasonably related to its rights and interests as a shareholder.

156. Such records include, but are not limited to: "(a) Excerpts from minutes of any meeting of, or records of any actions taken without a meeting by, the corporation's board of directors and board committees of the corporation maintained in accordance with s. 607.1601(1); (b) The financial statements of the corporation maintained in accordance with s. 607.1601(2); (c) Accounting records of the corporation; (d) The record of shareholders maintained in accordance with s. 607.1601(4); and (e) Any other books and records." Fla. Stat. § 607.1602.

157. Aiden Fintech has demanded access to such records.

158. Defendants have refused or failed to produce the requested documents and information, thereby violating Aiden's statutory and contractual rights.

159. Inspection of these records is necessary to: (i) evaluate and verify improper stock issuances; (ii) confirm unauthorized governance actions; (iii) determine the status of any buyout offers or concealed transactions; and (iv) protect and assert Aiden Fintech's rights as a shareholder.

160. Aiden Fintech requests all documents, during the time period 2021 to present, relating to: (i) stock issuance; (ii) board meetings regarding appointment of directors; and (iii) offers made to purchase Defendants.

WHEREFORE, Plaintiff, Aiden Fintech, seeks an order compelling Defendants to: (i) produce all relevant corporate books and records for inspection under Fla. Stat. § 607.1602; (ii) permit copying of all requested documents; and (iii) grant such other and further relief as the Court deems just and

UNOFFICIAL DOCUMENT

proper.

**COUNT XIV – FRAUDULENT MISREPRESENTATION**
(By USAG and PaySol Against All Defendants)

Plaintiffs, USAG and PaySol reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

161. Prior to and during the negotiation of the ACH Origination Agreements, Bank Defendants, through their Officers and Directors, made specific and repeated representations to USAG and PaySol that they were experienced, fully capable, and legally positioned to process ACH transactions for CRB merchants.

162. These statements concerned material facts that were central to USAG's and PaySol's respective decisions to enter into business with Bank Defendants and to invest significant time and resources in onboarding CRB merchants through Bank Defendants' ACH payment platform.

163. Defendants knew, or should have known, that these representations were false and misleading. In fact, Bank Defendants lacked the institutional ability and regulatory stability to process high-risk CRB merchant ACH transactions and were likely to suspend or disrupt services in response to regulatory scrutiny, all of which was known by Defendants at the time of making said misrepresentations.

164. Defendants made these misrepresentations with the intent that USAG and PaySol rely upon them in forming business plans, entering agreements, and onboarding merchants.

165. USAG and PaySol reasonably and justifiably relied on Defendants' misrepresentations and acted in reliance by: (i) entering into the ACH Origination Agreements; (ii) developing and expanding a CRB merchant portfolio; and (iii) relying on Defendants for underwriting, processing, and settlement services.

166. As a direct and proximate result of Defendants' fraudulent misrepresentations, USAG

UNOFFICIAL DOCUMENT

and PaySol suffered and continue to suffer damages including lost revenue, loss of merchant accounts, reputational harm, and business disruption.

167. USAG and PaySol are entitled to damages in an amount to be proven at trial, as well as punitive damages, as provided by Fla. Stat. § 768.72, for Defendants' intentional misconduct.

WHEREFORE, Plaintiffs, USAG and PaySol request this Court enter judgment against Defendants, jointly and severally for damages to be proven at trial, punitive damages and such other and further relief as this Court deems just and appropriate.

**COUNT XV – DECLARATORY RELIEF**
(By USAG and PaySol Against All Defendants)

Plaintiffs, USAG and PaySol reallege and incorporate by reference the paragraphs 1 through 80 as if fully set forth herein.

168. An actual, justiciable controversy exists between USAG and PaySol and Defendants concerning the rights, obligations, and duties under the ACH Origination Agreements executed by the parties, and the treatment of funds currently held by Defendants.

169. USAG and PaySol are entitled to immediate release and remittance of the funds held by Bank Defendants, as well as ongoing performance of Bank Defendants' obligations under the ACH Origination Agreements.

170. Bank Defendants dispute or have otherwise failed to affirm their obligations, have refused to remit the funds owed, and have suspended or frozen their performance under the Agreements without cause or authority.

171. USAG and PaySol have a legally protected interest in these funds and in the contractual relationship, which is being materially affected by Defendants' conduct.

172. This Court has jurisdiction to declare the rights and legal relations of the parties under Chapter 86, Florida Statutes.

UNOFFICIAL DOCUMENT

173. USAG and PaySol request a judicial declaration that: (i) Defendants are obligated to remit the funds owed to USAG and PaySol; (ii) Defendants are obligated to continue performing under the ACH Origination Agreements unless and until properly terminated; and (iii) Defendants' current withholding of funds and suspension of services is wrongful and unauthorized.

174. Such a declaration will resolve the uncertainty regarding the parties' legal relationship and guide future conduct.

175. WHEREFORE, Plaintiffs, USAG and PaySol request a judicial declaration that: (i) Defendants are obligated to remit the funds owed to USAG and PaySol; (ii) Defendants are obligated to continue performing under the ACH Origination Agreements unless and until properly terminated; and (iii) Defendants' current withholding of funds and suspension of services is wrongful and unauthorized, and such other and further relief as this Court deems just and appropriate.

**COUNT XVI – INJUNCTIVE RELIEF**
(By USAG and PaySol Against All Defendants)

USAG and PaySol reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

176. Bank Defendants are currently in possession of and have frozen funds that belong to USAG and PaySol and their merchants. These funds were derived from ACH transactions that USAG and PaySol facilitated under the ACH Origination Agreements.

177. USAG and PaySol have no adequate remedy at law, as the freezing of funds has caused and continues to cause irreparable harm, including the loss of merchant relationships, damage to business reputation, and interference with ongoing contractual obligations.

178. USAG and PaySol have a clear legal right to the release of funds and continued performance under the ACH Origination Agreements, which remain in effect and have not been properly terminated.

UNOFFICIAL DOCUMENT

179. Unless Defendants are enjoined, USAG and PaySol will continue to suffer harm that cannot be fully remedied by money damages alone.

180. USAG and PaySol seek preliminary and permanent injunctive relief as follows: (i) compelling Defendants to release all funds currently withheld that are owed to USAG and PaySol and their merchants; (ii) enjoining Defendants from taking any further action to interfere with the performance of the ACH Origination Agreements; and (iii) maintaining the status quo during the pendency of this litigation to avoid further harm.

WHEREFORE, Plaintiffs, USAG and PaySol, seek preliminary and permanent injunctive relief as follows: (i) compelling Bank Defendants to release all funds currently withheld that are owed to USAG and PaySol and their merchants; (ii) enjoining all Defendants from taking any further action to interfere with the performance of the ACH Origination Agreements; (iii) enjoining Defendants from contacting or soliciting customers of USAG or PaySol; and (iv) and maintaining the status quo during the pendency of this litigation to avoid further harm.

UNOFFICIAL DOCUMENT

**COUNT XVII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES**
(By Aiden Fintech Against Officers and Directors, and Gibbs individually)

Plaintiff, Aiden Fintech, realleges and incorporates by reference paragraphs 1 through 80, and 102 through 113, and 137 through 153 as if fully set forth herein.

181. Officers and Directors, specifically Gibbs, and others whose specific identities are unknown at this time, knowingly provided substantial assistance to each other in breaching their fiduciary duties owed to Aiden Fintech.

182. With the assistance of Gibbs, and other Officers and Directors, and possibly the Bank Defendants' outside corporate counsel, these actors provided substantial assistance in the Bank Defendants breaching their fiduciary duties owed to Aiden Fintech.

183. The aiding and abetting and assistance included, but was not limited to, concealing

bona fide offers to purchase Pasco, authorizing the issuance of unauthorized shares to dilute Aiden Fintech's ownership interest in the Bank Defendants, manipulating Bank Defendants' bond portfolio, excluding Aiden Fintech from participating in board decisions, and falsely representing to the Aidens that Defendants were compliant with laws and regulations that would allow Defendants to process ACH transactions that involved cannabis.

184. The Officers and Directors' actions, particularly Gibbs's, as well as outside counsel, were undertaken with knowledge of the breaches and with the intent to further their own interests at the expense of Aiden Fintech.

185. As a direct and proximate result of the Officers and Directors' and specifically Gibbs' conduct, Plaintiffs have suffered damages, including loss of ownership interest, exclusion from corporate governance, and financial harm.

WHEREFORE, Plaintiff. Aiden Fintech, requests this Court enter judgment against the Officers and Directors, and Gibbs individually, jointly and severally for damages to be proven at trial, and such other and further relief as this Court deems just and appropriate.

UNOFFICIAL DOCUMENT

**COUNT XVIII – CIVIL CONSPIRACY**
(By Aiden Fintech Against Gibbs, individually and Officers and Directors)

186. Aiden Fintech realleges and incorporate by reference paragraphs 1 through 80, and 102 through 113, 137 through 153 and 181 through 185 as if fully set forth herein.

187. The Officers and Directors, and Gibbs individually, and possibly others, entered into an agreement to breach their fiduciary duties owed to Aiden Fintech, to convert Plaintiffs' funds for their own use.

188. In furtherance of the agreement, the Officers and Directors, and Gibbs individually, committed overt acts, including concealing offers to purchase the company, issuing unauthorized shares to dilute Aiden Fintech's ownership interest, manipulating Bank Defendants' bond portfolio,

excluding Aiden Fintech from board participation, and falsely representing to Aiden Fintech that Bank Defendants were compliant with laws and regulations that would allow Bank Defendants to process ACH transactions that involved cannabis. Bank Defendants provided documentation to Plaintiffs contemplating that Plaintiffs' transactions involved the sale of cannabis. *See* **Composite Exhibit "H"**.

189. These actions were undertaken with the intent to harm Aiden Fintech and other Plaintiffs and to benefit Defendants personally.

190. As a direct and proximate result of the conspiracy, Plaintiffs have suffered damages, including loss of ownership interest, exclusion from corporate governance, and financial harm.

WHEREFORE, Plaintiff, Aiden Fintech prays for relief, jointly and severally, against Defendants:

1. For an award of general and special damages in excess of two million dollars ($2,000,000.00) and according to proof at the time of trial;

2. For an award of punitive damages pursuant to Fla. Stat. § 768.72, due to Defendants' intentional misconduct, fraud and gross negligence;

3. For interest due according to proof, including but not limited to prejudgment interest;

4. For costs of suit as provided by law; and

5. For such other and further relief that the Court considers just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims set forth in the Complaint.

Dated: May 9, 2025

UNOFFICIAL DOCUMENT

Respectfully submitted,

By: /s/ *Anthony Aragona, III*
Anthony Aragona, III, Esq.
Florida Bar Number: 36676
**GLOBAL LEGAL LAW FIRM PLLC**
200 W Palmetto Park Rd. Suite 302
Boca Raton, Florida 33432
Telephone: (858) 283-7056
aaragona@attorneygl.com

*Attorneys for Plaintiffs,*
U.S. ALLIANCE GROUP, INC.;
PAYMENT SOLUTIONS INTERNATIONAL, LLC;
AIDEN FLORIDA BANCSHARES, INC. and AIDEN FINTECH GROUP, INC.

UNOFFICIAL DOCUMENT

## VERIFICATION

I, Fadi Cheikha, on behalf of Plaintiffs, U.S. Alliance Group, Inc.; Payment Solutions International, LLC; Aiden Florida Bancshares, Inc., and Aiden Fintech Group, Inc., under penalty of perjury, deposes and says:

1. I am the CEO and Director of U.S. Alliance Group, Inc.; I am Manager of Payment Solutions International, LLC; I am Incorporator of Aiden Florida Bancshares, Inc., and I am Chief Executive Officer and Chief Financial Officer of Aiden Fintech Group, Inc., collectively, "Plaintiffs". I am authorized to execute this Verification on its behalf. I am also over the age of eighteen years.

2. I have read the foregoing Verified Complaint ("Verified Complaint"), and I have personal knowledge of the facts set forth therein, as delineated therein, or of these facts as they appear in the business records, reports, memoranda and data compilations of Plaintiffs, made at or near the time of the events described by, or from information transmitted by, a person or persons with knowledge of the events described whose regular practice it was to make and keep such records in the ordinary course of the regularly conducted business activities of Plaintiffs; that I am one of the persons with custody of such records; that I am familiar with the methods and preparation and identity of such records; that I routinely rely on such records in the usually course of my business and the business of Plaintiff.

3. The facts as set forth in the Verified Complaint are true and correct.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

UNOFFICIAL DOCUMENT

Fadi Cheikha, as CEO and Director of U.S. Alliance Group, Inc.; Manager of Payment Solutions International, LLC; and Incorporator of Aiden Florida Bancshares, Inc.; and Chief Executive Officer and Chief Financial Officer of Aiden Fintech Group, Inc.

STATE OF CA
COUNTY OF Orange

BEFORE ME, the undersigned authority, personally appeared, Fadi Cheikha, as CEO and Director of U.S. Alliance Group, Inc.; Manager of Payment Solutions International, LLC; Incorporator of Aiden Florida Bancshares, Inc.; and am Chief Executive Officer and Chief Financial Officer of Aiden Fintech Group, Inc., who is either personally known to me, or who has produced Driver's License as identification, and who, after being by me first duly sworn, deposes and says that he is CEO and Director of U.S. Alliance Group, Inc.; Manager of Payment Solutions International, LLC; and Incorporator of Aiden Florida Bancshares, Inc., and Chief Executive Officer and Chief Financial Officer of Aiden Fintech Group, Inc., Plaintiffs in the above action and is authorized to make this Verification, that he has read the Verified Complaint and that same is true and correct.

SWORN and SUBSCRIBED to this 9th day of May, 2025.
NOTARY PUBLIC, STATE OF CA

By:
Print Name: Caroline Rutenbar
My Comission Expires: August 13, 2026

CAROLINE JEAN RUTENBAR
Notary Public - California
Orange County
Commission # 2412809
My Comm. Expires Aug 13, 2026

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

# EXHIBIT "A"

# First National Bank of Pasco ACH Origination Agreement

## ODFI/Originator

This agreement is made this 3rd day of August by and between: US Alliance Group, Inc. ("The Company") and First National Bank of Pasco ("The Financial Institution").

The Company has requested that the Financial Institution permit it to initiate electronic signals for paperless entries through the Financial Institution to accounts maintained at the Financial Institution and at other financial institutions, by means of Automated Clearing House (the "ACH"). The Financial Institution has agreed to do so based on the terms of the Agreement.

Now, therefore, the Company and the Financial Institution agree as follows:

1. Rules

   The Company acknowledges receipt of a copy of the operating rules of NACHA (as amended from time to time, the "Rules"). The Company agrees to comply with and be bound by the Rules. The Financial Institution agrees to inform the Company of revisions to the Rules of which the Financial Institution has knowledge.

   Initials of Company employee acknowledging receipt: FC

2. Transmission of Entries: Security Procedures

   The Company will transmit all debit and credit entries to the Financial Institution at the location, on or before the deadlines, described on Attachment 4 to the Agreement. The Company will conform all entries to the format, content and specification contained in the Rules, except as provided with the security procedures described in Attachment 1 to the Agreement. Entries will be standard entry class code types listed on Attachment 7. The Company authorizes the Financial Institution to transmit all entries received by the Financial Institution from the Company in accordance with the terms of this Agreement and to credit or debit entries to the specified accounts. The Company agrees to maintain and update computer virus protection that would detect malware or Trojan Horse-type malicious code designed to detect passwords, security codes, etc.

UNOFFICIAL DOCUMENT

3. Financial Institution Obligations
In a timely manner and in accordance with the Rules, the Financial Institution will process, transmit and settle for the entries received from the Company, which comply with the terms of the Agreement, including the security procedures.

4. Warranties
The Company warrants to the Financial Institution all warranties the Financial Institution is deemed by the Rules to make with respect to entries originated by the Company. Without limiting the foregoing, the Company warrants and agrees that (a) each entry is accurate, is timely, has been authorized by the party whose account will be credited or debited and otherwise complies with the Rules; (b) each debited entry is for a sum which, on the settlement date with respect to it, will be owing to the Company from the party whose account will be debited, is for a sum specified by such party to be paid to the Company, or is a correction of a previously transmitted erroneous credit entry; (c) the Company has complied with all pre-notification requirements of the Rules which includes sending pre-notification six days prior to the first production entry and acting on any changes or returns resulting from these pre-notifications; (d) the Company will comply with the terms of the Electronic Funds Transfer Act if applicable, or Uniform Commercial Code Article 4A (UCC4A) if applicable and shall otherwise perform its obligations under this Agreement in accordance with all applicable laws and regulations; (e) the Company will retain the original or copy of the customer authorization record as required by the Rules for a period of not less than two (2) years after termination or revocation of such authorization and will, upon request of Financial Institution, furnish such original or copy to the Financial Institution. The Company shall indemnify the Financial Institution against any loss, liability or expense (including attorneys' fees and expenses) resulting from or arising out of any breach of any of the foregoing warranties or agreements; (f) the Company will comply with U. S. law in regards to origination of ACH entries including but not limited to sanctions enforced by the Office of Foreign Assets Control (OFAC). It shall be the responsibility of the Company to obtain information regarding such OFAC enforced sanctions. (This information may be obtained directly from the OFAC Compliance Hotline at 1-800-540-OFAC.)

UNOFFICIAL DOCUMENT

5. Provisional Credit
The Company acknowledges that the Rules make provisional any credit given for any entry until the Financial Institution crediting the account specified in the entry receives final settlement. If the Financial Institution does not receive final settlement, it is

entitled to a refund from the credited party and the originator of the entry shall not be deemed to have paid the party.

6. Settlement
The Company will maintain an account with the Financial Institution at all times during the term of this Agreement. The Company will maintain in the account as noted in Attachment 4 available funds sufficient to cover all credit entries initiated by it. The Company agrees to maintain a balance to cover returns and adjustments to prior funds credited. Bank may debit any account maintained by the Company at this financial institution or secure necessary collateral to satisfy any amount owing to the financial institution. The Company agrees not to exceed the origination limits also noted in Attachment 4.

7. File Cancellations or Amendment
The Company shall have no right to cancel or amend any entry/file after its receipt by the Financial Institution. However, the Financial Institution shall use reasonable efforts to act on a request by the Company to cancel an entry/file before transmitting it to the ACH or crediting an on-us entry. Any such request shall comply with the security procedures described on Attachment 1 to the Agreement. The Financial Institution shall have no liability if it fails to effect the cancellation.

8. Rejection of Entries
The Financial Institution shall reject any entry, including an on-us entry, which does not comply with the requirements of Section 1 of the Agreement and may reject any entry if the Company is not otherwise in compliance with the terms of the Agreement. The Financial Institution shall notify the Company by telephone of such rejection no later than the business day such entry would otherwise have been transmitted by the Financial Institution to the ACH or, in the case of an on-us entry, its effective entry date. The Financial Institution shall have no liability to the Company by reason of the rejection of any entry of the fact that such notice is not given at an earlier time than that provided for herein. The Financial Institution shall retain the right to reject any on-us transaction for any valid reason such as but not limited to insufficient funds or revoked authorization.

9. Notice of Returned Entries & Requests to Correct Information (NOC's)
The financial Institution shall notify the Company by telephone, fax or email of the receipt of a returned entry or NOC from the ACH no later than one business day after the business day of such receipt. The Financial Institution shall have no obligation to

UNOFFICIAL DOCUMENT

retransmit a returned entry if the Financial Institution complied with the terms of this Agreement with respect to the original entry. If a customer of the Company returns any transaction, then it is the Company's responsibility to collect any funds that are owed. In the event an entry is returned for correction, the Company agrees to make the correction before transmitting subsequent live entry to the receiver. The Company agrees not to originate a transaction where authorization has been revoked. In the event a return entry or NOC sent to the Company is in error, the Company will notify the Financial Institution within one business day of the entryreceipt.

10. Reversals
The Company may initiate a reversing entry of file of entries as permitted by the Rules.

11. Periodic Statement
The periodic statement issued by the Financial Institution for the Company's account will reflect entries credited and debited to the Company's account. The Company agrees to notify the Financial Institution within a reasonable time not to exceed thirty (30) days after the Company receives a periodic statement of any discrepancy between the Company's records and the information in the periodic statement.

12. Fees
The Company agrees to pay the Financial Institution for service provided under the Agreement in accordance with the schedules of charges attached to the Agreement as Attachment 5. The Financial Institution may change its fees from time to time upon notice to the Company and may base fees on account analysis.

13. International ACH Entries (IATs)
FNBP prohibits processing International ACH Entries (IATs).

14. ACK or ATX Entries
If a RDFI generates an ACK or ATK standard entry class code and is received by ODFI it will be the ODFI responsibility to respond as required. An RDFI which supports the ACH acknowledgement process will transmit an ACK or ATX entry so that it is made available to the ODFI no later than the opening of business on the second banking day following the Settlement Date of the CCD or CTX entry to which the acknowledgement relates.

15. Liability
(a) The Financial Institution shall be responsible only for performing the services expressly provided in this Agreement and shall be liable only for its negligence in performing those services. The Financial Institution shall not be responsible for the Company's acts or omission (including without limitation the amount, accuracy,



UNOFFICIAL DOCUMENT

timeliness of transmittal or due authorization of any entry received from the Company) or those of any other person, including without limitation any Federal Reserve Financial Institution or transmission or communications facility, and Receiver or Receiving Depository Financial Institution (including without limitation the return of an Entry by such Receiver or Receiving Depository Financial Institution), and no such person shall be deemed the Financial Institution's agent. The Company agrees to indemnify the Financial Institution against any loss, liability or expense (including attorney's fees and expenses) resulting from or arisingout of any claim of any person that the Financial Institution is responsible for any act or omission of the Company or any other person described in the Section 13 (a).

(b) In no event shall the Financial Institution be liable for any consequential, special, punitive or indirect loss or damage which the Company may incur or suffer in connection with the Agreement, including without limitation loss or damage from subsequent wrongful dishonor resulting from the Financial Institution's acts or omissions pursuant to this Agreement.

(c) Without limiting the generality of the foregoing provisions, the Financial Institution shall be excused from failing to act or delay in acting if such failure or delay is caused by legal constraint, interruption of transmission or communication facilities, equipment failure, war, emergency conditions or other circumstances beyond the Financial Institution's control. In addition, the Financial Institution shall be excused from failing to transmit or delay in transmitting an entry if such transmittal would result in the Financial Institution's having exceeded any limitation upon its intra-day net funds position established pursuant to present or future Federal Reserve guidelines or in the Financial Institution's otherwise violating any provision of any present or future risk control program of the Federal Reserve or any rule or regulation of any other U. S. governmental regulatory authority.

(d) Subject to the foregoing limitations, the Financial Institution's liability for loss shall be limited to general monetary damages not to exceed the total amount paid by the Company for the affected ACH service, as performed by the Financial Institution under this agreement for the preceding 30 calendar days.

(e) In the event of monetary penalties imposed by the National Automated Clearinghouse Association for violation of ACH rules, these penalties will be recovered from the Company if it is deemed by the Financial Institution that the violation was caused by the Company's disregard of these rules.

(f) The Company agrees to hold the Financial Institution harmless for any errors made on the part of a third party provider who creates the ACH file on behalf of the Company. In the event of an error, it is the responsibility of the Company to pursue resolution directly with the third party processor.

UNOFFICIAL DOCUMENT

(g) At any given time, the Financial Institution reserves the right to perform an internal audit of the Company to ensure compliance with the Agreement and NACHA rules.

16. Exposure Limits

The Company shall comply with the monetary file limits established by the Financial Institution (See Maximum File Limits in Attachment 4 of the Agreement).

"*Entry Settlement Limit*" means the maximum aggregate amount of In-Process Entries permitted to be outstanding at any time, which amount shall be separately communicated to the Company by the Financial Institution in writing from time to time.

"*In-Process Entries*" means the aggregate dollar amount of all credit or debit Entries initiated by Company and in process on any date for which settlement has not occurred with respect to credit Entries, or the applicable period for the return of items has not expired with respect to debit Entries.

"*Over Limit Entry*" means an Entry the amount of which would cause the aggregate amount of In-Process Entries to exceed the Entry Settlement Limit.

The Company agrees that the Financial Institution will not process an Over Limit Entry. The Financial Institution will suspend any Over Limit Entry submitted by the Company and may, following its receipt of an Over Limit Entry; suspend all In-Process Entries. The Company acknowledges that any Over Limit Entry or other In-Process Entries suspended by the Financial Institution will not settle on their scheduled Settlement Date. If the Company wishes to initiate an Entry that would cause the amount of In-Process Entries to exceed the Entry Settlement Limit, the Company may submit to the Financial Institution its request to initiate an Entry that otherwise would be an Over Limit Entry.

The Company must submit its request at least one (1) banking day prior to the date on which the Company wishes to initiate the Entry that otherwise would be an Over Limit Entry. The Financial Institution may require from the Company financial or other information in connection with the Financial Institution's consideration of the request. The Financial Institution may grant or deny the Company's request at its sole discretion. In addition to the foregoing, the Financial Institution generally reserves the right to limit the nature and amount of the preauthorized debit/credit Entries processed under this Agreement or to refuse to process any debit/credit Entries under this Agreement if, in the Financial Institution's sole judgment (i) there is reasonable cause to believe that any Entry will be returned or will not settle in the ordinary course of the transaction for any reason, (ii) to do otherwise would violate any limit set by the applicable clearing house association or any governmental authority or agency to control payment system risk, or (iii) a preauthorized credit Entry or the return of a preauthorized debit Entry



UNOFFICIAL DOCUMENT

would create an overdraft of the Company's accounts. If any of the foregoing actions are taken by the Financial Institution with respect to a particular preauthorized debit/credit Entry, the Financial Institution will notify the Company as promptly as practicable, but in no event later than one (1) banking day after its decision.

17. Security Interest
In order to secure the prompt payment and performance of all of the Company's obligations to the Financial Institution under this Agreement, the Company hereby grants to and in favor of the Financial Institution a security interest in, to, and covering all of the Company's accounts maintained by the Company with the Financial Institution, including all amounts (including reserves) held in the accounts at any time and from time to time. In the event the Company initiates insolvency or bankruptcy proceedings, the Financial Institution shall be deemed a secured party for all purposes with respect to the accounts and all amounts held in the accounts.

18. Inconsistency of Name and Account Number
The Company acknowledges that, if an entry describes the receiver inconsistently by name and account number, payment of the entry may be made on the basis of the account number even if it identifies a person different from the named receiver.

19. Data Retention
The Company shall retain data on file adequate to permit remaking of entries for five (5) business days following the date of their transmittal to the Financial Institution upon its request.

UNOFFICIAL DOCUMENT

20. Contingency
In the event the Company cannot create or transmit an ACH file due to hardware or communications outage, it is the responsibility of the Company to have contingency procedures in place. In the event the Financial Institution cannot process the file through normal channels, every effort will be taken by the Financial Institution to find alternate means to process the file. The Financial Institution will not be held liable for delayed files in any case resulting from hardware or communications outages.

21. Reserves
From time to time, the Financial Institution shall evaluate the Company's transaction activity for the purpose of establishing averages for transaction frequency, amount and returns and adjustments. These evaluations will occur at least annually and may occur more frequently at the Financial Institution's discretion. In connection with these evaluations, the Financial Institution reserves the right to require the Company to

establish reserves with the Financial Institution calculated by the Financial Institution to cover the Company's obligations to the Financial Institution arising from ACH activities under the Agreement. Reserves may be expressed as a fixed dollar amount or as a 'rolling reserve' calculated based on 'rolling' averages determined by the Financial Institution's periodic evaluations. The amount of reserves required by the Financial Institution, if any, will be communicated directly to the Company from time to time. The Company agrees to establish reserves as required by the Financial Institution within one business day after receipt of a communication from the Financial Institution setting forth the amount of required reserves and the basis of calculation used to determine the amount of reserves. The Financial Institution may suspend ACH processing activity for the Company if the Company fails to establish the required amount of reserves within the time period specified by the Financial Institution in its communication to the Company.

22. Amendments

From time to time the Financial Institution may amend any of the terms and conditions contained in this Agreement including, without limitation, any cut-off time, any business day and any part of Attachments hereto. Such amendments shall become effective upon receipt of notice by the Company or such later date as may be stated in the Financial Institution's notice to the Company.

23. Termination

The Financial Institution reserves the right to terminate the Agreement at any given time and will do so immediately upon its determination that the Company is in violation of the Rules or applicable laws or if the Company initiates any bankruptcy proceeding or is otherwise declared insolvent. The Company may terminate this Agreement upon thirty (30) days written notice to the Financial Institution. In the event the Company originated debit entries, the Company agrees to maintain an account with the Financial Institution to settle charge backs for a period of 90 days subsequent to the settlement date of the last debit file originated. The Financial Institution shall have no obligation to transmit entries if the Company is in default of any of its obligation under this Agreement, including the obligation to pay the Financial Institution for each credit entry. The Financial Institution shall be entitled to rely on any written notice believed by it in good faith to be signed by one of the Authorized Representatives whose names and signatures are set forth on Attachment 2 to the Agreement.

24. Non-Assignment

The Company may not assign the Agreement or any of the rights or duties to any person without the Financial Institution's prior consent.



UNOFFICIAL DOCUMENT

25. Binding Agreement Benefit
    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns. This Agreement is not for the benefit of any other person, and no other person shall have any right against the Financial Institution or the Company hereunder.

26. Waiver
    The Financial Institution may waive enforcement of any provision of the Agreement. Any such waiver shall not affect the Financial Institution's rights with respect to any other transaction or modify the terms of the Agreement.

27. Headings
    Headings are used for reference purposes only and shall not be deemed a part of this Agreement.

28. Governing Law
    This Agreement shall be construed in accordance with and governed by the laws of the State of Florida and the NACHA rules.

29. Right to Audit Clause
    Based on NACHA Guidelines (Article 2 Subsection 2.2.2.2.f) The right of the ODFI, First National Bank of Pasco to audit the Third-Part Sender's and its Originators' compliance with the Origination Agreement and the NACHA Rules.

***Company:***

Fadil, CEO — Signature

Fadi Cheikha — Print Name

CEO — Title

8/3/22 — Date

***First National Bank of Pasco:***

Signature — Print Name

Title — Date

UNOFFICIAL DOCUMENT

## ATTACHMENT 1: SECURITY PROCEDURES

The Financial Institution shall be entitled to rely on any written notice or other written communications believed by it in good faith to be genuine and to have been signed by the Authorized Representative, and any such communication shall be deemed to have been signed by such person.

