**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

Case No. 8:25-cv-01458-SDM-CPT

U.S. ALLIANCE GROUP, INC.;
PAYMENT SOLUTIONS
INTERNATIONAL, LLC;
AIDEN FLORIDA
BANCSHARES, INC., and
AIDEN FINTECH GROUP, INC.,

Plaintiffs,

v.

FIRST NATIONAL BANK OF PASCO;
FLORIDA BANCSHARES, INC.;
FNBPASCO HOLDINGS, LLC;
A.P. GIBBS; J. ESRY; S. HICKMAN, et al.,

Defendants.
_____________________________________/

# SECOND AMENDED COMPLAINT

Plaintiffs U.S. ALLIANCE GROUP, INC ("USAG"); PAYMENT SOLUTIONS INTERNATIONAL, LLC d/b/a PaySol ("PaySol," and collectively with USAG the "Payment Processors"); AIDEN FLORIDA BANCSHARES, INC. ("AidenShares"); and AIDEN FINTECH GROUP, INC. ("AidenTech", and, collectively with AidenShares, USAG, and PaySol, the "Plaintiffs") file this Complaint against Defendants FIRST NATIONAL BANK OF PASCO (the

"Bank"); FLORIDA BANCSHARES, INC. ("PascoShares"); FNBPASCO HOLDINGS, LLC ("Pasco Holdings," and, collectively with Pasco Shares, the "Bank Holding Companies"); A.P. GIBBS, individually, and as Chairman of the Bank and Bank Holding Companies ("Gibbs"); PAUL MIDILI, as Vice Chairman of the Bank and Bank Holding Companies ("Midili"); JOHN HENSON as Director of the Bank and Bank Holding ("Henson"); MARLENE MANN, as Director of the Bank and Bank Holding Companies ("Mann"); ERNEST PEEPLES, as Director of the Bank and Bank Holding Companies ("Peeples"); PAULA S. O'NEIL, as President & CEO of the Bank and Bank Holding Companies ("O'Neil"); STEVEN CARLE, as Director of the Bank and Bank Holding Companies ("Carle," and collectively with Gibbs, Midili, Mann, Henson, Peeples, and O'Neil, the "Entrenched Directors"); DANIEL FULGHAM, as Director of the Bank and Bank Holding Companies ("Fulgham"); STEVEN HICKMAN ("Hickman") as former President and CEO of the Bank and Bank Holding Companies; JOHN ZAZZERA as former President and CEO of the Bank and Bank Holding Companies ("Zazzera" and collectively with the Bank, Bank Holding Companies, Entrenched Directors, Hickman, and Fulgham, the "Defendants")[1], and allege as follows:

---

[1] Plaintiffs reserve the right to amend this Second Amended Complaint as discovery reveals additional facts, to allege Defendants' misconduct with greater specificity, and, as warranted, to add other individuals who served on the Bank's board of directors as Defendants in their individual capacities.

## I. INTRODUCTION

1. The Bank's board of directors calls the Bank the "Official Bank of the American Dream." For Fadi Cheikha, a Lebanese-American fintech entrepreneur who invested his capital, his companies, and his faith in the Bank, that description could not have been further from the truth.

2. Instead, Fadi Cheikha encountered a group of insiders who used the Bank for personal enrichment. When faced with a potential change of control, those insiders engaged in self-interested misconduct that affirmatively damaged the Bank to maintain their control.

3. Gibbs, the Bank's founding shareholder and Chairman of the Bank and Bank Holding Companies, made this position clear. Gibbs stated privately to the Entrenched Directors and others that Cheikha would acquire the Bank "over my dead body."

4. In early 2021, the Bank, which was in serious need of capital, publicly solicited Cheikha and Cheikha's fintech company, AidenShares.

5. AidenShares proposed a full acquisition and a plan to transform the Bank into a fee-income-driven fintech institution. AidenShares also spent more than $1,000,000 on due diligence to advance that plan.

6. AidenShares did not know that the Bank's board of directors was secretly restructuring the Bank's bond holdings to artificially inflate the book value

of the Bank and PascoShares to extract as much money as possible from AidenShares.

7. The bond gamble resulted in more than $20,000,000 in unrealized losses and rendered AidenShares' offer to acquire the Bank and PascoShares financially prohibitive.

8. Despite those losses, Cheikha remained involved through AidenTech. Under a share purchase agreement, AidenTech acquired a minority stake in PascoShares and appointed Cheikha to the board of directors for the Bank and PascoShares.

9. Cheikha brought substantial business relationships to the Bank, including USAG and PaySol. Those relationships helped sustain the Bank's financial condition during Cheikha's tenure on the board of directors for the Bank and PascoShares.

10. By the summer of 2024, the Bank still needed additional capital and was considering acquisition offers. At the same time, the Office of the Comptroller of the Currency ("OCC") was examining the Bank and pressing for reforms. Rather than cooperate, the Entrenched Directors resisted both.

11. AidenTech offered $50,000,000 to acquire the Bank outright. A second investor offered the same amount on less favorable terms. Both offers were viable.

12. Despite warnings that fiduciary duties required evaluation of each

offer, the Entrenched Directors rejected both offers and refused to undertake a proper valuation of the Bank's holdings to assess additional acquisition opportunities.

13. Gibbs had a personal reason to block both transactions. Gibbs had pledged shares in the Bank and Bank Holding Companies at $20 per share as collateral for a business venture. A change-of-control transaction would have required the Bank to recognize bond losses, reducing the value of the pledged collateral and exposing Gibbs to potential personal liability.

14. The remaining Entrenched Directors voted to reject both transactions for the same purpose.

15. Gibbs then introduced Fulgham to the Bank's management and the Entrenched Directors. Fulgham agreed to purchase shares at $20 per share, structured the transaction to avoid change-of-control scrutiny, and privately offered Gibbs and Midili board seats in Fulgham's company.

16. Fulgham also promised to generate fee income for the Bank through foreign deposits from European money service businesses.

17. Despite warnings from the Bank's management that Fulgham's business model posed significant BSA/AML, OFAC, and sanctions risks, Gibbs and the Entrenched Directors proceeded with Fulgham's proposed share purchase.

18. Immediately thereafter, Gibbs removed the existing CEO. Gibbs and the Entrenched Directors then fast-tracked the appointment of Zazzera as the new CEO without completing a thorough background check

19. As CEO, Zazzera quickly changed the Bank's BSA policies to accommodate foreign accounts without informing the Bank's BSA Officer, who had been hired to address prior regulatory deficiencies.

20. When the Bank's BSA Officer discovered the changes and raised concerns at a meeting of the Bank's board of directors, the Entrenched Directors dismissed those concerns. The Bank then terminated the BSA Officer the following week.

21. These governance failures led the Bank's board of directors to terminate agreements with USAG and PaySol, file an improper interpleader action against USAG and PaySol, appropriate funds in USAG's and PaySol's accounts as income while litigation was pending, amend the Bank's bylaws to foreclose shareholder challenges, use confidential merchant data to solicit USAG's and PaySol's clients, refuse to seat AidenTech's nominated replacement directors, and embroil the Bank in a series of related lawsuits.

22. Plaintiffs assert claims for breach of multiple written agreements, fraudulent inducement, breach of fiduciary duty and minority shareholder oppression, negligence and recklessness in payment system and ACH origination

oversight, grossly negligent hiring and supervision of key BSA and payments personnel, and misappropriation of trade secrets. Plaintiffs seek damages, rescission of a fraudulently induced release, restoration of governance and ownership rights, and injunctive relief to prevent the ongoing misappropriation of their trade secrets.

## II. PARTIES

### A. Plaintiffs

23. AidenShares is a Florida corporation, with its principal address located at 29883 Santa Margarita Pkwy, Rancho Santa Margarita, CA 92688, and is registered to do business in the State of Florida.

24. AidenTech is a Delaware corporation, with its principal address located at 29883 Santa Margarita Pkwy, Rancho Santa Margarita, CA 92688, and is registered to do business in the State of California.

25. USAG is a California corporation, with its principal address located at 29883 Santa Margarita Pkwy, Rancho Santa Margarita, CA 92688, and is registered to do business in the State of Florida.

26. PaySol is a Delaware limited liability company whose sole member is Fadi Cheikha and Kimberly Cheikha, as Trustees of the Cheikha Family Trust dated August 10, 2006. Fadi Cheikha and Kimberly Cheikha are citizens of California, and PaySol is registered to do business in the State of Florida.

## B. Defendants

27. The Bank is a federally chartered national association with FDIC Certification No. 26829. The Bank's principal place of business is located at 13315 U.S. Hwy 301, Dade City, Florida 33525.

28. PascoShares is a Florida corporation, with its principal place of business located at 13315 U.S. Hwy 301, Dade City, FL 33525.

29. Pasco Holdings is a Florida limited liability company with its principal place of business located at 13315 U.S. Hwy 301, Dade City, FL 33525.

30. Plaintiffs are informed and believe, and based thereon allege, that Gibbs resides in the State of Florida.

31. Plaintiffs are informed and believe, and based thereon allege, that Henson resides in the State of Florida.

32. Plaintiffs are informed and believe, and based thereon allege, that Mann resides in the State of Florida.

33. Plaintiffs are informed and believe, and based thereon allege, that Midili resides in the State of Florida.

34. Plaintiffs are informed and believe, and based thereon allege, that Carle resides in the State of Florida.

35. Plaintiffs are informed and believe, and based thereon allege, that Peeples resides in the State of Florida.

36. Plaintiffs are informed and believe, and based thereon allege, that O'Neil resides in the State of Florida.

37. Plaintiffs are informed and believe, and based thereon allege, that Fulgham resides in the State of Florida.

38. Plaintiffs are informed and believe, and based thereon allege, that Hickman resides in the State of Florida.

39. Plaintiffs are informed and believe, and based thereon allege, that Zazzera resides in the State of Florida.

## III. JURISDICTION AND VENUE

40. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because USAG and PaySol assert claims arising under federal law, including claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

41. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims and arise from a common nucleus of operative fact.

42. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2) because at least one Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

///

43. Assignment to the Tampa Division of the Middle District of Florida is proper because Pasco County lies within that Division and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in that Division.

## IV. ALLEGATIONS COMMON TO ALL COUNTS

### A. The Bank, Its Holding Companies, and the Entrenched Directors' Control.

44. The Bank is a nationally chartered bank founded in 1986 that operates five branches and holds assets exceeding $300,000,000.

45. PascoShares is a holding company for the Bank. PascoShares is privately held and owned by approximately 200 shareholders.

46. Upon information and belief, Pasco Holdings is a secondary holding company affiliated with the Bank.

47. The individuals who serve as directors of the Bank also serve as directors of PascoShares and Pasco Holdings.

48. Since at least 2021, the Bank and Bank Holding Companies have been controlled by a small group of shareholders.

49. Gibbs, a founding shareholder, has served as chairman of the Bank and PascoShares since the Bank's inception and controls approximately 11.68% of the voting shares. Gibbs also serves as the Bank's attorney of record.

50. Midili, also a founding shareholder, has served as vice-chairman for the Bank and PascoShares for an equal amount of time and controls approximately

4.94% of the voting shares.

51. Since at least 2011, Henson, Mann, and Peeples have served as directors of the Bank and PascoShares, including during the period in which the OCC first found the Bank to be engaged in unsafe and unsound banking practices and required the Bank to enter into a formal supervisory agreement. A true and correct copy is attached hereto as **Exhibit A**.

52. O'Neil has served as a Director of the Bank and PasoShares at all relevant times and, since approximately June 2025, as President and CEO.

53. Together, the Entrenched Directors control approximately 30% of the Bank and Bank Holding Companies' voting shares and exercise effective control over the Bank and Bank Holding Companies' decisions.

54. Through that control, the Entrenched Directors are able to approve transactions and policies without meaningful opposition.

**i. The Non-Party Directors of the Bank and Bank Holding Companies.**

55. Chris Black, a non-party was a director of the Bank and PascoShares between 2017 and through September 2024, when he resigned, in part, as a result of the misconduct as alleged below.

56. Glen Greenfelder was a member of the board of directors of the Bank and PascoShares between 2021 and October 29, 2022. Mr. Greenfelder passed away

on October 29, 2022. Greenfelder and Black are collectively referred to as the Non-Party Directors.

57. Cheikha is the principal of AidenShares and AidenTech. Pursuant to a treasury share purchase agreement between AidenTech and PascoShares, Cheikha was appointed as a director of the Bank and PascoShares, a position he held from March 17, 2023 until his resignation on August 14, 2024

**ii. The Bank's Chief Executives From 2021 To the Present.**

59. Hickman served as President and CEO of the Bank through approximately April 2023.

60. James Esry succeeded Hickman and served as President and CEO of the Bank through December 2024.

61. Zazzera succeeded Esry and served as President and CEO of the Bank a beginning in December 2024.

62. O'Neil has served as President and CEO of the Bank since approximately June 2025.

**B. The Entrenched Directors' Reckless Bond Gamble and Misrepresentations to AidenShares.**

63. Between 2019 and 2021, the Bank generated most of its revenue from business lending.

64. In March 2021, Hickman and Gibbs approached Fadi Cheikha to discuss a potential investment in, and acquisition of, the Bank, via AidenShares.

65. During this same period, Hickman, Gibbs, and Midili amended the Bank's investment policy to authorize the purchase of mortgage-backed securities.