Transmission of files will be agreed upon by one of the following three ways:

☒ **File Upload**

The Company's Authorized Representative(s), as noted in Attachment 2,will upload the file of their requested ACH entries to the secure file sharing system provided by the Financial Institution by 3:00 pm est. a minimum of one day prior to the date the entries are to settle. In the event the Company or the Authorized Representative(s) is unable to upload the file, the Company will be responsible for arranging alternative delivery of the ACH entries and totals verifications by the aforementioned deadline by contacting the Financial Institution immediately for alternative delivery methods.

The Financial Institution will anticipate the receipt of the email from the Company on each scheduled processing date identified by the Company in writing and agreed to by the Financial Institution. The Company's Authorized Representative(s) will notify the Financial Institution if a transmission does not take place on the prearranged scheduled processing date. The Company is responsible for ensuring the Financial Institution received the transmission on each processing date indicated in the processing schedule. The Company will not submit files or anticipate settlement of entries on bank non-processing dates noted in Attachment 6.

The Financial Institution will verify that the file totals agree with the Company information given by email which will include but is not limited to the total of the file and the effective date of the transactions. In the event of a discrepancy in the totals, the Financial Institution will call or email the specified Company Authorized Representative(s) designated by an authorized signatory of the Company. If an Authorized Representative(s) is not available for notification, then the file will not be processed until the Company's Authorized Representative(s) can be contacted on the next business day.

The Company is solely responsible for the accurate creation, modification and deletion of the account information maintained on the Company's personal computer. The Company is solely responsible for access by its employees of the data files maintained on the Company's computer. The company will need to submit in writing any requests for cancellations or amendments to these processing terms no less than 30 days prior to the change and must come from an account holder not just an authorized representative(s).

UNOFFICIAL DOCUMENT

☐ **Facsimile File Transmission:**

The Company's Authorized Representative, as noted in Attachment 2, will fax their requested ACH entries to the Financial Institution by 12:00 pm a minimum of one day prior to the date the entries are to settle. The Company's Authorized Representative will also provide the Financial Institution with the verification of totals contained in the transmission by sending a fax to the Financial Institution's ACH Contact. In the event the Company or the Authorized Representative is unable to fax the information, the Company will be responsible for arranging alternative delivery of the ACH entries and totals verifications by the aforementioned deadline.

The Financial Institution will anticipate the receipt of a fax transmission from the Company on each scheduled processing date identified by the Company in writing and agreed to by the Financial Institution. The Company's Authorized Representative will notify the Financial Institution if a transmission will not take place on the prearranged scheduled processing date. The Company is responsible for ensuring that the Financial Institution received the transmission on each processing date indicated in the processing schedule. The Company will not submit files or anticipate settlement of entries on bank non-processing dates noted in Attachment 6.

The Financial Institution will verify that the file totals agree with the Company information given by fax or phone. In the event of a discrepancy in the totals, the Financial Institution will call the specified Company Authorized Representative designated by an authorized signatory of the Company. If an Authorized Representative is not available for notification, then the file will not be processed until the Company's Authorized Representative can be contacted on the next business day.

The Company is solely responsible for the accurate creation, modification and deletion of the account information maintained on the Company's personal computer. The Company is solely responsible for access by its employees of the data files maintained on the Company's computer.

UNOFFICIAL DOCUMENT

☒ **Internet Banking File Transmission:**

The Company's Authorized Representative, as noted in Attachment 2, will log in to Internet Banking and complete or upload the file of their requested ACH entries to the Financial Institution by 12:00 pm a minimum of one day prior to the date the entries are to settle. In the event the Company or the Authorized Representative is unable to log in to Internet Banking and complete or upload the file, the Company will be responsible for arranging alternative delivery of the ACH entries and totals verifications by the aforementioned deadline.

The Financial Institution will anticipate the receipt of the email from the Company on each scheduled processing date identified by the Company in writing and agreed to by the Financial Institution. The Company's Authorized Representative will notify the Financial Institution if a transmission will not take place on the prearranged scheduled processing date. The Company is responsible for ensuring the Financial Institution received the transmission on each processing date indicated in the processing schedule. The Company will not submit files or anticipate settlement of entries on bank non-processing dates noted in Attachment 6. The Financial Institution will verify that the file totals agree with the Company information given by email or phone. In the event of a discrepancy in the totals, the Financial Institution will call the specified Company Authorized Representative designated by an authorized signatory of the Company. If an Authorized Representative is not available for notification, then the file will not be processed until the Company's Authorized Representative can be contacted on the next business day.

The Company is solely responsible for the accurate creation, modification and deletion of the account information maintained on the Company's personal computer. The Company is solely responsible for access by its employees of the data files maintained on the Company's computer.

UNOFFICIAL DOCUMENT

**Location for transmittal of ACH Files:**

Bank Name: First National Bank of Pasco

| ACH Contact | Email Address | Phone Number |
|---|---|---|
| Jeanne Boles | jboles@fnbpasco.com | (352) 521-7252 |
| Jamie Hamm | jhamm@fnbpasco.com | (352)521-7248 |
| | Fax Number | |
| | (352) 567-1777 | |

## ATTACHMENT 2: ACH AUTHORIZED SIGNATURE AND USER PERMISSION FORM

Date: 8/3/22 Company Name: US Allianco Group, Inc.

The 2 signatures below are the signatures of employees vested by our Board of Directors with full authority to sign transmittal registers used in conjunction with the deposit of ACH files.

| NAME | SIGNATURE |
|---|---|
| 1. Fadi Cheikha | [signature] |
| 2. Caroline Rutenbar | [signature] |
| 3. | |
| 4. | |
| 5. | |

UNOFFICIAL DOCUMENT

| NAME | CREATE/EDIT/DELETE | AUTHORIZE | AUTHORIZE SELF |
|---|---|---|---|
| 1. Ryan McQuown | all | ☐ | ☐ |
| 2. Erik Johnson | all | ☐ | ☐ |
| 3. Daniel Gunn | all | ☐ | ☐ |
| 4. | | ☐ | ☐ |
| 5. | | ☐ | ☐ |

**Authorized email addresses from which ACH files will be sent:**

| |
|---|
| ach@usag-inc.com |
| ryan.mcquown@usag-inc.com |
| erik.johnson@usag-inc.com |
| daniel.gunn@usag-inc.com |
| |

Company chooses one of the following file transmission methods:

☒ File Upload ◯ Fax transmission

◯ Internet Banking

Fadi Cheikha
Print Authorized Name

[signature]
Authorized Signature

CEO
Title

8/3/22
Date

Exception Reporting

(A) In event of a possible security violation, contacts, including alternate are:

Ryan McQuown
Print Name

(714) 321-7027
Phone

Caroline Rutenbar
Print Name

(949) 702-2126
Phone

(B) File discrepancies and/or rejects should be reported to:

Same as above
Print Name

Phone

Same as above
Print Name

Phone

UNOFFICIAL DOCUMENT

## ATTACHMENT 3: ACH FAX FILE TRANSMITTAL FORM

### ACH Fax
### File Transmittal

To:______________________________Date: ______________________________

Originator
Name: ______________________________________

Debits
Total:__________________Count:___________Effective Date: ___________

Credits
Total:__________________Count:___________Effective Date: ___________

Number of Prenotes: ________________

Authorized By:

______________________________________
Signature

______________________________ ______________________
Print Name Title

UNOFFICIAL DOCUMENT

## ATTACHMENT 4: PROCESSING SCHEDULE
## (For Corporate Originators)

**All files are required to be prefunded with available funds**

**Types of expected originated entries:** PPD/CCD credits & debits
**Frequency of expected originated entries:** daily Monday-Friday

**Entry settlement date to customer's account**
Account number for settlement purposes: don't have yet

***Debit entries to Company's account***

Files submitted by Customer, funds must be in account to satisfy debit by:
Effective entry date of credit items contained in file

Adjustments/Returns, funds will be made available to Customer on:
Effective entry date of adjustments/returns

***Credit entries to Company's account***

Files submitted by Customer, funds will be made available to Customer on:
Effective entry date of debit items contained in file

Adjustments/Returns, funds must be in account to satisfy debit by:
Effective entry date of adjustments/returns

UNOFFICIAL DOCUMENT

File Origination Limits

| | |
|---|---|
| Per Batch File Limit: | $ 200 M |
| Maximum Daily Origination: | $ 100 M |
| Maximum Monthly Origination: | $ 500 M |
| Maximum Per Transaction | $ 1,000,000 (1 M) |

**SEC Code/Transmission Types Allowed**

- [x] PPD Debit
- [x] PPD Credit
- [ ] RCK Debit
- [ ] ARC Debit
- [ ] POP Debit
- [ ] TEL Debit
- [x] CCD Debit
- [x] CCD Credit
- [ ] POP Debit
- [ ] IAT Credit
- [x] WEB Debit

Time Frame for Submission of Files

12PM PST 3 EST

***Debit Files***

Must be submitted to the Financial Institution no later than one banking day by 12:00 pm prior to the effective date of the file.

***Credit files***

Must be submitted to the Financial Institution no later than one banking day by 12:00 pm prior to the effective date of the file.

12PM PST 3 EST

Fadi Cheikha

Print Authorized Name

Authorized Signature

CEO

Title

8/3/22

Date

UNOFFICIAL DOCUMENT

## ATTACHMENT 5: FEE SCHEDULE

Bank reserves the right to revisit fee schedule on an annual basis beginning January 1, 2023.

| | |
|---|---|
| **One-time fees** | |
| Installation/Training | Waived |
| **Regular monthly fees** | |
| Administration fee | Waived |
| **File and Transaction Fees** | |
| File handling fee | Waived |
| Debit items originated | \$0.035 per item for low-risk merchants. \$0.10 per item for Tribal or Payday Lending merchants. |
| Credit items originated | \$0.035 per item for low-risk merchants. \$0.10 per item for Tribal or Payday Lending merchants. |
| Pre-note items originated | \$0.035 per item for low-risk merchants. \$0.10 per item for Tribal or Payday Lending merchants. |
| Return items | \$10.00 per item |
| Received Notifications of Change | Waived |

Fee Acknowledgement:

Fadi Cheikha
Print Authorized Name

[signature]
Authorized Signature

CEO
Title

8/3/22
Date

Bank Employee Name

Bank Employee Signature

Title

Date

UNOFFICIAL DOCUMENT

## ATTACHMENT 6: FEDERAL RESERVE BANK HOLIDAY SCHEDULE (Non-Processing Days)

- New Year's Day
- Martin Luther King Jr.'s Birthday
- President's Day
- Memorial Day
- Juneteenth Day
- Independence Day
- Labor Day
- Columbus Day
- Veteran's Day
- Thanksgiving Day
- Christmas Day
- Weekends (Saturday/Sunday)

Companies should not submit or expect settlement on originated files on the days listed above.

According to the standard Federal Reserve Bank holiday schedule, should any of the above listed holiday's fall on a Sunday, the next following Monday will be considered a non-bank working day and Companies should not submit or expect settlement on originated files.

UNOFFICIAL DOCUMENT

## ATTACHMENT 7: TYPES OF ENTRIES

The Financial Institution will transmit debit and/or credit Entries initiated by the Company to the ACH Network as provided in the *NACHA Operating Rules* (referred to as the "Rules") and this Agreement. As used in this Agreement, the following are ACH Standard Entry Class Codes (SEC):

- ***ARC - Accounts Receivable Entry*** - An ACH debit created from a check received in the U.S. Mail or a drop box location and converted to an ACH debit. (Refer to NACHA Rules regarding items eligible for check conversion).
- ***BOC – Back Office Conversion*** – During back office processing, an ACH debit is created from a check received at the point of check being tendered or received at a "manned" bill payment location for in-person payments. (Refer to NACHA Rules regarding items eligible for check conversion).
- ***CCD – Corporate Credit or Debit*** – Either a credit or debit where funds are either distributed or consolidated between corporate entities.
- ***CTX - Corporate Trade Exchange*** –The transfer of funds (debit or credit) within a trading partner relationship in which payments related information is placed in multiple addenda records.
- ***POP - Point-Of-Purchase-*** ACH debit application used by Originators as a method of payment for the in-person purchase of goods or services by receivers (check conversion). (Refer to NACHA Rules regarding items eligible for check conversion).
- ***PPD - Prearranged Payment and Deposit***
  - **Direct Deposit** - The transfer of funds into a consumer's account. Funds being deposited can represent a variety of products, such as payroll, interest, pension, dividends, etc.
  - **Direct Payment** - Preauthorized payment is a debit application. This includes recurring bills that do not vary in amount -- insurance premiums, mortgage payments, charitable contributions, and installment loan payments or standing authorizations where the amount does vary, such as utility payments.
- ***RCK - Re-presented Check*** - An ACH debit application used by originators to re-present a consumer check that has been processed through the check collection system and returned because of insufficient or uncollected funds. (Refer to NACHA Rules regarding items eligible for check conversion).
- ***TEL - Telephone-Initiated Entry*** – This is used for the origination of a single Entry debit transaction to a consumer's account pursuant to an oral authorization obtained from the consumer via the telephone.
- ***WEB- Internet-Initiated Entry*** - A debit Entry or enrollment in recurring debit to a consumer account initiated by an Originator pursuant to an authorization that is obtained from the receiver via the Internet.

The above SEC Codes are the most commonly-used.



UNOFFICIAL DOCUMENT

The following table shows the proper SEC Codes to use depending on how the Company obtained the authorization to debit/credit an individual or company's account:

| ***SEC Code*** | ***Debit / Credit*** | ***Authorization Method*** |
|---|---|---|
| PPD | Debit or Credit | Document signed by individual or similarly authenticated |
| CCD, CTX | Debit or Credit | Document signed or verbal agreement by Company* |
| WEB | Debit Only | Via the Internet |
| TEL | Debit Only | Verbal authorization via the telephone. (phone line must be recorded line or notice sent) |
| POP | Debit Only | Check converted to electronic transaction at the Point-of-Purchase. Signature is required on authorization form |
| BOC | Debit Only | In-person presented check converted to electronic transaction during back office processing. Notice provided at point of check being tendered and purchaser takes it. |
| ARC | Debit Only | Check received via mail/courier and converted to electronic transaction. Notice on statement for each transaction |
| RCK | Debit Only | Notice equals authorization |

UNOFFICIAL DOCUMENT

* All transactions from a business account must be CCD or CTX. Please see the CCD and CTX definition in the section above or refer to the NACHA Rules for a detailed explanation.

## ATTACHMENT 8: UCC ARTICLE 4A DISCLOSURE

First
National Bank of Pasco

## UCC ARTICLE 4A DISCLOSURE

### DISCLOSURES REGARDING ELECTRONIC "WHOLESALE CREDIT" TRANSACTIONS SUBJECT TO UNIFORM COMMERCIAL CODE ARTICLE 4A

**PROVISIONAL PAYMENT**

Credit given by First National Bank of Pasco ("us or we") to you ("owners or holders of the deposit, including their authorized representatives") with respect to an automated clearing house credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making payment to you via such entry (i.e. the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**NOTICE OF RECEIPT OF ENTRY**

Under the operating rules of the National Automated Clearing House Association, (NACHA) which are applicable to ACH transactions involving your account, we are not required to give next day notice to you of receipt of an ACH item and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statement we provide to you.

**CHOICE OF LAW**

We may accept on your behalf payments to your account which have been transmitted through one or more Automated Clearing Houses ("ACH") and which are not subject to the Electronic Funds Transfer Act and your rights and obligations with respect to such payments shall be construed in accordance with and governed by the laws of the state of Florida, unless it has otherwise specified in a separate agreement that the law of some other state shall govern.

**For questions, please call or write:**
First National Bank of Pasco
13315 U. S. Hwy. 301
Dade City, FL 33525
(352) 521-0141

UNOFFICIAL DOCUMENT

## ATTACHMENT 9: GLOSSARY

"ACH Network" means the funds transfer system (network) governed by the NACHA Rules which provides for the inter-financial institution clearing of electronic entries for participating financial institutions.

"Account" means a demand deposit account or other deposit account Company has with Financial Institution that Financial Institution permits to be linked to a Service.

"Agreement" means the Agreement for ACH Origination, which may change from time to time. All references to Agreement include all Schedules, Addendums and User Guides Financial Institution provides to Company from time to time.

"Effective Entry Date" means the date placed on an ACH transaction by the Originator of the transaction or the ODFI – it is normally the date the Originator or ODFI intends the transfer to take place.

"Electronic Funds Transfer Act" means the law passed by the US congress in 1978, which set out the rights and obligations of consumers and their financial institutions regarding the use of electronic systems to transfer funds. This act is implemented in the Federal Reserve Bank's Regulation E.

"Entries" mean Credit Entries and Debit Entries, including On-Us Entries consistent with the NACHA Rules and also includes any data for entries or any prenotification entries.

"File" means a group of ACH entries stored for delivery to an ACH receiving point.

"ODFI or Originating Depository Financial Institution" means financial institutions that originate ACH transactions on behalf of its customers. ODFI's must abide by the NACHA Operating Rules.

"Originator" means a company, individual or entity that initiates entries into the ACH Network.

"Password" means confidential, unique personal numbers, codes, marks, signs, public keys or other information composed of a string of characters used as a means of authenticating and accessing a Service.

"RDFI or Receiving Depository Financial Institution" means a financial institution qualified by NACHA to receive ACH transactions.

UNOFFICIAL DOCUMENT

"Regulation E" means the regulation published by the Federal Reserve Bank to implement the Electronic Fund Transfer Act mandating consumer rights and obligation with regard to electronic fund transfers.

"Return Entry or Return Entries" mean any item, which cannot be processed and is being returned by the RDFI to the ODFI for correction or re-initiation.

"Rules" mean the NACHA Operating Rules which provide a complete guide to the Rules and Regulations governing the ACH Network.

"SEC Codes" or Standard Entry Class codes mean the three-character code within an ACH company/batch header, which identifies the type of transactions within that batch (e.g. CCD, CTX, PPD, etc.).

"Security Procedures" means, unless we agree otherwise with you, the applicable security requirements and procedure for verifying the authenticity of Entries.

"Service" means the ACH Services and features of those services which Financial Institution may provide from time to time to Financial Institution's commercial or small business customers.

"Settlement Date" means the date on which settlement occurs, i.e., funds actually change hands as a result of an ACH entry.

"Uniform Commercial Code Article 4A (UCC4A)" means the portion of the Uniform Commercial Code which deals with certain funds transfers, including ACH credit transactions not subject to the Electronic Fund Transfer Act of Regulation E. This law outlines the protections and responsibilities given to the parties to wholesale credit transactions, and sets the legal standard for commercially reasonable security procedures to be used in conjunction with those transactions.

UNOFFICIAL DOCUMENT

## ATTACHMENT 10: DIRECT PAYMENT AUTHORIZATION AGREEMENT

**First National Bank of Pasco**
Direct Payment Authorization Agreement

| Payment Authorization Start Date |
| --- |
| ______________ |

Amount $________________________ Δ weekly Δ monthly Δ quarterly

**Mail to**: Accounting Dept., First National Bank of Pasco, 13315 U.S. Hwy. 301, Dade City, FL 33525

I/We hereby authorize **First National Bank of Pasco** to initiate entries to my/our account at the financial institution indicated below for my/our ______________________________________________, to include all future amounts charged. I/We also authorize the financial institution to withdraw these payments from my/our account.

Name: ______________________________________________________________

Lot # ______________ Phone Number: ____________________________________
(if required)

Financial Institution Name: ____________________________________________

Account Number: ____________________________________________________

This authorization for the transfer of funds is to remain in full force and effect until ______________________________________________ has received written notification from me (or either of us) of its termination. This authorization agreement or written notice **must be provided 15 days prior to the effective date** as to afford ______________________________________________ and First National Bank of Pasco a reasonable opportunity to act on it.

UNOFFICIAL DOCUMENT

Signer:_____________________________________________Date: ____________

Signer:_____________________________________________Date: ____________

***Please Attach a Voided Check and Last Copy of Coupon (if required)***

UNOFFICIAL DOCUMENT

# EXHIBIT "B"

# First National Bank of Pasco
# ACH CRB Origination Agreement
ODFI/Originator

This agreement is made this 3rd day of August by and between Payment Solutions International, LLC ("The Company") and First National Bank of Pasco ("The Financial Institution").

The Company has requested that the Financial Institution permit it to initiate electronic signals for paperless entries through the Financial Institution to accounts maintained at the Financial Institution and at other financial institutions, by means of Automated Clearing House (the "ACH"). The Financial Institution has agreed to do so based on the terms of the Agreement.

UNOFFICIAL DOCUMENT

Now, therefore, the Company and the Financial Institution agree as follows:

1. Rules
   The Company acknowledges receipt of a copy of the operating rules of NACHA (as amended from time to time, the "Rules"). The Company agrees to comply with and be bound by the Rules. The Financial Institution agrees to inform the Company of revisions to the Rules of which the Financial Institution has knowledge.

   Initials of Company employee acknowledging receipt: FC

2. Transmission of Entries: Security Procedures
   The Company will transmit all debit and credit entries to the Financial Institution at the location, on or before the deadlines, described on Attachment 4 to the Agreement. The Company will conform all entries to the format, content and specification contained in the Rules, except as provided with the security procedures described in Attachment 1 to the Agreement. Entries will be standard entry class code types listed on Attachment 7. The Company authorizes the Financial Institution to transmit all entries received by the Financial Institution from the Company in accordance with the terms of this Agreement and to credit or debit entries to the specified accounts. The Company agrees to maintain and update computer virus protection that would detect malware or Trojan Horse-type malicious code designed to detect passwords, security codes, etc.

3. Financial Institution Obligations
In a timely manner and in accordance with the Rules, the Financial Institution will process, transmit and settle for the entries received from the Company, which comply with the terms of the Agreement, including the security procedures.

4. Warranties
The Company warrants to the Financial Institution all warranties the Financial Institution is deemed by the Rules to make with respect to entries originated by the Company. Without limiting the foregoing, the Company warrants and agrees that (a) each entry is accurate, is timely, has been authorized by the party whose account will be credited or debited and otherwise complies with the Rules; (b) each debited entry is for a sum which, on the settlement date with respect to it, will be owing to the Company from the party whose account will be debited, is for a sum specified by such party to be paid to the Company, or is a correction of a previously transmitted erroneous credit entry; (c) the Company has complied with all pre-notification requirements of the Rules which includes sending pre-notification six days prior to the first production entry and acting on any changes or returns resulting from these pre-notifications; (d) the Company will comply with the terms of the Electronic Funds Transfer Act if applicable, or Uniform Commercial Code Article 4A (UCC4A) if applicable and shall otherwise perform its obligations under this Agreement in accordance with all applicable laws and regulations; (e) the Company will retain the original or copy of the customer authorization record as required by the Rules for a period of not less than two (2) years after termination or revocation of such authorization and will, upon request of Financial Institution, furnish such original or copy to the Financial Institution. The Company shall indemnify the Financial Institution against any loss, liability or expense (including attorneys' fees and expenses) resulting from or arising out of any breach of any of the foregoing warranties or agreements; (f) the Company will comply with U. S. law in regard to origination of ACH entries including but not limited to sanctions enforced by the Office of Foreign Assets Control (OFAC). It shall be the responsibility of the Company to obtain information regarding such OFAC enforced sanctions. (This information may be obtained directly from the OFAC Compliance Hotline at 1-800-540-OFAC.)



UNOFFICIAL DOCUMENT

5. Provisional Credit
The Company acknowledges that the Rules make provisional any credit given for any entry until the Financial Institution crediting the account specified in the entry receives final settlement. If the Financial Institution does not receive final settlement, it is entitled to a refund from the credited party and the originator of the entry shall not be deemed to have paid the party.

6. Settlement
The Company will maintain an account with the Financial Institution at all times during the term of this Agreement. The Company will maintain in the account as noted in Attachment 4 available funds sufficient to cover all credit entries initiated by it. The Company agrees to maintain a balance to cover returns and adjustments to prior funds credited. Bank may debit any account maintained by the Company at this financial institution or secure necessary collateral to satisfy any amount owing to the financial institution. The Company agrees not to exceed the origination limits also noted in Attachment 4.

7. File Cancellations or Amendment
The Company shall have no right to cancel or amend any entry/file after its receipt by the Financial Institution. However, the Financial Institution shall use reasonable efforts to act on a request by the Company to cancel an entry/file before transmitting it to the ACH or crediting an on-us entry. Any such request shall comply with the security procedures described on Attachment 1 to the Agreement. The Financial Institution shall have no liability if it fails to affect the cancellation.

8. Rejection of Entries
The Financial Institution shall reject any entry, including an on-us entry, which does not comply with the requirements of Section 1 of the Agreement and may reject any entry if the Company is not otherwise in compliance with the terms of the Agreement. The Financial Institution shall notify the Company by telephone of such rejection no later than the business day such entry would otherwise have been transmitted by the Financial Institution to the ACH or, in the case of an on-us entry, its effective entry date. The Financial Institution shall have no liability to the Company by reason of the rejection of any entry of the fact that such notice is not given at an earlier time than that provided for herein. The Financial Institution shall retain the right to reject any on-

UNOFFICIAL DOCUMENT

us transaction for any valid reason such as but not limited to insufficient funds or revoked authorization.

9. Notice of Returned Entries & Requests to Correct Information (NOC's)
   The financial Institution shall notify the Company by telephone, fax or email of the receipt of a returned entry or NOC from the ACH no later than one business day after the business day of such receipt. The Financial Institution shall have no obligation to retransmit a returned entry if the Financial Institution complied with the terms of this Agreement with respect to the original entry. If a customer of the Company returns any transaction, then it is the Company's responsibility to collect any funds that are owed. In the event an entry is returned for correction, the Company agrees to make the correction before transmitting subsequent live entry to the receiver. The Company agrees not to originate a transaction where authorization has been revoked. In the event a return entry or NOC sent to the Company is in error, the Company will notify the Financial Institution within one business day of the entry receipt.

10. Reversals
    The Company may initiate a reversing entry of file of entries as permitted by the Rules.

11. Periodic Statement
    The periodic statement issued by the Financial Institution for the Company's account will reflect entries credited and debited to the Company's account. The Company agrees to notify the Financial Institution within a reasonable time not to exceed thirty (30) days after the Company receives a periodic statement of any discrepancy between the Company's records and the information in the periodic statement.

12. Fees
    The Company agrees to pay the Financial Institution for service provided under the Agreement in accordance with the schedules of charges attached to the Agreement as Attachment 5. The Financial Institution may change its fees from time to time upon notice to the Company and may base fees on account analysis.

13. International ACH Entries (IATs)
    FNBP prohibits processing International ACH Entries (IATs).

UNOFFICIAL DOCUMENT

14. ACK or ATX Entries

If a RDFI generates an ACK or ATK standard entry class code and is received by ODFI it will be the ODFI responsibility to respond as required. An RDFI which supports the ACH acknowledgement process will transmit an ACK or ATX entry so that it is made available to the ODFI no later than the opening of business on the second banking day following the Settlement Date of the CCD or CTX entry to which the acknowledgement relates.

15. Liability

(a) The Financial Institution shall be responsible only for performing the services expressly provided in this Agreement and shall be liable only for its negligence in performing those services. The Financial Institution shall not be responsible for the Company's acts or omission (including without limitation the amount, accuracy, timeliness of transmittal or due authorization of any entry received from the Company) or those of any other person, including without limitation any Federal Reserve Financial Institution or transmission or communications facility, and Receiver or Receiving Depository Financial Institution (including without limitation the return of an Entry by such Receiver or Receiving Depository Financial Institution), and no such person shall be deemed the Financial Institution's agent. The Company agrees to indemnify the Financial Institution against any loss, liability or expense (including attorney's fees and expenses) resulting from or arising out of any claim of any person that the Financial Institution is responsible for any act or omission of the Company, or any other person described in the Section 13 (a).

(b) In no event shall the Financial Institution be liable for any consequential, special, punitive or indirect loss or damage which the Company may incur or suffer in connection with the Agreement, including without limitation loss or damage from subsequent wrongful dishonor resulting from the Financial Institution's acts or omissions pursuant to this Agreement.

(c) Without limiting the generality of the foregoing provisions, the Financial Institution shall be excused from failing to act or delay in acting if such failure or delay is caused by legal constraint, interruption of transmission or communication facilities, equipment failure, war, emergency conditions or other circumstances beyond the Financial Institution's control. In addition, the Financial Institution shall be excused from failing to transmit or delay in transmitting an entry if such transmittal would result in the Financial Institution's having exceeded any limitation upon its intra-day net funds position established pursuant to present or future Federal Reserve guidelines or in the Financial Institution's otherwise violating any provision of any

UNOFFICIAL DOCUMENT

present or future risk control program of the Federal Reserve or any rule or regulation of any other U. S. governmental regulatory authority.

(d) Subject to the foregoing limitations, the Financial Institution's liability for loss shall be limited to general monetary damages not to exceed the total amount paid by the Company for the affected ACH service, as performed by the Financial Institution under this agreement for the preceding 30 calendar days.

(e) In the event of monetary penalties imposed by the National Automated Clearinghouse Association for violation of ACH rules, these penalties will be recovered from the Company if it is deemed by the Financial Institution that the violation was caused by the Company's disregard of these rules.

(f) The Company agrees to hold the Financial Institution harmless for any errors made on the part of a third-party provider who creates the ACH file on behalf of the Company. In the event of an error, it is the responsibility of the Company to pursue resolution directly with the third-party processor.

(g) At any given time, the Financial Institution reserves the right to perform an internal audit of the Company to ensure compliance with the Agreement and NACHA rules.

16. Exposure Limits

The Company shall comply with the monetary file limits established by the Financial Institution (See Maximum File Limits in Attachment 4 of the Agreement).

"*Entry Settlement Limit*" means the maximum aggregate amount of In-Process Entries permitted to be outstanding at any time, which amount shall be separately communicated to the Company by the Financial Institution in writing from time to time.

"*In-Process Entries*" means the aggregate dollar amount of all credit or debit Entries initiated by Company and in process on any date for which settlement has not occurred with respect to credit Entries, or the applicable period for the return of items has not expired with respect to debit Entries.

"*Overlimit Entry*" means an Entry the amount of which would cause the aggregate amount of In-Process Entries to exceed the Entry Settlement Limit.