66. Without convening the board of directors of the Bank or PascoShares or obtaining formal approval, Hickman, Gibbs, and Midili directed the sale of the Bank's existing high-yield bond portfolio, valued at approximately $35,000,000, and replaced that portfolio with approximately $74,000,000 in lower-yield mortgage-backed securities using $45,000,000 of the Bank's liquidity (the "Reckless Bond Gamble").

67. Hickman, Gibbs, and Midili's goal was to artificially inflate the Bank's earnings and increase the book value of the Entrenched Directors' shares before the anticipated sale of the Bank to AidenShares, which was initially expected in June 2021. This strategy materially reduced yield and exposed the Bank to interest-rate risk and liquidity constraints.

68. Upon information and belief, the remaining Entrenched Directors approved, authorized, or otherwise ratified the Reckless Bond Gamble.

69. In November 2021, Hickman, acting individually and on behalf of PascoShares and the Entrenched Directors, falsely represented to AidenShares and its agents through written due diligence materials and oral discussions that the Bank held approximately $35,000,000 in high-yield bonds.

///

70. Gibbs served as the representative for the Entrenched Directors.

71. Gibbs and the Entrenched Directors failed to disclose significant operating expenses, including mortgage commissions, building costs, and information technology expenditures (the "Undisclosed Liabilities").

72. Upon information and belief, during this same period, the Entrenched Directors issued distributions and dividends to themselves while the acquisition negotiations were ongoing (the "Corporate Waste").

73. These omissions and misrepresentations were made to induce AidenShares to proceed with an acquisition at an inflated valuation.

74. AidenShares reasonably relied on these representations in evaluating the transaction and incurred substantial due diligence costs.

75. On December 31, 2021, AidenShares entered into a written agreement with the Entrenched Directors, Hicks, Black, and Greenfelder to acquire between 65% and 80% of PascoShares at approximately 1.9 times book value, with rights to board representation, preemptive rights, and a five-year transition framework (the "AidenShares' Acquisition"). A true and correct copy of the AidenShares' Acquisition agreement is attached hereto as **Exhibit B**. The transaction required regulatory approval and constituted a change of control as defined under 12 C.F.R. § 5.50.

///

76. AidenShares would not have offered that valuation had it known about the Reckless Bond Gamble, the Undisclosed Expenses, or the Corporate Waste.

### C. AidenTech's Minority Stake and Right to Nominate a Director to the Bank and PascoShares' Board of Directors.

77. During the due diligence period, the Reckless Bond Gamble began to backfire. The Bank's bond portfolio began to incur unrealized losses exceeding tens of millions of dollars.

78. After incurring more than $1,000,000 in due diligence costs, AidenShares discovered the Undisclosed Liabilities, the Corporate Waste, and the effects of the Reckless Bond Gamble on the Bank.

79. As a result, completing AidenShares' Acquisition on the originally proposed terms would have required AidenShares to source approximately $25 million in additional capital, and pushing the effective acquisition multiple above four times book value.

80. On October 6, 2022, AidenShares submitted a modified term sheet ("AidenShares's Modified Term Sheet").

81. Under AidenShares's Modified Term Sheet, AidenShares' shares remained pegged at approximately 1.9 times book value but included terms designed to address unrealized losses resulting from the Reckless Bond Gamble.

82. The Entrenched Directors rejected AidenShares' Modified Term Sheet.

83. Knowing they faced personal liability from the Reckless Bond Gamble, the Entrenched Directors offered AidenTech revised terms consisting of treasury shares and a board seat on the board of directors for the Bank and a board seat on the board of directors for PascoShares (the "Treasury Share and Directorship Agreement"), conditioned on an agreement terminating AidenShares' Acquisition (the "Termination of AidenShares' Acquisition"), which contained mutual releases. AidenShares did not execute the Termination of AidenShares' Acquisition.

84. In March 2023, AidenTech entered into the Treasury Share and Directorship Agreement. A true and correct copy is attached hereto as **Exhibit C.**

85. Under that agreement, AidenTech purchased 58,000 treasury shares for approximately $1,390,840.

86. The transaction provided AidenTech with a minority stake and the right to nominate a director to both the Bank and PascoShares.

87. Section 8.02 of the Treasury Share and Directorship Agreement contained a mutual release that required AidenTech to release PascoShares for any claims with regards to the AidenShares' Acquisition (the "Fraudulent Release").

///

88. Upon information and belief, Gibbs, acting as the representative of the Entrenched Directors and the Non-Party Directors, falsely represented to AidenTech that the release would be limited in scope and would not affect AidenShares' rights under the AidenShares' Acquisition.

89. AidenTech executed the Fraudulent Release in reliance on Gibb's mischaracterization of its scope.

## D. The Strategic Business Plan for a Change of Control of AidenShares' Acquisition: Integration of BridgeFi, USAG, and PaySol.

90. In connection with AidenShares' Acquisition, the parties developed a joint plan to grow the Bank's revenue by shifting services toward fee-based fintech services.

91. The plan focused on three areas: the BridgeFi/FirstFin Credit Program, the Bank's existing Cannabis Related Business ("CRB") programs, and a new Merchant Processing Program to be launched in partnership with USAG (the "Business Plan").

92. The parties anticipated closing by June 30, 2022.

93. The BridgeFi/FirstFin program was projected to offer small consumer credit products nationwide, generating monthly fees for the Bank

94. The Business Plan also expected continued growth from the Bank's existing CRB lending and deposit programs.

95. The Business Plan projected the launch of a Merchant Processing program in the fourth quarter of 2022, under which the Bank would become an approved Visa acquiring member and sponsor for USAG, and earn fee income from merchant transactions.

**i. The Merchant Processing Programs**

96. Prior to partnering with the Bank, USAG processed transactions for approximately 50,000 merchants through four separate sponsoring banks.

97. USAG and Paysol planned to migrate their existing merchant portfolio to the Bank to support the launch of the Merchant Processing Program.

98. On August 3, 2022, USAG entered into a written ACH Origination Agreement with the Bank authorizing USAG to originate ACH transactions (the "USAG ACH Agreement") through the Bank as Originating Depository Financial Institution ("ODFI"). A true and correct copy is attached hereto as **Exhibit D**.

99. On August 3, 2022, Paysol entered into a written ACH Origination Agreement with the Bank (the "PaySol ACH Agreement") authorizing USAG to originate ACH transactions through the Bank as ODFI. A true and correct copy is attached hereto as **Exhibit E**.

100. When the Bank first began ACH processing, the OCC required the Bank to establish a four-member board oversight committee to monitor the Merchant Processing Program.

101. On December 6, 2022, the Bank engaged external consultants to develop the Merchant Processing Program, obtaining approvals from Visa, Mastercard, Discover, and regional networks, and drafting compliant merchant policies and guidelines.

102. Upon information and belief, the Entrenched Directors reviewed and approved those policies.

103. The Bank hired a Merchant Processing Program Manager and directed him to conduct a site visit at USAG requiring implementation of specified transaction alert rules.

104. By summer of 2023, the Bank still had not launched its Merchant Processing Program.

105. On August 17, 2023, the Bank and PascoShares' board of directors, including the Entrenched Directors, Black, and Cheikha reviewed a third-party assessment of the Bank's actions to enter the merchant processing space as medium risk. The Entrenched Directors and Black elected to treat the Bank's actions as high risk.

106. On the same day, the Entrenched Directors and Black approved proceeding to final development stages of the Merchant Processing program. Cheikha abstained from voting.

///

107. On September 21, 2023, the Entrenched Directors and Black approved the Merchant Processing Policy. Cheikha abstained from voting.

108. The Bank began a limited rollout in September or October 2023, initially onboarding two merchants operating across 22 locations.

109. At the time of the OCC Exam, the Bank had only 31 actual merchants onboarded, representing three beneficial owners.

110. On November 16, 2023, the Entrenched Directors, Black, and Cheikha reviewed the ACH returns report and found no red flags.

**ii. The Cannabis Related Programs**

111. At all times relevant, the Bank held itself out as "offer[ing] fully compliant banking solutions to some of the largest MSO's and Medical Marijuana Treatment Centers in Florida and have financed the largest acquisition portfolio of dispensaries in the State of Florida."

112. Hickman, on behalf of the Bank and PascoShares, represented to AidenTech and USAG that the Bank was experienced in cannabis electronic payments.

113. On August 3, 2022, USAG entered into the USAG ACH Agreement.

114. On October 20, 2023, USAG entered into a Third-Party ACH Agreement with the Bank, which allows USAG to provide ACH third-party sender services to the Bank and USAG's approved customers (the "Third-Party ACH

Agreement"). A true and correct copy is attached hereto as **Exhibit F**.

115. On November 20, 2023, USAG entered into a POS Network Sponsorship Agreement (the "POS Agreement") with the Bank authorizing USAG to process merchant transactions through the Bank as sponsor bank. A true and correct copy is attached hereto as **Exhibit G**.

116. At the time, the Bank's cannabis banking and merchant processing activities were known to regulators and subject to oversight.

117. In fact, on August 17, 2023, the Entrenched Directors, Black, and Cheikha agreed the Bank's Cannabis Banking program was within acceptable risk tolerance.

118. On November 16, 2023, the Entrenched Directors, Black, and Cheikha reviewed the CRB program, found no red flags, and reported $34,000,000 in monthly fees from four primary customers.

### E. Rising Regulatory Scrutiny from the Entrenched Directors' Mismanagement of the Bank and PascoShares Reveals Control Deficiencies and Prompts AidenTech to Implement Corrective Measures.

119. Just eight months after joining the board of directors of the Bank and PascoShares, AidenTech discovered the true extent of the Bank's problems.

120. By late 2023, the Bank's regulatory condition had materially deteriorated under Hickman and the Entrenched Directors' mismanagement.

121. On September 21, 2023, the Bank's board of directors reviewed

Hickman's resignation. Hickman resigned following allegations of sexually harassment made by a Bank employee.

122. The Entrenched Directors approved one year of paid salary as severance to Hickman.

123. The Bank's board of directors later hired Esry as his replacement.

124. More troubling, AidenTech learned that the Entrenched Directors had concealed material information about the Bank's condition and liabilities during the pendency of AidenShares' Acquisition agreement.

125. On October 19, 2023, Cheikha discovered that the Asset/Liability Committee ("ALCO") had no defined authority limits and could approve bond transactions without full approval from the Bank's board of directors, the same lack of controls that enabled Hickman, Gibbs, and Midili to execute the Reckless Bond Gamble without authorization from the rest of the Bank's board of directors. Cheikha proposed a $5,000,000 ALCO authority limit to prevent future unauthorized transactions, and the Bank's board of directors approved that proposal.

126. The absence of defined ALCO authority limits and the ability of ALCO to approve bond transactions without full approval from the Bank's board of directors would have fundamentally changed AidenShares' decision to execute the Treasury Share and Directorship Agreement and the Fraudulent Release.

127. The absence of defined ALCO authority limits and the ability of ALCO to approve bond transactions without full approval from the Bank's board of directors would have fundamentally changed AidenTech's decision to execute the Treasury Share and Directorship Agreement.

128. On December 21, 2023, the Bank's board of directors convened a meeting attended by Cheikha and the Entrenched Directors.

129. At the meeting, Esry reported the Bank's ratings for Management and Earnings were downgraded by the OCC.

130. Esry reported the OCC downgraded the Bank's management and earnings ratings and expressed concern about the Bank's controls.

131. Esry reported the OCC identified deficiencies in the Bank's compliance and BSA programs, including weaknesses in oversight, customer due diligence, and monitoring procedures.

132. Upon information and belief, the Bank accumulated a backlog of more than 1,400 unresolved compliance alerts, many of which remained open for extended periods during Hickman's tenure.

133. The Earnings ratings were downgraded, in part due to the Reckless Bond Gamble which continued to weigh on the Bank's earnings and was expected to do so for several more years.

///

**F. Competing Offers for Additional Capital.**

134. Senior management recommended that the Bank increase its capital, strengthen its staffing, and invest in compliance and risk management.

135. For example, in January 2024, the Bank hired a BSA Compliance Officer, and that officer requested additional staff to oversee the program for the Bank's Board and Oversight Committee. The Bank's Board and Oversight Committee denied that request.

136. In June 2024, as the Bank's capital needs became more urgent, the Entrenched Directors, Black, and Cheikha, acting as directors of the Bank and PascoShares, considered competing proposals.

137. On June 20, 2024, the Entrenched Directors, Black, and Cheikha met to discuss a $50,000,000 capital proposal from an investor seeking 50.01% ownership (the "Thompson Offer").

138. During the meeting, Cheikha urged the Entrenched Directors to consider their fiduciary duties and adopt a legitimate valuation method to properly assess the offer and the Bank's capital needs. The Entrenched Directors refused to do so.

139. Peeples moved to decline the offer, and the motion passed, with the Entrenched Directors voting to reject. Cheikha and Black voted against rejection.

///

140. Gibbs opposed a sale because Gibbs had pledged shares at $20 per share as collateral for a business venture. A change of control would have required those shares to be marked to market, exposing Gibbs to personal liability.

141. On July 18, 2024, AidenTech submitted a letter of intent to acquire up to 100% of PascoShares for approximately $50,000,000, or roughly three times book value ("AidenTech's Offer"). AidenTech's Offer represented a substantial premium and provided a path to stabilize the Bank and support its programs.

142. On August 11, 2024, Black stated in an email to Henson, O'Neil, Carle, Gibbs, Mann, and Midili that the Entrenched Directors' conduct exposed the Bank and PascoShares to legal liability and urged those directors to meaningfully consider AidenTech's Offer.