The Company agrees that the Financial Institution will not process an Overlimit Entry. The Financial Institution will suspend any Overlimit Entry submitted by the Company and may, following its receipt of an Overlimit Entry; suspend all In-Process Entries. The Company acknowledges that any Overlimit Entry or other In-Process Entries suspended by the Financial Institution will not settle on their scheduled Settlement Date. If the Company wishes to initiate an Entry that would cause the amount of In-Process Entries

UNOFFICIAL DOCUMENT

to exceed the Entry Settlement Limit, the Company may submit to the Financial Institution its request to initiate an Entry that otherwise would be an Overlimit Entry. The Company must submit its request at least one (1) banking day prior to the date on which the Company wishes to initiate the Entry that otherwise would be an Overlimit Entry. The Financial Institution may require from the Company financial or other information in connection with the Financial Institution's consideration of the request. The Financial Institution may grant or deny the Company's request at its sole discretion. In addition to the foregoing, the Financial Institution generally reserves the right to limit the nature and amount of the preauthorized debit/credit Entries processed under this Agreement or to refuse to process any debit/credit Entries under this Agreement if, in the Financial Institution's sole judgment (i) there is reasonable cause to believe that any Entry will be returned or will not settle in the ordinary course of the transaction for any reason, (ii) to do otherwise would violate any limit set by the applicable clearing house association or any governmental authority or agency to control payment system risk, or (iii) a preauthorized credit Entry or the return of a preauthorized debit Entry would create an overdraft of the Company's accounts. If any of the foregoing actions are taken by the Financial Institution with respect to a particular preauthorized debit/credit Entry, the Financial Institution will notify the Company as promptly as practicable, but in no event later than one (1) banking day after its decision.

17. Security Interest

In order to secure the prompt payment and performance of all of the Company's obligations to the Financial Institution under this Agreement, the Company hereby grants to and in favor of the Financial Institution a security interest in, to, and covering all of the Company's accounts maintained by the Company with the Financial Institution, including all amounts (including reserves) held in the accounts at any time and from time to time. In the event the Company initiates insolvency or bankruptcy proceedings, the Financial Institution shall be deemed a secured party for all purposes with respect to the accounts and all amounts held in the accounts.

18. Inconsistency of Name and Account Number

The Company acknowledges that, if an entry describes the receiver inconsistently by name and account number, payment of the entry may be made on the basis of the account number even if it identifies a person different from the named receiver.

UNOFFICIAL DOCUMENT

19. Data Retention

The Company shall retain data on file adequate to permit remaking of entries for five (5) business days following the date of their transmittal to the Financial Institution upon its request.

20. Contingency

In the event the Company cannot create or transmit an ACH file due to hardware or communications outage, it is the responsibility of the Company to have contingency procedures in place. In the event the Financial Institution cannot process the file through normal channels, every effort will be taken by the Financial Institution to find alternate means to process the file. The Financial Institution will not be held liable for delayed files in any case resulting from hardware or communications outages.

21. Reserves

From time to time, the Financial Institution shall evaluate the Company's transaction activity for the purpose of establishing averages for transaction frequency, amount and returns and adjustments. These evaluations will occur at least annually and may occur more frequently at the Financial Institution's discretion. In connection with these evaluations, the Financial Institution reserves the right to require the Company to establish reserves with the Financial Institution calculated by the Financial Institution to cover the Company's obligations to the Financial Institution arising from ACH activities under the Agreement. Reserves may be expressed as a fixed dollar amount or as a 'rolling reserve' calculated based on 'rolling' averages determined by the Financial Institution's periodic evaluations. The amount of reserves required by the Financial Institution, if any, will be communicated directly to the Company from time to time. The Company agrees to establish reserves as required by the Financial Institution within one business day after receipt of a communication from the Financial Institution setting forth the amount of required reserves and the basis of calculation used to determine the amount of reserves. The Financial Institution may suspend ACH processing activity for the Company if the Company fails to establish the required amount of reserves within the time period specified by the Financial Institution in its communication to the Company.

22. Amendments

From time to time the Financial Institution may amend any of the terms and conditions contained in this Agreement including, without limitation, any cut-off time, any business day and any part of Attachments hereto. Such amendments shall become



UNOFFICIAL DOCUMENT

effective upon receipt of notice by the Company or such later date as may be stated in the Financial Institution's notice to the Company.

23. Termination
The Financial Institution reserves the right to terminate the Agreement at any given time and will do so immediately upon its determination that the Company is in violation of the Rules or applicable laws or if the Company initiates any bankruptcy proceeding or is otherwise declared insolvent. The Company may terminate this Agreement upon thirty (30) days written notice to the Financial Institution. In the event the Company originated debit entries, the Company agrees to maintain an account with the Financial Institution to settle charge backs for a period of 90 days subsequent to the settlement date of the last debit file originated. The Financial Institution shall have no obligation to transmit entries if the Company is in default of any of its obligation under this Agreement, including the obligation to pay the Financial Institution for each credit entry. The Financial Institution shall be entitled to rely on any written notice believed by it in good faith to be signed by one of the Authorized Representatives whose names and signatures are set forth on Attachment 2 to the Agreement.

UNOFFICIAL DOCUMENT

24. Non-Assignment
The Company may not assign the Agreement or any of the rights or duties to any person without the Financial Institution's prior consent.

25. Binding Agreement Benefit
This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns. This Agreement is not for the benefit of any other person, and no other person shall have any right against the Financial Institution or the Company hereunder.

26. Waiver
The Financial Institution may waive enforcement of any provision of the Agreement. Any such waiver shall not affect the Financial Institution's rights with respect to any other transaction or modify the terms of the Agreement.

27. Headings
Headings are used for reference purposes only and shall not be deemed a part of this Agreement.

28. Governing Law

    This Agreement shall be construed in accordance with and governed by the laws of the State of Florida and the NACHA rules.

29. Right to Audit Clause

    Based on NACHA Guidelines (Article 2 Subsection 2.2.2.2.f) The right of the ODFI, First National Bank of Pasco to audit the Third-Part Sender's and its Originators' compliance with the Origination Agreement and the NACHA Rules.

***Company:***

| | |
|---|---|
| [signature], CFO | Fadi Cheikha |
| Signature | Print Name |
| Manager | 8/3/22 |
| Title | Date |

***First National Bank of Pasco:***

| | |
|---|---|
| | |
| Signature | Print Name |
| | |
| Title | Date |

UNOFFICIAL DOCUMENT

## ATTACHMENT 1: SECURITY PROCEDURES

The Financial Institution shall be entitled to rely on any written notice or other written communications believed by it in good faith to be genuine and to have been signed by the Authorized Representative, and any such communication shall be deemed to have been signed by such person.

Transmission of files will be agreed upon by one of the following three ways:

☒ **File Upload**

The Company's Authorized Representative(s), as noted in Attachment 2,will upload the file of their requested ACH entries to the secure file sharing system provided by the Financial Institution by 3:00 pm est. a minimum of one day prior to the date the entries are to settle. In the event the Company or the Authorized Representative(s) is unable to upload the file, the Company will be responsible for arranging alternative delivery of the ACH entries and totals verifications by the aforementioned deadline by contacting the Financial Institution immediately for alternative delivery methods.

The Financial Institution will anticipate the receipt of the email from the Company on each scheduled processing date identified by the Company in writing and agreed to by the Financial Institution. The Company's Authorized Representative(s) will notify the Financial Institution if a transmission does not take place on the prearranged scheduled processing date. The Company is responsible for ensuring the Financial Institution received the transmission on each processing date indicated in the processing schedule. The Company will not submit files or anticipate settlement of entries on bank non-processing dates noted in Attachment 6.

The Financial Institution will verify that the file totals agree with the Company information given by email which will include but is not limited to the total of the file and the effective date of the transactions. In the event of a discrepancy in the totals, the Financial Institution will call or email the specified Company Authorized Representative(s) designated by an authorized signatory of the Company. If an Authorized Representative(s) is not available for notification, then the file will not be processed until the Company's Authorized Representative(s) can be contacted on the next business day.

The Company is solely responsible for the accurate creation, modification and deletion of the account information maintained on the Company's personal computer. The Company is solely responsible for access by its employees of the data files maintained on the Company's computer. The company will need to submit in writing any requests for cancellations or amendments to these processing terms no less than 30 days prior to the change and must come from an account holder not just an authorized representative(s).

DUPLICATE DOCUMENT

☐ **Facsimile File Transmission**

The Company's Authorized Representative, as noted in Attachment 2, will fax their requested ACH entries to the Financial Institution by 12:00 pm a minimum of one day prior to the date the entries are to settle. The Company's Authorized Representative will also provide the Financial Institution with the verification of totals contained in the transmission by sending a fax to the Financial Institution's ACH Contact. In the event the Company or the Authorized Representative is unable to fax the information, the Company will be responsible for arranging alternative delivery of the ACH entries and totals verifications by the aforementioned deadline.

The Financial Institution will anticipate the receipt of a fax transmission from the Company on each scheduled processing date identified by the Company in writing and agreed to by the Financial Institution. The Company's Authorized Representative will notify the Financial Institution if a transmission does not take place on the prearranged scheduled processing date. The Company is responsible for ensuring that the Financial Institution received the transmission on each processing date indicated in the processing schedule. The Company will not submit files or anticipate settlement of entries on bank non-processing dates noted in Attachment 6.

The Financial Institution will verify that the file totals agree with the Company information given by fax or phone. In the event of a discrepancy in the totals, the Financial Institution will call the specified Company Authorized Representative designated by an authorized signatory of the Company. If an Authorized Representative is not available for notification, then the file will not be processed until the Company's Authorized Representative can be contacted on the next business day.

The Company is solely responsible for the accurate creation, modification and deletion of the account information maintained on the Company's personal computer. The Company is solely responsible for access by its employees of the data files maintained on the Company's computer.

UNOFFICIAL DOCUMENT

☐ **Internet Banking File Transmission**

The Company's Authorized Representative, as noted in Attachment 2, will log in to Internet Banking and complete or upload the file of their requested ACH entries to the Financial Institution by 12:00 pm est. a minimum of one day prior to the date the entries are to settle. In the event the Company or the Authorized Representative is unable to log in to Internet Banking and complete or upload the file, the Company will be responsible for arranging alternative delivery of the ACH entries and totals verifications by the aforementioned deadline.

The Financial Institution will anticipate the receipt of the email from the Company on each scheduled processing date identified by the Company in writing and agreed to by the Financial Institution. The Company's Authorized Representative will notify the Financial Institution if a transmission does not take place on the prearranged scheduled processing date. The Company is responsible for ensuring the Financial Institution received the transmission on each processing date indicated in the processing schedule. The Company will not submit files or anticipate settlement of entries on bank non-processing dates noted in Attachment 6.

The Financial Institution will verify that the file totals agree with the Company information given by email or phone. In the event of a discrepancy in the totals, the Financial Institution will call the specified Company Authorized Representative designated by an authorized signatory of the Company. If an Authorized Representative is not available for notification, then the file will not be processed until the Company's Authorized Representative can be contacted on the next business day.

The Company is solely responsible for the accurate creation, modification and deletion of the account information maintained on the Company's personal computer. The Company is solely responsible for access by its employees of the data files maintained on the Company's computer.

**Location for transmittal of ACH Files:**

Bank Name: First National Bank of Pasco

| ACH Contact | Email Address | Phone Number |
|---|---|---|
| Jeanne Boles | jboles@fnbpasco.com | (352) 521-7252 |
| Jamie Hamm | jhamm@fnbpasco.com | (352)521-7248 |
| | Fax Number | |
| | (352) 567-1777 | |

UNOFFICIAL DOCUMENT

## ATTACHMENT 2: ACH AUTHORIZED SIGNATURE AND USER PERMISSION FORM

Date: 8/3/22 Company Name: Payment Solutions International

The 2 signatures below are the signatures of employees vested by our Board of Directors with full authority to sign transmittal registers used in conjunction with the deposit of ACH files.

UNOFFICIAL DOCUMENT

| NAME | SIGNATURE |
|---|---|
| 1. Fadi Cheikha | [signature] |
| 2. Caroline Rutenbar | [signature] |
| 3. | |
| 4. | |
| 5. | |

| NAME | CREATE/EDIT/DELETE | AUTHORIZE | AUTHORIZE SELF |
|---|---|---|---|
| 1. Ryan McQuown | all | ☐ | ☐ |
| 2. Erik Johnson | all | ☐ | ☐ |
| 3. Daniel Gunn | all | ☐ | ☐ |
| 4. | | ☐ | ☐ |
| 5. | | ☐ | ☐ |

**Authorized email addresses from which ACH files will be sent:**

| |
|---|
| ach@usag-inc.com |
| Ryan.mcquown@usag-inc.com |
| erik.johnson@usag-inc.com |
| daniel.gunn@usag-inc.com |
| |

Company chooses one of the following file transmission methods:

(X) File Upload ◯ Fax transmission

◯ Internet Banking

Fadi Cheikha
Print Authorized Name

[signature]
Authorized Signature

Manager
Title

8/3/22
Date

Exception Reporting

(A) In event of a possible security violation, contacts, including alternate are:

Ryan McQuown — (714) 321-7027
Print Name — Phone

Caroline Rutenbar — (949) 702-2126
Print Name — Phone

(B) File discrepancies and/or rejects should be reported to:

same as above
Print Name — Phone

Same as above

Revised 06/2022

UNOFFICIAL DOCUMENT

Print Name Phone

## ATTACHMENT 3: ACH FAX FILE TRANSMITTAL FORM

UNOFFICIAL DOCUMENT

### ACH Fax
### File Transmittal

To: ______________________ Date: ______________________

Originator Name: ______________________

Debits Total: ______________ Count: __________ Effective Date: __________

Credits Total: ______________ Count: __________ Effective Date: __________

Number of Prenotes: ______________

Authorized By:

______________________
Signature

______________________ ______________________
Print Name Title

Revised 06/2022

## ATTACHMENT 4: PROCESSING SCHEDULE
**(For Corporate Originators)**

**All files are required to be prefunded with available funds**

**Types of expected originated entries:** PPD / CCD credits & debits
**Frequency of expected originated entries:** daily Monday - Friday

**Entry settlement date to customer's account**
Account number for settlement purposes: don't have yet

***Debit entries to Company's account***
Files submitted by Customer; funds must be in account to satisfy debit by:
Effective entry date of credit items contained in file

Adjustments/Returns, funds will be made available to Customer on:
Effective entry date of adjustments/returns

***Credit entries to Company's account***
Files submitted by Customer; funds will be made available to Customer on:
Effective entry date of debit items contained in file

Adjustments/Returns, funds must be in account to satisfy debit by:
Effective entry date of adjustments/returns

UNOFFICIAL DOCUMENT

File Origination Limits

| | |
|---|---|
| Per Batch File Limit: | 300 M |
| Maximum Daily Origination: | 150 M |
| Maximum Monthly Origination: | 500 M |
| Maximum Per Transaction | 200,000 |

**SEC Code/Transmission Types Allowed**

- [x] PPD Debit
- [x] PPD Credit
- [ ] RCK Debit
- [ ] ARC Debit
- [ ] POP Debit
- [ ] TEL Debit
- [x] CCD Debit
- [x] CCD Credit
- [ ] POP Debit
- [ ] IAT Credit
- [x] WEB Debit

Time Frame for Submission of Files

***Debit Files***

Must be submitted to the Financial Institution no later than one banking day by 3:00 pm EST prior to the effective date of the file.

***Credit files***

Must be submitted to the Financial Institution no later than one banking day by 3:00 pm EST prior to the effective date of the file.

Fadi Cheikha
Print Authorized Name

[signature], CEO
Authorized Signature

Manager
Title

8/3/22
Date

UNOFFICIAL DOCUMENT

## ATTACHMENT 5: FEE SCHEDULE

| | |
|---|---|
| One-time fees<br>Installation/Training | Waived |
| Annual Self-Assessment/Bank Review & Rule Book fee of | $ 75.00 |
| CRB Compliance monthly fee | Built into ACH Transaction Fees |
| Per ACH Transaction either debit or credit: | $0.05 or a minimum monthly fee of $2,500.00 for the initial 3 months; thereafter a minimum fee of $5,000.00 per month |
| Fee Acknowledgement: | Bank reserves the right to revisit fee schedule on an annual basis beginning January 1, 2023. |

Fadi Cheikha
Print Authorized Name

[signature] CEO
Authorized Signature

Manager
Title

8/3/22
Date

Bank Employee Name

Bank Employee Signature

Title

Date

UNOFFICIAL DOCUMENT

## ATTACHMENT 6: FEDERAL RESERVE BANK HOLIDAY SCHEDULE (Non-Processing Days)

- New Year's Day
- Martin Luther King Jr.'s Birthday
- President's Day
- Memorial Day
- Juneteenth Day
- Independence Day
- Labor Day
- Columbus Day
- Veteran's Day
- Thanksgiving Day
- Christmas Day
- Weekends (Saturday/Sunday)

Companies should not submit or expect settlement on originated files on the days listed above.

According to the standard Federal Reserve Bank holiday schedule, should any of the above listed holiday's fall on a Sunday, the next following Monday will be considered a non-bank working day and Companies should not submit or expect settlement on originated files.

UNOFFICIAL DOCUMENT

## ATTACHMENT 7: TYPES OF ENTRIES

The Financial Institution will transmit debit and/or credit Entries initiated by the Company to the ACH Network as provided in the *NACHA Operating Rules* (referred to as the "Rules") and this Agreement. As used in this Agreement, the following are ACH Standard Entry Class Codes (SEC):

- ***ARC - Accounts Receivable Entry -*** An ACH debit created from a check received in the U.S. Mail or a drop box location and converted to an ACH debit. (Refer to NACHA Rules regarding items eligible for check conversion).
- ***BOC – Back Office Conversion*** – During back-office processing, an ACH debit is created from a check received at the point of check being tendered or received at a "manned" bill payment location for in-person payments. (Refer to NACHA Rules regarding items eligible for check conversion).
- ***CCD – Corporate Credit or Debit –*** Either a credit or debit where funds are either distributed or consolidated between corporate entities.
- ***CTX - Corporate Trade Exchange*** –The transfer of funds (debit or credit) within a trading partner relationship in which payments related information is placed in multiple addenda records.
- ***POP - Point-Of-Purchase-*** ACH debit application used by Originators as a method of payment for the in-person purchase of goods or services by receivers (check conversion). (Refer to NACHA Rules regarding items eligible for check conversion).
- ***PPD - Prearranged Payment and Deposit***
  - **Direct Deposit** - The transfer of funds into a consumer's account. Funds being deposited can represent a variety of products, such as payroll, interest, pension, dividends, etc.
  - **Direct Payment** - Preauthorized payment is a debit application. This includes recurring bills that do not vary in amount -- insurance premiums, mortgage payments, charitable contributions, and installment loan payments or standing authorizations where the amount does vary, such as utility payments.
- ***RCK - Re-presented Check -*** An ACH debit application used by originators to re-present a consumer check that has been processed through the check collection system and returned because of insufficient or uncollected funds. (Refer to NACHA Rules regarding items eligible for check conversion).
- ***TEL - Telephone-Initiated Entry*** – This is used for the origination of a single Entry debit transaction to a consumer's account pursuant to an oral authorization obtained from the consumer via the telephone.
- ***WEB- Internet-Initiated Entry*** - A debit Entry or enrollment in recurring debit to a consumer account initiated by an Originator pursuant to an authorization that is obtained from the receiver via the Internet.

UNOFFICIAL DOCUMENT

The above SEC Codes are the most commonly used.

The following table shows the proper SEC Codes to use depending on how the Company obtained the authorization to debit/credit an individual or company's account:

| ***SEC Code*** | ***Debit / Credit*** | ***Authorization Method*** |
|---|---|---|
| PPD | Debit or Credit | Document signed by individual or similarly authenticated |
| CCD, CTX | Debit or Credit | Document signed or verbal agreement by Company* |
| WEB | Debit Only | Via the Internet |
| TEL | Debit Only | Verbal authorization via the telephone. (Phone line must be recorded line or notice sent) |
| POP | Debit Only | Check converted to electronic transaction at the Point-of-Purchase. Signature is required on authorization form |
| BOC | Debit Only | In-person presented check converted to electronic transaction during back-office processing. Notice provided at point of check being tendered and purchaser takes it. |
| ARC | Debit Only | Check received via mail/courier and converted to electronic transaction. Notice on statement for each transaction |
| RCK | Debit Only | Notice equals authorization |

UNOFFICIAL DOCUMENT

* All transactions from a business account must be CCD or CTX. Please see the CCD and CTX definition in the section above or refer to the NACHA Rules for a detailed explanation.

## ATTACHMENT 8: UCC ARTICLE 4A DISCLOSURE

First
National Bank of Pasco

## UCC ARTICLE 4A DISCLOSURE

### DISCLOSURES REGARDING ELECTRONIC "WHOLESALE CREDIT" TRANSACTIONS SUBJECT TO UNIFORM COMMERCIAL CODE ARTICLE 4A

UNOFFICIAL DOCUMENT

**PROVISIONAL PAYMENT**

Credit given by First National Bank of Pasco ("us or we") to you ("owners or holders of the deposit, including their authorized representatives") with respect to an automated clearing house credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making payment to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**NOTICE OF RECEIPT OF ENTRY**

Under the operating rules of the National Automated Clearing House Association, (NACHA) which are applicable to ACH transactions involving your account, we are not required to give next day notice to you of receipt of an ACH item and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statement we provide to you.

**CHOICE OF LAW**

We may accept on your behalf payments to your account which have been transmitted through one or more Automated Clearing Houses ("ACH") and which are not subject to the Electronic Funds Transfer Act and your rights and obligations with respect to such payments shall be construed in accordance with and governed by the laws of the state of Florida, unless it has otherwise specified in a separate agreement that the law of some other state shall govern.

**For questions, please call or write:**
First National Bank of Pasco
13315 U. S. Hwy. 301
Dade City, FL 33525
(352) 521-0141

## ATTACHMENT 9: GLOSSARY

"ACH Network" means the funds transfer system (network) governed by the NACHA Rules which provides for the inter-financial institution clearing of electronic entries for participating financial institutions.

"Account" means a demand deposit account or other deposit account Company has with Financial Institution that Financial Institution permits to be linked to a Service.

"Agreement" means the Agreement for ACH Origination, which may change from time to time. All references to Agreement include all Schedules, Addendums and User Guides Financial Institution provides to Company from time to time.

"Effective Entry Date" means the date placed on an ACH transaction by the Originator of the transaction or the ODFI – it is normally the date the Originator or ODFI intends the transfer to take place.

"Electronic Funds Transfer Act" means the law passed by the US congress in 1978, which set out the rights and obligations of consumers and their financial institutions regarding the use of electronic systems to transfer funds. This act is implemented in the Federal Reserve Bank's Regulation E.

"Entries" mean Credit Entries and Debit Entries, including On-Us Entries consistent with the NACHA Rules and also includes any data for entries or any prenotification entries.

"File" means a group of ACH entries stored for delivery to an ACH receiving point.

"ODFI or Originating Depository Financial Institution" means financial institutions that originate ACH transactions on behalf of its customers. ODFI's must abide by the NACHA Operating Rules.

"Originator" means a company, individual or entity that initiates entries into the ACH Network.

UNOFFICIAL DOCUMENT

"Password" means confidential, unique personal numbers, codes, marks, signs, public keys or other information composed of a string of characters used as a means of authenticating and accessing a Service.

"RDFI or Receiving Depository Financial Institution" means a financial institution qualified by NACHA to receive ACH transactions.

"Regulation E" means the regulation published by the Federal Reserve Bank to implement the Electronic Fund Transfer Act mandating consumer rights and obligation with regard to electronic fund transfers.

"Return Entry or Return Entries" mean any item, which cannot be processed and is being returned by the RDFI to the ODFI for correction or re-initiation.

"Rules" mean the NACHA Operating Rules which provide a complete guide to the Rules and Regulations governing the ACH Network.

"SEC Codes" or Standard Entry Class codes mean the three-character code within an ACH company/batch header, which identifies the type of transactions within that batch (e.g., CCD, CTX, PPD, etc.).

"Security Procedures" means, unless we agree otherwise with you, the applicable security requirements and procedure for verifying the authenticity of Entries.

"Service" means the ACH Services and features of those services which Financial Institution may provide from time to time to Financial Institution's commercial or small business customers.

"Settlement Date" means the date on which settlement occurs, i.e., funds actually change hands as a result of an ACH entry.

"Uniform Commercial Code Article 4A (UCC4A)" means the portion of the Uniform Commercial Code which deals with certain funds transfers, including ACH credit transactions not subject to the Electronic Fund Transfer Act of Regulation E. This law outlines the protections and responsibilities given to the parties to wholesale credit transactions and sets the legal standard for commercially reasonable security procedures to be used in conjunction with those transactions.

UNOFFICIAL DOCUMENT

## ATTACHMENT 10: DIRECT PAYMENT AUTHORIZATION AGREEMENT

**First National Bank of Pasco**
Direct Payment Authorization Agreement

| Payment Authorization Start Date |
|---|
| ______________ |

Amount $ ______________________ ☐ weekly ☐ monthly ☐ quarterly

**Mail to**: Accounting Dept., First National Bank of Pasco, 13315 U.S. Hwy. 301, Dade City, FL 33525

I/We hereby authorize **First National Bank of Pasco** to initiate entries to my/our account at the financial institution indicated below for my/our ____________________________________________, to include all future amounts charged. I/We also authorize the financial institution to withdraw these payments from my/our account.

Name: ______________________________________________________________

Lot # _____________ Phone Number: ____________________________________
(If required)

Financial Institution Name: _________________________________________________

Account Number: _______________________________________________________

This authorization for the transfer of funds is to remain in full force and effect until ____________________________________________ has received written notification from me (or either of us) of its termination. This authorization agreement or written notice **must be provided 15 days prior to the effective date** as to afford ____________________________________________ and First National Bank of Pasco a reasonable opportunity to act on it.

Signer: ____________________________________________ Date: ____________

Signer: ____________________________________________ Date: ____________

***Please Attach a Voided Check and Last Copy of Coupon (if required)***

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

# EXHIBIT "C"

First National Bank of Pasco
ESTD 1986

SPECIALTY BANKING
First National Bank of Pasco

To Whom It May Concern

Re: US Alliance Group, Inc.

Please let this letter serve as confirmation that on November 20, 2023, First National Bank of Pasco has approved to sponsor US Alliance Group, Inc. DBA: Regala Card, DBA Electronic Cash Systems ▯ECS▯, DBA Levl Pay, DBA Payment Solution International ▯Paysol▯ for the following:

- Credit / Debit Processing
- ATM Processing
- ACH Processing
- PIN Debit Processing
- Ecommerce Debit Processing
- Ecommerce Credit Processing
- Gi▯ and loyalty
- Bill Pay
- Push Payment

For the following type of merchants, contingent upon due diligence, and compliance requirements of the US Government, Card Schemes and Networks:

- Money Service Businesses
- State Licensed cannabis related businesses in states with legalized programs for cannabis use, as long as it meets compliance requirements.
- CBD or Hemp excluding Delta 8, Delta 9, or any other Hemp derived product. causing a euphoric ▯high▯ feeling.
- Retail merchants
- Restaurants

UNOFFICIAL DOCUMENT

- Medical
- Professional services
- Online and ECommerce services
- Transportation and delivery
- Mail order and telephone order.

First National Bank of Pasco has registered US Alliance Group, Inc. into the following Networks:

- Accel Network
- AFFN Network
- Cirrus Network
- CULIANCE Network
- Discover Network
- Interlink Network
- Maestro Network
- Mastercard Network
- NYCE Network
- PULSE Network
- STAR Network
- Visa Network
- Cirrus ATM Network
- Plus ATM Network
- Co-Op Network

UNOFFICIAL DOCUMENT

Please feel free to contact me directly at (352) 521-4090 should you have any questions.

Sincerely,



Mike Mashke
Sr. EVP/Chief Revenue Officer

cc. Fadi Cheikha, US Alliance Group, Inc.

UNOFFICIAL DOCUMENT

# EXHIBIT “D”

First
National Bank of Pasco

UNOFFICIAL DOCUMENT

January 5, 2024

To Whom It May Concern

Re: US Alliance Group, Inc.

Please let this letter serve as confirmation that First National Bank of Pasco has approved US Alliance Group, Inc. for ATM and POS Sponsorship and has registered them into the following Debit Networks:

- Accel Network
- AFFN Network
- Cirrus Network
- CULIANCE Network
- Discover Network
- Interlink Network
- Maestro Network
- Mastercard Network
- NYCE Network
- Plus Network
- PULSE Network
- STAR Network
- Visa Network

Please feel free to contact me directly at (352) 521-4090 should you have any questions.

Sincerely,

Mike Mashke
Sr. EVP/Chief Revenue Officer

cc: Fadi Cheikha, US Alliance Group, Inc.