143. On August 12, 2024, the Entrenched Directors, Black, and Cheikha met. At that meeting, Cheikha presented AidenTech's Offer and warned that capital constraints were already slowing the growth of the Merchant Processing Program. Cheikha then left the meeting.

144. At that same meeting, Esry argued that shareholders needed the capital.

145. At that same meeting, Black warned that rejecting AidenTech's Offer risked litigation, loss of valuable business lines, and a capital shortfall that would alarm the OCC.

146. Despite these warnings, the Entrenched Directors rejected AidenTech's Offer. Gibbs, Peeples, and O'Neil opposed the offer without articulating concrete reasons. Black and Esry voted against rejection.

147. Around the same time, the Entrenched Directors introduced Fulgham to the Bank's management. Fulgham proposed that the Bank hold foreign deposits from European money service businesses in exchange for fee income.

148. Bank management rejected the proposal because Fulgham was evasive and, given the regulatory scrutiny, the AML/OFAC risks were too great.

149. Unknown to AidenTech or other shareholders, Gibbs and Midili were promised board seats in Fulgham's company in exchange for supporting his investment in the Bank.

150. On August 14, 2024, Cheikha resigned as a director of the Bank, stating that he had lost confidence in the ability of the board of directors for the Bank and PascoShares to fulfill its fiduciary obligations to the Bank's depositary customers and shareholders.

151. In his resignation letter, Cheikha exercised his contractual right under the Treasury Share and Directorship Agreement to nominate replacement directors by appointing Mike Mashke, or alternatively Manny Long, to the boards of directors of the Bank and PascoShares to ensure adequate oversight and banking expertise. Both Mashke and Long were senior executives of the Bank.

152. Director Black resigned shortly thereafter.

## G. The Bank Approves Fulgham's Investment in the Bank and Bank Holding Companies and Appoints Him to the Board of Directors.

153. The Entrenched Directors, the Bank, and the Bank Holding Companies refused to appoint Mashke or Long to the boards of directors of the Bank and the Bank Holding Companies.

154. Instead, the Entrenched Directors pursued alternative arrangements involving Fulgham's entity, DEF Trading LLC.

155. Gibbs urged the Entrenched Directors, then the only members of the boards of directors of the Bank and PascoShares, to approve a letter of intent permitting DEF Trading LLC to purchase up to 9.9% of the Bank's stock on terms suggesting a path to controlling ownership, similar to the transaction initially proposed to AidenShares.

156. After approving the transaction, then-CEO Esry asked Gibbs whether the capital would remain at PascoShares or be moved to the Bank.

157. Gibbs responded that Gibbs was attempting to move capital into the Bank because management was "complaining."

158. On December 5, 2024, Fulgham, through DEF Trading LLC, purchased 108,900 shares of Florida Bancshares at $20 per share, more than double the approximate $9 book value, for approximately $2,200,000.

159. The transaction did not address the Bank's capital needs and allowed Gibbs and the Entrenched Directors to avoid a change of control that would have required the Bank to recognize tens of millions of dollars in losses from the Reckless Bond Gamble.

160. Three days later, on December 9, 2024, Gibbs fired Esry as CEO, upon information and belief, for pretextual reasons.

161. Gibbs then appointed Steven Zazzera as CEO without completing a standard background check.

162. The Bank's management raised concerns about hiring Zazzera, including Zazzera's prior employment at Axiom Bank during a period of public regulatory trouble.

163. Shortly after taking the role, Zazzera changed the Bank's BSA policy to allow foreign accounts and international wires without consulting the Bank's BSA Compliance Officer.

164. The BSA Compliance Officer objected to Zazzera's unilateral actions at the next meeting of the Bank's board of directors. The Bank terminated the BSA Compliance Officer weeks later.

## H. <u>The Entrenched Directors' Subsequent Actions Confirm Breaches of the Duty of Care to Shareholders and Negligence in ACH and ODFI Responsibilities.</u>

165. The Entrenched Board of Directors continued to operate without

effective oversight or strategic direction and reacted belatedly to the consequences of the Bank's mismanagement.

166. On December 26, 2024, Zazzera, then President and CEO of the Bank, sent USAG a letter styled as a notice of intent to terminate the POS Network Sponsorship Agreement, pursuant to Section VIII(B)(a), (b), and (d) of that agreement (the "Notice to Terminate POS Agreement"). A true and correct copy is attached hereto as **Exhibit H**.

167. In that letter, Zazzera represented that the OCC had determined that USAG's internal controls relating to audits and suspicious activity monitoring were deficient, and that USAG had failed to comply with the Bank's Program requirements. The letter provided that the agreement would terminate in twenty days.

168. On March 21, 2025, the Bank sent Cheikha, on behalf of AidenTech, USAG, and PaySol, a formal 30-Day Notice of Account Closure & Termination of Services (the "Notice to Terminate the ACH Agreements"). A true and correct copy of that notice is attached hereto as **Exhibit I**.

169. The Notice to Terminate the ACH Agreements stated that the Bank had made "the strategic decision to discontinue offering deposit accounts and services to Tier I and Tier II (direct and indirect) cannabis related businesses," including businesses with merchants tied to the cannabis industry and payment

processing for cannabis-related businesses.

170. The Notice to Terminate the ACH Agreements expressly stated that a cashier's check representing the balance in each account on the date of closure would be mailed to the business address on file.

171. The Bank did not honor that promise. Instead of closing the accounts and disbursing the balances by cashier's check as the Bank committed to do in writing, the Bank froze the accounts.

172. On or about April 11, 2025, the Bank froze USAG's and PaySol's deposit accounts at the Bank. On or about the same day, the Bank sent a letter claiming that the Bank could freeze USAG's and USAG's affiliates' accounts. A true and correct copy of that letter is attached hereto as **Exhibit J**.

173. The letter asserted that the Bank had identified several alleged breaches by USAG under the Third Party ACH Agreement, the POS Sponsorship Agreement, and "other" unidentified agreements.

174. The letter further stated that the OCC had demanded that the Bank obtain a third-party lookback to determine "the scope and severity of USAG's violations of law" and that the Bank was immediately exercising its "rights to indemnity and its security interest" (a "Lookback Report").

175. The Bank then froze USAG's ***and*** PaySol's accounts and said it would use the funds to pay for a Lookback Report, expected to cost more than $1 million.

176. At the time, USAG held approximately $200,000 in their accounts ending in ****1656, ****1669, ****1546, ****0026, ****0039, ****2095, ****2105, ****2118, and ****0042 at the Bank. USAG's accounts contained settlement funds and reserve deposits generated through its ACH payment processing operations on behalf of CRB merchants.

177. At the time, Paysol held approximately $2,200,000 in its accounts ending in ****1659, ****4560, ****4573, ****4586, ****4599, ****4609, ****4612, ****4625, ****5307, ****5310, ****5323, ****5336, ****5349, ****5352, ****5365, ****5378, ****5381, ****5394, ****5417, ****5420, ****5475, ****5666, ****5679, ****5682, ****5695, ****5705, ****5718, ****5721, ****5734, ****5747, ****5750, ****1782, and ****1559 at the Bank.

178. The funds in PaySol's accounts at the Bank came from CRB transactions processed through a separate financial institution and were held by the Bank pursuant to the PaySol ACH Origination Agreement, which generated fee income for the Bank.

179. Following the freeze, certain CRB merchants sought the return of their funds and initiated litigation against USAG, PaySol, and the Bank.[2]

///

---

[2] See *NDC Parentco LLC v. First National Bank of Pasco*, Case No. 8:25-cv-02085 (M.D. Fla.), and *Hashery LLC v. First National Bank of Pasco*, Case No. 2:25-cv-05727 (D.N.J.).

180. On July 23, 2025, instead of releasing the funds to PaySol, the Bank filed an improper interpleader action claiming uncertainty as to ownership of the funds. See *First Nt'l Bank Pasco v. U.S. All. Grp., Inc., Payment Solutions Int'l, LLC, et al.*, Case No. 8:25-cv-01934-TPB-AAS (M.D. Fla.) (the "Interpleader Lawsuit"). A true and correct of the operative complaint is attached hereto as **Exhibit K**.

181. The Bank knew that the funds it froze belonged to PaySol, which held the funds under the PaySol ACH Origination Agreement. The Bank filed the Interpleader Lawsuit to justify the seizure of those funds and delay repayment.

182. The Bank refused to provide the transition assistance required under the Bank's contracts and used confidential merchant portfolio information obtained solely through the Bank's role as ODFI to solicit USAG's and PaySol's merchants.

183. The Bank's withholding of settlement and reserve funds caused CRB merchants to move processing to competitors.

184. That merchant attrition caused ongoing lost revenue and reputational harm to USAG and PaySol.

185. On August 21, 2025, the Entrenched Directors amended the bylaws of the Bank and PascoShares in an effort to block a shareholder attempt to replace the Entrenched Directors.

///

186. The amendment added a provision restricting shareholder action by written consent, even though § 607.0704, Fla. Stat., protects that right and the Bank's Articles of Incorporation do not restrict it.

187. The Entrenched Directors also increased the threshold for calling a special shareholder meeting from 10% ownership to at least 51% and imposed burdensome notice requirements under Article II, Section 13.

188. Upon information and belief, these changes were designed to prevent shareholders from challenging or removing the Entrenched Directors.

189. On September 11, 2025, the OCC entered into a formal agreement with the Bank and the Entrenched Directors, finding unsafe or unsound practices relating to the Bank's BSA/AML risk management and suspicious activity reporting, violations of 12 C.F.R. § 21.11 and 31 C.F.R. § 1010.610, and imposing corrective obligations across 13 articles addressing the Bank's compliance committee, board governance, strategic and capital planning, BSA officer and staffing, internal controls, customer due diligence, suspicious activity review, and independent audit programs (the "2025 Regulatory Agreement with the OCC"). A true and correct copy of that agreement is attached hereto as **Exhibit L**.

190. The 2025 Regulatory Agreement with the OCC contradicts the Bank's claims. The 2025 Regulatory Agreement with the OCC does not identify CRB merchants, USAG, or PaySol as the source of the OCC's concerns, does not require

any Lookback Report, and does not reference merchant processing, third-party payment processors, or ACH activity. Instead, the 2025 Regulatory Agreement with the OCC addresses only the Bank's failures in BSA/AML compliance, governance, and internal controls.

191. On September 18, 2025, the Entrenched Directors held a meeting of the Bank's board of directors. At that meeting, the Entrenched Directors confirmed that the Entrenched Directors were seeking to exit all relationships tied to Plaintiffs and Plaintiffs' affiliates.

192. The Bank engaged third-party consultants to prepare a Lookback Report to assess the Bank's ACH transactional activity, with a focus on third-party activity.

193. On or about October 2, 2025, Henson, Gibbs, Midili, Carle, and O'Neil met as members of the Bank's CAP Oversight-Audit Committee to review the Bank's Lookback Report.

194. The third-party consultants reviewed approximately 500,000 transactions and flagged 578 alerts involving 121 indirect customers based on eight targeted fraud detection rules created by the third-party consultants.

195. The third-party consultants recommended only two individuals for additional review.

///

196. The third-party consultants identified one Bank customer based on multiple risk factors, including unusual activity patterns and conduct consistent with potential fraud or money laundering, which warranted further investigation.

197. The only other individual identified for investigation was Cheikha.

198. Upon information and belief, the Lookback Report flagged Cheikha solely because Cheikha was "associated with fourteen merchants" within the lookback sample.

199. Upon information and belief, unlike the first individual, the Lookback Report identified no specific risk factors, suspicious transactional patterns, or behavioral indicators that justified investigation of Cheikha.

200. Despite the absence of any articulated suspicious activity, suspicious pattern, or identified risk characteristic linked to Cheikha personally, the Entrenched Directors submitted Cheikha for additional review.

201. Upon information and belief, the Entrenched Directors flagged Cheikha for additional review as a pretext. The Entrenched Directors had rejected Cheikha's acquisition offer and blocked Cheikha's director nominees months earlier and then relied on Cheikha's association with fourteen merchants to discredit Cheikha and obscure the Entrenched Directors' regulatory failures.

202. On October 16, 2025, the Entrenched Directors held a meeting of the Bank's board of directors at which Bank management reported that the Bank had

offset $298,000 from USAG and PaySol and recorded those funds as income.

203. The Entrenched Directors approved, authorized, or ratified the Bank's actions to offset $298,000 from USAG and PaySol and to record those funds as income.

204. By December 23, 2025, the Bank had zeroed out USAG's funds and had offset approximately $800,000 from PaySol's funds at the Bank.

205. The Entrenched Directors approved, authorized, or ratified the Bank's actions to zero out USAG's funds, offset approximately $800,000 from PaySol's funds, and record those funds as income.

206. The Bank then returned approximately $1,400,000 to PaySol.

207. Even though the Bank later dismissed the Interpleader Lawsuit, USAG and PaySol incurred more than $100,000 in attorneys' fees to obtain the return of USAG's and PaySol's funds.

208. Following that dismissal, the Special Magistrate in that action recommended that USAG and PaySol be awarded attorneys' fees.

209. This outcome is consistent with a broader pattern of misconduct by the Bank's leadership documented under oath by the Bank's senior executives.

210. For example, in *Zazzera, Ciccotto & Ibrahim v. First National Bank of Pasco*, Case No. 8:26-cv-00399 (M.D. Fla.), the Bank's newly installed President and CEO and two other senior officers allege that, after presenting the Entrenched

Directors with documentary evidence of regulatory violations, undisclosed liabilities, and improper related-party transactions, the Bank terminated those officers in retaliation for whistleblowing and the Entrenched Directors failed to act on that evidence (the "Whistleblower Lawsuit"). A true and correct copy of the complaint is attached hereto as **Exhibit M**.