13315 U.S. Highway 301 • Dade City, FL 33525-5435 • (352) 521-0141

UNOFFICIAL DOCUMENT

# EXHIBIT “E”

DocuSign Envelope ID: C6E2EA65-77FA-4B29-85A3-929FF06590685

paysol

# List of Supporting documents to be submitted along with PaySol Merchant Application:

- PaySol setup form
- Preprinted voided check or bank letter
- W-9
- Copy of business license
- Government issued identification
- Three months business bank statements
- One year business financials

UNOFFICIAL DOCUMENT

EXHIBIT
2

[redacted]

## *Merchant Application*

### *Electronic Payment Services Agreement*

**Applicant Information**

| Business/ Legal Name ("Company") | DBA Name (if multiple names, use attached Appendix A) |
|---|---|
| [redacted] | |

| Physical Address (Street, City, ST, Zip) *CANNOT BE A P.O.BOX |
|---|
| 24671 US HWY 19N Clearwater, FL 33763 |
| **Mailing Address (if different from Physical Address)** |
| 24671 US HWY 19N Clearwater, FL 33763 |

| Business Phone | Business Fax | Company Website |
|---|---|---|
| 844-878-5438 | | [redacted] |

| [redacted]ax ID | Type of Company - Sole Prop (DBA), LLC, Corp., Partnership, Non-Profit | Hours of Operation | Year Established |
|---|---|---|---|
| [redacted] | Corp | 7:00am-9:00pm | 2016 |

| State(s) Licensed in / License # | Customer Service Phone | Customer Service E-mail |
|---|---|---|
| FL, CA, MA, CT | 844-878-5438 | |

**Principal/Officer/Manager** (if multiple owners, use attached Appendix A to list all ownership of 25% or more)

| Name | Title |
|---|---|
| [redacted] | |

The names of the employees listed below are vested by the Merchant with full authority to access the payment processing account, as well as, communicate with the Payment Solutions International LLC in accordance with the Agreement, ("Authorized Representative"). Authorized Representatives shall originate transactions in accordance with the Rules defined in the Terms and Conditions. The Merchant may add or delete a name by giving written notice to the Licensee.

| Name | Title | Contact Phone | Email Address |
|---|---|---|---|
| Rick Wilson | IT Director | 850.382.7209 | rick.wilson@trulieve.com |
| **Name** | **Title** | **Contact Phone** | **Email Address** |
| Ryan Blurst | Controller | 727.796.5751 | ryan.blust@trulieve.com |

**Additional Required Information**

| Has the company, any principal, officer, manager or authorized representative ever: | Yes | No |
|---|---|---|
| been indicted, arrested, or convicted of any crime other than minor traffic violations during the past ten years? | ☐ | ☒ |
| been the subject of an administrative hearing by any Department or Agency of the federal Government or any State Government during the past ten years? | ☐ | ☒ |
| filed for Bankruptcy? | ☐ | ☒ |
| **Is any principal, officer, manager or authorized representative: (If Yes, list the individual and country below)** | | |
| a senior foreign political figure or family member of a senior foreign political figure? | ☐ | ☒ |
| a Senior Executive of a foreign owned business? | ☐ | ☒ |

If the answer to any question above was YES, please provide a detailed description:

75

**Merchant Application**

**Electronic Payment Services Agreement**

## Warranty of Application and Investigative Authorization

The above business and the undersigned Beneficial Owners which includes all individuals and/or entities holding 25% or more interest in the business or have substantial management duties related to the business ("Beneficial Owners") and all personal guarantors (collectively "Merchant") submitting this application for Electronic Payment Services ("Agreement") represent and warrant to Payment Solutions International LLC ("Licensee") that all information, data, and statements contained in or submitted with the application are true, correct, and complete. Merchant agrees to notify Licensee in writing immediately of any and all changes that may occur from time to time regarding any and all information contained in the Agreement. In connection with this Agreement, the undersigned Beneficial Owners hereby understand and agree that Licensee may make investigative background inquiries concerning the Merchant as a business and the Beneficial Owners and personal guarantors as individuals. Inquiries may include consumer reports, investigative consumer reports, criminal, and other reports. These reports may include information as to character, credit worthiness, general reputation, personal characteristics, mode of living, work habits, performance, and experience along with reasons for termination of past employment from previous employers. Further, the Beneficial Owners understand that Licensee may request information from federal, state, and other agencies that maintain records of the Beneficial Owner's credit, criminal, civil, and other experiences. The undersigned authorize without reservation any party or agency contacted by Licensee and/or its agent to furnish the information described above.

| Owner/Officer 1 Signature | Name (Please Print) | Title | Date |
|---|---|---|---|
| x DocuSigned by: Mohan Srinivasan | Mohan Srinivasan | CFO | 3/27/20 |
| x | | | |

Owner/Officer 2 Signature — Name (Please Print) — Title — Date

* *insert additional pages for each Beneficial Owner*

## Processing Fees

| | | |
|---|---|---|
| Transaction Fee: $ | Surcharge Fee to Cardholder: $ 3.00 | |
| Chargeback Fee: $45.00 | | |
| | | |
| | | |

## Miscellaneous Fees

| Monthly Statement (per location) | Monthly Platform Fee (per device) | Monthly Compliance Fee (per location) |
|---|---|---|
| $25 | $ 10 | $ 25 |
| | | |

UNOFFICIAL DOCUMENT

## ACH Authorization Release to Debit and Credit Bank Account

The undersigned authorizes Payment Solutions International LLC "Licensee" to credit or debit its account via ACH for the following items: DAILY TRANSACTION SETTLEMENT, SETTLEMENT ERROR CORRECTIONS, ADJUSTMENTS, FEES, and INCOME DISTRIBUTION. The credits and debits pursuant to this agreement will be affected through the Federal Reserve Automated Clearing House system. Merchant shall audit and balance the data contained in the periodic statements and reports provided by Licensee, and/or third party authorization and shall promptly, but in no event more than 30 days after the date of the disputed item, notify Licensee, and/or third party authorization in writing (the "Notice Date") of any disputed item or items on such periodic statements and reports. If Licensee, and/or third-party authorization determines that the disputed item was credited or debited in error by Licensee and/or third-party authorization, shall correct the error. Notwithstanding, Licensee and/or third-party authorization, shall not be liable for any recovery, reimbursement or otherwise of any amounts over 30 days from the Notice Date. Licensee and/or third-party authorization will, however, use its commercially reasonable efforts to recover any amounts over such 30-day period. and/or third-party authorization, shall not be liable for any damages, interest or costs associated with the error other than correcting the error.

| | Routing Number | Checking | Savings | Account # | Daily Transactions | Statement Fees |
|---|---|---|---|---|---|---|
| Bank 1 | 063105515 | X | ☐ | [redacted] | X | ☐ |

| Owner/Officer Signature | Name (Please Print) | Title | Date |
|---|---|---|---|
| x DocuSigned by: Mohan Srinivasan | Mohan Srinivasan | CFO | 3/27/20 |

## Merchant Application
### Electronic Payment Services Agreement

**Acceptance of Processing Services**

Merchant understands and agrees that this Agreement includes: (a) the application and (b) the 7 page Terms and Conditions ("Terms and Conditions") expressly incorporated by reference herein that are collectively referred to as the "Agreement". The Merchant hereby accepts and agrees to abide by the Terms and Conditions of this Agreement. Merchant represents and warrants to Payment Solutions International LLC "Licensee" that (i) this agreement and the Terms and Conditions have been reviewed and understood in their entirety, (ii) all of the information provided in, for, and with the Agreement is true and correct, (iii) Licensee is properly authorized to investigate Merchant and each person listed on the Agreement as provided above, (iv) Merchant has authorized the undersigned to execute this Agreement, and (v) Merchant has received a copy of this Payment Processing Services Merchant Agreement which copy includes the Terms and Conditions. Merchant specifically understands and agrees that the Terms and Conditions shall only become effective upon acceptance of this agreement by Licensee and Merchant's subsequent receipt of an X Identification code (XID) which will be provided by Payment Solutions International LLC "Licensee".

| | | | |
|---|---|---|---|
| x Mohan Srinivasan | Mohan Srinivasan | CFO | 03/27/20 |
| Owner/Officer Signature | Name (Please Print) | Title | Date |

**Personal Guarantee**

The undersigned ("Guarantor") does hereby personally guarantee to Payment Solutions International LLC "Licensee", as well as to its successors and assigns, the full, prompt and complete performance by Merchant of all of Merchant's obligations under this Agreement, including, but not limited to, the payment of credit losses, reversals and expenses in accordance with the Agreement, whether arising before or after termination of this Agreement. This guaranty is a guaranty of payment and is a debt of the Guarantor for his or her own account. This guaranty is not a guaranty of collection. Accordingly, Licensee shall not be obligated or required before enforcing this guaranty against Guarantor: (a) to pursue any right or remedy Licensee may have against Merchant, Guarantor or any other guarantor of these obligations or commence any suit or other proceeding against Merchant, Guarantor or any other guarantor of these obligations in any court or other tribunal; (b) to make any claim in a liquidation or bankruptcy of Merchant or any other guarantor of these obligations; or (c) to make demand of the Merchant or any other guarantor of these obligations or to enforce or seek to enforce or realize upon any collateral security held by Licensee which may secure any of these obligations. This guaranty shall not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit, or variation of terms of this Agreement made by or agreed to by Licensee or Merchant. Guarantor hereby waives any notice of acceptance of this guaranty, notice of non-payment or non-performance of any provision of the Agreement by Merchant, and all other notices or demands regarding the Agreement. Guarantor agrees to promptly provide to Licensee any information reasonably requested from time to time, concerning his or her financial condition, business history, business relationships and employment information.

x ______________________ as Guarantor ______________________ ________
Signature Name (Please Print) Date

x ______________________ as Guarantor ______________________ ________
Signature Name (Please Print) Date

UNOFFICIAL DOCUMENT

## TERMS AND CONDITIONS

This Merchant Electronic Payment Services Agreement, which includes these Terms and Conditions, and the Application that precedes these terms (the "Application" and collectively the "Agreement") is made by Payment Solutions International LLC, a Delaware Corporation doing business as PaySol ("Licensee"), with offices at 2140 S. Dupont Hwy, Camden DE 19934, and the Merchant authorizing this Agreement as identified on the Application ("Merchant"), each individually a ("Party") and collectively ("Parties"), effective as of the date described in Section "Effective Date", below.

### 1.0 RELATIONSHIP OF PARTIES

1.1 **Licensee Acceptance of Application**. Upon receipt of Merchant's fully completed Application, Licensee shall determine whether to accept the Application and provide the products and services requested by Merchant. Merchant understands and agrees that the Application is subject to Licensee Acceptance as defined below. Licensee will manifest acceptance by providing an X identification code ("XID") and Merchant may begin processing transactions. The XID will be embedded in the equipment provided by Licensee, or Licensee will provide Merchant with instructions that list the XID and give the steps required by Licensee for programming the terminal into Merchant's existing product or platform ("Licensee Acceptance"). In the event Licensee requires modifications to the Application, Licensee will provide a list of those requested modifications to the Merchant ("Conditions of Acceptance") and send same to the Merchant's e-mail, fax, or address listed in the Application.

1.2 **Effect of Transactions**. Although Merchant shall not be required to submit a transmission to accept the terms of the Merchant Electronic Payment Services Agreement, MERCHANT'S SUBMISSION OF A PROCESSING PROGRAM TRANSACTION FOR PROCESSING TO LICENSEE (a "TRANSACTION") SHALL SIGNIFY MERCHANT'S UNEQUIVOCAL ACCEPTANCE OF THIS AGREEMENT, INCLUDING THE TERMS AND CONDITIONS, AND CONDITIONS PRECEDENT TO ACCEPTANCE, IF ANY, AND ANY AMENDMENTS OR UPDATES TO THE AGREEMENT.

1.3 **Effective Date.** The Effective Date shall be the date that Licensee Accepts the Merchant Application, ("Effective Date").

1.4 Merchant Receipt of Agreement Components. By signing the Application, Merchant acknowledges receipt during the full Agreement. Merchant understands and agrees that this Agreement includes two components: (a) the Application component and (b) these Terms and Conditions component, which collectively constitute Agreement. The two components are inseparable, and the information provided by Merchant in the Applications is an integral part of this Agreement as if fully incorporated herein.

1.5 **Merchant Representations and Warranties**. The Merchant submitting the Application represents and warrants to Licensee that all information, data, and statements contained in or submitted with the Application are true, correct and complete. Merchant further agrees that during the Term of this Agreement and any renewal period, Merchant shall notify Licensee in writing immediately of any and all changes that may occur from time to time regarding any and all information contained in and submitted with the Application, including without limit, and changes to Merchant's business, owners, officers, managers, product offerings, or financial condition. In the event that Merchant's information, data, and statements provided in and with the Application(s) or requested by Licensee from time to time are found by Licensee to be false, incorrect and/or incomplete or Merchant fails to update Licensee regarding any changes in the previous sentence, then Merchant agrees to indemnify, defend, and hold harmless Licensee against any resultant loss, liability or expense to Licensee, including attorneys' fees and expenses, pursuant to the indemnification provisions of section 4.2 of these Terms and Conditions, and Licensee may terminate this Agreement immediately, increase fees, and/or adjust its Reserve Account ("Reserve" as defined below under the section Titles "Reserve Account") withholding without notice to Merchant.

**1.6 Merchant Underwriting.** Upon receipt of the Application and prior to Licensee's Acceptance, Licensee will investigate and underwrite Merchant using the information, data, and statements contained in or submitted with the Application(s) provided by the Merchant and all other information that Licensee may discover through its investigation. From time to time, Licensee may request information related to Merchant's financial condition, business operations, owners, officer, managers, employees, customers, products, services, and any other information that Licensee may require from Merchant to determine the Merchant's current compliance herewith. Merchant shall provide the data, information and statements further requested by Licensee within five (5) calendar days or sooner as reasonably required by Licensee, absent compliance. Licensee may terminate this Agreement immediately, increase fees, and/or adjust its Reserve withholding.

**1.7 Compliance with Applicable Law.**

a. General. Merchant represents and warrants that it has obtained all necessary regulatory approvals, certificates and licenses, and that it is in compliance and will remain in compliance with all applicable federal, state and local laws, rules and regulations; and all rules, regulations, by-laws, standards and procedures adopted and/or amended from time to time by the Associations (including without limitation, the Payment Card Industry Data Security Standard), and each relevant "Association" which means VISA U.S.A., Inc. ("Visa"), MasterCard International Incorporated ("MasterCard") and Discover Financial Services LLC ("Discover") and each relevant "Issuer" which means a member of an Association that enters into a contractual relationship with the individual or entity that initiates the transaction through the use of a card or other electronic means (a "Cardholder") for the issuance of one or more Cards in connection with the operation of its business; and the Debit Networks including without limit, Accel, Fiserv Solutions, LLC, Armed Forces Financial Network, Credit Union 24, NYCE Payments Network, LLC, Shazam Inc. Star ("collectively the Debit Networks") (collectively the "Rules" and/or "Applicable Law.") Merchant represents and warrants that it understands the importance of complying with Applicable Law in connection with any and all actions it takes in connection with Transactions (including, without limitation, complying with requirements relating to Transaction information, storage and disclosure), and covenants at all times to comply in full with all Applicable Law. Merchant further acknowledges and agrees that it is responsible for the actions of all of its employees while in Merchant's employ.

b. Data Security Rules. Without limiting the generality of the foregoing or any other provision of this Agreement, Merchant understands that it and all of its employees, agents, representatives and service Licensees must comply with the Rules, including without limitation, those relating to Cardholder information security issues, non-disclosure of Cardholder information and Transaction documents, retention and storage of Cardholder and Transaction information and other security procedures adopted by the Associations. Merchant hereby confirms its agreement to abide by and fully comply with such Rules, including, without limitation, the Rules and procedures described below:

c. Transaction Information. Merchant acknowledges that the sale or disclosure of databases containing Cardholder account numbers, personal information, or other Transaction information to third parties is strictly prohibited by the Rules. Unless Merchant obtains consents from the banking institution that sponsors the transactions hereunder (the "Processing Financial Institution," Licensee, and each applicable Association, issuing Processing Financial Institution and Cardholder, Merchant must not use, disclose, sell or disseminate any Cardholder information obtained in connection with a Transaction (including without limitation, the names, addresses and Card account numbers of Cardholders, copies of imprinted sales drafts and/or credit records, mailing lists, tapes or other media obtained in connection with a sales draft and/or credit record) except for purposes of authorizing, completing and settling Transactions and resolving any Chargebacks, retrieval requests or similar issues involving Transactions, other than pursuant to a court or governmental agency request, subpoena or order. Merchant shall use proper controls for, limit access to, and render unreadable prior to discarding all records containing Cardholder account numbers and Card imprints. Merchant may not retain or store magnetic stripe data after a Transaction has been authorized. If Merchant stores any electronically captured signature of a Cardholder, Merchant may not reproduce such signature except upon the specific request of Processing Financial Institution. Merchant shall store all media containing Cardholder names, Cardholder account information, and other personal information, as well as Card imprints (such as sales drafts and credit records, rental agreements, and carbons) in an area limited to selected personnel and, prior to discarding any such information, destroy it in a manner that renders the data unreadable. Merchant further warrants and agrees that in the event of its failure, including Bankruptcy, insolvency, or other suspension of business operations, it will not sell, transfer or disclose any materials that contain Cardholder account numbers, personal information, or Transaction information to third parties, and shall return the information to Processing Financial Institution and provide acceptable proof of destruction to Processing Financial Institution.

d. Logos. Merchant must display logos regarding the Debit Networks and Card Brands indicating its acceptance thereof and shall not discriminate against the acceptance of any card type or brand.

**1.8 Cardholder Information**. Unless Merchant obtains consents from Licensee and each applicable Association, Card Issuer and Cardholder, Merchant must not use, disclose, store, sell or disseminate any Cardholder information obtained in connection with a Transaction (including the names, addresses and Card account numbers of Cardholders) except for purposes of authorizing, completing and settling Transactions and resolving any Chargebacks, Retrieval Requests or similar issues involving Transactions, other than pursuant to a court or governmental agency request, subpoena or order. Merchant shall use proper controls for and limit access to, and render unreadable prior to discarding, all records containing Cardholder account numbers and Card imprints. Merchant may not retain or store Magnetic Stripe data or Card Validation Codes after a transaction has been authorized. If Merchant stores any electronically captured signature of a Cardholder, Merchant may not reproduce such signature except upon Licensee's specific request. Merchant acknowledges that Merchant will not obtain ownership rights in any information relating to and derived from Card transactions.

**1.9 Prohibited Transactions**. Merchant shall not do any of the following:

**(a)** Establish a minimum on debit cards or greater than $10.00 on credit cards or a maximum dollar Transaction amount;

**(b)** Obtain multiple Authorizations for amounts less than the total sale amount;

**(c)** Obtain Authorization for the purpose of setting aside the Cardholder's credit line for use in future sales;

**(d)** Extend credit for or defer the time of payment of the total cash price in any Transaction;

**(e)** Honor the transaction vehicle, which may include a payment card, virtual card, or digital currency or voucher, (collectively a "Card") except in a Transaction where a total cash price is due and payable;

**(f)** Make any special charge to or extract any special agreement or security from any Card holder in connection with any Transaction;

**(g)** Transmit or accept payment for any Transaction that was not originated directly between Merchant and a Cardholder for the sale or lease of goods or the performance of services of the type indicated in the Application form to which this Agreement is attached;

**(h)** Honor or accept a Card as payment for any legal services or expenses arising out of or related to: (i) any domestic relations matter where such services or expenses are furnished to a person whose name is not embossed on a Card; or (ii) any Bankruptcy, insolvency, compromise, composition or other process affecting Cardholder's creditors;

**(i)** Use Merchant's own Card, or one to which Merchant has access, to process a Transaction for the purpose of obtaining credit for Merchant's own benefit;

**(j)** Re-process any Transaction that was previously charged back to Processing Financial Institution and subsequently returned to Merchant, irrespective of Cardholder approval;

**(k)** Initiate a Transaction credit without a preceding debit at least equal to the credit;

**(l)** Initiate a Transaction credit without a balance in the Operating Account at least equal to the credit;

**(m)** Use the equipment, computer, device or any other mechanism used to process transactions, (collectively "Equipment") or any data received thereon for any other purpose other than for determining whether or not Merchant should accept checks or Cards in connection with a current sale or lease of goods or services;

**(n)** Use the Equipment or any data received thereon for credit inquiry purposes or any other purpose not authorized by this Agreement;

**(o)** Draw or convey any inference concerning a person's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living when

**(p)** any Card or check is processed as non-accepted;

**(q)** Disclose any information obtained through the Equipment to any person except for necessary disclosures to affected Cardholders, Processing Financial Institution and/or the Issuer;

**(r)** Disburse funds in the form of travelers cheques, if the sole purpose is to allow the Cardholder to make a cash purchase of goods or services from Merchant;

**(s)** Disburse funds in the form of cash, except where permitted by Applicable Law;

**(t)** Accept a Card to collect or refinance an existing debt (whether originally owed to Merchant or otherwise) that is considered uncollectible (for example, payments to a collection agency or attempts to recover funds for a dishonored check) except to the extent specifically permitted by Applicable Law;

**(u)** Issue a Transaction credit in respect of goods or services acquired in a cash transaction which are returned;

**(v)** Make any cash refund to a Cardholder who has made a purchase with a credit Card (all Transaction credits shall be issued to the same credit Card account number used in the sale);

**(w)** Require a Cardholder to complete a postcard or similar device that includes the Cardholder's account number, Card expiration date, signature or any other Card account data in plain view when mailed;

**(x)** Accept a Card for the purchase of Scrip (as defined by applicable VISA regulations), except to the extent specifically permitted by Applicable Law;

**(y)** Accept any payment directly from a Cardholder for previous Card charges incurred and processed by Merchant;

**(z)** Require, through an increase in price or otherwise, any Cardholder to pay any surcharge in connection with any Transaction or to pay any part of any charge imposed on Merchant by Processing Financial Institution except, in either case, as expressly permitted by, and under terms and conditions that comply in full with, Applicable Law;

**(aa)** Provide cash to a Visa cardholder unless Merchant is either (i) participating in Visa Cash-Back Services or (ii) a hotel or cruise line;

**(bb)** Cause any Cardholder to waive its right to dispute a Transaction;

**(cc)** Request the Card Verification Value 2 data (as defined by Visa) on any paper order form;

**(dd)** Request a Cardholder account number for any purpose that is not related to payment for goods or services;

**(ee)** Add any tax to Transactions, unless applicable law expressly requires that a Merchant be permitted to impose a tax, and only if such tax is included in the Transaction amount and not collected separately; or

**(ff)** Process payments for a product or service that has not been disclosed and approved by Processing Financial Institution and Licensee. This includes web processing and processing on a website that has not been approved by Processing Financial Institution and Licensee. Merchant shall disclose to Processing Financial Institution and Licensee all URLs through which Merchant processes transactions or otherwise accepts at the time of executing this Agreement, upon request, and before processing through any URL not previously disclosed.

Should Merchant engage in any of the prohibited transactions, including without limit that Merchant offers any products or services that are not bona fide and compliant with the Rules, Merchant shall be responsible to pay Licensee an amount equal to the damages that Licensee could suffer related to such prohibited conduct to include a penalty of $10,000 per occurrence, plus all costs, fees, fines, attorneys' fees and other costs and expenses incurred by Licensee.

OFFICIAL DOCUMENT

## Merchant Application

## Electronic Payment Services Agreement

1.10 **Adjustments and Returns**. Merchant will maintain a fair exchange and return policy and make adjustments with respect to goods and services sold and/or leased to its customers whenever appropriate. If Merchant limits its acceptance of returned merchandise, or if Merchant is an Electronic Commerce Merchant, Merchant will ensure that its return policy is clearly set forth on the Transaction receipt or on Merchant's website, as required by Applicable Law. If goods are returned, or services are terminated or canceled, or any price is adjusted, Merchant will prepare and transmit a credit or return Transaction, either electronically or by paper, for the amount of the adjustment as a deduction from the total amount of Transactions transmitted that day. If the amount of credit or return Transactions exceeds the amount of sales Transactions, Merchant shall pay the excess to Processing Financial Institution. Merchant shall make no cash refunds on credit Transactions and shall handle all credit adjustments as provided in this Section. If no refund or return will be given, Merchant must advise Cardholder in writing, at the time of the Transaction, that the sale is a "final sale" and "no returns" are permitted. Merchant must advise Cardholder in writing of any policy of Merchant that provides for no-cash refunds and in-store credit only. Merchant shall follow Association reservation/no-show policies and shall notify Cardholders in writing of this policy on all advance reservations. Merchant also shall notify Cardholders at the time of the reservation of the exact number of days required for reservation deposit refunds.

1.11 **Exclusive Processing Agent**. During the initial term and any renewal terms, Merchant grants Licensee the exclusive right to manage the processing services for Point of Banking payment services, and, as and when available through Licensee, Merchant grants Licensee the exclusive right to manage the processing services for debit payments, credit payments and any other payment services Licensee is then able to provide.

Licensee will contract with Processing Financial Institution and/or processor to settle funds accessed through Merchant's terminal. Merchant agrees not to allow any individual, group or individuals, partnerships, or corporations to provide competing services at the Merchant's location(s) without written authority from Licensee. Merchant acknowledges that execution of this Agreement may not affect a release from Merchant's duties or obligations of Licensee to third parties, including other processing or service Licensees.

### 2. OPERATIONS

2.1 **Amendment of Operations**. The specifications, operating procedures, and processes described in this Merchant Electronic Payment Services Agreement are provided to help facilitate the timely administration of the services and program ("Processing Programs") set forth herein ("Operations"). From time to time Licensee may amend the Operations. The amendments shall be made in the sole and absolute discretion of Licensee and the amendments may include but are not limited to, changes in the Rules, provisions of this Agreement, third-party Licensees. Such amendments shall become effective immediately if no notice is required in Licensee's sole and absolute discretion; or upon written notice to Merchant vis-à-vis the contact information provided by Merchant in the Application; or such later date as may be stated in Licensee's notice to the Merchant. Notwithstanding this section, Merchant's continued performence under this Agreement shall constitute Merchant's unconditional acceptance of any Amendment hereto.

2.2 **Change in Business**. Merchant shall provide Licensee with immediate notice of intent to: (a) Transfer or sell any substantial part of its total assets, or liquidate those assets; (b) Change the basic nature of its business, including selling any products or services un related to its current business or of which have not been disclosed to Licensee; (c) Change more than twenty percent (20%) ownership interests or transfer any control/ management of its business; or (d) Enter into any joint venture, partnership or similar business arrangement whereby any person or entity not a party to this Agreement assumes any interest in or management of Merchant's business. Failure to provide notice as required herein may be deemed a material breach of these Terms and Conditions and shall be grounds for Licensee to immediately terminate the Agreement, adjust pricing and other terms, and/or adjust Reserve withholdings.

2.3 **Prohibition of Furnishing Account Information; Use of Third Parties**. Merchant shall not, without the Cardholder's consent, sell, purchase, provide or exchange any Card information in the form of Transaction documents, carbon copies of imprinted Transaction documents, mailing lists, tapes, journal rolls or other media obtained through the use of a Card to any third party. Merchant may use third parties that do not have a direct agreement with Processing Financial Institution as Merchant's agent for the direct delivery of Transactions for clearing and settlement if

(a) Merchant advises Processing Financial Institution that it will use a third-party processor in this capacity, identifying the third party so selected by Merchant; (b) Merchant agrees that Processing Financial Institution will reimburse Merchant only for the Visa Transactions delivered by that third-party processor to Visa Net; and (c) Merchant assumes responsibility for any

failure by its third-party processor to comply with Applicable Law.

Merchant shall notify Bank of the identity of any third-party performing services to Merchant in connection with which such third party has access to any Card information.

2.4 **PIN Debit Card Acceptance**. Most, but not all, ATM Cards (Debit Cards) can be accepted at the point of sale at participating locations. Examine the back of the PIN Debit Card to determine if the Card participates in a network that Merchant is authorized to accept. Network mark(s) are usually printed on the back of the Card. If the PIN Debit Card is valid and issued by a participating network, Merchant must comply with the following general requirements for all participating networks, in addition to the specific requirements of the network:

- Merchant must honor all valid PIN Debit Cards when presented that bear authorized network marks.
- Merchant must treat transactions by Cardholders from all Issuers in the same manner.
- Merchant may not establish a minimum or maximum transaction amount for PIN Debit Card acceptance.
- Merchant may not require additional information, besides the Personal Identification Number and Cardholder's signature, for the completion of the transaction unless the circumstances appear suspicious.
- Merchant shall not disclose transaction related information to any party other than Merchant's agent, a network, or issuing institution and then only for the purpose of settlement or error resolution.

Merchant may not process a Credit Card transaction in order to provide a refund on a PIN Debit Card transaction.

- Merchant must retain a signed copy of the sales draft/receipt.
- Merchant must process a Reversal or an Adjustment within 45 days if it processed a transaction in error.
- Transaction Processing. The following general requirements apply to all PIN Debit Card transactions:
- All debit transactions must be authorized and processed electronically. There is no Voice Authorization or imprinter procedure for PIN Debit Card transactions.
- Merchant may not complete a PIN Debit Card transaction that has not been authorized. If Merchant cannot obtain an Authorization at the time of sale, Merchant should request another form of payment from the customer or process the transaction as a Store and Forward or Resubmission, in which case Merchant assume the risk that the transaction fails to authorize or otherwise declines. The Cardholder should be instructed to contact the Issuer to find out why a transaction has been declined.
- Merchant may not complete a PIN Debit Card transaction without entry of the Personal Identification Number (PIN) by the Cardholder. The PIN must be entered into the PIN pad only by the Cardholder. Merchant cannot accept the PIN from the Cardholder verbally or in written form.
- The PIN Debit Network used to process Merchant's transaction will depend upon, among other things, the availability of the network at the time of the transaction, whether a particular PIN Debit Card is enabled for a particular network and the routing requirements established by the networks and the card issuers. Licensee may, at its sole discretion, utilize any PIN Debit Network available for a given transaction.
- Merchant must issue a receipt to the Cardholder upon successful completion of a transaction. The Cardholder account number will be masked so that only the last four digits will appear. The masked digits will appear as a non-numeric character such as an asterisk. This is referred to as PAN truncation.
- Merchant may not manually enter the account number. The account number must be read electronically from the Magnetic Stripe or CHIP. If the Magnetic Stripe or CHIP are unreadable, Merchant must request another form of payment from the customer. •Any applicable tax must be included in the total transaction amount for which Authorization is requested. Tax may not be collected separately in cash.
- Merchant IS RESPONSIBLE TO SECURE MERCHANT'S EQUIPMENT AND TO INSTITUTE APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM PROVIDING CASH ADVANCES ON DECLINED OR CANCELLED TRANSACTIONS. Merchant MUST ADVISE CARDHOLDER TO CONTACT THE ISSUER IF THERE IS A DISCREPANCY.
- NOTE: Approved transactions and refunds cannot be voided through the terminals.

## 3.FINANCIAL MATTERS

**3.1 Provisional Nature of Credits**. All Credits to Merchant's Bank Account or other payments to Merchant are provisional and are subject to, among other things, Licensee's final audit, Chargebacks (including Licensee's related losses), fees and fines imposed by the Associations. Merchant agrees that Licensee may debit or credit Merchant's Settlement Account for any deficiencies, overages, fees and pending Chargebacks, or may deduct such amounts from settlement funds due to Merchant. Alternatively, Licensee may elect to invoice Merchant for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified.

**3.2 Funding Delays**. Licensee will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties including but not limited to any Association or Merchant's financial institution.

**3.3 Change in Terms**. In addition to any other remedies available to us under this Agreement, Merchant agrees that should any event of default occur, Licensee may, with or without notice, change processing or payment terms and fees, and/or suspend Credits or other payments of any and all funds, money and amounts now due or hereafter to become due to Merchant pursuant to the terms of this Agreement, until Licensee has had reasonable opportunity to investigate such event.

**3.4 Merchant Bank Account(s).**

**(a)** Merchant shall designate one or more bank deposit accounts as their Merchant Bank Account in the Application ("Merchant Bank Account"). In the event Merchant wishes to have more than one Merchant Bank Account, Merchant shall submit voided checks marking each voided check with the purpose of making each a Merchant Bank Account with the Application.

**(b)** The Merchant shall set up each Merchant Bank Account and hereby expressly authorizes and shall perform all other authorizations necessary to allow Licensee to make debit and credit entries through the Automated Clearing House ("ACH"). Licensee may, without prior notice or demand, obtain payment of any amount due and payable to Licensee under the Agreement by debiting the Merchant Bank Account. This authorization shall remain effective for the term of the Agreement and any renewal term until Merchant cancels as set forth under the heading "5. TERM and TERMINATION."

**(c)** The Merchant shall at all times maintain a balance of available funds in the Merchant Bank Account sufficient to cover its payment obligations under this Agreement. Merchant may be required to fund credit entries in advance, and Merchant agrees to comply with any such advance directions from Licensee or Processing Financial Institution. In the event there are insufficient funds in the Merchant Bank Account to cover Merchant's obligations under this Agreement, the Merchant agrees (a) that Licensee may debit any account maintained by the Merchant with Processing Financial Institution or any affiliate of Licensee, (b) offset from the Reserve Account, and/or (c) that Licensee may set off against any amount Licensee owes to the Merchant, in order to obtain payment of the Merchant's obligations under this Agreement. Merchant shall not close or change the Merchant Bank Account except as provided under the heading "5. TERM and TERMINATION" below. Merchant shall be solely liable for all fees and costs associated with the Merchant Bank Account and for any and all overdrafts or other fallout from having insufficient funds.