211. A concurrent shareholder derivative action alleges similar misconduct from a different perspective. In *DEF Trading, LLC v. Florida Bancshares, Inc., et al.*, Case No. 8:25-cv-02996 (M.D. Fla.), a shareholder alleges that the Entrenched Directors continued to provide banking services to cannabis-related merchants without the compliance protocols required by federal law, resulting in an OCC enforcement action, and simultaneously amended the Bank's bylaws to entrench the Entrenched Directors and block shareholders from voting the Entrenched Directors out (the "DEF Trading Lawsuit"). A true and correct copy of the complaint is attached hereto as **Exhibit N**.

## V. CAUSES OF ACTION

### COUNT I - BREACH OF FIDUCIARY DUTY (DERIVATIVE ACTION)
### AidenTech on Behalf of PascoShares Against the Entrenched Directors

212. Plaintiff AidenTech repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

***<u>Nature of Action and Standing</u>***

213. AidenTech brings this action derivatively on behalf of nominal

defendant PascoShares under § 607.0740 et seq., Fla. Stat., to redress injuries to the corporation caused by the Entrenched Directors' breaches of fiduciary duty.

214. AidenTech is a shareholder of PascoShares, holding 58,000 shares (approximately 5% of all shares) purchased on March 17, 2023.

215. AidenTech was a shareholder at the time the wrongful conduct alleged herein occurred and continues to hold such shares.

216. AidenTech will fairly and adequately represent the interests of PascoShares in enforcing and prosecuting its rights.

217. This action is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

***<u>Demand Futility</u>***

218. Asking the Entrenched Directors to sue themselves for the self-dealing, entrenchment, and governance failures alleged herein would be an empty formality.

219. Pre-suit demand on the board of directors of PascoShares is excused as futile because the board of directors is not disinterested, lacks independence, and consists of the wrongdoers who would face personal liability.

220. The Entrenched Directors are not disinterested with respect to the claims asserted herein because the Entrenched Directors are the same individuals who committed the wrongful acts alleged, and each would face personal liability

if the corporation pursued these claims.

221. The Entrenched Directors are not disinterested with respect to the claims asserted herein because the Entrenched Directors adopted bylaw amendments on August 21, 2025 designed to entrench themselves and block shareholder challenges.

222. The Entrenched Directors have consistently voted as a bloc to advance their agenda rather than the corporation's interests.

223. Demand is futile, because the Entrenched Directors, "by reason of hostile interest or otherwise," cannot be expected to institute litigation against themselves.

224. The Entrenched Directors owed fiduciary duties of care and loyalty to PascoShares under Fla. Stat. § 607.0830.

225. The duty of care requires directors to (a) become reasonably informed before making decisions, (b) establish adequate oversight and monitoring systems, and (c) discharge duties with the care an ordinarily prudent person would exercise under similar circumstances.

226. The duty of loyalty requires directors to (a) act in good faith in the corporation's best interests, (b) refrain from self-dealing or deriving improper personal benefits, (c) avoid conflicts of interest or disclose them, and (d) not engage in corporate waste.

227. The Entrenched Directors breached their fiduciary duties of care and loyalty to PascoShares through self-dealing, conscious disregard of known risks, and recklessness, which overcomes the presumption of the business judgment rule under § 607.0831(1)(b), Fla. Stat., including:

***Gibbs' Corporate Waste Through Self-Dealing***

A. Gibbs pledged his PascoShares stock at $20 per share as collateral for a personal obligation and then acted to preserve that valuation by opposing transactions that would have required recognition of the Bank's true financial condition.

B. Gibbs approved an insider loan exceeding $1,000,000 to Gibbs's daughter without DLC approval and instead obtained approval from another PascoShares board member in violation of Regulation O (12 C.F.R. § 215).

C. Gibbs and Midili received undisclosed personal benefits, including board positions in Fulgham's company, in exchange for supporting Fulgham's investment.

D. These transactions were not disclosed, were not subjected to independent review, and were approved to benefit insiders at the expense of the corporation.

///

***The Entrenched Directors' Rejection of Superior Capital Offers***

E. The Entrenched Directors voted to reject AidenTech's Offer of $50 million to acquire PascoShares at nearly three times book value.

F. The Entrenched Directors did not seriously consider Thompson's Offer, as evidenced by Cheikha's request that the Entrenched Directors consider their fiduciary duties and adopt a legitimate valuation method to properly assess Thompson's Offer and similar proposals. When Black moved to investigate proper valuation methods, the Entrenched Directors voted against that motion.

G. Gibbs voted to reject AidenTech's Offer and Thompson's Offer without disclosing Gibbs's stock pledge conflict and without providing any business justification, stating only that the bond losses were "artificial."

H. Instead, the Entrenched Directors approved Fulgham's investment despite warnings from management that Fulgham's business model posed significant BSA/AML and sanctions risks. The transaction was structured to avoid regulatory scrutiny and did not address the Bank's capital needs.

***Failure of Oversight and Conscious Disregard of Regulatory Risk***

I. The Entrenched Directors failed to implement and monitor adequate

compliance and risk management systems.

J. The Bank accumulated a backlog of more than 1,400 unresolved compliance alerts, experienced regulatory downgrades, and received repeated warnings regarding deficiencies in BSA/AML controls.

K. Despite these known issues, the Entrenched Directors denied requests for additional staff to address BSA/AML compliance.

L. The Entrenched Directors approved the hiring of Zazzera as CEO without appropriate diligence despite known regulatory concerns.

M. Zazzera unilaterally rewrote the Bank's BSA policy in 2024 without the knowledge or endorsement of the Bank's BSA Officer. When the Bank's BSA Officer objected, the Bank terminated the BSA Officer the following week. Upon information and belief, the Entrenched Directors approved or ratified Zazzera's conduct.

N. The Entrenched Directors' failures directly caused the October 2025 OCC Formal Agreement and more than $500,000 in costs related to Lookback Reports.

***<u>Bylaw Amendments</u>***

O. On August 21, 2025, the Entrenched Directors amended bylaws to restrict shareholder written consent and raise the threshold for special meetings from 10% to 51%. These amendments were designed to

prevent shareholders from challenging or removing directors amid pending litigation and OCC investigation.

***Multiple Lawsuits and Litigation Costs Resulting from the Entrenched Directors' Misconduct***

P. The Entrenched Directors authorized, approved, or ratified the Bank's actions to freeze USAG's and PaySol's accounts in violation of the agreements between the Bank and USAG and PaySol, respectively.

Q. The Entrenched Directors authorized, approved, or ratified the Bank's actions to file the Interpleader Lawsuit claiming uncertainty as to ownership of funds the Bank had already seized and partially used. The Entrenched Directors knew or should have known that the funds belonged to USAG, PaySol, and their merchants and that no legitimate basis existed to withhold those funds. The Interpleader Lawsuit was a failed attempt to justify the seizure, delay repayment, and shift blame for the Bank's regulatory failures. After the interpleader action failed, the Special Magistrate awarded USAG and PaySol attorneys' fees incurred in defending that action.

R. The Entrenched Directors' conduct directly triggered multiple lawsuits against the Bank, including a shareholder derivative action

alleging mismanagement and seeking damages in excess of $3,000,000 in the DEF Trading Lawsuit, and an employment retaliation action brought by senior executives alleging termination for raising concerns regarding regulatory violations and improper conduct in the Whistleblower Lawsuit.

S. Entrenched Directors' actions constitute bad faith, misuse of corporate authority, and corporate waste.

228. As a direct and proximate result of the Entrenched Directors' breaches of fiduciary duty, PascoShares has suffered damages, including:

A. Lost capital opportunities from rejected acquisition offers, including at least $50,000,000 in potential liquidity;

B. Corporate waste through improper transactions and litigation costs;

C. Regulatory costs, including OCC-mandated remediation and compliance expenses;

D. Loss of business opportunities and revenue-generating programs; and

E. Attorneys' fees and costs incurred as a result of Defendants' misconduct.

**WHEREFORE**, Plaintiff AidenTech on behalf of PascoShares demands judgment against the Entrenched Directors for compensatory damages,

disgorgement of profits and personal benefits obtained through breach of fiduciary duty, equitable relief including restoration of governance rights, attorneys' fees and costs, and such other relief as this Court deems just and proper.

**COUNT II - BREACH OF FIDUCIARY DUTY (DIRECT ACTION)**
**AidenTech Individually Against Entrenched Director Defendants**

229. AidenTech repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

***Standing and Direct Injury***

230. AidenTech is a shareholder of PascoShares.

231. AidenTech was a shareholder when the conduct giving rise to this action occurred and remains a shareholder.

232. AidenTech brings this claim as a direct action under the "special injury" and "duty owed" tests recognized under Florida Law.

233. Unlike other shareholders, AidenTech suffered harm that flowed directly to AidenTech and was not merely secondary to any corporate harm, including:

A. Targeted exclusion from governance through the refusal to seat AidenTech's board nominee following Cheikha's resignation;

B. Deprivation of AidenTech's bargained-for board representation rights, for which AidenTech paid approximately $1,390,840; and

C. Loss of AidenTech's ability to monitor and protect the business relationships and programs AidenTech introduced to the Bank, including BridgeFi, USAG, and PaySol.

***Fiduciary Duties Owed***

234. The Entrenched Directors owed fiduciary duties of care and loyalty to PascoShares and its shareholders, including AidenTech, under Fla. Stat. § 607.0830.

235. The duty of care requires directors to discharge their duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances, including becoming reasonably informed before making decisions and establishing adequate oversight systems.

236. The duty of loyalty prohibits directors from (a) self-dealing or deriving improper personal benefits, (b) acting in conscious disregard of the corporation's best interests, and (c) engaging in oppressive conduct toward minority shareholders, particularly in close corporations.

***Breaches of Fiduciary Duty***

237. Gibbs breached his fiduciary duties of care and loyalty through the following acts and omissions, which constitute a conscious disregard of AidenTech's rights and the corporation's best interests by acting in Gibbs's personal interest to block AidenTech's $50,000,000 acquisition offer.

238. Gibbs pledged his PascoShares stock as collateral and used his influence to prevent a change-of-control transaction that would have reduced the value of the pledged shares and exposed Gibbs to personal liability. This conduct constitutes self-dealing and bad faith under § 607.0832, Fla. Stat., which requires directors to disclose conflicting interests and prohibits interested directors from voting on transactions from which the directors derive improper personal benefit.

239. Each of the Entrenched Directors independently breached fiduciary duties of care and loyalty through the following acts and omissions, which constitute a conscious disregard of AidenTech's rights and the corporation's best interests, including:

A. Knowingly approving or participating in conduct that harmed AidenTech, including rejecting AidenTech's acquisition offer without valuation or legitimate justification despite the Bank's need for capital;

B. Refusing to accept or appoint AidenTech's nominee to the boards of directors of the Bank and the Bank Holding Companies;

C. Failing to protect AidenTech's interests after refusing to appoint AidenTech's nominee, leaving no representative on the boards of directors of the Bank and PascoShares and preventing AidenTech from stopping the Entrenched Directors' actions to terminate

agreements with BridgeFi, PaySol, and USAG; and

D. Cancelling the Bank's contracts with USAG and PaySol without the required notice, taking more than $2,000,000 in merchant funds, using AidenTech's confidential customer information to contact those customers directly, and voting on September 18, 2025, to replace all of Cheikha's programs with the Bank's own programs.

240. The business judgment rule does not protect the Entrenched Directors. Section 607.0831(1)(b), Florida Statutes, imposes personal liability where a director's conduct constitutes self-dealing or bad faith. Gibbs's undisclosed stock pledge and Gibbs's use of board control to block AidenTech's acquisition offers to protect that pledge constitute the type of interested and disloyal conduct the statute addresses and do not constitute a valid exercise of business judgment.

241. The Board's rejection of AidenTech's $50,000,000 acquisition offer is likewise unprotected. The business judgment rule requires directors to act on an informed basis, in good faith, and in the corporation's best interest. A vote to reject a three-times-book-value offer by a capital-deficient bank without a legitimate business reason does not constitute a valid exercise of business judgment.

242. As a direct result of Defendants' conduct, AidenTech suffered damages, including the loss of AidenTech's board representation rights, the loss of AidenTech's acquisition opportunity, the loss of business value from

AidenTech's programs, and attorneys' fees and costs.

**WHEREFORE**, Plaintiff AidenTech demands judgment against the Entrenched Directors for compensatory damages in an amount to be proven at trial; disgorgement of profits and personal benefits derived from breaches of fiduciary duty, including proceeds from the transaction with Fulgham and any reverse board seat compensation; equitable relief including restoration of AidenTech's Treasury Share and Directorship Agreement § 5.01 board nomination rights and appointment of AidenTech's nominee to the board of directors for the Bank and PascoShares; punitive damages for willful, wanton, and malicious conduct; attorneys' fees and costs under Fla. Stat. § 607.0831 and applicable law; and such other and further relief as this Court deems just and proper.

**COUNT III -BREACH OF CONTRACT**
**(TREASURY SHARE AND DIRECTORSHIP AGREEMENT)**
**AidenTech against PascoShares**

243. AidenTech repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

244. On March 17, 2023, AidenTech and PascoShares entered into a valid and enforceable Treasury Share and Directorship Agreement.