**3.5 Fees for Processing Program Services**. The Merchant shall pay all charges for the services described in this Agreement. Furthermore, each Processing Program requires charges unique to that program. Fees shall be calculated pursuant to this Merchant Processing Agreement, any supplemental Processing Program Agreements, and any additional agreed upon pricing supplements. Licensee reserves the right to change the charges for the services upon advance notice to Merchant. Merchant's continued processing of any transactions under the Agreement shall constitute Merchants unconditional acceptance of any such changes.

**3.6 Interchange Assumptions**. Merchant shall be charged fees for the services, which shall be calculated and payable pursuant to this Agreement and

**3.7 any additional pricing supplements**. Merchant acknowledge that the fees agreed to are based on the assumption that Merchant's transactions will qualify for certain reduced interchange levels. If a transaction fails to qualify for Merchant's Anticipated Interchange Levels, then the Association will downgrade the transaction and process it at a more costly interchange level for which it does qualify. In that event, Merchant shall be charged a Non-Qualified Interchange Fee, which is the difference in the interchange fee associated with the Anticipated Interchange Level and the interchange fee associated with the interchange level at which the transaction actually was processed; plus, any applicable Non-Qualified Surcharge for each non-qualifying transaction, the amount of which is set forth in the service fee schedule. Imposed Fines. Merchant agrees to pay any fines imposed on Licensee by any of the Associations, Processing Financial Institution, federal, state or local regulating body, or any entity or body having jurisdiction over the activity contemplated under this Agreement with respect to Merchant's acts or omissions during the term of the Agreement or in any way related to Merchant. Further, Merchant shall cooperate and comply with all requests of Licensee and/or the Processing Financial Institution related to such fines or penalties.

**3.8 Taxes**. The Merchant shall be responsible for payment of any sales, use, excise, value-added, utility or other similar taxes relating to the services provided for herein. If Licensee is required to pay any taxes, interests, fines or penalties owed by Merchant, said amount shall become immediately due and payable by Merchant to Licensee. If excise, sale or use taxes are imposed on Transactions, Merchant shall be responsible for the collection and payment thereof. Merchant shall not add any tax to any Transaction unless the applicable laws and regulations expressly provides that Merchant is permitted to impose a tax, and any such tax amount, if so allowed, shall be included in the Transaction amount and not collected separately. Processing Financial Institution or Licensee shall be entitled to recover from Merchant any of said taxes paid by it on behalf of Merchant immediately after payment.

**3.9 Fee Modifications.**

**(a)** Change in Assumptions; Risk. The fees for services set forth in this Agreement are based on assumptions associated with the anticipated annual volume and average transaction size for all services as set forth in this Agreement, the Application, and Merchant's method of doing business. If the actual gross volume or average transaction size in dollars are not as represented and/or expected or large variations occur, or if Merchant significantly alters its method of doing business resulting in changes to such representations, Licensee may adjust Merchant's transaction fees, increase Reserve withholdings, or suspend Transactions, without prior notice. Licensee has assumed certain risks by agreeing to provide Merchant with Processing Program services. Accordingly, Merchant understands and agrees that Licensee may modify the terms and/or fees set forth in this Agreement pursuant to Licensee's underwriting of Merchant from time to time. Merchant's continued processing of any transactions under the Agreement shall constitute Merchants unconditional acceptance of any such changes.

**(b)** Change by Service Licensees. The fees for services set forth in this Agreement may be adjusted to reflect increases or decreases by third parties that assist in performance of the services required by the Processing Programs selected by Merchant. Said fees for services include, but are not limited to, the Associations interchange rates, assessments, dues, fees, on-line communications, vault cash, and similar items. All such fee adjustments shall be Merchant's responsibility to pay and shall become effective upon the date any such change is implemented by Licensee or the applicable third party. Merchant's continued processing of any transactions under the Agreement shall constitute Merchants unconditional acceptance of any such changes.

**(c)** Change by Regulation. This Agreement may be modified to pass through to Merchant the financial, economic and regulatory effects of any present or future federal, state or local statute, regulation or government policy, including increasing fees due from Merchant or reducing compensation due to Merchant. Merchant's continued processing of any transactions under the Agreement shall constitute Merchants unconditional acceptance of any such changes.

**3.10 Adjustments to Account**. If Merchant believes any adjustments should be made with respect to Merchant's Settlement Account, Merchant must notify Licensee in writing within 45 days after any debit or Credit is or should have been affected. If Merchant notifies Licensee after such time period, Licensee may, in its sole discretion, assist Merchant, at Merchant's expense, in investigating whether any adjustments are appropriate and whether any amounts are due to or from other parties, but Licensee shall not have any obligation to investigate or effect any such adjustments. Any voluntary efforts by Licensee to assist Merchant in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

**3.11 Security Interest.** Merchant hereby grants to Licensee a lien and Security Interest in the Merchant Bank Account, the Reserve Account, any inventory with respect to which a Transaction has occurred but has not yet been fulfilled, and any other bank account established by Merchant in accordance with this Agreement to the extent of any and all fees, payments and expenses which may arise under this Agreement, and Merchant shall execute any document and obtain any consents or waivers from the bank at which the bank accounts are maintained as requested by Licensee to protect and perfect Licensee's Security Interest therein ("Security Interest"). Merchant grants this Security Interest to secure all Merchant's obligations to Licensee under this Agreement. Merchant will pay all costs and expenses associated with filing any required documents to perfect Licensee's Security Interest in all public filing offices, where filing is deemed by Licensee to be necessary or desirable. Licensee is authorized to file financing statements relating to the Security Interest inventory without notice to Merchant, where authorized by law. Merchant appoints Licensee as its attorney-in-fact to execute such documents as are necessary or desirable to accomplish perfection of any security interests. This appointment is coupled with an interest and shall be irrevocable as long as Merchant owes any amount to Licensee.

**3.12 Reserve Account.** Upon, or at any time after, execution of this Agreement, Merchant authorizes Processing Financial Institution to establish a non-interest-bearing reserve account at Processing Financial Institution in Processing Financial Institution's name (the "Reserve Account") in such amount as Processing Financial Institution or Licensee from time to time may determine in its their sole discretion that are sufficient to satisfy Merchant's current or future obligations related to transactions processed or otherwise incurred by Processing Financial Institution or Licensee on Merchant's behalf under this Agreement, applicable law or private regulation, including amounts owed to cover any Chargebacks, refunds, fees, fines, actual or potential losses, or risks, (collectively the "Liabilities"). Processing Financial Institution or Licensee may fund the Reserve Account by deducting amounts from payments due to Merchant, by effecting a charge against Merchant Bank Account or against any of Merchant's accounts at Processing Financial Institution or any other account authorized by Merchant via ACH payment as authorized herein, or by demanding payment from Merchant (which payment Merchant shall make within ten (10) days after receipt of any such demand). The Reserve Account will be maintained for a minimum of nine months after the date on which this Agreement terminates or until such time as Licensee and/or Processing Financial Institution determines that the release of the funds to Merchant is prudent, in the best interest of Processing Financial Institution and Licensee, and commercially reasonable, and that Merchant's account with Processing Financial Institution under this Agreement and any other agreement entered into between Merchant, Licensee, and/or Processing Financial Institution is fully resolved. Merchant and Licensee acknowledge and agree that only Processing Financial Institution, and not Licensee, may authorize or effect any release of funds from the Reserve Account to Merchant. Processing Financial Institution and Licensee may withdraw funds from the Reserve Account at any time to offset any indebtedness of Merchant to Processing Financial Institution that may arise out of or relate to the obligations of Merchant under this agreement (including, but not limited to, Chargebacks and fees) or to offset any other indebtedness of Merchant to Processing Financial Institution under any other agreement entered into between Merchant and Processing Financial Institution. Upon expiration of this nine-month period, or greater time if required under the Rules, any balance remaining in the Reserve Account will be paid to Merchant. Processing Financial Institution will inform Merchant in writing of any charges debited to the Reserve Account during this nine-month period, or greater time if required under the Rules. Notwithstanding the foregoing, Processing Financial Institution, in its sole discretion, may release funds from the Reserve Account prior to the expiration of such nine-month period based on its assessment of the risks associated with effecting such release. Processing Financial Institution may deposit into the Reserve Account funds it would otherwise be obligated to pay Merchant, if it determines such action is reasonably necessary to protect its interest. (Processing Financial Institution, on its own behalf or at Licensee's request, may, without notice to Merchant, apply deposits in the Reserve Account against any outstanding amounts Merchant owes under this Agreement or any other agreement between Merchant and Processing Financial Institution or Licensee. Merchant acknowledges and agrees that Merchant's interest in the Reserve Account is strictly limited to surplus funds in the Reserve Account, if any should exist, after satisfaction of all Liabilities. In the event that a court for any reason determines at any time that Processing Financial Institution is not the sole and exclusive owner of the funds in the Reserve Account, then Merchant also grants to Processing Financial Institution and Licensee a security interest in and lien to all funds held in the Reserve Account, regardless of source, as part of a security agreement within the meaning of the Uniform Commercial Code. Merchant also grants to Processing Financial Institution and Licensee a security interest in and lien upon: (i) the Processing Financial Institution Account (as set forth above) and all funds at any time in the Processing Financial Institution Account, whatever the source of such funds; (ii) future Transactions; and (ii) all Merchant's rights relating to this Agreement including, without limitation, all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Upon request of Processing Financial Institution and Licensee, Merchant will execute one or more financing statements or other documents to evidence this security interest. Merchant authorizes and appoints Licensee and Processing Financial Institution its attorney in fact to sign its name to any financing statement used for the perfection of any security interest or lien granted in this Agreement. Merchant represents and warrants that no other party has a security interest in the Secured Assets. These security interests and liens will secure all of Merchant's obligations under this Agreement and any other agreements between Merchant, Licensee and Processing Financial Institution. With respect to such security interests and liens, Processing Financial Institution and Licensee will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from Processing Financial Institution and Licensee written consent prior to granting a security interest of any kind in the Secured Assets to a third party. In the event of a Bankruptcy proceeding, Processing Financial Institution and Licensee may exercise their rights under this Agreement to debit the Reserve Account for amounts due Processing Financial Institution and Licensee regardless of the pre-petition or post-petition nature of the amount due Processing Financial Institution and/or Licensee, and Merchant promises not to contest any Motion for Relief from Automatic Stay that Processing Financial Institution and Licensee may decide to file to debit the Reserve Account. Further, Processing Financial Institution and Licensee do not consent to the assumption of this Agreement in the event of a Bankruptcy proceeding. Nevertheless if this Agreement is assumed Merchant agrees that, in order to establish adequate assurance of future performance within the meaning of 11 U.S.C. Sec. 365, as amended from time to time, Merchant must establish or maintain a Reserve Account in an amount satisfactory to Processing Financial Institution and Licensee; (c) Processing Financial Institution and Licensee have the right of recoupment and set-off. This means that they may offset any outstanding/uncollected amounts owed to them from: (i) any amounts they would otherwise be obligated to deposit into the Account; and (ii) any other amounts Licensee and Processing Financial Institution may owe Merchant under this Agreement or any other agreement; (d) The rights conferred upon Processing Financial Institution and Licensee in this Section are not intended to be exclusive of each other or of any other rights and remedies of Processing Financial Institution and Licensee under this Agreement, at law or in equity. Rather, each and every right of Processing Financial Institution and Licensee at law or in equity will be cumulative and concurrent and in addition to every other right.

**3.13 Offset and Debit.** All amounts Merchant owes to Licensee and/or Processing Financial Institution, for any reason, may be charged to the Operating Account or Reserve Account, recouped by adjustment to any credits due to Merchant, or set off against any account or property Processing Financial Institution holds for or on behalf of Merchant.

**3.14 Processing Transactions.** (a) Merchant shall obtain authorizations from the Processing Financial Institution ("Authorizations") and process Transactions using Equipment as may be approved from time to time by Processing Financial Institution and Licensee, in its sole discretion. Merchant shall be responsible to ensure that all Equipment is compliant with all Rules. Merchant shall validate Cards and Cardholders in face-to-face transactions as required by Applicable Law. (b) Merchant shall obtain Authorizations for Transactions in a manner required by Applicable Law and in the manner, and following the processes and procedures, determined from time to time by Processing Financial Institution, in its sole discretion, and communicated to Merchant by either Processing Financial Institution or Licensee. (c) Merchant shall not submit a Transaction to Processing Financial Institution (electronically or otherwise) until Merchant has performed its obligations to the


[redacted]

## Merchant Application

## Electronic Payment Services Agreement

Cardholder in connection with the Transaction or obtained Cardholder's consent for a Pre-Authorized Recurring Order Transaction.(d) Merchant shall not transmit any Transaction to Processing Financial Institution that Merchant knows or should have known to be illegal, fraudulent or not authorized by the Cardholder. (e) Merchant shall not process a Transaction that does not result from an act between a Cardholder and Merchant. (f) Merchant shall not request or use any Card

**3.15 number or Transaction data for any purpose other than as payment for its goods or services.** (g) Merchant may transmit a Transaction that effects a prepayment of services or full prepayment of custom-ordered merchandise, manufactured to a Cardholder's specifications, if Merchant advises Cardholder of the immediate billing at the time of the Transaction and within time limits established by the Associations.

**3.16 Chargebacks.** The acceptance by Processing Financial Institution of any Transaction processed in accordance with the terms of this Agreement shall be without recourse to Merchant. Any transaction disputes will result in an automatic loss to Merchant..

In addition to any other remedy available to Processing Financial Institution or Licensee, upon the occurrence of a Monthly Chargeback Violation, Merchant must pay to Processing Financial Institution or Licensee, as applicable but in no case duplicative, a fee for chargebacks that exceed 1% of the total processing volume in an amount of $25 per chargeback.

At least once each month, Processing Financial Institution or Licensee shall provide a statement (the "Merchant Statement") to Merchant. All information appearing on the Merchant Statement shall be deemed accurate and affirmed by Merchant unless Merchant objects by written notice specifying the particular item in dispute within 30 days of the date of the Merchant Statement.

**3.17** Retention of Information. Merchant shall retain the information required to be submitted in connection with a Transaction or to be maintained in connection with a complaint for seven (7) years from the date of the Transaction or the complaint. At the request of Processing Financial Institution, Merchant shall provide such information to Processing Financial Institution or Licensee, as directed by Processing Financial Institution, within five (5) days of receipt of a request from Processing Financial Institution. Failure to meet such time frame or non-delivery of any item or delivery of an illegible copy of an item requested by an Issuer shall, among other things, constitute a waiver by Merchant of any claims and may result in an irrevocable Chargeback for the full amount of the Transaction.

**3.18** Recovery of Cards. Merchant will use its best efforts to reasonably and peaceably recover and retain any Card with respect to which Merchant receives notification of cancellation, restrictions, theft or counterfeiting. This notice may be given: (i) electronically through the Equipment, (ii) by the Authorization Center through any means; or (iii) by listing on any canceled Card or restricted Card list. Merchant shall also take reasonable steps to recover a Card that it has reasonable grounds to believe is counterfeit, fraudulent or stolen.

**3.19** Customer Complaints. Merchant shall respond promptly to inquiries from Cardholders and shall attempt to resolve any disputes amicably. If unresolved disputes occur with a frequency unacceptable to Processing Financial Institution or Licensee, Processing Financial Institution or Licensee may terminate this Agreement. Processing Financial Institution reserves the right to charge Merchant reasonable fees and reimbursement on account of excessive Card holder inquiries, refunds or Chargebacks. Merchant agrees to maintain the following information in writing with respect to each claim or defense asserted by a Cardholder for which Merchant has received notice:

(a) The Cardholder's name;

(b) The Card account number;

(c) The date and time the Cardholder asserted the claim or defense;

(d) The nature of the claim or defense; and

The action that Merchant took in an attempt to resolve the dispute. Upon request, Merchant shall furnish Processing Financial Institution with this information in writing within 10 days.

### 4. LIABILITY; INDEMNIFICATION

**4.1 Limitations on Liability.** Licensee shall be responsible only for performing the services expressly provided for in this Agreement and shall be liable only for its gross negligence in performing those services. IN NO EVENT SHALL LICENSEE OR PROCESSING FINANCIAL INSTITUTION BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, PUNITIVE OR INDIRECT LOSS OR DAMAGE THAT THE MERCHANT MAY INCUR OR SUFFER IN CONNECTION WITH THIS AGREEMENT, INCLUDING LOSSES OR DAMAGE FROM SUBSEQUENT WRONGFUL DISHONOR RESULTING FROM LICENSEE'S ACTS OR OMISSIONS PURSUANT TOTHIS AGREEMENT. IN NO EVENT SHALL THE TOTAL AGGREGATE LIABILITY OF LICENSEE FOR ANY AND ALL CLAIMS, LOSSES OR DAMAGES ARISING UNDER THIS AGREEMENT EXCEED THE LESSER OF (i) THE TOTAL AMOUNT OF FEES ACTUALLY PAID TO LICENSEE BY MERCHANT DURING THE THREE (3) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT THAT GAVE RISE TO THE CLAIM, LOSS OR DAMAGE; or (ii) $10,000 WHETHER OR NOT THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN OR CONTEMPLATED AND REGARDLESS OF THE LEGAL OR EQUITABLE THEORY OF LIABILITY WHICH MAY BE ASSERTED.

**4.2 Delays.** NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, LICENSEE SHALL HAVE NO LIABILITY FOR ANY DELAY IN FUNDING TRANSACTIONS TO Merchant FOR ANY REASON.

**4.3 Indemnity.** Merchant agrees to indemnify, defend, and hold harmless Licensee against any loss, liability or expense (including attorneys' fees and expenses) resulting from any claim of any third party for, any act of omission by the Merchant or its officers, directors, shareholders, employees, agents, and representatives. Merchant agrees to indemnify, defend and hold Processing Financial Institution, and Licensee harmless from any and all losses, claims, damages, liabilities and expenses, including attorneys' fees and costs (whether or not an attorney is an employee of Processing Financial Institution or Processing Financial Institution's affiliates, Licensee or affiliates of Licensee) arising out of any of the following:

(a) Merchant's failure to comply with this Agreement; (b) Any act or omission of Merchant; (c) Merchant's failure to comply with any Equipment's user's guide; (d) Merchant's failure to comply with any Applicable Law; (e) Any dispute concerning the quality, condition or delivery of any merchandise or the quality of performance of any service; (f) The fraud or dishonesty of Merchant or Merchant's employees, Licensees, successors, agents and/or assigns; (g) Merchant's selection of an Internet service Licensee or other telecommunication services Licensee; (h) The theft of or damage or destruction to any Equipment; or (i) Full Recourse Transactions, unauthorized Transactions and prohibited Transactions.

### 5. TERM and TERMINATION

**5.1 Term and Termination.** The initial Term for this Agreement shall be for the period of three (3) years beginning on the Effective Date (the "Term"), and shall renew for an additional successive three (3) year terms unless any Party hereto provides the other written notice of its intent not to renew one (1) year prior to the expiration of the current Term. Merchant must expressly terminate by submitting a cancellation form available by emailing support@paysolonline.com to Licensee via the methods set forth thereon, which include email support@paysolonline.com or mail to the address set forth in the notice provision below. Termination prior to the expiration of the initial Term or any renewal Term, for any reason whatsoever including termination by Licensee, shall result in the assessment of a Program Early Termination Fee as described herein. Licensee reserves the right to terminate this Agreement immediately without cause upon providing written notice of such termination to the Merchant. In the event Licensee terminates this Agreement without cause, Merchant shall not be assessed a Program Early Termination Fee by Licensee. Merchant expressly understands that each Association may also terminate or limit the ability to perform under this Agreement.

**5.2 Upon Default.** Licensee shall have the right to terminate this Agreement, effective immediately, without notice if Merchant is in default of any obligation under this Agreement or if Merchant is declared bankrupt, files a voluntary petition under any bankruptcy laws, has a receiver appointed for all or substantially all of its property, or makes an assignment of all or substantially all its assets to creditors.

**5.3 Program Early Termination Fee.** If Merchant terminates, breaches this Agreement prior to the end of the Term, (by way of illustration and not limitation) whether by failing to (a) process any transactions in a calendar month or by switching to a different processor, (b) cure any default under this Agreement, or (c) by Merchant giving notice of termination, then Merchant shall pay a Program Early Termination Fee. The Early Termination Fee will be an amount equal to the greater of (i) the average monthly processing fees charged to the Merchant for the previous 12 months (or such shorter time if the Merchant has processed for less than 12 months) multiplied by the

## *Merchant Application*

## *Electronic Payment Services Agreement*

number of months remaining under the agreement, or (ii) $550. The parties agree that the amount set forth in the previous sentence is not a penalty, but instead a fair calculation of the damages that Licensee would suffer, and that such amount is otherwise extremely difficult if not impossible to calculate due to the specific nature and complexities of the electronic payment processing industry. The termination fee shall not be Licensee's exclusive remedy and shall apply in the event of early termination for any reason whatsoever related to Merchants breach of this Agreement regardless of the party that ultimately terminates the Agreement.

**5.4 Effect of Termination**. Upon the termination of a Processing Program, Merchant's obligations shall include, but not be limited to, (a) payment of all applicable fees and charges for any services performed by Licensee prior to the effective date of termination; (b) payment of Program Early Termination Fee; (c) payment of all costs and expenses incurred to collect amounts owed by Merchant to Licensee; and (d) payment of any subsequent returned items from Merchant's use of the services. All existing obligations, warranties, indemnities and agreements with respect to Transactions entered into before such termination shall remain in full force and effect, and, regardless of any such termination, Merchant shall remain liable for all obligations to Cardholders and Processing Financial Institution that are incurred while this Agreement is in effect. Licensee may, in its sole and absolute discretion, hold Merchant's funds for a period of time that it deems necessary and, in an amount sufficient to cover said financial obligations from the final deposit to the Merchant Bank Account. Within thirty (30) days of termination of this Agreement Merchant shall return to Licensee all materials that are the property of Licensee and provided by Licensee to Merchant, as part of the services contemplated hereunder, including, but not limited to software, hardware manuals and instructions.

### 6. CONFIDENTIALITY

**6.1 Confidentiality**. Each Party acknowledges and agrees that it may obtain certain confidential information from the other in the course hereof. Such information includes, but is not limited to, pricing, and technical information, operating procedures, and other information pertaining to the business and customers of each Party ("Confidential Information"). Such Confidential Information does not include: (a) information that is publicly available; (b) information received from a third party not in violation of any confidentiality obligation; (c) information already known by the receiving Party at the time of disclosure, and (d) independently developed information. Each Party agrees: (i) to maintain the confidentiality of the other's Confidential Information, using efforts no less protective than such Party uses to in the protection of its own information; (ii) not to disclose such information to any third party, except auditors and regulators, or as otherwise required by law or directed by the disclosing Party; (iii) not to use such information for any purpose whatsoever other than its performance hereunder; (iv) to return all Confidential Information to the other Party upon request. The Parties stipulate and agree that it is not confidential information whether Merchant's, or Merchant's transactee, transfer of funds through Licensee has been returned, reversed, allegedly unauthorized, or otherwise contested.

### 7. GENERAL

**7.1 Entire Agreement**. The Agreement is the complete and exclusive statement of the agreement between Licensee and the Merchant with respect to the subject matter hereof and supersedes any prior agreement(s) between Licensee and Merchant with respect to such subject matter.

**7.2 Amendment or Modification**. Except as otherwise provided herein, no provision of this Agreement may be amended or modified by Merchant except through a signed writing by Licensee. Any amendment to this Agreement shall be effective the later of either the effective date contained in the notice of acceptance by Licensee, fifteen (15) days after the notice is mailed, or when expressly agreed.

**7.3 Regulatory Amendment; Modifications**. In the event performance of the services provided herein would result in a violation of any present or future statute, regulation or government policy to which Licensee and Processing Financial Institution is subject, and which governs or affects the transactions contemplated by this Agreement, then this Agreement shall be deemed amended to the extent necessary to comply with such statute, regulation or policy, and Licensee and Processing Financial Institution shall incur no liability to the Merchant as a result of such violation or amendment.

**7.4 Section Headings.** All Section headings are for descriptive purposes only. The language of each Section shall control.

**7.5 Notice.** Except as otherwise expressly provided herein, any written communication shall be delivered, or sent to the addresses provided above, unless another address is substituted by notice delivered or sent by Licensee or Merchant's as provided herein. Except as otherwise expressly provided herein, any such notice shall be deemed given when received.

**7.6 Force Majeure**. Except when prevented from doing so by causes beyond its control, including, but not limited to Acts of God, strikes, mechanical or electrical breakdown, fire, flood, war, governmental action, accident, Licensee shall process transactions in accordance with this Agreement.

**7.7 Telecopy.** A telecopy (fax) of a signed offer, acceptance, amendment, addendum, or notice shall be deemed the equivalent of the original document.

**7.8 Prohibition of Assignment and Delegation**. Merchant may not assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of Licensee, which consent may be withheld in Licensee's sole and absolute discretion. Despite Licensee's consent, no assignment will release the Merchant from any of its obligations or alter any of its primary obligations to be performed under the Agreement. Any attempted assignment or delegation in violation of this provision is void or voidable at the option of Licensee and will entitle Licensee to terminate this Agreement immediately.

**7.9 Licensee Assignment and Delegation**. Licensee may assign any of its rights to or delegate any of its duties under this Agreement at any time.

**7.10 Waiver**. Licensee may waive enforcement of any provisions of this Agreement. Any such waiver shall not affect Licensee's rights with respect to any other transaction or modification of the terms of this Agreement.

**7.11 Binding Agreement; Benefit**. This Agreement shall be binding upon and to the benefit of the Parties hereto and their respective legal representatives, successors, and permitted assigns. This Agreement is not for the benefit of any other person, and no other person shall have any right against Licensee or the Merchant hereunder.

**7.12 Severability**. In the event that any provision of this Agreement shall be determined to be invalid, illegal or unenforceable to any extent, the remainder of this Agreement shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**7.13 Governing Law and Venue.** This Agreement is governed by and must be interpreted under California law, without regard to its choice-of-law provisions. The sole and exclusive venue for resolving disputes under this Agreement will be the federal or state courts of Orange County, California.

**7.14 Attorney's Fees**. Should either Party pursue an action in court or arbitration against the other regarding any provision of this Agreement, the prevailing Party shall be entitled to all costs incurred in connection with such action including a reasonable attorney's fees.

BINDING ARBITRATION. ANY DISPUTE OR CLAIM BETWEEN THE PARTIES ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE FULLY AND FINALLY RESOLVED BY BINDING ARBITRATION IN ORANGE COUNTY CALIFORNIA IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES AND PRACTICES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA") FROM TIME TO TIME IN FORCE AND EFFECT. THIS AGREEMENT TO ARBITRATE SHALL BE SPECIFICALLY ENFORCEABLE AND IS THE EXCLUSIVE REMEDY FOR THE RESOLUTION OF SUCH DISPUTES UNDER THIS AGREEMENT. THERE SHALL BE A SINGLE ARBITRATOR, WHO MUST BE (I) A LAWYER ENGAGED FULL-TIME IN THE PRACTICE OF LAW AND A MEMBER IN GOOD STANDING OF THE STATE BAR OF CALIFORNIA AND (II) ON THE AAA REGISTER OF ARBITRATORS. WITHIN THIRTY (30) DAYS OF THE CONCLUSION OF THE ARBITRATION HEARING, THE ARBITRATOR SHALL PREPARE WRITTEN FINDINGS OF FACT AND CONCLUSIONS OF LAW. JUDGMENT ON THE WRITTEN AWARD MAY BE ENTERED AND ENFORCED IN ANY STATE OR FEDERAL COURT LOCATED IN ORANGE COUNTY CALIFORNIA. THE PARTIES HEREBY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE TRIBUNAL SO SELECTED, TO THE EXCLUSION OF ANY OTHER COURT WHICH MIGHT HAVE HAD JURISDICTION APART FROM THIS SECTION, WAIVE ANY DEFENSE OF LACK OF IN PERSONAM JURISDICTION OF SUCH COURTS AND AGREE THAT SERVICE OF PROCESS IN ANY ACTION BEFORE SUCH COURTS MAY BE MADE BY MAILING IT TO THE PARTY TO BE SERVED AT THE ADDRESS PROVIDED HEREIN. IT IS MUTUALLY AGREED THAT THE WRITTEN DECISION OF THE ARBITRATOR SHALL BE VALID, BINDING, FINAL AND NON-APPEALABLE; PROVIDED HOWEVER, THAT THE PARTIES HERETO AGREE THAT THE ARBITRATOR SHALL NOT HAVE THE AUTHORITY TO AWARD PUNITIVE DAMAGES AGAINST ANY PARTY TO SUCH ARBITRATION. THE ARBITRATOR SHALL REQUIRE THE NON-PREVAILING PARTY TO PAY THE ARBITRATOR'S FULL FEES AND EXPENSES OR, IF IN THE ARBITRATOR'S OPINION THERE IS NO PREVAILING PARTY, THE ARBITRATOR'S FEES AND EXPENSES WILL BE BORNE EQUALLY BY THE PARTIES THERETO. EACH OF THE PARTIES HERETO FURTHER AGREES THAT IT WILL NOT BECOME A MEMBER OF ANY CLASS-WIDE LITIGATION OR ARBITRATION AND WILL NOT INITIATE ANY CLASS ACTION LITIGATION OR ARBITRATION AGAINST THE OTHER PARTY. FURTHER THE PARTIES AGREE THAT THEY WILL NOT ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OF ANY GROUP, CLASS, OR OTHERWISE SIMILARLY SITUATED INDIVIDUAL OR ENTITY.


[redacted]

## Setup Form

Customer #:                DBA Name: Trulieve, Inc

| Non-Taxable Items | Quantity | Unit Price | Amount |
|---|---|---|---|
| Application Fee (Non Refundable) | 52 | 75 | $ 3900 |
| Encryption Fee | 599 | 35 | $ 20,965 |
| Wireless Activation Fee | | | $ |
| | | | |

| Taxable Items | Purchase | Repro/Own | Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| Z1 Terminal | ☐ | ☐ | | | $ |
| Z3 Pinpad | ☐ | ☐ | | | $ |
| Z6 Pinpad | ☐ | ☐ | | | $ |
| Z9 Terminal | ☐ | ☐ | | | $ |
| Z11 Terminal | ☐ | ☐ | | | $ |

*Shipping address city tax rate will apply when shipping address is in CA

| | |
|---|---|
| Tax ____% | $ |
| Subtotal Taxable Items | $ |
| Balance Due | $ |

UNOFFICIAL DOCUMENT

### Payment Information

Select One: ☐ Visa ☒ Mastercard ☒ Discover ☒ American Express

Name on Card: Trulieve

Cardholder's Contact Telephone Number:

Last Four Digits of Card Number: ACH

*A representative will contact the cardholder to retrieve the remaining digits, Exp date, and CVV Code.