245. Under the agreement, AidenTech purchased 58,000 treasury shares for $1,390,840 in exchange for the appointment of Fadi Cheikha to the board of directors of PascoShares and the right to nominate and seat an additional director

on the board of directors of the Bank:

> **Board Composition**. Within seven (7) days following the date of this Agreement, the Company shall set the size of its Board of Directors at 11 and cause Fadi Cheikha to be appointed or elected to the Company's Board of Directors. Following closing, the Purchaser shall have the right to nominate one individual to serve as a member of the Bank's Board of Directors. Within a reasonable amount of time following such nomination, and subject to such individual providing such documentation and cooperation as the Bank reasonably requests, the Bank's Board of Directors shall conduct a background investigation and in person interview with such nominee. If, in its reasonable discretion, the Bank's Board of Directors determines that such individual possesses the appropriate characteristics to serve on the Bank's Board of Directors, the Bank shall create a new directorship and cause such individual to be appointed or elected to the Bank's Board of Directors. If the Bank's Board of Directors determine that any such nominee does not possess such characteristics, the Purchaser shall have the right to nominate alternative individuals until one such individual has been appointed or elected to the Bank's Board of Directors

Treasury Share and Directorship Agreement § 5.01.

246. The Treasury Share and Directorship Agreement further required PascoShares to take all actions necessary to effectuate AidenTech's governance rights and to ensure the full benefit of the transactions contemplated:

> **Further Assurances**. The Company and the Purchaser shall, at any time after the transfer of Shares pursuant to this Agreement, upon request of the other party and without further consideration, take all such further acts and execute, acknowledge and deliver all such further

> documents, instruments, assignments, transfers, conveyances, powers of attorney and assurances as may be required to convey, transfer and vest in the Purchaser the full right and title to the Shares and to complete the transactions contemplated by this Agreement.

Treasury Share and Directorship Agreement § 8.08.

247. PascoShares represented that PascoShares and the Bank were in full compliance with all laws and had no undisclosed regulatory issues or liabilities beyond certain reported issues or liabilities:

> **Compliance with Law**s….
> (b) Each of the Company and the Bank:
>
> (i) is not in Default under any of the provisions of its articles of incorporation or bylaws (or other governing instruments);
>
> (ii) is in material compliance with and not in Default under any Laws, Orders, Permits, or formal agreements with any Governmental Authority applicable to its business or employees conducting its business; or
>
> (iii) except as disclosed on Section 3.10(b)(iii) of the Company's Disclosure Memorandum, and except where such disclosure or availability would constitute a violation of the confidentiality restrictions of Part 309 of the Code of Federal Regulations ("Part 309") or comparable regulations of any applicable Governmental Authority, has not received any written notification or written communication from any Governmental Authority (x) asserting that it is not, or may not be, in compliance with any Laws or Orders where such noncompliance is material, (y) threatening to revoke any material Permits, or (z) requiring it to enter into or consent to the issuance of a cease and desist order,

> injunction, formal agreement, directive, commitment, or memorandum of understanding, or to adopt any board resolution or similar undertaking, which restricts materially the conduct of its business or in any manner relates to its employment decisions, its employment or safety policies or practices, its capital adequacy, its credit or reserve policies, its hiring or compensation of management or the payment of dividends, except, in each case, for such written notifications or written communications which have previously been appropriately addressed and resolved.
>
> (c) except as disclosed on Section 3.10(c) of the Company's Disclosure Memorandum, and except where such disclosure or availability would constitute a violation of the confidentiality restrictions of Part 309 or comparable regulations of any applicable Governmental Authority, there is no material unresolved violation, criticism, or exception by any Governmental Authority with respect to any report or statement relating to any examinations or inspections of the Company or the Bank.

Treasury Share and Directorship Agreement § 3.10.

248. AidenTech fully performed all of its obligations under the Treasury Share and Directorship Agreement.

249. Cheikha was appointed to PascoShares' Board and actively participated as a director from at least April 20, 2023 through August 14, 2024.

250. All conditions precedent to PascoShares' performance occurred, were performed, were satisfied, or were waived.

251. PascoShares materially breached the Treasury Share and Directorship Agreement in the following respects, each of which goes to the essence of the

contract:

A. **Breach of § 5.01**. PascoShares, acting through the Entrenched Directors, refused to approve AidenTech's nominees, imposed conditions not contemplated by the Treasury Share and Directorship Agreement, and failed to act within a reasonable time, thereby depriving AidenTech of its bargained-for board representation.

B. **Breach of § 8.08**. On August 14, 2024, AidenTech resigned its board seat but immediately reasserted its rights under § 5.01 by designating a replacement nominee. On August 23, 2024, AidenTech again formally asserted AidenTech's board-designation rights in writing. On August 26, 2024, PascoShares, through counsel, rejected AidenTech's nomination and refused to take further action to effectuate AidenTech's governance rights under the Treasury Share and Directorship Agreement. PascoShares' refusal to honor, facilitate, or implement the governance provisions of the Treasury Share and Directorship Agreement constitutes a direct breach.

C. **Breach of § 3.10.** Upon information and belief, at the time the Treasury Share and Directorship Agreement was executed, PascoShares had received or was aware of imminent written communications from the OCC identifying material deficiencies in

the Bank's BSA/AML compliance program, which PascoShares failed to disclose

252. As a direct and proximate result of PascoShares' material breaches, AidenTech has suffered damages, including but not limited to the loss of AidenTech's contractual governance and board-designation rights, the loss of the voting influence and shareholder protections that AidenTech's equity stake was intended to provide, costs incurred to monitor and mitigate the consequences of PascoShares' conduct, and the loss of the benefit of PascoShares' contractual representations and warranties.

**WHEREFORE**, Plaintiff AidenTech demands judgment against PascoShares for compensatory damages, consequential damages, specific performance of its governance rights under the Treasury Share and Directorship Agreement, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**COUNT IV -BREACH OF IMPLIED COVENANT OF GOOD FAITH (TREASURY SHARE AND DIRECTORSHIP AGREEMENT) AidenTech against PascoShares**

253. AidenTech repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

254. AidenTech repeats and re-alleges paragraphs 244-251 as though fully set forth herein.

255. On March 17, 2023, AidenTech and PascoShares entered into a valid and enforceable Treasury Share and Directorship Agreement.

256. The agreement granted PascoShares discretion in implementing AidenTech's governance rights, including the process, timing, and approval of AidenTech's board nominee.

257. Under Florida law, the agreement includes an implied covenant of good faith and fair dealing that governs PascoShares' exercise of that discretion and prohibits conduct that frustrates the Agreement's purpose or deprives AidenTech of its bargained-for benefits.

258. Pasco Bancshares exercised its contractual discretion in bad faith and in a manner that unfairly frustrated the agreed purpose of the Treasury Share and Directorship Agreement and defeated AidenTech's reasonable expectations.

259. PascoShares breached § 5.01 by unreasonably withholding approval of AidenTech's board nominee and imposing pretextual conditions not contemplated by the reasonable discretion standard set forth in the Treasury Share and Directorship Agreement.

260. PascoShares breached § 8.08 by refusing to take further acts and execute further documents necessary to effectuate AidenTech's governance and nomination rights.

261. Even where certain express terms were nominally observed in form,

PascoShares' conduct was not the product of honest mistake, poor judgment, or negligence, but a calculated effort to strip AidenTech of the board representation rights for which AidenTech had bargained and paid while retaining the consideration AidenTech provided.

262. As a direct and proximate result of PascoShares' bad-faith performance, AidenTech suffered damages, including but not limited to the loss of the benefits and value of AidenTech's governance rights under the Treasury Share and Directorship Agreement, costs incurred to monitor and mitigate the consequences of PascoShares' conduct, and attorneys' fees and costs.

**WHEREFORE,** Plaintiff AidenTech demands judgment against PascoShares for compensatory damages, consequential damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

**COUNT V - FRAUDULENT MISREPRESENTATION AND OMISSION (AIDENSHARES' ACQUISITION)**
**AidenShares against the Entrenched Directors and Hickman**

263. AidenShares repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

264. In or around March 2021, representatives of the Bank and PascoShares approached Cheikha, the founder and CEO of USAG and PaySol and the controlling principal of AidenShares and AidenTech, regarding a potential investment in and acquisition of the Bank.

265. Defendants Gibbs and Hickman, acting on behalf of themselves and the Entrenched Directors, falsely represented through written due diligence materials and oral communications that the Bank held approximately $35,000,000 in high-yield bonds and was in sound financial condition.

266. At the time of these statements, Defendants had already caused or approved the Reckless Bond Gamble, including restructuring the Bank's bond portfolio by replacing higher-yield assets with approximately $74,000,000 in lower-yield mortgage-backed securities.

267. Upon information and belief, during this same period, Hickman and the Entrenched Directors issued distributions and dividends to themselves while the acquisition negotiations were ongoing.

268. Hickman and the Entrenched Directors concealed the Undisclosed Liabilities and the Corporate Waste, making the Bank appear more valuable than it was.

269. Defendants knew that these representations were false or misleading or made these representations with reckless disregard for the truth.

270. Defendants made these representations to induce AidenShares to enter into an agreement to acquire shares from Hickman and the Entrenched Shareholders at an inflated price and to shift the financial consequences of the Reckless Bond Gamble to AidenShares.

271. AidenShares reasonably relied on Defendants' representations and omissions in negotiating and entering into the December 31, 2021 agreement.

272. On December 31, 2021, AidenShares entered into the AidenShares' Acquisition with the Entrenched Directors and Hicks. The AidenShares' Acquisition provided for the acquisition of 65% to 80% of PascoShares at 1.9 times book value and granted AidenShares preemptive rights on new stock issuances, board representation, and a five-year transition framework.

273. AidenShares would not have entered into the AidenShares' Acquisition, or would have entered into the AidenShares' Acquisition on materially different terms, had AidenShares known about the Reckless Bond Gamble, the Undisclosed Liabilities, or the Corporate Waste.

274. The Reckless Bond Gamble destroyed shareholder value, impaired the Bank's ability to raise capital on favorable terms, and undermined the viability of the proposed acquisition by AidenShares.

275. As a result of the Reckless Bond Gamble, AidenShares could not complete the AidenShares' Acquisition because the acquisition would trigger change-of-control regulations and require the Bank to mark all assets to market at closing, resulting in recognition of losses from the Reckless Bond Gamble that AidenShares would have been required to fund. This outcome would have required AidenShares to pay more than four times book value, which constituted

terms materially different from those originally agreed to.

276. Subsequently, after incurring over $1 million in due diligence costs, AidenShares discovered that Defendants had concealed the Undisclosed Liabilities and Corporate Waste from their financial disclosures to AidenShares.

277. Knowing that the Entrenched Directors faced personal liability from the Reckless Bond Gamble, the Entrenched Directors offered AidenTech the Treasury Share and Directorship Agreement conditioned on AidenShares executing the Termination of AidenShares' Acquisition, which contained mutual releases. AidenShares did not execute the Termination of AidenShares' Acquisition.

278. In March 2023, AidenTech entered into the Treasury Share and Directorship Agreement.

279. Section 8.02 of the Treasury Share and Directorship Agreement contained a mutual release that required AidenTech to release PascoShares from any claims regarding the AidenShares' Acquisition (the "Fraudulent Release").

280. Gibbs, acting as the representative of the Entrenched Directors and the Non-Party Directors, falsely represented to AidenTech that the release would be limited in scope and would not affect AidenShares' rights under the AidenShares' Acquisition. Upon information and belief, that representation was false.

281. AidenTech executed the Fraudulent Release in reliance on Gibbs's mischaracterization of the scope of the Fraudulent Release.

282. As a direct result of Defendants' fraudulent conduct, AidenShares suffered damages, including more than $1,000,000 in due diligence and transaction costs and the loss of the benefit of the AidenShares' bargain.

**WHEREFORE**, Plaintiff AidenShares demands judgment against the Entrenched Directors and Hickman for compensatory damages, consequential damages, rescissory damages, punitive damages, attorneys' fees and costs, and such other relief as the Court deems just and proper

**COUNT VI - BREACH OF CONTRACT**
**(PAYSOL ACH AGREEMENT)**
**PaySol against the Bank**

283. PaySol repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

284. On August 3, 2022, PaySol and the Bank entered into the valid, binding, and enforceable PaySol ACH Agreement**.**

285. The PaySol ACH Agreement expressly incorporates the NACHA Operating Rules (the "NACHA Rules") and sets forth the parties' respective rights and obligations.

286. The PaySol ACH Agreement contains the following provisions:

A. **Financial Institution Obligations (§ 3)**. The Bank was required to

process, transmit, and settle entries received from PaySol in a timely manner and in accordance with the NACHA Rules, including entries which comply with the terms of the Agreement and security procedures.

> In a timely manner and in accordance with the Rules, the Financial Institution will process, transmit and settle for the entrie received from the Company, which comply with the terms of the Agreement, including security procedures.

B. **Termination (§ 23)**. The Bank reserved the right to terminate the Paysol ACH Agreement immediately immediately only upon a determination that PaySol violated applicable law or NACHA Rules. In all other circumstances, the ACH Agreement required thirty days' written notice.