Billing Address:

City/State/Zip:

*I agree to pay the above amount

*Merchant Signature: DocuSigned by: Mohan Srinivasan   Name (please print): Mohan Srinivasan   Date: 3/27/20

### Set Up Information

| | |
|---|---|
| Contact for Setup: Rick Wilson | Additional Instructions: |
| Contact Telephone: 850.382.7209 | |
| Best time for Install/Repr: A.M. ☒ P.M. ☐ | |
| Shipping Address: 3494 Martin Hurst Rd Tallahassee, FL 32312 | |

*Default shipping address will be DBA Address

paysol

## Appendix A

| *Fill out only for additional Principal/Officer/Manager with 25% or more ownership | | |
|---|---|---|
| Name | | Title |
| Home Address (Street, City, ST, Zip) | | Ownership % |
| Work Telephone | Mobile Telephone | Social Security Number |
| Driver's License State & Number | Driver's License Expiration Date | Date of Birth |

| | | |
|---|---|---|
| Name | | Title |
| Home Address (Street, City, ST, Zip) | | Ownership % |
| Work Telephone | Mobile Telephone<br>Trulieve, Inc | [redacted] Security Number |
| Driver's License State & Number<br>75 | [redacted] License Expiration Date | [redacted] |

| | | |
|---|---|---|
| Name<br>35 | | Title<br>20,965 |
| Home Address (Street, City, ST, Zip) | | Ownership % |
| Work Telephone | Mobile Telephone | Social Security Number |
| Driver's License State & Number | Driver's License Expiration Date | Date of Birth |

| | | |
|---|---|---|
| Name | | Title |
| Home Address (Street, City, ST, Zip) | | Ownership % |
| Work Telephone | Mobile Telephone | Social Security Number |
| Driver's License State & Number | Driver's License Expiration Date | Date of Birth |

| *Fill out only for Multiple DBAs |
|---|
| DBA Name |
| DBA Name |
| DBA Name |
| DBA Name |

[redacted]

**Addendum A to the Paysol Merchant Application for [redacted]**

The terms of the Electronic Payment Services Agreement for [redacted] are amended as set forth below.

1. The term "Merchant" collectively refers to Trulieve, Inc. and its parent, subsidiaries and affiliates.

2. Section 1.5 is hereby amended by adding the following as the last sentence:

> *For so long as Merchant is a publicly traded company, any disclosure or notice requirements of this Section 1.5 shall be deemed satisfied by Merchant's public disclosures.*

3. Section 1.6 is hereby amended by adding the following as the last sentence:

> *For so long as Merchant is a publicly traded company, any disclosure or notice requirements of this Section 1.6 shall be deemed satisfied by Merchant's public disclosures.*

4. Section 1.7 is hereby amended by adding the following as the last sentence:

> *For purposes of this Agreement, the term Applicable Law shall exclude United States federal laws relating to the cultivation, distribution or possession of marijuana in the United States.*

5. Section 1.11 is hereby amended by adding the following as the last sentence:

> *Notwithstanding the foregoing, the exclusivity and limitations of this section shall not apply with respect to any agreement or arrangement Merchant has in place prior to the effective date of this Agreement.*

6. Section 2.2 is hereby amended by adding the following as the last sentence:

> *For so long as Merchant is a publicly traded company, any disclosure or notice requirements of this Section 2.2 shall be deemed satisfied by Merchant's public disclosures.*

7. New Section 5.5 is added as follows:

> *Merchant shall have the right to terminate this Agreement immediately in the event the Application is inoperable or unavailable for 5 or more days during the Term. In the event the Agreement is so terminated, Merchant will not be liable for any amounts to Licensee, including fees (specifically including any Program Early Termination Fee), costs or damages.*

UNOFFICIAL DOCUMENT

8. New Section 5.6 is added as follows:

*In the event federal banking laws and regulations allow Associations or nationally regulated financial institutions to conduct business with cannabis companies, Licensee and Merchant agree to negotiate in good faith an amendment to this Agreement to reflect competitive terms generally available to non-cannabis companies. In the event the parties cannot agree to the terms of such amendment, either party may cancel this agreement, without penalty (specifically including any Program Early Termination Fee), upon 15 days prior notice.*

IN WITNESS WHEREOF, the parties have caused this Agreement to be made and executed by their authorized representatives as of the date below.

Date: 3/27/2020

Payment Solutions International, LLC DBA: PAYSOL

**Licensee** [redacted]

DocuSigned by: Fadi Cheikha
966C692FE77443F...

DocuSigned by: Mohan Srinivasan
8FB5BD17115749...

Name: Fadi Cheikha Name: Mohan Srinivasan

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

# EXHIBIT "F"

---------- Forwarded message ---------
From: **Chris Black** <tpa2slc@gmail.com>
Date: Sun, Aug 11, 2024 at 12:14 PM
Subject: Some things to consider prior to our Special Meeting
To: Jim Esry <jesry@fnbpasco.com>, John Henson <jhensoncpa@verizon.net>, Paula O'Neil <clerkpaula@gmail.com>, Stephen D. Carle <hodgescarle@hotmail.com>, AP Gibbs <anderpgibbs@gmail.com>, Marlene Mann <marlenehmann@aol.com>, Paul Midili <paulmidili1@gmail.com>

Good afternoon fellow board members (minus Fadi),

Prior to our meetings tomorrow, I wanted to share some thoughts with my peers, as it's prudent we all have an understanding of what's at stake with regards to the decisions we're undertaking on behalf of the bank.

First, I understand there's some speculation that Fadi and I are in "cahoots" so I'd like to set the record straight and affirm that this is wholly untrue. My holdings in this bank account for less than 1% of my net worth so I have no financial incentive (let alone time) to participate in anything of this nature. All of our responsibilities as a directors on this board is to provide guidance to management in an ethical and fiduciary manner from the lens solely of what's in the best interest of the bank, its employees, and shareholders.

Next, I would like to apologize to anyone whom I may have offended at times with any commentary I've provided relating to topics important to our bank. It's incumbent as members of this board that we listen to, understand, and then make the most rational decisions possible for the bank and shareholders. I respect altering opinions and always try to provide feedback in a constructive manner. I realize at times this comes across in what may be construed as aggressive, however I can assure you I have the bank's best interest at the forefront of my thoughts. I would appreciate, if this happens in the future, that I be treated with the same level of respect I have treated everyone with during my tenure here.

Presently, everyone is aware of our capital position and the necessity to raise capital in order to not only execute on the initiatives we've been working toward, but also to continue to reward our shareholders with dividends well into the future. Leading into tomorrow's meeting, I called Jim yesterday to understand more about Mr. Pearlman's opinion on the viability of the proposed preferred stock offering which was pitched at our last meeting. I was informed that Mr. Pearlman rendered an opinion roughly two weeks ago suggesting this is not a great option due to the discount to book value that would be required to adequately sell those types of shares on the open

UNOFFICIAL DOCUMENT

market. Mr. Pearlman suggested that a common stock offering would be a better course of action however that too would likely be discounted in the open market to the tune of approximately 90% of book value (at best). This type of offering would also have costs and would dilute all existing shareholders.

Today, our bank sits at an inflection point. The predicament is complex with several moving parts. If this bank is to survive and succeed, we need to have a plan to implement what we're building and the capital resources necessary to execute. At present, given the opinion from Mr. Pearlman, the LOI in front of us makes the most business sense for a number of reasons:

1) Not a buyout of the bank...existing shareholders have the ability to contribute their shares into the newly capitalized bank
2) Extremely fair value (1.9x book is over market when compared to other bank M&A recently)
3) Management team and employees of the bank to remain
4) Expediency to close

I'm certainly open to hearing other plans on how to raise the capital necessary to continue operations of the bank, however given where we stand, this appears to be the best path forward.

I would be remiss if I didn't articulate my view of what will likely happen to the bank in the event we vote this LOI down. First, I think Fadi will step down and sue the bank. Given the situation with Steve and Kerry and the alleged bond portfolio mishap that sank the original deal, I believe Fadi has a case against us. The downside of that scenario means, as members of the board, we're all personally liable for what we may or may not have known was happening with the bond portfolio and how it impacted the deal falling apart. Personally, I don't need/want any litigation or costs (time and money) with that type of action. Is that how you'd like to spend some of your time/money in the future?

Additionally, many of the programs we're ramping are programs Fadi has been involved in bringing to the bank. I would suspect, if he walks away, so do all the programs including the time and energy our teams have spent developing the infrastructure to support them. This alone would be extremely unlikely to recover from and would almost certainly result in the layoff of several of our employees as we would no longer have the means to support their payroll with no income (and projected income) from the programs. Not to mention the OCC scrutiny from a lack of strategic planning perspective.

Lastly, our executive leadership team has been through the ringer as of late. Everything from Steve's untimely departure, to the implementation of our new Jack Henry system, to Kerry's threat of violence, to the OCC's MRA etc...it hasn't exactly been a walk in the park. I worry about how much more



UNOFFICIAL DOCUMENT

our team can handle. Should this LOI be voted down, I believe it sends the message that we don't have an adequate plan for how to execute on all our initiatives and therefore we risk losing them to attrition.

To summarize, we find ourselves in a precarious position. A place with deep emotional connection embedded. I can only hope that each of us can take an introspective, business minded look at the circumstances and make the fiduciary decision we're obligated to make as members of this board. Doing the right thing even when it's hard has been my fundamental philosophy that has proven to be impactful each and every time I've been faced with decisions. I feel strongly that this instance is no different and I trust you all will use the same philosophy in making this decision.

I'll look forward to seeing everyone tomorrow afternoon.

Best,

Chris Black
813-997-1114 Mobile

UNOFFICIAL DOCUMENT

UNOFFICIAL DOCUMENT

# EXHIBIT "G"

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement") is made and entered into as of March 17, 2023, by and between Florida Bancshares, Inc. (the "Company") and Aiden Fintech Group, Inc. (the "Purchaser").

RECITALS

WHEREAS, the Company is a Florida corporation that serves as a bank holding company for its wholly-owned subsidiary, First National Bank of Pasco, a national banking association (the "Bank");

WHEREAS, the Company holds One Hundred Forty Seven Thousand Three Hundred Forty Nine (147,349) shares of treasury stock (the "Treasury Shares") consisting of the Company's common stock, par value $1.00 per share; and

WHEREAS, the Company now desires to sell, convey, transfer and assign Fifty Eight Thousand (58,000) Treasury Shares (the "Shares") to the Purchaser, and the Purchaser desires to purchase and accept from the Company, all right title and interest in and to the Shares, upon and subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the premises and of the mutual agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

UNOFFICIAL DOCUMENT

ARTICLE I
PURCHASE AND SALE OF THE SHARES

1.01. Sale of Shares to the Purchaser. On the terms and subject to the conditions set forth in this Agreement, the Company hereby sells, assigns, transfers, and delivers to the Purchaser, and the Purchaser hereby agrees to purchase from the Company, the Shares. The Company transfers the Shares free and clear of all liens, security interests, pledges, encumbrances, adverse claims and demands of every kind, character and description whatsoever. The purchase of the Shares by the Purchaser shall be referred to herein as the "Stock Purchase."

1.02 Purchase Price. The Purchaser shall purchase the Shares at a total price equal to One Million, Three Hundred Ninety Thousand, Eight Hundred Forty Dollars, and no cents ($1,390,840.00) (the "Purchase Price"), subject to a credit of One Hundred Ninety Thousand, Eight Hundred Forty Dollars, and no cents ($190,840.00) (the "Credit") as consideration for business opportunities introduced by affiliates of the Purchaser to the Bank, which the Bank has availed itself of and will continue to avail itself of.. The Purchaser has delivered to the Company One Million Two Hundred Thousand Dollars and no cents ($1,200,000.00) in immediately available funds in accordance with the Company's written wire transfer instructions representing the Purchase Price, net of the Credit.

1.03. Implementation of Transfer of Shares. On the date hereof, the Company shall deliver to the Purchaser (or a custodian designated in writing by the Purchaser) a certificate or certificates

representing the Shares issued in the name of the Purchaser (or its nominee in accordance with its delivery instructions).

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

As an inducement to the Company to enter into this Agreement and to consummate the Stock Purchase, the Purchaser hereby represents and warrants as follows:

2.01. Corporate Status. The Purchaser is a Delaware corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware, has corporate power and authority to own its properties and assets and to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified or where the failure to be so qualified or in good standing would not reasonably be expected to have, a material and adverse effect on the business, results of operations, condition (financial or otherwise), prospects, assets, properties, employees, liabilities (absolute, accrued, contingent or otherwise) or reserves of the Purchaser.

2.02. Authority.

(a) The Purchaser has the power and authority necessary to execute, deliver, and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated herein have been duly and validly authorized by all necessary action in respect thereof on the part of the Purchaser, and this Agreement represents a legal, valid, and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms (except in all cases as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and except that the availability of the equitable remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding may be brought).

(b) Neither the execution and delivery of this Agreement by the Purchaser, nor the consummation of the transactions contemplated hereby, nor compliance by the Purchaser with any of the provisions hereof, will (i) conflict with or result in a breach of any provision of the Purchaser's certificate of incorporation or bylaws or any resolution adopted by the board of directors or the shareholders of the Purchaser, (ii) constitute or result in a Default under, or require any consent pursuant to, or result in the creation of any Lien on any asset of the Purchaser under any Contract or Permit of the Purchaser involving aggregate payments to any Person in any calendar year in excess of $100,000, or (iii) constitute or result in a Default under, or require any consent pursuant to, any Law or Order applicable to the Purchaser or any of its assets (including the Purchaser becoming subject to or liable for the payment of any Tax on any of the Assets owned by the Purchaser or the Company).

2.03. Board Approval. The board of directors of the Purchaser has adopted this Agreement and approved the transactions contemplated hereby.

UNOFFICIAL DOCUMENT

2.04. Accredited Investor. Purchaser is an “accredited investor” as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended (“Securities Act”).

2.05. Independent, Well-Informed Decision. Purchaser, along with Purchaser’s financial advisers, has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of this transaction pursuant to the terms of this Agreement. Purchaser has independently evaluated the merits of its decision to purchase Shares pursuant to this Agreement, and the Purchaser is not relying upon, and has not relied upon, any statement, representation or warranty made by any Person, except for the statements, representations and warranties contained in this Agreement. Purchaser is able to bear the economic risk of an investment in the Shares and, at the present time, is able to afford a complete loss of such investment. Purchaser acknowledges that the Company has made available to Purchaser certain information regarding the Shares and the Company as required by 15 U.S.C. § 77d(d)(3).

2.06. Negotiated Purchase Price. Purchaser acknowledges that there is no ready market for the Shares and, therefore, the Purchase Price does not necessarily represent the fair market or actual value of the Shares; rather, such purchase price was agreed to by the Company and the Purchasers as a consequence of arm’s-length dealing.

2.07. Financing. The Purchaser has available all funds necessary for the payment of the Purchase Price.

2.08. Due Diligence. Purchaser has been provided with information by the Company in response to its due diligence requests prior to the date of this Agreement. Such information has been satisfactory to Purchaser. Purchaser is not relying on any representations and warranties of the Company other than those explicitly contained in this Agreement.

2.09. No Injunction. No Law, Order, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or Governmental Authority of competent jurisdiction that prohibits the consummation of any of the transactions contemplated by this Agreement.

2.10. Full Disclosure. No representation or warranty contained in this Article II contains any untrue statement of a material fact or omits to state any material fact necessary to prevent any such representation, warranty, or statement from being misleading to the Company.

UNOFFICIAL DOCUMENT

ARTICLE III
REPRESENTATION AND WARRANTIES OF THE COMPANY

As an inducement to Purchaser to enter into this Agreement and to consummate the Stock Purchase, the Company hereby represents and warrants as follows:

3.01. Company Disclosure Memorandum. The Company has delivered to Purchaser a memorandum (the “Company Disclosure Memorandum”) containing certain information regarding the Company as indicated at various places in this Agreement. All information set forth in the Company Disclosure Memorandum or in documents incorporated by reference in the Company Disclosure Memorandum is true, correct, and complete in all material respects, does not omit to state any material fact necessary to make the statements therein not misleading, and shall be deemed for all purposes of this Agreement to constitute part of the representations and

warranties of the Company under this ARTICLE III. The information contained in the Company Disclosure Memorandum shall be deemed to be part of and qualify all representations and warranties contained in this ARTICLE III and the covenants in to the extent applicable. Disclosure of any fact or item in any section of the Company Disclosure Memorandum shall be deemed to have been disclosed with respect to every other section of the Company Disclosure Memorandum in respect of which the applicability is reasonably apparent on its face.

3.02. Corporate Status. The Company is a Florida corporation duly incorporated, validly existing and in good standing under the laws of the State of Florida, has corporate power and authority to own its properties and assets and to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified or where the failure to be so qualified or in good standing would not reasonably be expected to result in a Material Adverse Change. The Company is a bank holding company duly registered under the Bank Holding Company Act of 1956, as amended and the applicable regulations and interpretations of Governmental Authorities responsible for implementing such statute.

3.03. Company Capitalization. The authorized capital stock of the Company consists solely of 5,200,000 shares of capital stock divided into (a) 5,000,000 shares of Company common stock, par value $1.00 per share (the "Company Common Stock"), and (b) 200,000 shares of Company preferred stock, no par value (the "Company Preferred Stock"). As of the date of this Agreement, there are 952,716 shares of Company Common Stock and no shares of Company Preferred Stock outstanding. The outstanding shares of the Company Common Stock are duly authorized and validly issued and fully paid and non-assessable. Except as described in the Company Financial Statements (including any related notes thereto), the Company has reserved no authorized and unissued shares of Company Common stock for issuance.

3.04. Authority of the Company; No Conflicts.

(a) The Company has the power and authority necessary to execute, deliver, and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated herein have been duly and validly authorized by all necessary action in respect thereof on the part of the Company, and this Agreement represents a legal, valid, and binding obligation of the Company, enforceable against the Company in accordance with its terms (except in all cases as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and except that the availability of the equitable remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding may be brought).

(b) Neither the execution and delivery of this Agreement by the Company, nor the consummation of the transactions contemplated hereby, nor compliance by the Company with any of the provisions hereof, will (i) conflict with or result in a breach of any provision of the Company's articles of incorporation or bylaws or any resolution adopted by the board of directors or the shareholders of the Company, (ii) constitute or result in a Default under, or require any consent pursuant to, or result in the creation of any Lien on any asset of the Company or the Bank under, any Contract or Permit of the Company involving aggregate payments to any Person in any

UNOFFICIAL DOCUMENT

calendar year in excess of $100,000, or (iii) constitute or result in a Default under, or require any consent pursuant to, any Law or Order applicable to the Company or the Bank or any of their respective material assets (including the Purchaser or the Company becoming subject to or liable for the payment of any Tax on any of the Assets owned by the Purchasers or the Company).

3.05. Securities Offerings; Financial Statements.

(a) The Company has provided copies of the Company Financial Statements to the Purchaser. Each of the Company Financial Statements (including, in each case, any related notes) was, or will be, prepared in accordance with GAAP (except as may be indicated in the notes to such Company Financial Statements), fairly presented or will fairly present, in all material respects, the financial position of the Company at the respective dates and the results of operations and cash flows for the periods indicated, including the fair values of the assets and liabilities shown therein, except that the unaudited interim financial statements were or are subject to normal and recurring year-end adjustments which were not or are not expected to be material in amount or effect.

(b) The Company's independent public accountants, which have expressed their opinion with respect to the Company's year-end financial statements (including the related notes), are and have been throughout the periods covered by such Company Financial Statements an independent certified public accounting firm. The Company's independent public accountants have audited the Company's year-end financial statements for the last five (5) years through December 31, 2021.

(c) Other than those listed in Section 3.05(c) of the Company Disclosure Memorandum, the information contained in the budget or the pro forma financial information (including, without limitation, the most recent projections and forecasts contained therein) that was provided by the Company to the Purchaser was based upon reasonable assumptions, which assumptions, to the Company's Knowledge, remain reasonable.

3.06. Absence of Undisclosed Liabilities. The Company has no Liabilities required under GAAP to be set forth on a consolidated balance sheet or in the notes thereto, except Liabilities which are (i) accrued or reserved against in the balance sheet of the Company as of December 31, 2021, included in the Company Financial Statements delivered prior to the date of this Agreement or reflected in the notes thereto, (ii) incurred in the ordinary course of business consistent with past practices, including, without limitation, all letters of credit and unfunded loan commitments or credit lines, or (iii) incurred in connection with the transactions contemplated by this Agreement. Except as incurred in the ordinary course of business or as reflected on the Company's consolidated balance sheet at December 31, 2021, or Liabilities described in any notes thereto (or Liabilities for which neither accrual nor footnote disclosure is required pursuant to GAAP or any applicable Governmental Authority), the Company is not directly or indirectly liable, by guarantee, indemnity, or otherwise, upon or with respect to, or obligated, by discount or repurchase agreement or in any other way, to provide funds in respect to, or obligated to guarantee or assume any Liability of any Person for any amount in excess of $50,000 and any amounts, whether or not in excess of $50,000 that, in the aggregate, exceed $100,000.

3.07. Absence of Certain Changes or Events. Except as disclosed in the Company Financial Statements delivered prior to the date of this Agreement or as disclosed in Section 3.07 of the Company Disclosure Memorandum or as otherwise expressly permitted or contemplated by this

UNOFFICIAL DOCUMENT

Agreement, since December 31, 2021, (i) there have been no events, changes, or occurrences which have had, or are reasonably likely to have, individually or in the aggregate, a Material Adverse Change, and (ii) since December 31, 2021, the Company and the Bank have conducted their respective businesses in the ordinary course of business consistent with past practice.

3.08. Tax Matters. The Company and the Bank have both duly and timely filed (i) all required federal and state Tax Returns, and (ii) all material required Tax Returns of other governmental units having jurisdiction with respect to Taxes imposed upon their incomes, properties, revenues, franchises, operations or other assets, or Taxes imposed which might create a material Lien or encumbrance on any of such assets or affect materially and adversely their business or operations (other than Tax Returns that are not yet due or for which a request for extension was timely filed consistent with requirements of applicable Law). All federal, state and local Taxes paid or payable by the Company or the Bank have been paid, or have been accrued or reserved on the Company's books and financial statements in accordance with GAAP applied on a basis consistent with prior periods. Neither the Company nor the Bank has received any written notice of a Tax deficiency or assessment of additional taxes of any kind and, to the Knowledge of the Company, there is no threatened claim against the Company or the Bank, or to the Knowledge of the Company, any basis for any such claim, for payment of any additional federal, state, local or foreign Taxes for any period prior to the date of this Agreement in excess of the accruals or reserves with respect to any such claim shown in the Company Financial Statements or disclosed in the notes with respect thereto.

3.09. Books and Records. Each of the Company and the Bank maintains accurate books and records reflecting its Assets and Liabilities and maintains proper and adequate internal accounting controls which are designed to provide reasonable assurance that (i) transactions are executed with management's authorization; (ii) transactions are recorded as necessary to permit preparation of the Company Financial Statements and to maintain accountability for the Company's Assets; (iii) access to the Company's Assets is permitted only in accordance with management's authorization; (iv) the reporting of the Company's Assets is compared with existing Assets at regular intervals; and (v) accounts, notes and other receivables and inventory are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis. True and correct copies of the organizational documents of the Company and the Bank have been made available to the Purchaser for its review.

3.10. Compliance with Laws.

(a) The deposit accounts of the Bank are insured by the Federal Deposit Insurance Corporation (the "FDIC") through the Deposit Insurance Fund to the fullest extent permitted by Law, and all premiums and assessments required to be paid in connection therewith have been paid when due. No proceedings for the revocation or termination of such deposit insurance are pending or, to the Knowledge of the Company, threatened. Each of the Company and the Bank has in effect all Permits necessary for it to own, lease, or operate its Assets and to carry on its business as now conducted, except for those Permits the absence of which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Change, and there has occurred no Default under any such Permit, other than Defaults which could not reasonably be anticipated to have, individually or in the aggregate, a Material Adverse Change, and the execution, delivery and

UNOFFICIAL DOCUMENT

performance of this Agreement do not materially violate any such Permit, or will result in any revocation, cancellation, suspension, material modification or nonrenewal thereof.

(b) Each of the Company and the Bank:

(i) is not in Default under any of the provisions of its articles of incorporation or bylaws (or other governing instruments);

(ii) is in material compliance with and not in Default under any Laws, Orders, Permits, or formal agreements with any Governmental Authority applicable to its business or employees conducting its business; or

(iii) except as disclosed on Section 3.10(b)(iii) of the Company's Disclosure Memorandum, and except where such disclosure or availability would constitute a violation of the confidentiality restrictions of Part 309 of the Code of Federal Regulations ("Part 309") or comparable regulations of any applicable Governmental Authority, has not received any written notification or written communication from any Governmental Authority (x) asserting that it is not, or may not be, in compliance with any Laws or Orders where such noncompliance is material, (y) threatening to revoke any material Permits, or (z) requiring it to enter into or consent to the issuance of a cease and desist order, injunction, formal agreement, directive, commitment, or memorandum of understanding, or to adopt any board resolution or similar undertaking, which restricts materially the conduct of its business or in any manner relates to its employment decisions, its employment or safety policies or practices, its capital adequacy, its credit or reserve policies, its hiring or compensation of management or the payment of dividends, except, in each case, for such written notifications or written communications which have previously been appropriately addressed and resolved.

(c) except as disclosed on Section 3.10(c) of the Company's Disclosure Memorandum, and except where such disclosure or availability would constitute a violation of the confidentiality restrictions of Part 309 or comparable regulations of any applicable Governmental Authority, there is no material unresolved violation, criticism, or exception by any Governmental Authority with respect to any report or statement relating to any examinations or inspections of the Company or the Bank.

3.11. Legal Proceedings. There is no Litigation pending or, to the Knowledge of the Company, threatened against the Company or the Bank or any of their assets, interests, or rights, nor are there any Orders outstanding against the Company or the Bank, nor do any facts or circumstances exist that would be likely to form the basis for any material claim against the Company that, if adversely determined, individually or in the aggregate, would result in a Material Adverse Change or would materially impede or delay the Company's ability to perform its covenants and agreements under this Agreement or to consummate the transactions hereby, including the Stock Purchase.

3.12. Brokers and Finders. Except as disclosed in Section 3.12 of the Company Disclosure Memorandum, neither the Company, nor any of its officers, directors, employees or Representatives, has employed any broker, finder, or investment banker or incurred any Liability for any financial advisory fees, investment bankers fees, brokerage fees, commissions, or finder's or other such fees in connection with this Agreement or the transactions contemplated hereby.

UNOFFICIAL DOCUMENT

3.13. Board Approval. The Company board of directors, at a meeting duly called and held, has by unanimous vote of the directors present adopted this Agreement and approved the transactions contemplated hereby.

3.14. No Injunction. No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction that prohibits the consummation of any of the transactions contemplated by this Agreement.

3.15. Full Disclosure. No representation or warranty contained in this ARTICLE III contains any untrue statement of a material fact or omits to state any material fact necessary to prevent any such representation, warranty, or statement from being misleading to the Purchaser.

ARTICLE IV
FUTURE TRANSACTIONS

**4.01. Acknowledgement. The Purchaser acknowledges that the Company makes no representation or warranty regarding its or the Bank's current or future intentions or plans with respect to capital raising, mergers or acquisitions (as either buyer or seller), sale or issuance of stock or other securities, or any other corporate transactions. The Purchaser recognizes and acknowledges that the Company or the Bank, or their respective boards of directors, may pursue any such transaction without the input or approval of the Purchaser (other than its rights as a shareholder of the Company).**

ARTICLE V
COVENANTS OF THE PARTIES

5.01. Board Composition. Within seven (7) days following the date of this Agreement, the Company shall set the size of its Board of Directors at 11 and cause Fadi Cheikha to be appointed or elected to the Company's Board of Directors. Following closing, the Purchaser shall have the right to nominate one individual to serve as a member of the Bank's Board of Directors. Within a reasonable amount of time following such nomination, and subject to such individual providing such documentation and cooperation as the Bank reasonably requests, the Bank's Board of Directors shall conduct a background investigation and in person interview with such nominee. If, in its reasonable discretion, the Bank's Board of Directors determines that such individual possesses the appropriate characteristics to serve on the Bank's Board of Directors, the Bank shall create a new directorship and cause such individual to be appointed or elected to the Bank's Board of Directors. If the Bank's Board of Directors determine that any such nominee does not possess such characteristics, the Purchaser shall have the right to nominate alternative individuals until one such individual has been appointed or elected to the Bank's Board of Directors.

5.02. Confidentiality. The Company and the Purchaser will, and will cause its respective Representatives to, hold in strictest confidence and not disclose to any other Person not affiliated with the Company or the Purchaser any information regarding this Agreement, including the existence, contents, terms, or conditions of this Agreement, or the transaction contemplated hereby, except as contemplated by this Agreement, required by Law or to respond on a confidential basis to a request from any applicable Governmental Authority having supervisory oversight of

UNOFFICIAL DOCUMENT

the Company or from any Person who is conducting a "due diligence" review of the Company in connection with any transaction described in Section 4.01. In the event that disclosure is required by Law or requested by any applicable Governmental Authority, the Company or the Purchaser will notify the other party as soon as possible so that such other party is afforded a reasonable time to object to the disclosure of the terms, conditions or other contents of this Agreement, to the extent disclosure is purportedly required by law, and to assist in the preparation of any response to an applicable Governmental Authority.

5.03. Press Releases; Communication. The Company and the Purchaser agree that neither will issue any press release or other public disclosure materially related to this Agreement or any other transaction contemplated hereby; provided, however, that nothing in this Section 5.03 shall be deemed to prohibit any party from making any disclosure which its counsel deems necessary or advisable in order to satisfy such party's disclosure obligations imposed by Law (including, but not limited to, a letter from the Company to its shareholders).

ARTICLE VI
INTENTIONALLY OMITTED

ARTICLE VII
INTENTIONALLY OMITTED

ARTICLE VIII
MISCELLANEOUS

8.01. Entire Agreement. This Agreement contains the entire agreement between the parties to this Agreement with respect to the transactions contemplated by this Agreement and may not be amended or modified, nor may any of its terms be waived, except by written instrument signed by the parties hereto.