> The Financial Institution reserves the right to terminate the Agreement at any given time and will do so immediately upon its determination that the Company is in violation of the Rules or applicable laws or if the Company initiates any bankruptcy proceeding or is otherwise declared insolvent. The Company may terminate this Agreement upon thirty (30) days written notice to the Financial Institution. In the event the Company originated debit entries, the Company agrees to maintain an account with the Financial Institution to settle charge backs for a period of 90 days subsequent to the settlement date of the last debit file originated. The Financial Institution shall have no obligation to transmit entries if the Company is in default of any of its obligation under this Agreement, including the

> obligation to pay the Financial Institution for each credit entry. The Financial Institution shall be entitled to rely on any written notice believed by it in good faith to be signed by one of the Authorized Representatives whose names and signatures are set forth on Attachment 2 to the Agreement.

287. PaySol fully performed all obligations under the PaySol ACH Agreement or was excused from further performance.

288. All conditions precedent to the Bank's obligations under the PaySol ACH Agreement occurred, were performed, were satisfied, or were waived.

289. On March 21, 2025, the Bank sent PaySol the Notice to Terminate the ACH Agreements.

290. The Notice to Terminate the ACH Agreements stated that the Bank was discontinuing services because the Bank had "made the strategic decision to discontinue offering deposit accounts and services to Tier I and Tier II (direct and indirect) cannabis related businesses" and because "the risks and costs of compliance regarding provision of third-party ACH processing services . . . outweigh any benefit to the Bank."

291. PaySol was not in violation of the NACHA Rules or applicable law as of the date of the Notice to Terminate the ACH Agreements, and PaySol had not initiated bankruptcy or insolvency proceedings.

///

292. The Bank materially breached the PaySol ACH Agreement in the following respects, each of which goes to the essence of the contract:

A. **Breach of § 23 — Improper Termination Notice**. The Bank issued a termination notice based on a strategic decision to exit cannabis-related business, which is not a permissible basis for immediate termination under the PaySol ACH Agreement.

B. **Breach of §§ 3 and 23 — Wrongful Account Freeze and Suspension of Processing**. Following delivery of the March 21, 2025 Notice to Terminate the ACH Agreements and before the contractual 30-day notice period expired, the Bank froze PaySol's deposit accounts (account numbers ending in ****1659, ****4560, ****4573, ****4586, ****4599, ****4609, ****4612, ****4625, ****5307, ****5310, ****5323, ****5336, ****5349, ****5352, ****5365, ****5378, ****5381, ****5394, ****5417, ****5420, ****5475, ****5666, ****5679, ****5682, ****5695, ****5705, ****5718, ****5721, ****5734, ****5747, ****5750, ****1782, and ****1559) and refused to process and settle entries as required under the PaySol ACH Agreement. PaySol held approximately $2,200,000 in those accounts.

C. **Breach of § 23 — Failure to Provide Required Wind-Down and Transition Services**. The Bank further breached the PaySol ACH

Agreement by refusing to provide a commercially reasonable wind-down and transition, including failing to cooperate in transferring PaySol's merchant portfolio to a successor institution. Instead, the Bank seized PaySol's funds, filed the Interpleader Lawsuit, and then took approximately $800,000 from those funds in a manner inconsistent with the Bank's contractual obligations.

293. As a direct result of the Bank's breaches, PaySol suffered damages, including the loss of funds, customer attrition, lost revenue, transition costs, and harm to PaySol's business and relationships.

**WHEREFORE**, Plaintiff PaySol demands judgment against the Bank for compensatory damages, consequential damages, return of all wrongfully seized and misapplied funds, attorneys' fees and costs, and such other relief as this Court deems just and proper.

**COUNT VII - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (PAYSOL ACH AGREEMENT)**
**PaySol against the Bank**

294. PaySol repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

295. Paysol repeats and re-alleges paragraphs 284-292 as though fully set forth herein.

296. The PaySol ACH Agreement grants the Bank discretion over matters

including exposure limits, reserves, account controls, and wind-down procedures.

297. Under Florida law, the PaySol ACH Agreement includes an implied covenant of good faith and fair dealing governing the Bank's exercise of that discretion.

298. This covenant forbids the Bank from using the Bank's discretionary authority to frustrate the other party's reasonable expectations or to deprive PaySol of the benefits of the PaySol ACH Agreement.

299. The Bank breached that covenant by exercising the Bank's contractual discretion in bad faith and in a manner designed to frustrate the purpose of the PaySol ACH Agreement and deprive PaySol of its bargained-for benefits.

300. The Bank acted in bad faith by arbitrarily increasing reserves, reducing exposure limits, and imposing account restrictions without legitimate contractual or risk-based justification.

301. The Bank invoked alleged regulatory or NACHA concerns as a pretext to refuse transition and wind-down cooperation required under the PaySol ACH Agreement.

302. The Bank delayed and conditioned the release of funds and reserves beyond any reasonable or contractually permitted basis.

303. This conduct was not the result of mistake or negligence but a deliberate effort to withhold funds, disrupt PaySol's business, and appropriate the

benefits of the parties' relationship.

304. As a direct result of the Bank's bad-faith conduct, PaySol suffered damages, including the loss of funds, customer attrition, lost revenue, transition costs, and harm to PaySol's business and relationships.

**WHEREFORE**, Plaintiff PaySol demands judgment against the Bank for compensatory damages, consequential damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

**COUNT VIII - VIOLATIONS OF THE DEFEND TRADE SECRETS ACT**
**(18 U.S.C. § 1836(b))**
**PaySol against the Bank**

305. PaySol repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

306. PaySol owns proprietary, confidential, and nonpublic trade secrets, including its merchant portfolio data, which encompasses merchant identities, contact information, pricing structures, underwriting and risk practices, transaction mapping, funding cadences, reserve positions, contractual terms, and transition strategies (the "Merchant Portfolio Data").

307. This information derives independent economic value from not being generally known or readily ascertainable by others and is used in interstate commerce.

308. PaySol has taken reasonable measures to maintain the secrecy of the

Merchant Portfolio Data, including but not limited to: (a) limiting access to the data on a need-to-know basis; (b) requiring nondisclosure and non-solicitation agreements with employees, contractors, and business partners; (c) maintaining restricted systems access with credentialing requirements; and (d) imposing contractual return, purge, and limited-use obligations on parties with access to the data, including the Bank.

309. The Bank obtained the Merchant Portfolio Data solely by virtue of its role as sponsor bank and ODFI under the Paysol ACH Agreements, POS Agreement, and Third Party ACH Agreement. These agreements imposed express confidentiality and limited-use obligations on the Bank with respect to PaySol's proprietary data.

310. The Bank misappropriated the Merchant Portfolio Data by using that information outside the scope of those permitted purposes, including soliciting PaySol's merchants for competing services and diverting portfolio value.

311. Pasco Bank knew the information was proprietary and subject to confidentiality and use restrictions.

312. The Bank's misappropriation was willful, malicious, and oppressive and was undertaken with knowledge that the data was proprietary and that the Bank's use of the data was restricted to the specific purposes authorized by the agreements

313. As a direct and proximate result of the Bank's misappropriation, PaySol suffered injuries, including but not limited to merchant attrition caused by the unauthorized solicitation of PaySol's merchants, diminished portfolio value, lost revenue, transition costs necessitated by the misappropriation, and loss of goodwill.

314. Additionally, the Bank was unjustly enriched by its unauthorized use of the Merchant Portfolio Data.

315. Plaintiffs are entitled to damages, including exemplary damages for willful and malicious misappropriation, disgorgement of the Bank's unjust enrichment, and reasonable attorneys' fees under the Defend Trade Secrets Act.

**WHEREFORE**, Plaintiff PaySol demands judgment against the Bank for compensatory damages, exemplary damages for willful and malicious misappropriation, disgorgement of unjust enrichment, injunctive relief, attorneys' fees and costs under 18 U.S.C. § 1836, and such other relief as the Court deems just and proper.

**COUNT IX - BREACH OF CONTRACT**
**(USAG ACH AGREEMENT)**
**USAG against the Bank**

316. USAG repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

317. On August 3, 2022, USAG and the Bank entered into the valid,

binding, and enforceable USAG ACH Agreement.

318. The USAG ACH Agreement expressly incorporates the NACHA Rules and sets forth the parties' respective rights and obligations regarding ACH origination, settlement, exposure limits, reserves, termination, and transition.

319. Under the USAG ACH Agreement, the Bank was required to process, transmit, and settle USAG's ACH entries in accordance with the USAG ACH Agreement and the NACHA Rules:

> In a timely manner and in accordance with the Rules, the Financial Institution will process, transmit and settle for the entrie received from the Company, which comply with the terms of the Agreement, including security procedures.

USAG ACH Agreement § 3.

320. Under the USAG ACH Agreement, the Bank reserved the right to terminate the USAG ACH Agreement immediately only upon a determination that USAG was in violation of the NACHA Rules or applicable law or if USAG initiated bankruptcy or insolvency proceedings. In all other circumstances, the USAG ACH Agreement required 30 days' written notice:

> The Financial Institution reserves the right to terminate the Agreement at any given time and will do so immediately upon its determination that the Company is in violation of the Rules or applicable laws or if the Company initiates any bankruptcy proceeding or is otherwise declared insolvent. The Company may terminate this Agreement upon thirty (30) days written notice to the Financial Institution. In the event the

> Company originated debit entries, the Company agrees to maintain an account with the Financial Institution to settle charge backs for a period of 90 days subsequent to the settlement date of the last debit file originated. The Financial Institution shall have no obligation to transmit entries if the Company is in default of any of its obligation under this Agreement, including the obligation to pay the Financial Institution for each credit entry. The Financial Institution shall be entitled to rely on any written notice believed by it in good faith to be signed by one of the Authorized Representatives whose names and signatures are set forth on Attachment 2 to the Agreement.

USAG ACH Agreement § 23.

321. USAG fully performed all obligations under the USAG ACH Agreement or was excused from further performance. USAG was not in violation of the NACHA Rules or applicable law as of the date of the Notice to Terminate the ACH Agreements, and USAG had not initiated bankruptcy or insolvency proceedings.

322. All conditions precedent to the Bank's obligations under the USAG ACH Agreement occurred, were performed, were satisfied, or were waived.

323. On March 21, 2025, the Bank sent USAG the Notice to Terminate the ACH Agreements.

324. The Notice to Terminate the ACH Agreements stated that the Bank was discontinuing services because the Bank had "made the strategic decision to discontinue offering deposit accounts and services to Tier I and Tier II (direct and

indirect) cannabis related businesses" and because "the risks and costs of compliance regarding provision of third-party ACH processing services . . . outweigh any benefit to the Bank."

325. The Bank materially breached the USAG ACH Agreement in the following respects, each of which goes to the essence of the contract:

A. **Breach of § 23 — Improper Termination.** The Bank's strategic decision to exit cannabis-related business is not a permissible basis for immediate termination under § 23 of the USAG ACH Agreement;

B. **Breach of §§ 3 and 16 — Wrongful Account Freeze and Suspension of Processing.** Following delivery of the March 21, 2025 Notice to Terminate the ACH Agreements and before the contractual 30-day notice period expired, the Bank froze USAG's deposit accounts (accounts ending in ****1656, ****1669, ****1546, ****0026, ****0039, ****2095, ****2105, ****2118, and ****0042, as well as related cards and digital banking accounts, including accounts under the DBA "Regala Card") and refused to process and settle entries as required under the USAG ACH Agreement. USAG held approximately $200,000 in those accounts;

C. **Breach of § 23 — Failure to Provide Required Wind-Down and Transition Services**. The Bank breached the USAG ACH Agreement

by reducing or eliminating USAG's settlement limits and imposing ad hoc holds on transactions without the required notice or contractual basis, causing foreseeable merchant attrition and settlement failures; and

D. **Breach of § 16 — Improper Manipulation of Exposure/Settlement Limits**. The Bank further breached the USAG ACH Agreement by refusing to provide a commercially reasonable wind-down and transition, including failing to cooperate in transferring USAG's merchant portfolio to a successor institution. Instead, the Bank seized USAG's funds, filed the Interpleader Lawsuit, and then took $200,000 from those funds in a manner inconsistent with the Bank's contractual obligations.

326. As a direct result of the Bank's breaches, USAG suffered damages, including the loss of funds, customer attrition, lost revenue, transition costs, and harm to USAG's business and relationships.

**WHEREFORE**, Plaintiff USAG demands judgment against the Bank for compensatory damages, consequential damages, return of all wrongfully seized and misapplied funds, attorneys' fees and costs, and such other relief as this Court deems just and proper.

///

**COUNT X - BREACH OF CONTRACT**
**(POS AGREEMENT)**
**USAG against the Bank**

327. USAG repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

328. On or about November 20, 2023, USAG and the Bank entered into the valid, binding, and enforceable POS Agreement.

329. The POS Agreement governs the parties' sponsorship relationship and imposes, among other obligations, confidentiality restrictions, limitations on merchant communications, and requirements governing termination and transition:

> **II) Duties of Client**.
>
> **A) Compliance**. Client agrees to abide by the Network Operating Rules, and all applicable laws, rules, regulations, Government Requirements, the Rules and any rules, orders and regulations issued by the Regulatory Authorities (collectively "Legal Requirements") relating to the sponsorship of Client, and Client's Program by Bank contemplated in this Agreement, which includes but is not limited to the acquiring of transactions through the Networks, as all of the foregoing may be amended from time to time. "Government Requirements" shall mean, as the context requires, collectively all statutes, codes, ordinances, federal, state, and local laws, regulations (including Regulation E), rules, orders and decrees of all governmental authorities (including without limitation federal, state and local governments, governmental agencies and quasi-governmental agencies). Client shall

at all times comply with PCI requirements as a merchant and third party servicer.