8.02. Prior Agreement. The parties agree that that certain Stock Purchase Agreement, dated as of December 21, 2021, by and among, the Company, Ander P. Gibbs, and Aiden Florida Bancshares, Inc. (the "Prior Agreement") was terminated as of January 31, 2023. In consideration of the receipt of the investment contemplated hereunder: (a) the Company hereby releases the Purchaser and all affiliates of the Purchaser from any and all obligations or liabilities any affiliate of the Purchaser may have or have had under the Prior Agreement; and (b) the Purchaser hereby releases the Company and all affiliates of the Company from any and all obligations or liabilities the Company or any affiliate of the Company may have or have had under the Prior Agreement.

8.03. Successors and Assigns. The provisions of this Agreement shall inure to the benefit of and be binding upon the parties and their successors and permitted assigns. This Agreement, or any rights or obligations hereunder, may not be assigned by the Company without the prior written consent of the Purchaser.

8.04. GOVERNING LAW. THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF FLORIDA, WITHOUT REFERENCE TO THE CONFLICT OF LAWS PRINCIPLES OF THE STATE OF FLORIDA OR ANY OTHER PRINCIPLE THAT COULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION. ANY ACTION OR PROCEEDING SEEKING

UNOFFICIAL DOCUMENT

TO ENFORCE, CHALLENGE OR AVOID ANY PROVISION OF, OR BASED ON ANY RIGHT ARISING OUT OF, THIS AGREEMENT SHALL BE BROUGHT ONLY IN THE COURTS OF THE STATE OF FLORIDA, COUNTY OF PASCO, AND EACH OF THE PARTIES CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS) IN ANY SUCH ACTION OR PROCEEDING AND WAIVES ANY OBJECTION TO JURISDICTION OR VENUE LAID THEREIN.

8.05. Severability. If any provision contained in this Agreement is, or for any reason is held to be, invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

8.06. Fees and Expenses. The Purchaser and the Company shall each pay its own expenses and costs (including, without limitation, all counsel fees) in connection with this Agreement and the transactions contemplated hereby.

8.07. Attorneys' Fees. If any action at Law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, or with respect to a breach hereof, the prevailing party shall be entitled to recover reasonable attorneys' fees from the other party, which fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose, and shall be in addition to any other relief that may be awarded.

8.08. Further Assurances. The Company and the Purchaser shall, at any time after the transfer of Shares pursuant to this Agreement, upon request of the other party and without further consideration, take all such further acts and execute, acknowledge and deliver all such further documents, instruments, assignments, transfers, conveyances, powers of attorney and assurances as may be required to convey, transfer and vest in the Purchaser the full right and title to the Shares and to complete the transactions contemplated by this Agreement.

8.09. Survival of Representations and Warranties. The representations and warranties of the Company and the Purchaser shall survive and remain in full force and effect until the thirtieth (30th) day following the Company's delivery to the Purchaser the Company's independent certified public accountants' audit report on the Company's consolidated financial statements for the year ended December 31, 2023.

8.10. Certain Definitions.

(a) "Affiliate" means (i) any other Person directly, or indirectly through one or more intermediaries, controlling, controlled by or under common control with such Person; (ii) any officer, director, partner, employer, or direct or indirect beneficial owner of any ten percent (10%) or greater equity or voting interest of such Person; or (iii) any other Person for which a Person described in clause (ii) acts in any such capacity.

(b) "Assets" means all of the assets, properties, businesses and rights of such Person of every kind, nature, character and description, whether real, personal or mixed, tangible or intangible, accrued or contingent, or otherwise relating to or utilized in such Person's business, directly or indirectly, in whole or in part, whether or not carried on the books and records of such Person, and

UNOFFICIAL DOCUMENT

whether or not owned in the name of such Person or any Affiliate of such Person and wherever located.

(c) "Company Financial Statements" means: (i) the balance sheets (including related notes and schedules, if any) of the Company and the Bank as of December 31, 2022, and as of December 31, 2021, and the related statements of operations, changes in shareholders' equity, and cash flows (including related notes and schedules, if any) for the three (3) and twelve (12) months ended December 31, 2022, and for each of the three (3) fiscal years ended December 31, 2021, and (ii) the balance sheets of the Company and the Bank (including related notes and schedules, if any) and related statements of operations, changes in shareholders' equity, and cash flows (including related notes and schedules, if any) including those prepared by the Company with respect to periods ended subsequent to December 31, 2022.

(d) "Contract" means any written or oral agreement, arrangement, authorization, commitment, contract, indenture, instrument, lease, license, obligation, plan, practice, restriction, understanding, or undertaking of any kind or character, or other document to which any Person is a party or that is binding on any Person or its capital stock, Assets or business.

(e) "Default" means: (i) any breach or violation of, default under, contravention of, or conflict with, any Contract, Law, Order, or Permit, (ii) any occurrence of any event that with the passage of time or the giving of notice or both would constitute a breach or violation of, default under, contravention of, or conflict with, any Contract, Law, Order, or Permit, or (iii) any occurrence of any event that with or without the passage of time or the giving of notice would give rise to a right of any Person to exercise any remedy or obtain any relief under, terminate or revoke, suspend, cancel, or modify or change the current terms of, or renegotiate, or to accelerate the maturity or performance of, or to increase or impose any Liability under, any Contract, Law, Order, or Permit.

(f) "GAAP" means generally accepted accounting principles in the United States, consistently applied during the periods involved.

(g) "Governmental Authority" means any federal, state, county, local or foreign court, arbitrator, governmental or administrative agency, bureau, commission, regulatory authority, stock market, stock exchange or trading facility.

(h) "Knowledge" as used with respect to a Person (including references to such Person being aware of a particular matter) means those facts that are known or should reasonably have been known after due inquiry by that Person, if an individual or, if such Person is an entity, by the chairman, chief executive officer, president, or chief financial officer of such Person.

(i) "Law" means any code, law (including common law), ordinance, regulation, reporting or licensing requirement, rule, statute, regulation or order applicable to a Person or its Assets, Liabilities or business, including those promulgated, interpreted or enforced by any Governmental Authority.

(j) "Liability" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the ordinary course of business) of

UNOFFICIAL DOCUMENT

any type, whether accrued, absolute or contingent, liquidated or unliquidated, matured or unmatured, or otherwise.

(k) "Lien" means any conditional sale agreement, default of title, easement, encroachment, encumbrance, hypothecation, infringement, lien, mortgage, pledge, reservation, restriction, security interest, title retention or other security arrangement, or any adverse right or interest, charge, or claim of any nature whatsoever of, on, or with respect to any property or any property interest, other than (i) Liens for current property Taxes not yet due and payable, (ii) for any depository institution, pledges to secure public deposits and other Liens incurred in the ordinary course of the banking business, and (iii) Liens that are of public record and do not preclude or restrict the ability to use the affected property for the purposes for which such property is being used on the date of this Agreement.

(l) "Litigation" means any action, arbitration, cause of action, claim, complaint, criminal prosecution, demand letter, governmental or other examination or investigation, hearing, inquiry, administrative or other proceeding, or notice (written or oral) by any Person alleging potential Liability, but shall not include claims of entitlement under any employee benefit plan that are made or received in the ordinary course of business.

(m) "Material Adverse Change" means any event, circumstance, change or occurrence that has had, or would reasonably be expected to have, a material and adverse effect on the business, results of operations, condition (financial or otherwise), prospects, assets, properties, employees, liabilities (absolute, accrued, contingent or otherwise) or reserves of the Company and/or the Bank; provided that it shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to the following: (i) general economic or political conditions (ii) conditions generally affecting the industries in which the Bank operates; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) natural disasters or other force majeure events or any epidemic, pandemic or disease outbreak (including COVID-19), or (vi) any action required or permitted by this Agreement, except, in the case of clause (i), (ii), (iii), (iv), or (v), where such event has a disproportionate impact on the Company and/or the Bank relative to other community banks operating primarily in the Southeastern United States, in which case only the disproportionate effect will be taken into account.

(n) "Order" means any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, directive, ruling, or writ of any Governmental Authority.

(o) "Permit" means any federal, state, local, and foreign Governmental Authority approval, authorization, certificate, easement, filing, franchise, license, notice, permit, or right to which any Person is a party or that is or may be binding upon or inure to the benefit of any Person or its securities, Assets, or business.

(p) "Person" means a natural person or any legal, commercial or Governmental Authority, such as, but not limited to, a corporation, general partnership, joint venture, limited partnership, limited liability company, limited liability partnership, trust, business association, group acting in concert, or any person acting in a representative capacity.

UNOFFICIAL DOCUMENT

(q) "Representative" means, with respect to any Person, the officers, directors, employees, agents, investment bankers, financial advisors, attorneys, accountants and other Representatives of such Person or any subsidiary of such Person.

(r) "Tax" means (a) means all taxes, charges, fees, levies, imposts, duties, or assessments, including income, gross receipts, excise, employment, sales, use, transfer, recording license, payroll, franchise, severance, documentary, stamp, occupation, windfall profits, environmental, federal highway use, commercial rent, customs duties, capital stock, paid-up capital, profits, withholding, Social Security, single business and unemployment, disability, unclaimed property, escheat, real property, personal property, registration, ad valorem, value added, alternative or add-on minimum, estimated, or other taxes, fees, assessments or charges of any kind whatsoever, imposed or required to be withheld by any Governmental Authority (domestic or foreign), including any interest, penalties, and additions imposed thereon or with respect thereto whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person, and (b) any Liability for the payment of any taxes, interest, penalty, addition to tax or like additional amount resulting from the application of Treasury Regulation Section 1.1502-6 or comparable federal, state or local Law.

(s) "Tax Return" means any return, declaration, report, claim for refund, property rendition or information return or statement relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

8.11. Notices. All notices, requests, demands and other communications required or permitted hereby shall be in writing and shall be delivered to the addresses of the parties hereto set forth below their signature on the signature pages hereof (or to such other address as any party may have furnished to the others in writing in accordance herewith) either personally, by nationally recognized overnight courier service or sent by electronic mail, and all such communications are deemed delivered (a) in the case of personal delivery or electronic mail, when received; and (b) in the case of an overnight courier service, one (1) Business Day after delivery to such courier service with instructions for overnight delivery. "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law in the State of Florida.

8.12. Execution. This Agreement may be executed in any number of counterparts, each of which will be an original and all, when taken together, will be considered one and the same agreement. This Agreement will become effective when each party hereto will have delivered an executed counterpart hereof to the other parties hereto. In the event that any signature is delivered by digital signature, facsimile transmission, or by e-mail delivery of a ".pdf" format data file, such signature will create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

8.13. Construction. The headings herein are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party. This Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

UNOFFICIAL DOCUMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**THE COMPANY**

FLORIDA BANCSHARES, INC.

By: ______________________
Name: Ander P. Gibbs
Title: Chairman of the Board of Directors

Address for Notice:
First National Bank of Pasco
13315 US Highway 301
Dade City, FL 33525
shickman@fnbpasco.com

with a copy to:

Richard Pearlman
Igler and Pearlman, P.A.
2457 Care Drive, Suite 203
Tallahassee, FL 32308
richard.pearlman@iglerlaw.com

**PURCHASER**

AIDEN FINTECH GROUP, INC.

By: ______________________
Name: ______________________
Title: ______________________

Address for Notice:

with a copy to:

Jonathan Hightower
Fenimore Kay Harrison LLP
191 Peachtree Street NE
Suite 849
Atlanta, Georgia 30303
JHightower@fkhpartners.com

*[Signature Page to Stock Purchase Agreement]*

UNOFFICIAL DOCUMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**THE COMPANY**

FLORIDA BANCSHARES, INC.

By:____________________________
Name: Steven D. Hickman
Title: President and Chief Executive Officer

Address for Notice:
First National Bank of Pasco
13315 US Highway 301
Dade City, FL 33525
shickman@fnbpasco.com

with a copy to:

Richard Pearlman
Igler and Pearlman, P.A.
2457 Care Drive, Suite 203
Tallahassee, FL 32308
richard.pearlman@iglerlaw.com

**PURCHASER**

AIDEN FINTECH GROUP, INC.

By: Fadi [signature], CEO
Name: Fadi Cheikha
Title: CEO

Address for Notice:

with a copy to:

Jonathan Hightower
Fenimore Kay Harrison LLP
191 Peachtree Street NE
Suite 849
Atlanta, Georgia 30303
JHightower@fkhpartners.com

UNOFFICIAL DOCUMENT

*[Signature Page to Stock Purchase Agreement]*

UNOFFICIAL DOCUMENT

# COMPOSIT EXHIBIT "H"

First
National Bank of Pasco

# Specialty Banking Account Cannabis-Related Business Certification

I acknowledge that our business Payment Solutions International, LLC is doing business with Cannabis Businesses (grower, manufacturer, or distributor of cannabis) either directly or indirectly, in which we receive payments for our services. I further acknowledge that our business is fully aware of the Cole Memo Priorities listed below and to the best of our ability certify that our client's businesses are not in violation of the Cole Memo Priorities:

- Preventing the distribution of marijuana to minors;
- Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;
- Preventing the diversion of marijuana from states where it is legal under state law in some form to other states;
- Preventing state-authorized marijuana activity from being used as a cover or pretext for trafficking of other illegal drugs or other illegal activity;
- Preventing violence and the use of firearms in the cultivation and distribution of marijuana;
- Preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands;
- Preventing marijuana possession or use on federal property.

As the Primary Principle of the business, I hereby certify to the following on behalf of the business:

- We have read and will comply with this Specialty Banking Account Cannabis-Related Business Certification and are aware of the fees associated with this type of specialty banking account.
- Our business nor our client's businesses violate the above Cole Memo Priority activities. We agree to immediately notify you if we suspect any violations in the future.
- We understand the co-mingling funds between business and personal accounts are strictly prohibited.
- We are aware of the fees associated with this type of specialty banking account.
- We agree to notify First National Bank of Pasco before any changes in business activities, including but not limited to: additions or changes to facilities and license type, ownership change, business strategy or direction, additions, or changes to services provided, product sales, etc.

[signature] 6/2/22

Authorized Business Representative Signature Date

Fadi Choikha Manager

Printed Name Title

UNOFFICIAL DOCUMENT

First
National Bank of Pasco

# Onboarding Retail Questionnaire
# For Cannabis-Related Businesses (CRB)

This questionnaire is designed to aid compliance in identifying the current and future use of the deposit account as it relates to cannabis-**related** businesses (CRB) **of any kind**. A legal cannabis business is one who cultivates plants, processes the flower into cannabis oil, and manufactures and distributes clinical-grade cannabis products through a dispensing facility within the State of Florida. Products cannot cross state lines and only distributed to patients with a prescription (attestation) from a state-certified medical doctor. The Florida Department of Health regulates all cannabis-related activities, and for qualified bank account purposes must adhere to the "Cole Memo Priorities" and FinCEN guidance. For purposes of this questionnaire, Hemp and CBD products, those with THC content 0.3% or less, are included as a CRB.

| Entity Related Questions: |
|---|
| 1. What cannabis-related products or services does your business provide? merchant settlements |
| 2. Was your business created specifically to serve the cannabis industry? yes |
| 3. What is your estimated gross revenue (all sources) for this year (12-months)? $18,000,000 |
| 4. Describe the business ownership structure. Owned by Fadi and Kimberly Cheikha Trust |
| 5. Are you registered and in good standing in the state of Florida? no, but signing up |
| a. The municipality (or Counties) where you operate? |
| 6. Will you be raising/accepting any investor funds for your business? no |
| a. If so, how will this change your ownership or structure? |
| 7. Where is your current checking account(s) held? Lafayette State Bank |
| a. Is it known that funds are derived from CRB activities? yes |
| 8. Do you sell products outside the state of Florida? no products are sold |
| a. Do you sell products via the internet? |
| b. If you sell outside the state of Florida, how do you ensure compliance with other states' rules? |
| c. Who do you process your merchant services (Visa & MasterCard) with? |
| 9. List all the businesses with whom you conduct CRB? One Pay Cloud/Transact First/Merchants |
| a. Describe the business activities with each CRB. Processor |
| b. What percentage of your monthly income will be derived from CRB related activities? 100% |
| c. Do you know who the CRB has a banking relationship? yes |
| i. Can you provide the contact information for the point of contact at the CRB? yes |
| d. Have you verified current financial statements of the CRB(s) you are doing business with? yes |
| e. Describe how well you know the cannabis business that you are doing business with, or its principal owners or officers. Well, as we underwrite all of them |
| f. Please provide a copy of your "Know Your Customer" policy. PaySol contracts USAG for services |
| g. Is the business publicly traded? ☐ YES ☒ NO Under what symbol? |
| 10. Is your business related to any Money Service or Money Transmitter Business (i.e., check cashing or the selling of reloadable prepaid cards)? ☐ YES ☒ NO If no, skip to the next section. |
| a. IF YES, are you federally registered? |
| b. IF YES, are you state registered? |
| c. Please, complete the chart below: |

| Do you conduct any of the following: | Yes | No |
|---|---|---|
| Money Order (Issuer/Seller/ Redeemer) | ☐ | ☒ |
| Travelers Checks (Issuer/Seller/ Redeemer) | ☐ | ☒ |
| Money Transmission | ☐ | ☒ |
| Check Cashing | ☐ | ☒ |
| Currency Exchange (International or Online) | ☐ | ☒ |
| Currency Dealing (International or Online) | ☐ | ☒ |
| Prepaid Access (Provider/Seller of prepaid access) | ☐ | ☒ |

## Documentation Needed for Application and Ongoing Monitoring:

1. Do you have any issues with transparency with First National Bank of Pasco as it pertains to any CRB related income, transactions, or activities? no
2. Will you provide additional documentation and information related to CRB income, transactions, or activities as requested by the Bank? yes
3. Are you aware of the due diligence and ongoing monitoring and reporting requirements for the CRB industry and verifying all funds derived directly or indirectly from the industry? yes
4. Please provide a copy of your "Know Your Customer" policy.
5. Please provide a copy of your "Anti-Money Laundering" policy.
6. Please provide your Articles of Incorporation/Organizational Documents
7. Please provide Fictitious Name Filing (if applicable).
8. Please provide your SS-4 Tax Identification Number.
9. Please provide a copy of Primary Identification for each account signer.
10. For each account signer, please provide their city & state of birth and Mothers Maiden Name.

UNOFFICIAL DOCUMENT

## Regulatory Priorities:

1. How do you monitor the CRB from which you accept funds to ensure that they are conducting their business according to Cole Memo Priorities? The merchant's bank and own compliance departments.
   a. If one of your client(s) has their licenses revoked or 'not renewed,' what do you do? Shut them down
   b. Do you have written monitoring procedures you can provide with your account documentation? yes
2. How do you ensure that your client(s) are legally licensed and valid annually? We underwrite them
   a. Will you be willing to share this information with us as it is obtained? yes
3. How do you ensure that your CRB client(s) comply with all local municipalities' zoning requirements (if required)? via underwriting

## Account Information:

Please complete the chart below as it pertains to the number of accounts that you will be looking to open:

| Name on Account | Type of Business (LLC, Partnership, Inc., etc.) | Type of Account (Checking or Savings) |
|---|---|---|
| Payment Solutions International, LLC | LLC | Checking |
| | | |
| | | |
| | | |

Please describe the **beneficial ownership** of each account referenced above using the chart below:

| Person's Name | Person's Title | Person's Capacity (beneficial owner, control person, or both) | Ownership Percentage | Account Signer (Yes or No) |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[attach a separate sheet if necessary]

Please describe the different types of transactions expected to be conducted in the account regularly using the chart below:

| Transaction | Anticipated Monthly Dollar Amount | Anticipated # of Monthly Transactions |
|---|---|---|
| Cash Deposits | $0 | 0 |
| Cash Withdrawals | $0 | 0 |
| Check Deposits | $0 | 0 |
| Check Withdrawals | $500,000 | 5 |
| Remote Deposit Capture | $0 | 0 |
| ACH Deposits | $45,000,000 | 120 |
| ACH Withdrawals | $45,000,000 | 30 (30,000 individual) |
| ATM Deposits | $0 | 0 |
| ATM Withdrawals | $0 | 0 |
| Purchase of Cashier's Checks | $0 | 0 |
| Incoming Wires (Domestic) | $1,000,000 | 2 |
| Outgoing Wires (Domestic) | $1,000,000 | 2 |
| Incoming Wires (International) | $0 | 0 |
| Outgoing Wires (International) | $0 | 0 |

UNOFFICIAL DOCUMENT

Is any of your anticipated cash flow expected to be considered seasonal, meaning it will increase or decrease at certain times of the year? ☐ YES ☒ NO

a. If yes, please explain?

Have you received and signed the First National Bank of Pasco, Specialty Banking Cannabis-Related Account Certification form? ☒ YES ☐ NO

Additional Comments:

Completed by: [signature] Date: 6/10/22

UNOFFICIAL DOCUMENT

# EXHIBIT "I"

DocuSign Envelope ID: 165FE7CB-9522-4CFC-8692-82BE0DDB28DE

**Third Party ACH Agreement**

This Third Party ACH Agreement ("Agreement") is entered into as of the 20th day of October, 2023 ("Effective Date") by and between First National Bank of Pasco, ("Bank") and US Alliance Group, Inc ("Company"). For purposes of this Agreement, Bank and Company each will be referred to individually as a "Party" and together as the "Parties."

WHEREAS, Bank is a depository institution and member of the Federal Deposit Insurance Corporation ("FDIC") and maintains FDIC insurance up to applicable deposit insurance limits on deposits;

WHEREAS, Bank is a member of the National Automated Clearing House Association ("NACHA") and is in the business, among other things, of originating and receiving ACH Entries and establishing and maintaining accounts in connection therewith;

WHEREAS, Company is in the business of providing ACH Third Party Sender services to approved customers of Company ("Customers" or "Platforms");

NOW, THEREFORE, the Parties hereby agree as follows:

1. **Definitions.** Except as otherwise specifically indicated in this Article 1 or elsewhere in this Agreement, capitalized terms used in this Agreement shall have the meanings set forth in the Rules (as defined below):

   (a) "Agreement" means this Third Party ACH Agreement.

   (b) "Applicable Law" means any and all federal, state, and other governmental statutes, codes, ordinances, laws, regulations, rules, guidance, written directives, orders, and decrees applicable to a Party that are made by a regulatory authority having jurisdiction over such Party, including but not limited to FDIC Rules, Federal Reserve Regulations, and NACHA Rules.

   (c) "Business Day" means Monday through Friday, excluding federal banking holidays.

   (d) "Confidential Information" means any and all information that is disclosed by one Party to the other Party and that relates to a Party's business or the Parties' business relationship hereunder, including, but not limited to, information concerning finances, products, services, customers and suppliers. Confidential Information shall not include information which (i) is in or comes into the public domain without breach of this Agreement by the receiving Party; (ii) was in the possession of the receiving Party prior to receipt from the disclosing Party and was not acquired by the receiving Party from the disclosing Party under an obligation of confidentiality or non-use; (iii) is acquired by the receiving Party from a third party not under an obligation of confidentiality or non-use to the disclosing Party; or (iv) is independently developed by the receiving Party without use of any Confidential Information of the disclosing Party.

   (e) "Effective Date" means the date first written above.

   (f) "Entry Settlement Limits" means the maximum the aggregate amount of In-Process Entries permitted to be outstanding at any time, which amount shall be separately communicated to the Company by the Bank in writing from time to time and as described in the Company's Master ACH Agreement.

   (g) "FDIC Insurance" means the insurance of Bank's deposits by the FDIC.

   (h) "In-Process Entries" means the aggregate dollar amount of all credit or debit entries initiated by Company and in process on any date for which settlement has not occurred with respect to credit entries, or the applicable period for the return of items has not expired with respect to debit entries.

   (i) "Master ACH Agreement" means any agreement between Bank and Company which sets forth the terms on which Bank shall provide ACH origination services to Company.

   (j) "Membership" means collectively Network Membership and Bank's status as a member bank in the Federal Reserve and related FDIC Insurance.

   (k) "NACHA Rules" means the rules and regulations provided by NACHA.

   (l) "Network Membership" means the membership of Bank in NACHA and any other applicable Network.

   (m) "Origination Services" mean Bank's transmission as an ODFI of a credit Entry, debit Entry, or Non-Monetary Entry to a Receiver's account at an RDFI as more particularly set forth in this Agreement.

   (n) "Person" means any natural or legal person, including any individual, corporation, partnership, limited liability company, trust or unincorporated association, or other entity.

UNOFFICIAL DOCUMENT

(o) "Reserve Amount" as defined under section 5.

(p) "Rules" means any and all applicable Federal, state, local or organizational rules applicable to the activities contemplated by this Agreement, including without limitation, rules promulgated by the Board of Governors of the Federal Reserve or the FDIC and NACHA Rules.

(q) "Security Breach" means (i) any act or omission that materially compromises either the security, confidentiality, or integrity of data or the physical, technical, administrative, or organizational safeguards put in place by a Party or a third-party service provider that relate to the protection of the security, confidentiality, or integrity of data, or (ii) receipt of a complaint in relation to the privacy and data security practices of a Party or a third-party service provider or a breach or alleged breach of this Agreement relating to such privacy and data security practices. Without limiting the foregoing, a material compromise shall include any unauthorized access to, unauthorized disclosure of, or unauthorized acquisition of nonpublic personal information.

(r) "Security Program" means a comprehensive, written information security program that contains appropriate administrative, technical, and physical safeguards designed to (a) protect the security, confidentiality, and integrity of nonpublic personal information, (b) ensure against any anticipated threats or hazards to the security and integrity of nonpublic personal information, (c) protect against unauthorized access to or use of nonpublic personal information that could result in substantial harm or inconvenience to any Customer, User, potential Customer or any User, and (d) ensure the proper disposal of nonpublic personal information.

(s) "Services" mean the services made available by Bank under this Agreement.

(t) "SWIFT Services" means Bank's services relating to the real-time gross settlement funds international transfer system operated by the Society for Worldwide Interbank Financial Telecommunication.

(u) "Term" means the period commencing on the Effective Date and terminating as set forth in Article 12 hereof.

(v) "Customer" has the meaning set forth in the recitals. Each Customer must be approved by Bank prior to receiving Services or Submitting Entries to Company.

(w) "Customer Account" means each deposit account type, or established at Bank in the name of the Customer or Customer for benefit of third parties, including Users.

(x) "Customer Data" means any data or information of any Customer, User or prospective User that is provided to or obtained by a Party, as applicable, in connection with the performance of its obligations under this Agreement, including, but not limited to, "nonpublic personal information" as defined by the GLBA and its implementing regulations.

(y) "Wire Services" means Fedwire Services and SWIFT Services provided by Bank.

(z) "Third Party Sender" shall have the meaning as defined in the NACHA Rules.

(aa) "Originator" shall have the meaning as defined in the NACHA Rules.

(bb) "Users" means any customer of the Customer who receives Services or whose Customer Account is debited or credited in connection with the Services.

2. **Party Representations and Warranties.** Each Party represents and warrants to the other Party as follows:

(a) Such Party is duly organized, validly existing and in good standing under the laws of the state of jurisdiction of its formation and any state it conducts business, has full corporate power and authority to carry on its business as currently conducted;

(b) Such Party's agreement to provide the services and other obligations hereunder do not violate any agreement or obligation between such Party and any third party; and

(c) When executed and delivered by Company, this Agreement will constitute the legal, valid, and binding obligation of Company, enforceable in accordance with its terms.

3. **Company's Obligations.** In addition to such other duties and obligations as are set forth in this Agreement, the Company shall:

(a) **BSA/AML.** Develop, administer and maintain an effective Bank Secrecy Act, know-your customer, anti- money laundering and anti-terrorist financing, compliance program, which shall include a customer identification program required by FinCEN regulations (collectively, "BSA/AML"), which specifically addresses the Services and which, at a minimum shall: (i) comply with Applicable Law; (ii) satisfy all BSA/AML compliance program requirements applicable to the Bank with respect to the Services; (iii) include a system of internal controls to ensure ongoing compliance and regular independent testing of BSA/AML compliance; (vi) designate a BSA compliance officer responsible for managing BSA compliance of the Services; (v) provide appropriate and ongoing training for



UNOFFICIAL DOCUMENT

Company personnel; and (vi) at least once per year, Company shall provide Bank with an internal BSA audit and Bank shall treat such audit reports as Company's Confidential Information under this Agreement and, as applicable, promptly and fully resolve any exceptions noted in such BSA audit report with the development and implementation of a corrective action plan by Company's management, which shall be acceptable to Bank in its reasonable judgment;

(b) OFAC. Comply with all regulations of the Office of Foreign Assets Control ("OFAC"), including, but not limited to: (i) ensuring that all Customers and Users are screened as required by and in compliance with Applicable Law and the BSA/AML policy established pursuant to Section 4(a); and (ii) complying with all OFAC and Bank directives regarding the prohibition or rejection of unlicensed trade and financial transactions with OFAC specified countries, entities and individuals in connection with the Services;

(c) Software Services. Maintain software services necessary to (i) maintain records for transaction authorizations, including without limitation Origination Services and Wire Services as required by law; and (ii) provide Bank access to the software services, including but not limited to an administrative dashboard necessary to view, edit, and manage Users, Customers, Balances, Reserves, and BSA/AML compliance related information in order for Bank to provide Services under this Agreement; and

(d) Bank and Regulatory Audits.

(i) Company agrees that Bank, its authorized representatives and agents, and any regulatory authority (collectively the "Auditing Party") shall have the right, upon reasonable prior written notice no less than ten (10) business days, or at any other time required by a Regulatory Authority, to inspect, audit, and examine all of Company's facilities, records, books, accounts, data, reports, papers and computer records relating to the activities contemplated by this Agreement including, but not limited to, financial records and reports, any Security Program employed by Company to protect the Customer Data to which Company may have access, associated audit reports, summaries of test results or equivalent measures taken by Company to ensure that the security programs meet the requirements imposed with respect to third party vendors by the regulatory authorities. Company shall make all requested documentation and facilities that are tailored to Company's performance hereunder, available to the Auditing Party for the purpose of conducting such inspections and audits, and the Auditing Party shall have the right to make copies and abstracts of any records and documentation specifically pertaining to the subject matter of this Agreement.

(ii) Company agrees to cooperate with any examination, inquiry, audit, information request, document or record request, site visit or the like, which may be required by any regulatory authority with audit examination or supervisory authority over Bank, to the fullest extent requested by such regulatory authority or Bank. Company shall also provide such other information as Bank or a regulatory authority may request with respect to the financial condition of Company and such other commercially reasonable information as Bank may request from time to time with respect to any third party who has contracted with Company to perform services in connect with this Agreement.

(iii) All information provided by Company or the resulting work product under this Article 4(d), Bank and Regulatory Audits, shall be considered Confidential Information of Company.

(e) Company Compliance with Law and Policies. At all times, Company, in performing its duties and obligations related to the Services under this Agreement, shall comply with all Applicable Law and Bank's policies.