…

**N) Responsibility for Expenses**. Except as expressly provided herein, each Party shall be responsible for and bear its own costs and expenses in connection with this Agreement, including the costs of the Services required to be performed by it hereunder, the costs and expenses of facilities, equipment, employees, training, communication, computer systems, travel, other business expenses and the fees and charges of its attorneys, accountants, agents and advisors.

...

**VIII) Term And Termination of Agreement**

**A) Term**. This Agreement shall have an initial term commencing on the date hereof and continuing in effect for a term of three (3) years ("Initial Term") or until terminated in accordance with the Agreement. After the Initial Term, the Agreement shall automatically extend for successive one (1) year periods ("Renewal Term"), unless prior to the expiration of the then current term either Party provides written notice to the other at least sixty (60) days in advance of the expiration date of the then current term, or as provided below, of its election not to renew or extend this Agreement.

**B) Termination of Agreement Except as provided in Section VII(B)**. either Party may terminate this Agreement immediately upon the occurrence of one or more of the following events listed below, but only if the failure continues for a period of (A) twenty (20) days after the non-performing Party receives written notice from the other Party specifying the failure in the case of a failure not involving the payment of money, or (B) ten (10) days after the non-performing Party receives written notice from the other party specifying the failure in the

case of a failure to pay any amount then due hereunder; provided, however, that either Party, in its sole discretion, may terminate this Agreement on five (5) days notice if a substantially similar material failure has occurred within the previous three (3) months:

(a) Failure by the other Party to observe or perform, in any material respect, that Party's obligations to the other Party hereunder, so long as the failure is not due to the actions or failure to act of the terminating Party,

(b) In the event any financial statement, representation, warranty, statement or certificate furnished to it by the other Party in connection with or arising out of this Agreement is materially adverse to the terminating Party and intentionally untrue as of the date made or delivered.

(c) Upon any change to or enactment of or change in interpretation or enforcement of any Legal Requirement or Rule which would have a material adverse effect upon such Party's ability to perform its obligations or such Party's costs/revenues with respect to the Services.

(d) Material violation by either Party of any Rule or Legal Requirement relating to the performance of this Agreement.

**IX Confidentiality**. Bank acknowledges that the identity of the merchants submitted to Bank by Client under this Agreement is the confidential information of Client and at no time either before or after the termination of this Agreement will Bank share the identity of such merchants, either internally or externally, for any sales or marketing purpose. Bank shall not directly communicate with any Merchant introduced to Bank by Client with respect to any product offerings without the prior written consent of Client. All Merchants that are submitted by Client under this Agreement and all Merchants or affiliates referred to Bank by such

> merchants that request additional merchant accounts or related goods and services shall be referred to Client for providing said items. Notwithstanding the aforementioned, Bank may communicate with any merchant that initiates communication directly to Bank and Bank may initiate communication with Merchant for reasons involving security and/or risk management. In all cases, Bank will make its best effort to involve Client in these conversations

POS Agreement §§ II, VIII.

330. USAG performed all obligations under the POS Agreement, and all conditions precedent to the Bank's performance were satisfied or waived.

331. By letter dated December 26, 2024, the Bank issued a "notice of intent to terminate" stating that the Bank was terminating the POS Agreement "pursuant to Section VIII(B)(a), (b), and (d)" and that "the agreement shall terminate in 20 days, on January 15, 2025, if USAG does not fully remedy its breaches," while simultaneously "request[ing] that USAG waive the cure period and agree to an immediate termination."

332. The Bank breached the POS Agreement by invoking termination provisions without satisfying the contractual requirements for termination, including the required notice and cure process.

333. The Bank breached the POS Agreement by imposing unilateral and non-contractual transition terms, including accelerated termination timelines and reserve release conditions not authorized by the POS Agreement.

334. The Bank materially breached the POS Agreement by misusing the Bank's "indemnity rights and perfected security interest" to freeze USAG's accounts and apply those funds toward the alleged OCC-mandated lookback and other asserted indemnifiable items. The POS Agreement does not authorize indemnity for lookback costs.

335. The Bank breached the POS Agreement's confidentiality and non-solicitation provisions by using USAG's merchant information to communicate directly with merchants, including Community Choice Financial and other merchants placed by USAG, regarding continued or replacement services without USAG's consent and outside any permitted exception.

336. As a direct result of the Bank's breaches, USAG suffered damages, including disruption of settlement funds, merchant attrition, loss of portfolio value and revenue associated with merchants boarded to the Bank under the POS Agreement, transition costs, and harm to USAG's business and relationships.

**WHEREFORE**, Plaintiff USAG demands judgment against the Bank for compensatory and consequential damages, return of wrongfully withheld or misapplied funds, attorneys' fees and costs, and such other relief as the Court deems just and proper.

///

///

**COUNT XI - BREACH OF CONTRACT**
**(THIRD-PARTY ACH AGREEMENT)**
USAG against the Bank

337. USAG repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

338. On October 20, 2023, the Bank and USAG entered into the valid, binding, and enforceable Third-Party ACH Agreement under which USAG agreed to provide ACH third-party sender services to the Bank and USAG's approved customers.

339. The Third-Party ACH Agreement required either party to terminate only upon 30 days' written notice to the other party.

340. Article 11(b) of the Third-Party ACH Agreement required both parties to "use commercially reasonable efforts in good faith" to wind down or transition the Services "as soon as reasonably possible (not more than 90 days)" in a manner that would "minimize any adverse effect of the termination on Customers."

341. The Third-Party ACH Agreement required the Bank to maintain software services and provide USAG access to an administrative dashboard necessary to view, edit, and manage Users, Customers, Balances, Reserves, and BSA/AML compliance-related information.

342. USAG performed all obligations under the Third-Party ACH

Agreement, and all conditions precedent to the Bank's performance were satisfied or waived.

343. The Bank terminated the Third-Party ACH Agreement without providing the required 30 days' written notice.

344. The Bank failed to engage in a commercially reasonable wind-down or transition and instead disrupted services.

345. The Bank disabled USAG's access to required systems and administrative tools, preventing USAG from managing accounts and customer activity.

346. The Bank's termination breached Article 11 of the Third Party ACH Agreement.

347. As a direct and proximate result of the Bank's breach, USAG suffered damages, including the loss of merchant relationships, damage to USAG's reputation and business relationships, and the costs of establishing alternative banking infrastructure.

**WHEREFORE**, Plaintiff USAG demands judgment against the Bank for compensatory and consequential damages, attorneys' fees and costs, and such other relief as the Court deems just and proper.

///

///

## COUNT XII - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (USAG ACH AGREEMENT, THIRD PARTY ACH AGREEMENT, AND POS AGREEMENTS) USAG against the Bank

348. USAG repeats and re-alleges paragraphs 1-211 as though fully set forth herein.

349. USAG repeats and re-alleges paragraphs 317-325, 328-335, 338-346 as though fully set forth herein.

350. The USAG ACH Agreement, the Third Party ACH Agreement, and the POS Agreement between USAG and the Bank are valid and enforceable and grant the Bank discretion over matters including exposure limits, reserves, account controls, system access, termination, and wind-down procedures.

351. Under Florida law, each agreement includes an implied covenant of good faith and fair dealing governing the Bank's exercise of that discretion.

352. The Bank breached that covenant by exercising the Bank's contractual discretion in bad faith and in a manner designed to frustrate the purpose of the agreements and deprive USAG of USAG's bargained-for benefits.

353. The Bank acted in bad faith by imposing arbitrary restrictions on accounts, reserves, settlement activity, and system access without legitimate contractual or risk-based justification.

///

354. The Bank invoked alleged regulatory or rule-based concerns as a pretext to justify termination, refusal to process transactions, and denial of transition cooperation.

355. The Bank exercised the Bank's discretion to disrupt services, disable access to required systems, and condition or delay the release of funds in a manner not grounded in the USAG ACH Agreement, the Third Party ACH Agreement, or the POS Agreement.

356. This conduct was not the result of mistake or negligence but a deliberate effort to withhold funds, interfere with USAG's merchant relationships, and appropriate the benefits of the parties' relationship.

357. As a direct and proximate result of the Bank's bad-faith performance, USAG suffered damages, including but not limited to lost settlement funds, merchant attrition, transition and re-platforming costs, and other consequential losses flowing from the Bank's bad-faith exercise of discretion.

**WHEREFORE**, Plaintiff USAG demands judgment against the Bank for compensatory damages, consequential damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

**COUNT XIII - CONVERSION**
**USAG and PaySol against the Bank**

358. USAG and PaySol repeat and re-allege paragraphs 1-211 as though fully set forth herein.

359. USAG maintained deposit accounts at the Bank (accounts ending in ****1656, ****1669, ****1546, ****0026, ****0039, ****2095, ****2105, ****2118, and ****0042) containing approximately $200,000 in specific and identifiable settlement funds and reserve deposits.

360. PaySol maintained deposit accounts at the Bank (accounts ending in ****1659, ****4560, ****4573, ****4586, ****4599, ****4609, ****4612, ****4625, ****5307, ****5310, ****5323, ****5336, ****5349, ****5352, ****5365, ****5378, ****5381, ****5394, ****5417, ****5420, ****5475, ****5666, ****5679, ****5682, ****5695, ****5705, ****5718, ****5721, ****5734, ****5747, ****5750, ****1782, and ****1559) containing approximately $1,800,000 in specific and identifiable settlement funds and merchant reserve deposits.

361. USAG and PaySol owned and had an immediate right to possess the funds in USAG's and PaySol's respective accounts.

362. The Bank's March 21, 2025 Notice to Terminate the ACH Agreements confirmed USAG's and PaySol's right to possession of the funds by expressly stating that a cashier's check representing the balance in each account on the date of closure would be mailed to the business address on file.

363. On or about April 11, 2025, the Bank froze USAG's and PaySol's accounts without authorization and refused to disburse the balances.

///

364. The Bank exercised unauthorized dominion over USAG's funds by offsetting $200,000 from USAG's accounts and recording those funds as the Bank's income.

365. The Bank exercised unauthorized dominion over PaySol's funds by offsetting $800,000 from PaySol's accounts and recording those funds as the Bank's income.

366. The Bank's actions constituted an unauthorized exercise of dominion over USAG's and PaySol's funds inconsistent with USAG's and PaySol's rights of possession.

367. USAG and PaySol demanded the return of USAG's and PaySol's funds. The Bank refused.

368. As a direct and proximate result of the Bank's conversion, USAG and PaySol suffered damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs USAG and PaySol request that the Court enter judgment against the Bank for compensatory damages, consequential damages, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

///

///

///

## COUNT XIV - RECKLESS OVERSIGHT OF PAYMENTS SYSTEM AND RISK MANAGEMENT[3]
### AidenTech, USAG, and PaySol against the Bank, the Bank's Holding Companies, Hickman, Zazzera, and Fulgham

369. Plaintiffs repeat and re-allege paragraphs 1-211 as though fully set forth herein.

370. The Bank held itself out as experienced in cannabis electronic payments and as offering fully compliant banking solutions to the largest MSOs and Medical Marijuana Treatment Centers in Florida.

371. Hickman, on behalf of the Bank and the Bank Holding Companies, represented to AidenTech and USAG that the Bank was experienced in cannabis electronic payments.

372. The Bank made staffing decisions to oversee USAG and required USAG to implement certain rules.

373. By undertaking high-risk ACH, merchant processing, and cannabis-related payment activities, Defendants owed a duty to exercise at least ordinary care and to avoid reckless conduct in overseeing payments operations, risk management, and regulatory compliance consistent with applicable banking

[3] USAG and PaySol do not assert a private right of action under OCC rules. OCC sources are cited solely as standard-of-care context demonstrating well-known, board-level expectations for payment-system activities (notice with safety-and-soundness representations; and the continuing obligation to identify, measure, monitor, and control risks).

standards and OCC safety and soundness expectations.

374. Defendants had a duty to implement and maintain adequate controls over BSA/AML compliance, transaction monitoring, staffing, and supervisory infrastructure and to respond appropriately to known risks and regulatory warnings.

375. Defendants had a duty to refrain from taking unilateral legal, regulatory, or corporate actions that Defendants knew or should have known would foreseeably disrupt and damage USAG's and PaySol's processing operations, merchant relationships, and settlement flows.

376. Defendants' conduct amounts to recklessness or an act or omission committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property as those terms are defined under § 607.0831, Fla. Stat.

377. Defendants recklessly failed to establish and maintain adequate oversight of the Bank's payments program, including:

A. Failing to implement reasonable safeguards necessary to protect USAG's and PaySol's processing services, merchant relationships, and settlement flows and permitting the Merchant Processing Programs to proceed and expand while knowingly lacking adequate controls, staffing, and compliance infrastructure;

B. Declining to implement additional staffing, capital, and compliance resources that the Bank's BSA Compliance Officer advised were required;

C. Failing to exercise reasonable care in hiring, retaining, and supervising personnel responsible for payments operations and BSA/AML compliance, including appointing Zazzera as CEO without completing a standard background check despite management raising concerns regarding Zazzera's prior employment at Axiom Bank during a period of public regulatory scrutiny;

D. Permitting Zazzera to unilaterally change the Bank's BSA policy to allow foreign accounts and international wires without consulting the Bank's BSA Compliance Officer and terminating the Bank's BSA Compliance Officer weeks after the Bank's BSA Compliance Officer objected to Zazzera's actions at a board meeting;

E. Approving a $2,200,000 sale of 108,900 shares to Fulgham's entity, DEF Trading LLC, at more than double book value, structuring that transaction to avoid change-of-control scrutiny and conceal losses from the Reckless Bond Gamble, and, upon information and belief, permitting Fulgham to influence the hiring of Zazzera as President and CEO of the Bank, direct changes to the Bank's policies and

operating rules, including BSA and payments-related policies, and advance a foreign deposit and payments-driven business plan that Bank management had previously warned posed unacceptable BSA, AML, OFAC, and sanctions risks and had rejected as too risky;

F. Filing the Interpleader Lawsuit despite knowing, or being in a position where Defendants should have known as the ODFI, the ownership and proper disposition of the funds at issue, thereby freezing funds belonging to USAG and PaySol and directly disrupting USAG's and PaySol's ability to settle transactions, retain merchants, and continue operations; and

G. Taking actions that caused or contributed to OCC regulatory intervention into USAG's and PaySol's processing services while maintaining inadequate controls, understaffed compliance functions, and unresolved deficiencies, which Defendants knew or should have known would foreseeably result in operational disruption, termination of processing services, and material harm to USAG and PaySol.