4. Reserve Account/Amount. From time to time, Bank shall evaluate Company's activities and performance under his Agreement. Upon the Bank's request, Company shall maintain a deposit account at Bank which holds the reserve amounts deposited by Company pursuant to this Section and the ACH Agreement ("Reserve Account"). Company shall deposit an amount equal to the "Initial Reserve Requirement," which shall be an amount determined and adjusted by Bank in its reasonable discretion not to exceed $50,000.00 for every $100,000,000.00 processed. The Bank shall release the Reserve Account at such times as it determines in its reasonable discretion. In the event Company fails to fund or replenish the Reserve Account or to otherwise pay amounts owing to Bank under this Agreement , Bank may exercise the right of offset for any and all subsidiaries and/or affiliated account owned by Company and held with the Bank. The Bank also reserves the right to evaluate and request adjustments to Reserve requirements on a monthly basis.

To secure Company's obligations under this Agreement, Company hereby grants Bank a first priority security interest in the Reserve Account and the funds therein or proceeds thereof, and agrees that Bank has control of the Reserve Account for purposes of the Uniform Commercial Code, Article 9-314. Company further agrees to take such steps as Bank may reasonably require to perfect or protect such first priority security interest. Bank shall have all of the rights and remedies of a secured party under Applicable Law with respect to the Reserve Account and the funds therein or proceeds thereof, and shall be entitled to exercise those rights and remedies in its discretion upon a default by Company of any provision of this Agreement. Company agrees that it will maintain the lien against the Reserve Account in favor of Bank and agrees that it will not grant any other party an interest in the Reserve Account. Company authorizes Bank, and irrevocably appoints Bank as its attorney-in-fact, to withdraw funds from the Reserve Account to cover any amounts due to it under this Agreement, including losses incurred in connection with this Agreement.

5. Bank's Obligations. In addition to such other duties and obligations as are set forth in this Agreement, the Bank shall:

a. Membership. At its sole expense, (i) maintain its Membership in good standing and shall timely pay all fees, dues, and assessments associated with such Membership; (ii) promptly provide notice to Company if Bank receives notice from NACHA, the Federal Reserve, FDIC or other regulator of a material breach by Bank of rules or regulations including, but not limited to Rules that may jeopardize Bank's Membership; and (iii) Bank shall use commercially reasonable efforts to promptly resolve any



UNOFFICIAL DOCUMENT

such breach;

b. **Origination Services, Generally.** Bank shall provide Company with Origination Services for Customer transaction services as stated in the Master ACH Agreement;

c. **Bank Oversight.** At all times, Bank shall have the right to control, oversee, and audit (as set forth in this Agreement) Company's use of the Services to ensure that Company's performance of the Services complies with Applicable Law and Bank's policies for where the Bank is located. The Company will also supply the bank with a reasonable percentage, deemed by the bank based on Company volume, all documentation related to the underwriting of the services being provided and any agreements that the Company has entered into with the Customer. Once Agreement has been signed and executed the Company agrees to supply all newly added Customer(s) to Bank, with supporting agreements and any other requested documents related to application process, prior to originating any ACH transactions on their behalf for approval.

d. **Bank Compliance with Law.** At all times, Bank, in performing its duties and obligations related to the Services under this Agreement, shall comply with the Rules, all Applicable Law and Bank's policies.

6. **Origination Services**

(a) **Transmittal of Entries by Company.** Company shall (i) submit Entries to Bank in compliance with the NACHA Rules subject to the total dollar amount of Entries transmitted by Company to Bank on any day shall not exceed the Entry Settlement Limits; and (ii) prior to such Entry submission, ensure all debit or credit authorizations have been provided as required by the NACHA Rules and the Master ACH Agreement. Bank will use commercially reasonable efforts to notify Company in advance if Entry Settlement Limits will be exceeded. Company shall retain all liabilities of an Originator or Receiver as set forth in the NACHA Rules and as may be set forth in the Master ACH Agreement. Each Customer must be bound by terms identical in all material respects to those set forth herein, the Master ACH Agreement, NACHA Rules and the Applicable Law. Company and each Customer shall be liable to Bank for Customer's failure to comply with the NACHA Rules, Applicable Law and its failure to comply with terms set forth herein that relate to such Customer.

(b) **Processing, Transmittal and Settlement by Bank.** Except as provided in Article 6(c), On-Us Entries, and Article 6(d), Rejection of Entries, Bank shall (i) process Entries received from Company to conform with the file specifications set forth in the NACHA Rules and as may otherwise be required by the Master ACH Agreement, (ii) transmit such Entries as an ODFI to the ACH Operator, and (iii) settle for such Entries as provided in the NACHA Rules and the Master ACH Agreement.

(c) **On-Us Entries.** Except as provided in Article 6(d), Rejection of Entries, in the case of an Entry received for credit to an account maintained with Bank ("On-Us Entry"), Bank shall credit the Receiver's account in the amount of such Entry on the Effective Entry Date contained in such Entry, provided the requirements set forth in clauses (i) and (ii) of Article 6(a) and the Master ACH Agreement are met. If any of those requirements is not met, Bank shall use reasonable efforts to credit the Receiver's account in the amount of such Entry no later than the next Business Day following such Effective Entry Date.

(d) **Rejection of Entries.** Bank may reject any Entry which does not comply with the requirements of Article 6(a), Transmittal of Entries By Company, or Article 6(a), Company Data Security Obligations which violates NACHA Rules, Applicable Law, the Master ACH Agreement, or the terms of this Agreement or which contains an effective Entry Date more than two (2) Business Days after the Business Day such entry is received by Bank. Bank may reject an On-Us Entry for any reason for which an Entry may be returned under the NACHA Rules or the Master ACH Agreement. Bank shall use its commercially reasonable efforts to notify Company by (email or telephone) of such rejection no later than the Business Day such Entry would otherwise have been transmitted by Bank to the ACH Operator or, in the case of an On-Us entry, its Effective Entry Date. Notices of rejection shall be effective when given. Bank shall have no liability to Company by reason of the rejection of any such Entry pursuant to the terms of this Agreement, the Master ACH Agreement, NACHA Rules, Applicable Law except when the loss is due to bank's gross negligence or willful misconduct. In the event that any Entries are rejected by the ACH Operator for any reason, it shall be the responsibility of Company to remake such Entries. Should the File be rejected due to an error caused by Bank, Bank shall be responsible for remaking the File. In such a case, Company shall supply sufficient information to allow Bank to recreate the Entries for up to five (5) Business Days after midnight of the Settlement Date.

(e) **Cancellation or Amendment by Company.** Company shall have the right to cancel or amend any Entry or an ACH batch as provided in the Master ACH Agreement.

(f) **Error Detection.** Bank has no obligation to discover and shall not be liable to Company for errors made by Company or any Customer, including but not limited to errors made in identifying the Receiver, or an Intermediary or RDFI, or for errors in the amount of an Entry or for errors in Settlement Dates. Bank shall likewise have no duty to discover and shall not be liable for duplicate Entries issued by Company. Notwithstanding the foregoing, if Company discovers that any Entry it has initiated was in error, it shall promptly notify Bank of such error. In the event that Company makes an error or issues a duplicate Entry, Company shall reimburse Bank for any loss, damages, or expenses, incurred by Bank as result of the error or issuance of duplicate Entries. For the avoidance of doubt, Bank shall reimburse Company for any loss, damages or expense incurred by Company for a duplicate entry directly caused by Bank's gross negligence or willful misconduct.



UNOFFICIAL DOCUMENT

(g) Prohibited Transactions. Neither Company nor any Customer shall use or attempt to use the Services (a) to engage in any illegal purpose or activity or to violate any Applicable Law, rule or regulation, (b) to breach any contract or agreement by which Company is bound, (c) to engage in any internet or online gambling transaction, whether or not gambling is legal in any applicable jurisdiction, or (d) to engage in any transaction or activity that is not specifically authorized and permitted by this Agreement. Bank may decline to execute any transaction or activity that Bank believes violates the terms of this Agreement or that of the Master ACH Agreement.

(h) Notice of Returned Entries. Bank shall notify Company of a returned or changed Entry as provided by the Master ACH Agreement.

(i) Notifications of Change. Bank shall notify Company of all Notification of Change (NOC) Entries received by Bank relating to Entries transmitted by Company by electronic transmission no later than three (3) business days after receipt thereof. It is the responsibility of Company to make the requested changes within six (6) Business Days or prior to the initiation of the next live entry, whichever is later with the following exceptions: (a) the Originator may choose, at its discretion to make the changes specified in any NOC or corrected NOC relating to ARC, BOC, POP, RCK, XCK and single entry TEL or WEB, (b) in the case of CIE and credit WEB entries, the ODFI or Third- Party Service Provider is responsible for making the changes and (c) for an NOC in response to a Prenotification Entry, the Originator must make the changes prior to originating a subsequent entry if the ODFI receives the NOC by opening of business on the second Business Day following the settlement date of the Prenotification Entry.

(j) Payment by Company for Entries. Company shall pay Bank the amount of each ACH Entry transmitted by Bank pursuant to this Agreement or the Master ACH Agreement at such time as specified in the Schedule A of the Agreement or in the Master ACH Agreement.

(k) Electronic Debit Entries. Company will receive immediately available funds for any Electronic Debit Entries initiated by it not later than the Settlement Date of the items. Provisions may be made for reserve accounts to be maintained for posting of any return Debit Items received, as stated elsewhere within this Agreement, the Master Agreement and/or the NACHA Rules. Company shall promptly provide immediately available funds to indemnify Bank if any Debit Items are rejected after Bank has permitted Company to withdraw immediately available funds, should funds not be available in Company's accounts to cover the amount of the rejected or returned Entries.

(l) Balance Account. Each Business Day, Company shall verify that settlement has been completed and that each Customer Account has been properly funded and balanced. Bank may obtain payment of any amount due and payable to it under this Agreement by debiting the applicable Customer Account or the Reserve Account. Company shall at all times maintain a balance of available funds in an account at Bank with a balance sufficient to cover Company's payment obligations under this Agreement.. In the event Bank elects to process credit Entries initiated by Company and Company has not maintained sufficient collected funds in the Reserve Account or other Company-owned account with Bank to cover them, the total amount of the insufficiency advanced by Bank on behalf of Company shall be immediately due and payable by Company to Bank without any further demand from Bank. If Bank elects to pay an overdraft on any Company-owned account on any one or more occasions, it shall not be considered a waiver of Bank's rights to refuse to do so at any other time nor shall it be an agreement by Bank to pay other items in the overdraft.

(m) ACH Audits. At least once a year and no later than December 1st, Company shall provide Bank with an ACH audit. Bank shall treat such audit reports as Company's Confidential Information under this Agreement. Company shall promptly and fully resolve any exceptions noted on the ACH audit reports with the development and implementation of a corrective action plan by Company's management.

(n) Reserves and Exposure Settlement Limits. In the event Entry Settlement Limit may be exceeded on a Business Day, Company and Bank shall work diligently to resolve such deficiency and update the Entry Settlement Limit and/or Reserve Amount prior to the batch time of the Business Day in which the Exposure Settlement Limit would otherwise be met or exceeded. Notwithstanding the above, in the event Bank desires to change the Exposure Settlement Limit and/or Reserve Amount. Bank shall provide Company with written notice of such proposed changes at least ten (10) Business Days prior to the changes to take effect.

(o) ACH Rules. Company acknowledges receipt of a copy or has access to a copy of the NACHA Rules. A copy of the NACHA Rules is available at www.achrulesonline.org. Company agrees to comply with and be bound by the NACHA Rules. In the event Company violates any of the applicable NACHA Rules and NACHA imposes a fine on Bank because of Company's violation, Company shall reimburse Bank for the fine. The Bank reserves the right to suspend Originators and Third Party Senders for breach of the NACHA Rules or to terminate this Agreement pursuant to Article 11(b) of this Agreement. The Bank reserves the right to audit the Company, each Customer, Originator and/or Third Party Senders compliance with this Agreement, with the Master ACH Agreement, and with the NACHA Rules. Bank agrees that it shall also abide by and follow the NACHA Rules.

7. Data Security.

(a) Company Data Security Obligations.

(i) Company represents and warrants that its creation, collection, receipt, access, use, storage, disposal, and disclosure of Customer Data does and will comply with all applicable federal and, state privacy and data protection laws, as well as all other applicable regulations and directives. At a minimum, pursuant to NACHA Rules, Company must use commercially reasonable encryption technology for the entry and transmission of ACH Entries.

(ii) Without limiting Company's obligations under Article 7(a)(i), Company shall implement administrative, physical, and technical

safeguards to protect Customer Data from unauthorized access, acquisition, or disclosure, destruction, alteration, accidental loss, misuse, or damage that are no less rigorous than best industry practices, and shall ensure that all such safeguards, including the manner in which Customer Data is created, collected, accessed, received, used, stored, processed, disposed of, and disclosed, comply with applicable data protection and privacy laws, as well as the terms and conditions of this Agreement.

(iii) At least once per year, Company shall conduct a site audit of the information technology and information security controls for all facilities used in complying with its obligations under this Agreement, including, but not limited to, obtaining a network-level vulnerability assessment. Upon Bank's request, Company shall make available within ten (10) business days, the review of the Company's latest Statement on Standards for Attestation Engagements (SSAE) No. 16 audit reports for Reporting on Controls at a Service Organization (Type II, SOCH 1) and any other audit reports relating to Company's information technology security controls. Bank shall treat such audit reports as Company's Confidential Information under this Agreement. Company shall promptly and fully resolve any exceptions noted on the SSAE report or other audit reports with the development and implementation of a corrective action plan by Company's management.

(b) Security Program. Each Party shall and shall require its third-party service providers that receive Customer Data to establish and maintain a Security Program as long as it stores Customer Data. At all times during and after the Term and any wind-down or transition period, (i) each Party shall use at least the same degree of care in protecting Customer Data against unauthorized disclosure as it accords to its other confidential customer information, but in no event less than the industry standard of care for financial institutions and (ii) the Security Program shall comply with all information and data security requirements of each Network and Applicable Law. Within five (5) Business Days of Bank's written request, Company shall provide to Bank a summary of Company's written Security Program, and thereafter upon Bank's request will provide updates on the status of such Security Program. Each Party's Security Program shall be Confidential Information of such Party.

(c) Security Breach Procedures.

(i) Each Party shall notify the other Party of a Security Breach as soon as practicable, but no later than twenty-four (24) hours after the breached Party becomes aware of any Security Breach. The Party with a Security Breach shall be referred herein as the "Breached Party."

(ii) Immediately following notification under Article 7(c)(i) above of a Security Breach, the Parties shall coordinate with each other to investigate the Security Breach. The Breached Party shall fully cooperate with the other Party in handling the matter, including, without limitation: (i) assisting with any investigation; (ii) providing the other Party with physical access to the facilities and operations affected; (iii) facilitating interviews with the Breached Party's employees and others involved in the matter; and (iv) making available all relevant records, logs, files, data reporting, and other materials required to comply with Applicable Law, regulation, industry standards, or as otherwise reasonably required by the other Party.

(iii) The Breached Party shall at its own expense use best efforts to immediately contain and remedy any Security Breach and prevent any further Security Breach, including, but not limited to taking any and all action necessary to comply with applicable privacy rights, laws, regulations, and standards. The Breached Party shall reimburse the other Party for all actual reasonable costs incurred by the other Party in responding to, and mitigating damages caused by, any Security Breach, including all costs of notice and/or remediation pursuant to Article 7(c)(iv).

(iv) The Breached Party agrees that it shall not inform any third party of any Security Breach without first obtaining the other Party's prior consent, other than to inform a complainant that the matter has been forwarded to the other Party's legal counsel or as required by Applicable Law.

(v) The Breached Party shall maintain and preserve all documents, records, and other data related to any Security Breach.

(vi) In the event of any Security Breach, Breached Party shall promptly use its best efforts to prevent a recurrence of any such Security Breach.

(d) Equitable Relief. Breached Party acknowledges that any breach of its covenants or obligations set forth in this Article 7 may cause the other Party irreparable harm for which monetary damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, the other Party is entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available from any court, in addition to any other remedy to which the other Party may be entitled at law or in equity. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

(e) Material Breach. The Breached Party's failure to comply with any of the provisions of this Article 7 is a material breach of this Agreement. In such event, the other Party may terminate the Agreement effective immediately upon written notice to the Breached Party without further liability or obligation to Breached Party, subject to Section 11(c)

(f) Indemnification. The Breached Party shall defend, indemnify, and hold harmless the other Party and its subsidiaries, affiliates, and their respective officers, directors, employees, agents, successors, and permitted assigns (each, a "Breach Indemnitee") from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of



UNOFFICIAL DOCUMENT

whatever kind, including reasonable attorneys' fees, the cost of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers, arising out of or resulting from any third-party claim against any Breach Indemnitee arising out of or resulting from Breached Party's failure to comply with any of its obligations under this Article 7.

8. **Disaster Recovery, Business Resumption, and Contingency Plans.** At all times during the Term and any wind-down or transition period, each Party shall prepare and maintain disaster recovery, business resumption, and contingency plans appropriate for the nature and scope of the activities of, and the obligations to be performed by, such Party. Each Party shall ensure that its plans are sufficient to enable such Party to promptly resume, without giving effect to the force majeure provisions of Article 12 of this Agreement, the performance of its obligations hereunder in the event of a natural disaster, destruction of facilities or operations, utility or communication failures or similar interruption in operations and shall ensure that all material records, including, but not limited to, User Data, are backed up in a manner sufficient to survive any disaster or business interruption. Each Party shall periodically, and no less than annually, test its respective disaster recovery, business resumption, and contingency plans as may be appropriate and prudent in light of the nature and scope of its obligations hereunder.

9. **Compensation.**

(a) **Bank Compensation.** Company shall pay Bank the charges for the services provided in connection with this Agreement as set forth in Schedule A attached hereto. Bank may change its fees from time to time upon notice to Company. Such charges do not include, and Company shall be responsible for payment of, any sales, use, excise, value added, utility or other similar taxes relating to such services, and any other fees or charges provided for in the Account Agreement of Bank. Increases to any third-party Fees that are listed are passed through to Company effective upon any such increases the Bank should experience. All such charges are in addition to any charges under the Master ACH Agreement.

10. **Confidentiality.**

(a) **Obligations of Non-Disclosure and Non-Use.** Unless otherwise agreed to in advance, in writing, by the disclosing Party or except as expressly permitted by this Agreement, the receiving Party will not, except as required by law or court order, use Confidential Information of the disclosing Party or disclose it to any third party for the Term and for a period of two (2) years thereafter.

i. The receiving Party may disclose Confidential Information of the disclosing Party only to those of its employees or contractors who need to know such information. In addition, prior to any disclosure of such Confidential Information to any such employee or contractor, such employee or contractor shall be made aware of the confidential nature of the Confidential Information and shall execute, or shall already be bound by, a non-disclosure agreement containing terms and conditions consistent with the terms and conditions of this Agreement.

ii. In any event, the receiving Party shall be responsible for any breach of the terms and conditions of this Agreement by any of its employees or contractors.

iii. The receiving Party shall use the same degree of care to avoid disclosure of the disclosing Party's Confidential Information as the receiving Party employs with respect to its own Confidential Information of like importance, but not less than a reasonable degree of care.

(b) **Return of Confidential Information.** Upon the termination or expiration of this Agreement for any reason, or upon the disclosing Party's earlier request, the receiving Party will deliver to the disclosing Party all of the disclosing Party's property or Confidential Information in tangible form that the receiving Party may have in its possession or control. The receiving Party may retain one copy of the Confidential Information in its legal files.

(c) **Privacy Laws.** During the course of this Agreement, a Party may receive from the other Party certain information that is protected under state and federal financial and healthcare information privacy laws, including applicable sections of the federal Gramm-Leach-Bliley Act ("GLBA") and the Health Insurance Portability and Accountability Act of 1996 (HIPAA"), as may be amended from time to time (collectively, "Protected Information"). The Receiving Party shall not use or disclose Protected Information other than as necessary to implement this Agreement, to maintain data bases for the provision of services hereunder, or as permitted by law. Within ten (10) business days of the termination or expiration of this Agreement for any reason, the Receiving Party shall either (i) return any information described in this Article 11(c) to the Disclosing Party or (ii) if the return of such information is not possible or practicable, certify to the Disclosing Party in writing that such information has been destroyed.

11. **Term and Termination.**

(a) **Term.** Either party may terminate this agreement with or without impact to the Master ACH agreement within 30 days of written notice to each other.

(b) **Effect of Termination and Transition.**

(i) The termination of this Agreement shall not terminate, affect, or impair any rights, obligations, or liabilities of any Party that



UNOFFICIAL DOCUMENT

accrue prior to termination or with respect to the Services occurring or arising prior to termination, or which, under this Agreement, continue after termination. Provisions of this Agreement that, by their nature, should survive termination of this Agreement shall survive such termination.

(ii) Unless otherwise required by Applicable Law, in the event of the expiration or termination of this Agreement, the Parties shall use commercially reasonable efforts in good faith to wind down or transition, as applicable, the Services as soon as reasonably possible (not more than 90 days) to provide for a smooth and orderly wind-down or transition in accordance with Applicable Law pursuant to this Article 11, Term and Termination. The Parties acknowledge that the purpose of the wind-down of the Services is to minimize any adverse effect of the termination on Customers.

(iii) Except as specifically set forth in this Agreement or the agreed upon plan for wind-down or transition, each Party shall bear its own out-of-pocket costs and expenses associated with the wind-down or transition of the Services, except that Company shall pay all of Bank's out-of-pocket costs and expenses in effectuating any transfer or winddown.

(iv) Except as otherwise contemplated by the adopted plan for wind-down or transition or as otherwise required by Applicable Law, the Parties shall continue to be bound by this Agreement and provide services hereunder until such time as the wind-down is complete or the Services are transitioned as provided in this Article 1, Term and Termination.

(v) Company shall maintain funds in the Reserve Account equal to the Reserve Amount for a period of at least one-hundred-eighty (180) days after the Transition Period, and Bank will transfer to Company any amounts remaining in the Reserve Account net of all payments due to Bank under this Agreement, including losses associated with account fraud, no later than five (5) Business Days after the end of such period or sooner if the exposure or potential liability warrants an earlier release.

(vi) Notwithstanding anything to the contrary, Bank shall provide transition services under this Section during the continuance of any event or circumstance that would give rise to Bank's right to terminate this Agreement unless such assistance would violate any Applicable Law, NACHA Rules or any order or instruction of a regulatory authority.

12. Force Majeure. Either Party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, pandemics or other public health emergency, insurrection, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature.

13. Disclaimers of Warranties.

(a) EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, BANK SPECIFICALLY DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ARISING OUT OF OR RELATED TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, EACH OF WHICH IS HEREBY EXCLUDED BY BANK UNDER THIS AGREEMENT.

(b) EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, BANK SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE", WITHOUT ANY REPRESENTATION OF WARRANTY, WHETHER EXPRESSED, IMPLIED OR STATUTORY. USE OF BANK SOFTWARE SERVICES IS AT COMPANY'S OWN RISK. BANK DOES NOT WARRANT THE SERVICES WILL MEET COMPANY'S, BE CONTINUOUS, UNINTERRUPTED, SECURE, TIMELY, OR ERROR-FREE, OR THAT DEFECTS WILL BE CORRECTED. BANK SHALL NOT BE RESPONSIBLE FOR ANY SOFTWARE SERVICE INTERRUPTIONS OR SERVICE FAILURES THAT MAY AFFECT THE SERVICES.

(c) THIS DISCLAIMER OF WARRANTY ARTICLE 13, DISCLAIMER OF WARRANTIES, SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION.

14. Limitation of Liability. Each Party shall not be liable for any special, incidental, consequential, indirect or punitive damages (including loss of anticipated profits) arising in any way out of this Agreement, however caused and on any theory of liability. Except for each Party's (a) liability arising from fraud, gross negligence, or willful misconduct or (b) intellectual property infringement or data breach; and (c) the indemnity obligations, each Party's financial liability under this Agreement shall not exceed $10,000.

15. Indemnification. Except as related to the terms of this Agreement, Company shall defend, indemnify, and hold Bank, its officers, directors, employees, agents and suppliers (collectively "Disclaiming Entities") harmless from and against all claims, actions, proceedings, damages, losses, judgments, settlements, penalties, fines, costs and expenses (including attorneys' fees) arising from third parties in connection with (i) Company's breach of this Agreement; or (ii) Company's violation of any Rules or Applicable Law; or (iii) the negligence, recklessness, or willful misconduct of the Party in connection with its performance of its obligations under this Agreement. Company shall defend, indemnify, and hold Bank and its respective officers, directors, employees, agents and suppliers harmless from and against all claims, actions, proceedings, damages, losses, judgments, settlements, penalties, fines, costs and expenses (including attorneys' fees) arising from Customers or other third parties in connection with; (i) the actions or omissions of Customer or Company; or (ii) any Customer of Company.

16. Independent Contractors. It is understood that both Parties hereto are independent contractors and engage in the operation of their own respective businesses. Each Party shall be fully responsible for its own employees, servants and agents, and the employees, servants and agents of one Party shall not be deemed to be employees, servants and agents of the other Party for any purpose whatsoever.

DocuSign Envelope ID: 165FE7CB-9522-4CFC-8692-82BE0DDB28DE

17. **Non-Exclusivity**. Bank and Company agree that this Agreement is not intended to create an exclusive relationship of any type between Bank and Company. Bank and Company may each enter into similar arrangements with one or more third parties.

18. **Assignment**. Neither Party may, without written approval of the other, assign this Agreement or transfer its interest or any part thereof under this Agreement to any third party

19. **Governing Law and Dispute Resolution.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida (United States), without giving effect to any choice of law or conflict of law provisions. Any dispute or claim between the Parties arising out of or in connection with any provision of this Agreement shall be finally settled by binding arbitration in Pasco County Florida, in accordance with the Commercial Rules of Arbitration of the American Arbitration Association by one arbitrator appointed in accordance with such Commercial Rules. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Notwithstanding the foregoing, the Parties may apply to any court of competent jurisdiction for preliminary or interim equitable relief, or to compel arbitration in accordance with this Article 22, Confidentiality, without breach of this arbitration provision.

20. **General**. This Agreement and the Master ACH Agreement constitute the entire agreement of the Parties on the subject hereof and supersedes all prior understandings and instruments on such subject. In the event of any conflict between the terms of this Agreement and the Master ACH Agreement, the terms of this Agreement shall control. All notices under this Agreement shall be emailed to the Party listed on Page 1 of this Agreement unless notified otherwise by either Party. If any provision of this Agreement is found to be unenforceable or invalid, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and enforceable. All waivers and modifications must be in a writing signed by both Parties and failure to enforce a provision shall not constitute a waiver. The Agreement may be executed in one or more counterparts.

Executed as of the 10/20, 2023

| US Alliance Group, Inc. | Bank |
|---|---|
| DocuSigned by: Fadi Cheikha CEO | |
| By: 966C692FE77443F... | By: |
| Print Name: Fadi Cheikha | Print name: James Esty |
| Print Title: CEO | Print title: President & CEO |
| Date: 10/23/2023 | Date: October 20, 2023 |

UNOFFICIAL DOCUMENT

DocuSign Envelope ID: 165FE7CB-9522-4CFC-8692-82BE0DDB28DE

**SCHEDULE A**

**SCHEDULE OF FEES AND CHARGES**

This fee schedule is Confidential Information and not to be disclosed to third parties. The fees for this service will be charged on a monthly basis on a date determined by Bank. Fees may be subject to change pursuant to Article 9(a) (Bank Compensation) of the Agreement.

| Description | Amount | Frequency |
|---|---|---|
| ~~Same Day ACH~~Monthly Transaction Units | ~~$0.5025~~$0.035 | Per item~~transaction~~ |
| ~~Next~~ Same Day ACH | ~~See master agreement for Company~~$0.125 | Per ~~Transaction~~Item |
| ~~Low or Moderate Risk~~Unauthorized -Return Fees | $~~1.5010.00~~3.00 | Per ~~t~~Item~~ransaction~~ |
| ~~High Risk Origination~~ACH Returns | ~~$0..0525~~$0.25 | Per ~~transaction~~item |
| ~~High Risk Returns~~Addenda | ~~$2.5035.00~~$0.05 | Per ~~transaction~~record |
| Notice of Change (NOC) | $1.00 | |
| Proof of Authorization | $5.00 | |
| Pre-note | $0.05 | |
| Sunday Night/Holiday Submission | $25.00 | Per file |
| Epayment Routing Director Access | $25.00 | Per month |
| Minimum Fee | $5,000.00 | By third month of contract from date of execution |
| | | |

UNOFFICIAL DOCUMENT

DocuSign Envelope ID: 165FE7CB-9522-4CFC-8692-82BE0DDB28DE

**Schedule B**
**Merchant Listing and Limitations**

Company must not perform services with Customers in the following lines of business without prior bank approval. Bank may amend this list from time to time.

**Prohibited Products, Services, and Methods of Selling** - The Bank will not accept customers that offer these types of products, services, or methods of selling.

- Offshore Businesses
- Adult Entertainment Businesses
- Escort Services or Encounter Groups/Clubs
- Massage Parlors (not associated with salons/chiropractic care)
- "Pseudo" Products
- Nested Payment Processors
- Pyramid Schemes/Multiple Level Sales
- Shell Corporations
- Tax Anticipation Programs
- Tattoo Parlors
- Aircraft Dealers
- Online Firearms/Ammunition Sales
- Online Tobacco/e-cigarettes/e-liquid Sales
- Unfair, Predatory, or Deceptive Practices/Goods
- Products/Services deemed illegal by any level of Government
- Transaction Types prohibited by Visa/ MasterCard/American Express/Discover

**Restricted/High Products, Services, and Methods of Selling** – Acceptance of these types of businesses will be based on enhanced due diligence review and results.

- Cryptocurrency
- Auctions/Auction Services and Websites
- Bail Bond Services
- Bars/Taverns (not serving food)
- Credit Restoration/Debt Relief Services
- Door to Door
- Flea Markets
- Modeling Agencies
- Online Dating Services (if known & reputable)
- Neighborhood Party Sales
- Resort Land Promotions
- Talent Booking Agencies
- Third Party Hotel Reservation Services
- Vitamin and Supplement Sales
- Nutraceuticals
- Short term loans with high interest rates
- Collection Agencies
- Credit Card Schemes
- Government Grants
- Home Based Charities
- Lifetime Guarantees
- Student Loan Assistance Companies
- Fantasy Sports
- Get Rich Quick Schemes
- Raffle/Sweepstakes
- "As Seen on TV"
- Telemarketing
- Pharmaceutical Sales
- Tobacco Sales

UNOFFICIAL DOCUMENT