378. Defendants' reckless oversight was a direct and proximate cause of USAG's and PaySol's losses, including missed settlements, merchant attrition, diminished portfolio value, impairment of reserves, abrupt loss of processing

services, and costs associated with transitioning USAG's and PaySol's business and addressing the consequences of Defendants' actions.

379. USAG and PaySol suffered damages in an amount to be proven at trial, including consequential and special damages reasonably flowing from Defendants' reckless oversight of the Merchant Processing Program.

**i. The Agency Allegations.**

380. Plaintiffs are informed and believe, and based thereon allege, that PascoShares and Pasco Holdings controlled the Bank with respect to the governance matters alleged herein such that the Bank functioned as an instrumentality or agent of PascoShares and Pasco Holdings, or both, in carrying out the wrongful acts at issue.

381. Plaintiffs are informed and believe, and based thereon allege, that the Bank and the Bank Holding Companies share overlapping directors and officers, operate from the same headquarters, and acted pursuant to common policies and directives with respect to the governance matters alleged herein.

382. Plaintiffs are informed and believe, and based thereon allege, that PascoShares manifested assent for the Bank to act on PascoShares' behalf and for PascoShares' benefit with respect to the governance matters alleged herein and that PascoShares retained and exercised the right of control over the means and manner of the Bank's conduct with respect to those matters.

383. Plaintiffs are informed and believe, and based thereon allege, that the Bank accepted that undertaking and acted subject to PascoShares' control, thereby creating an actual agency relationship. Plaintiffs further allege that PascoShares held out to Plaintiffs and others that PascoShares directed and oversaw the Bank's payments activities, creating apparent agency and reasonable reliance.

384. Plaintiffs are informed and believe, and based thereon allege, that PascoShares used the Bank as a mere instrumentality to advance PascoShares' strategic aims, evade or frustrate PascoShares' obligations to AidenTech under the Treasury Share and Directorship Agreement, and exert improper leverage over USAG and PaySol by using Bank-level controls over settlement funds, reserves, and merchant communications.

385. Plaintiffs are informed and believe, and based thereon allege, that the foregoing domination and control was coupled with improper conduct, including misuse of funds, pretextual suspensions, refusal to provide contract-required transition assistance, and targeted actions to disenfranchise AidenTech's governance rights, proximately causing Plaintiffs' injuries.

386. Accordingly, to prevent injustice, the Court should (a) treat the Bank's acts and omissions as those of PascoShares under principles of actual and apparent agency or (b) disregard corporate separateness between PascoShares and the Bank for the limited purpose of liability on the claims stated herein under alter-ego or

instrumentality principles, or both, and impose joint and several liability as equity requires.

387. In the alternative, to the extent the Court determines that the Bank is the primary actor on the payments counts, PascoShares is vicariously liable for the Bank's conduct as principal because PascoShares directed, controlled, ratified, and benefited from the acts alleged.

388. Nothing in these allegations is intended to assert a separate cause of action. Plaintiffs plead agency and alter-ego as theories by which the Bank Holding Companies are liable for the Bank-level actionable conduct alleged and to avoid injustice resulting from Defendants' use of the corporate form.

WHEREFORE, Plaintiffs AidenTech, USAG, and PaySol demand judgment against the Bank, the Bank's Holding Companies, Hickman, Zazzera, and Fulgham for compensatory damages, punitive damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

**COUNT XV – NEGLIGENCE IN ACH ORIGINATION/ODFI–TPS OVERSIGHT[4]**
**AidenTech, USAG, and PaySol against the Bank, the Bank's Holding Companies, Hickman, Zazzera, and Fulgham**

389. Plaintiffs repeat and re-allege paragraphs 1-211 as though fully set

[4] USAG and PaySol do not assert a private right of action under BSA/OFAC or other regulations; those materials are referenced solely as standard-of-care context.

forth herein.

390. Defendants undertook to act as the ODFI and to provide ACH origination, settlement, risk management, and related oversight for USAG's and PaySol's merchants and TPS program.

391. By undertaking those services, Defendants owed USAG and PaySol a common-law duty to exercise reasonable care so as not to create or exacerbate foreseeable risks of loss to USAG's and PaySol's specifically identifiable funds, settlement flows, merchant relationships, and business operations.

392. This service-based duty exists independent of the parties' contracts and arises from Defendants' affirmative control over onboarding and approval of customers, limit-setting, reserve methodology, return-rate and anomaly monitoring, exception handling, and transition execution.

393. Defendants, acting as ODFI for USAG's and PaySol's sponsored TPS program, owed a common-law duty of reasonable care independent of contract because Defendants exercised affirmative control over ACH origination, risk management, settlement, reserves, monitoring, and transition services for a limited and identifiable class of affected parties.

394. Defendants failed to use reasonable care, including:

A. Permitting the Merchant Processing Programs to proceed and expand while knowingly lacking adequate controls, staffing, and compliance

infrastructure to safely administer those programs, thereby exposing USAG's and PaySol's merchants and funds to foreseeable regulatory and operational risk;

B. Holding the Bank out as experienced in cannabis electronic payments and as offering "fully compliant banking solutions" to cannabis-related businesses, inducing USAG and PaySol to migrate merchant portfolios to the Bank despite lacking the compliance infrastructure, staffing, and operational capacity to support the volume and complexity of the programs the Bank agreed to host and knowing or having reason to know that the Bank's existing resources were inadequate to safely administer those programs;

C. Installing Zazzera as CEO in December 2024 without completing a standard background check despite management raising concerns regarding Zazzera's prior employment at Axiom Bank during a period of public regulatory scrutiny and thereafter permitting Zazzera to unilaterally alter the Bank's BSA policy to allow foreign accounts and international wires without consulting the Bank's BSA Compliance Officer or notifying USAG's and PaySol's compliance teams, thereby changing the regulatory and operational environment in which USAG's and PaySol's merchant processing operated;

D. Terminating the Bank's BSA Compliance Officer, who was hired to address prior regulatory deficiencies and oversaw the compliance program on which USAG's and PaySol's operations depended, weeks after the Bank's BSA Compliance Officer objected at a board meeting to Zazzera's unilateral BSA policy changes, without ensuring continuity of BSA oversight, thereby creating a foreseeable gap in the monitoring and compliance infrastructure on which USAG and PaySol relied;

E. Offsetting more than $298,000 from USAG's and PaySol's accounts and recording those funds as the Bank's income, thereby treating custodial funds held for identifiable third-party merchants as the Bank's revenue;

F. Filing the Interpleader Lawsuit despite occupying the role of Originating Depository Financial Institution responsible for tracking and reconciling settlement funds when Defendants knew or, in the exercise of reasonable care, should have known the proper parties entitled to those funds;

395. Defendants' negligence was a direct and proximate cause of USAG's and PaySol's losses, including missed or delayed settlements, merchant attrition, diminished portfolio value, impairment of reserves, emergency migration and

transition costs, and associated lost revenues and out-of-pocket expenses.

396. USAG and PaySol suffered damages in an amount to be proven at trial, including consequential and special damages reasonably flowing from Defendants' negligent performance of ACH services.

**ii. The Agency Allegations.**

397. Plaintiffs are informed and believe, and based thereon allege, that PascoShares and Pasco Holdings controlled the Bank with respect to the governance matters alleged herein such that the Bank functioned as an instrumentality or agent of PascoShares and Pasco Holdings, or both, in carrying out the wrongful acts at issue.

398. Plaintiffs are informed and believe, and based thereon allege, that the Bank and the Bank Holding Companies share overlapping directors and officers, operate from the same headquarters, and acted pursuant to common policies and directives with respect to the governance matters alleged herein.

399. Plaintiffs are informed and believe, and based thereon allege, that PascoShares manifested assent for the Bank to act on PascoShares' behalf and for PascoShares' benefit with respect to the governance matters alleged herein and that PascoShares retained and exercised the right of control over the means and manner of the Bank's conduct with respect to those matters.

///

400. Plaintiffs are informed and believe, and based thereon allege, that the Bank accepted that undertaking and acted subject to PascoShares' control, thereby creating an actual agency relationship. Plaintiffs further allege that PascoShares held out to Plaintiffs and others that PascoShares directed and oversaw the Bank's payments activities, creating apparent agency and reasonable reliance.

401. Plaintiffs are informed and believe, and based thereon allege, that PascoShares used the Bank as a mere instrumentality to advance PascoShares' strategic aims, evade or frustrate PascoShares' obligations to AidenTech under the Treasury Share and Directorship Agreement, and exert improper leverage over USAG and PaySol by using Bank-level controls over settlement funds, reserves, and merchant communications.

402. Plaintiffs are informed and believe, and based thereon allege, that the foregoing domination and control was coupled with improper conduct, including misuse of funds, pretextual suspensions, refusal to provide contract-required transition assistance, and targeted actions to disenfranchise AidenTech's governance rights, proximately causing Plaintiffs' injuries.

403. Accordingly, to prevent injustice, the Court should (a) treat the Bank's acts and omissions as those of PascoShares under principles of actual and apparent agency or (b) disregard corporate separateness between PascoShares and the Bank for the limited purpose of liability on the claims stated herein under alter-ego or

instrumentality principles, or both, and impose joint and several liability as equity requires.

404. In the alternative, to the extent the Court determines that the Bank is the primary actor on the payments counts, PascoShares is vicariously liable for the Bank's conduct as principal because PascoShares directed, controlled, ratified, and benefited from the acts alleged.

405. Nothing in these allegations is intended to assert a separate cause of action. Plaintiffs plead agency and alter-ego as theories by which the Bank Holding Companies are liable for the Bank-level actionable conduct alleged and to avoid injustice resulting from Defendants' use of the corporate form.

**WHEREFORE,** Plaintiffs AidenTech, USAG, and PaySol request that the Court enter judgment against the Bank, the Bank Holding Companies, Hickman, Zazzera, and Fulgham for compensatory damages, consequential damages, attorneys' fees and costs, and such other relief as the Court deems just and proper.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs USAG, PaySol, AidenTech, and AidenShares respectfully request that this Court enter judgment in their favor against Defendants and award the following relief:

**A.** Compensatory and consequential damages in an amount to be proven at trial;

**B.** Return of all funds wrongfully seized, frozen, offset, or misapplied from USAG's and PaySol's accounts, together with prejudgment interest thereon;

**C.** Rescission of the Fraudulent Release and the release provisions contained within the Treasury Share and Directorship Agreement, or in the alternative, rescissory damages;

**D.** Specific performance of AidenTech's governance and board nomination rights under Section 5.01 of the Treasury Share and Directorship Agreement;

**E.** Disgorgement of all profits and personal benefits obtained by Defendants through the wrongful conduct alleged herein;

**F.** Injunctive relief to prevent the ongoing unauthorized use and misappropriation of Plaintiffs' proprietary trade secrets;

**G.** Punitive and exemplary damages as permitted by law, including under 18 U.S.C. § 1836(b)(3)(C) and Florida Statutes §§ 607.0831 and 768.72;

**H.** Attorneys' fees and costs pursuant to 18 U.S.C. § 1836, Florida Statutes § 607.0831, and any other applicable statute or contractual provision;

**I.** Prejudgment and post-judgment interest at the highest rates permitted by law;

**J.** An accounting of all funds received, held, offset, or disbursed by the Bank from USAG's and PaySol's accounts;

**K.** Such other and further relief as this Court deems just and proper.

## VII. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable. To the extent Plaintiffs' claims that must be heard by this Court (e.g., specific performance, declaratory and injunctive relief, accounting, constructive trust, and inspection) contain overlapping factual issues, Plaintiffs request an advisory jury to the extent appropriate.

Dated: April 3, 2026

Respectfully submitted,

By: /s/ Jordan Michael Krassner
Jordan Michael Krassner
Florida Bar Number: 117524
Jesus M. Caro
Florida Bar No: 1032736
**GLOBAL LEGAL LAW FIRM PLLC**
900 N Federal Hwy., Suite 370
Boca Raton, Florida 33432
Telephone: (760) 459-1757
jkrassner@attorneygl.com
jcaro@attorneygl.com
*Attorneys for Plaintiffs,*
*U.S. Alliance Group, Inc., Payment Solutions International, LLC, Aiden Florida Bancshares, Inc., and Aiden Fintech Group, Inc.*

Service List to Include:
edelucas@attorneygl.com
aoberman@attorneygl.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 3, 2026, I electronically filed the foregoing SECOND AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Jordan Michael Krassner*
Jordan Michael Krassner